# Exhibit 11

INVESTMENT AND SUBSCRIPTION AGREEMENT

dated March 10, 2015

relating to

Mediterra Holdings SA

made by and among

Re Gotham LLC

Demergon Funds on behalf of Demergon Private Equity Fund

Yannis Valambous

David Steinhardt

Ioannis Pipilis

Hellas Geniki Investments SA

and

Tamal LLC

Antonio Jose Gracias

████████████

Sarissa Capital Domestic Fund LP

Nikolaos Fragkistas

Nicole Sabrina Gertner

Georgios Dionysios Bekatoros

Miranta Patera

John Galantic

Cepheus Hellas Investments SA

Eleni Zarakoviti Fragkista

Sarissa Capital Offshore Master Fund LP

and

T & A HOLDINGS LUXEMBOURG SARL

and

Spyros Foteinos

and

Mediterra Holdings SA

1

This investment and subscription agreement ("**Agreement**") is dated March 10, 2015, and entered into by and among

| 1. | **Series A Investors** | |
|---|---|---|
| 1.1 | Re Gotham LLC<br>767 Fifth Avenue, 40th floor<br>c/o Lisa Somar<br>New York, NY 10153, USA | ("Series A Investor 1") |
| 1.2 | Demergon Funds on behalf of Demergon Private Equity Fund<br>28-32, Place de la Gare,<br>1616 Luxembourg, Grand Duchy of Luxembourg | ("Series A Investor 2") |
| 1.3 | Yannis Valambous<br>Flat 9 Greycoat House, 27 Greycoat Street<br>London SW1P 2QF, UK | ("Series A Investor 3") |
| 1.4 | David Steinhardt<br>120 East End Ave, Apt 7a<br>New York, NY 10028 | ("Series A Investor 4") |
| 1.5 | Ioannis Pipilis<br>8 Hollywood Road<br>London, SW10 9HY, UK | ("Series A Investor 5") |
| 1.6 | Hellas Geniki Investments SA<br>c/o Mr. Ricardo A. Durling Jr.<br>Edificio Vallarino<br>Penthouse<br>Calle 52 y Elvira Mendez<br>P.O. Box 0816-06805, Panama, R.P. | ("Series A Investor 6") |

(Series A Investors 1 to 6, collectively "**Series A Investors**" and individually a "**Series A Investor**")

| 2. | **Series B Investors** | |
|---|---|---|
| 2.1 | Tamal LLC<br>40 East 80th Street, Apt 20A<br>New York, NY 10075 | ("Series B Investor 1") |
| 2.2 | Antonio Jose Gracias<br>875 N. Michigan Avenue, Suite 3214<br>Chicago, IL 60611 | ("Series B Investor 2") |
| 2.3 | ██████████████ | ("Series B Investor 3") |

2

2.4   Sarissa Capital Domestic Fund LP
      c/o Sarissa Capital Management LP
      660 Steamboat Road, 3rd Floor
      Greenwich, CT 06830                                      ("Series B Investor 4")

2.5   Nikolaos Fragkistas
      23, Yakinton Street, Palaio Psychico
      Athens, Greece, 15452                                    ("Series B Investor 5")

2.6   Nicole Sabrina Gertner
      254 Park Avenue South, Apt 7d
      New York, NY 10010                                       ("Series B Investor 6")

2.7   Georgios Dionysios Bekatoros
      Stratigou Kallari 26-28
      Athens 154 52, Greece                                    ("Series B Investor 7")

2.8   Miranta Patera,
      Em. Benaki 10,
      15452 P. Psyhiko, Athens
      Greece                                                   ("Series B Investor 8")

2.9   John Galantic
      230 Stuyvesant Avenue
      Rye, NY 10580                                            ("Series B Investor 9")

2.10  Cepheus Hellas Investments SA
      c/o Mr. Ricardo A. Durling Jr.
      Edificio Vallarino
      Penthouse
      Calle 52 y Elvira Mendez
      P.O. Box 0816-06805, Panama, R.P.                        ("Series B Investor 10")

2.11  Eleni Zarakoviti Fragkista
      2, Gounari Street, Kifisia
      Athens, Greece, 14561                                    ("Series B Investor 11")

2.12  Sarissa Capital Offshore Master Fund LP
      c/o Sarissa Capital Management LP
      660 Steamboat Road, 3rd Floor
      Greenwich, CT 06830                                      ("Series B Investor 12")

(Series A Investors 1 to 6 and Series B Investors 1 to 12, collectively "**Series B Investors**" and individually a "**Series B Investor**")

3

3.    **Founder Shareholder**

**T & A HOLDINGS LUXEMBOURG SARL**
9, Place Claire Fontaine
1341 Luxembourg, L                                    ("**Founder Shareholder**")


4.    **Other Shareholder**

Spyros Foteinos
48 G. Lyra Street,
145-61, Kifisia
Attica, Greece                                       ("**Other Shareholder**")

(Founder Shareholder, Series A Investors and Other Shareholder, collectively "**Existing Shareholders**" and individually an "**Existing Shareholder**")


and


solely in respect of the obligations of the Company under Sections 3(b), 3.1.1(a), 3.1.2, 6, 7.3.3, 7.4, 8, 11 to 12:

5.    **Company**

**Mediterra Holdings SA**
Boulevard de Grancy 1
1003 Lausanne
Switzerland                                          ("**Company**")

(Company, Series B Investors 1 to 12 and Existing Shareholders, collectively "**Parties**" and individually a "**Party**")

4

## Table of Contents

1.  Definitions...................................................................................................................5
2.  Current Equity Structure of the Company ............................................................5
3.  Increase of Share capital ........................................................................................6
3.1     Capital Increase / Extraordinary General Meeting of Shareholders............................6
3.2     Resolutions to be passed by the Board of Directors........................................................7
3.3     Use of proceeds...................................................................................................................7
4.  Subscription of Preferred B Shares.......................................................................7
4.1     Undertaking to Subscribe...................................................................................................7
4.2     Cash Contribution ..............................................................................................................9
5.  Ownership Structure after the Capital Increase..................................................10
6.  Conduct of Business until Closing........................................................................10
7.  Closing ....................................................................................................................11
7.1     Place and Date of Closing.................................................................................................11
7.2     Conditions Precedent to Closing......................................................................................11
7.3     Closing Actions.................................................................................................................11
7.4     Issuance of New Shares and Registration in Share Register..........................................12
8.  Termination and Rescission..................................................................................13
8.1     Termination and Rescission by a Series B Investor........................................................13
8.2     Termination and Rescission by the Founder Shareholder..............................................13
9.  Representations and Warranties...........................................................................13
9.1     Representations and Warranties of the Company and of Founder Shareholder.............13
9.2     Representations, Warranties, Covenants and Acknowledgements of Series B Investors ......14
9.3     Representations and Warranties of the Other Shareholder ............................................14
9.4     Exclusive Representations and Warranties .....................................................................14
10. Indemnification; Remedies ..................................................................................14
10.1    Time Limitations..............................................................................................................14
10.2    Limitations on Liability ...................................................................................................15
10.3    Remedies of Existing Shareholders ................................................................................16
10.4    Remedies Exclusive .........................................................................................................16
11. Miscellaneous .......................................................................................................17
11.1    Nature of Parties' Rights and Obligations ......................................................................17
11.2    Confidentiality .................................................................................................................17
11.3    Successors and Assigns....................................................................................................18
11.4    Costs and Expenses, Taxes .............................................................................................18
11.5    Notices .............................................................................................................................18
11.6    Entire Agreement.............................................................................................................22
11.7    Severability ......................................................................................................................22
11.8    Survival............................................................................................................................22
11.9    Amendments ....................................................................................................................22
11.10   Waiver of Rights..............................................................................................................22
12. Governing Law and Arbitration............................................................................23
12.1    Governing Law .................................................................................................................23
12.2    Arbitration........................................................................................................................23

**Preamble**

A) The Company is organized in the form of a Swiss stock corporation (*Aktiengesellschaft; société anonyme*) registered with the commercial register of the Canton of Vaud under the number CH-550.1.125.485-5 (IDE CHE-300.400.513) having its registered office at Lausanne, rue du Grand-Chêne 2, Switzerland.

B) The Company's core business consists of developing, marketing and distributing nutritional bars, nutritional supplements, health foods and other products related to general health and wellness.

C) The Company increased its share capital in a first round of financing (**"Financing Round A"**) by way of issuance of 28,572 Preferred A Shares in the Company with a nominal value of CHF 1.- per Preferred A Share, each fully paid-in in cash, thereby increasing the issued share capital of the Company by a nominal amount of CHF 28,572.- from CHF 100,000.- to CHF 128,572.-. That share capital increase was entirely subscribed by the Series A Investors.

D) The Company intends to further increase its share capital in a second round of financing (**"Financing Round B"**) by way of issuance of up to 24,500 Preferred B Shares in the Company with a nominal value of CHF 1.- per Series B Share, each to be fully paid-in in cash, thereby increasing the issued share capital of the Company by a nominal amount of up to CHF 24'500.- from CHF 128,572.- to a maximum of CHF 153,072.-, (**"Capital Increase"**). Series A Investors 1 to 6 as well as Series B Investors 1 to 12 will participate to that Financing Round B, such participants being referred collectively to as Series B Investors and individually each as a Series B Investor.

E) The Parties intend to enter, inter alia, into a certain shareholders agreement substantially in the form attached hereto as **Appendix D ("Shareholders Agreement")** on or immediately prior to the Closing Date.

F) The Parties wish to determine in this Agreement their respective rights and obligations in relation to the Series B Investors' investment in the Company and the subscription and issuance of new Preferred B Shares in the Company.

**Based on the foregoing**, the Parties agree as follows:

1. **DEFINITIONS**

   For purposes of this Agreement (including the introductory paragraphs and the Appendices), capitalized terms shall have the meanings set forth in **Appendix 1**.

2. **CURRENT EQUITY STRUCTURE OF THE COMPANY**

   As at the date of this Agreement, the Company has an issued statutory share capital in the nominal amount of CHF 128,572.-, divided into 100,000 common shares (*Stammaktien; actions ordinaires*) with a nominal value of CHF 1.- per share and 28,572 Preferred A Shares (*Vorzugsaktien; actions privilégiées*) with a nominal value of CHF 1.- per Preferred A Share, each fully paid-in (**"Existing Shares"**). The Company has further created a conditional capital

in the amount of CHF 22,689.- ("**Conditional Capital**") such as to implement the Company's Stock Plan. The Company has no treasury shares.

## 3.    INCREASE OF SHARE CAPITAL

In order to give effect to the Capital Increase and on the terms and subject to the conditions of this Agreement:

(a)    the participants to the Financing Round B (including but not limited to the Series B Investors) will provide for cash equity funding to the Company in the amount of at least USD 2,500,000, but up to USD 3,250,000.- at a pre-money valuation of the Company (fully diluted) of USD 18,000,000.- in one or two share capital increases for purposes of enabling the Company to expand its Business; and

(b)    each of the Existing Shareholders and the Company hereby undertakes to the Series B Investors to generally use their powers and take all actions and execute all documents required to effect the transactions contemplated under this Agreement and to consummate the Capital Increase in accordance with the terms and conditions hereof.

It is already agreed that if the cash equity injection at Closing Date is lower than USD 3,250,000.-, a second share capital increase could occur but not later than six months after the Closing, it being expressly specified that (i) such second share capital increase shall be deemed to be part of the Financing Round B and (ii) that the Series B Investors shall have no obligation to participate or finance such second share capital increase. To give effect to that second share capital increase, the Parties already agree to accept an authorized share capital equivalent to the difference between the nominal share capital increase effectively occurring at Closing and the amount of CHF 24,500.-.

## 3.1    Capital Increase / Extraordinary General Meeting of Shareholders

### 3.1.1    Undertakings of Existing Shareholders

Each of the Existing Shareholders and (regarding subsection (a)) the Company hereby undertakes to the Series B Investors to:

(a)    procure that an extraordinary general meeting of shareholders of the Company ("**Extraordinary General Meeting**") is convened in a timely manner and takes place on the Closing Date;

(b)    approve, or procure that the Proxy Holder approves, the resolutions to be taken by the Extraordinary General Meeting in accordance with Section 3.1.3.

### 3.1.2    Waiver of Preferential Subscription Rights

Each of the Existing Shareholders hereby unconditionally and irrevocably waives all of its/his preferential subscription rights (*Bezugsrechte; droits de souscription préférentiels*) in connection with the Capital Increase and hereby agrees that the Company allocates the appropriate number of Preferred B Shares in the Capital Increase exclusively to the Series B Investors in accordance with this Agreement and the cap table set forth in **Appendix 5**.

3.1.3   Resolutions to be passed by the Extraordinary General Meeting

The following resolutions shall be passed at the Extraordinary General Meeting on the Closing Date:

(a)     to replace the Existing Articles by, and adopt, the Articles substantially in the form attached hereto as **Appendix 3.1.3(a)**;

(b)     to increase the nominal statutory share capital of the Company by the maximum aggregate amount of CHF 24,500.- from CHF 128,572.- up to CHF 153,072.- to enable the Capital Increase through the issuance of up to 24,500 new Preferred B Shares, each at the issue price of USD 140.- (**"Issue Price"**) for Series B Investors 1 to 12 but with a discount for Series A Investors[1], to the Series B Investors in accordance with, and at the total Subscription Amounts set forth in Section 4;

(c)     to increase the conditional capital such as to maintain it at 15% of the outstanding share capital; and

(d)     to permit, to the extent necessary, an authorized share capital increase of up to CHF 5,321.-[2].

**3.2     Resolutions to be passed by the Board of Directors**

The Founder Shareholder undertakes to procure that the Board will approve the registration of the Series B Investors as shareholders with voting rights of the relevant number of Preferred B Shares subscribed by the respective Series B Investors in the Company's share register in accordance with Section 7.3.1(e).

**3.3     Use of proceeds**

The Company shall use the proceeds of the Capital Increase as working capital.

The Parties are in agreement that the contemplated use of proceeds does not encompass any kind of guarantee or warranty that anticipated sales revenues, earnings or other expectations will actually be achieved.

**4.     SUBSCRIPTION OF PREFERRED B SHARES**

**4.1     Undertaking to Subscribe**

Subject to the terms and conditions of this Agreement (including, without limitation Section 7.2), the respective Series B Investor undertakes to subscribe for Preferred B Shares as follows:

---

[1] Series A Investors will get a discount as per and within the limits of the Sep. 2013 shareholders agreement
[2] Such amount to represent the difference in nominal value between a total cash injection of USD 3.25M as contemplated and the currently confirmed cash equity injection of USD 2.505M.

8

(a)   Series A Investor 1 shall subscribe for 1,339 Preferred B Shares for an aggregate subscription amount of USD 150,000.- ("**Series A Investor 1 Subscription Amount**");

(b)   Series A Investor 2 shall subscribe for 2,586 Preferred B Shares for an aggregate subscription amount of USD 300,000.- ("**Series A Investor 2 Subscription Amount**");

(c)   Series A Investor 3 shall subscribe for 1,339 Preferred B Shares for an aggregate subscription amount of USD 150,000.- ("**Series A Investor 3 Subscription Amount**");

(d)   Series A Investor 4 shall subscribe for 223 Preferred B Shares for an aggregate subscription amount of USD 25,000.- ("**Series A Investor 4 Subscription Amount**");

(e)   Series A Investor 5 shall subscribe for 892 Preferred B Shares for an aggregate subscription amount of USD 100,000.- ("**Series A Investor 5 Subscription Amount**");

(f)   Series A Investor 6 shall subscribe for 803 Preferred B Shares, each at the Issue Price, for an aggregate subscription amount of USD 100,000.- ("**Series A Investor 6 Subscription Amount**");

(g)   Series B Investor 1 shall subscribe for 714 Preferred B Shares, each at the Issue Price, for an aggregate subscription amount of USD 100,000.- ("**Series B Investor 1 Subscription Amount**");

(h)   Series B Investor 2 shall subscribe for 714 Preferred B Shares, each at the Issue Price, for an aggregate subscription amount of USD 100,000.- ("**Series B Investor 2 Subscription Amount**");

(i)   Series B Investor 3 shall subscribe for 1,286 Preferred B Shares, each at the Issue Price, for an aggregate subscription amount of USD 180,000.- ("**Series B Investor 3 Subscription Amount**");

(j)   Series B Investor 4 shall subscribe for 436 Preferred B Shares, each at the Issue Price, for an aggregate subscription amount of USD 61,000.- ("**Series B Investor 4 Subscription Amount**");

(k)   Series B Investor 5 shall subscribe for 536 Preferred B Shares, each at the Issue Price, for an aggregate subscription amount of USD 75,000.- ("**Series B Investor 5 Subscription Amount**");

(l)   Series B Investor 6 shall subscribe for 1,428 Preferred B Shares, each at the Issue Price, for an aggregate subscription amount of USD 200,000.- ("**Series B Investor 6 Subscription Amount**");

(m)   Series B Investor 7 shall subscribe for 1,428 Preferred B Shares, each at the Issue Price, for an aggregate subscription amount of USD 200,000.- ("**Series B Investor 7 Subscription Amount**");

(n)     Series B Investor 8 shall subscribe for 3,571 Preferred B Shares, each at the Issue Price, for an aggregate subscription amount of USD 500,000.- ("**Series B Investor 8 Subscription Amount**");

(o)     Series B Investor 9 shall subscribe for 357 Preferred B Shares, each at the Issue Price, for an aggregate subscription amount of USD 50,000.- ("**Series B Investor 9 Subscription Amount**");

(p)     Series B Investor 10 shall subscribe for 714 Preferred B Shares, each at the Issue Price, for an aggregate subscription amount of USD 100,000.- ("**Series B Investor 10 Subscription Amount**");and

(q)     Series B Investor 11 shall subscribe for 535 Preferred B Shares, each at the Issue Price, for an aggregate subscription amount of USD 75,000.- ("**Series B Investor 11 Subscription Amount**")

(r)     Series B Investor 12 shall subscribe for 278 Preferred B Shares, each at the Issue Price, for an aggregate subscription amount of USD 39,000.- ("**Series B Investor 12 Subscription Amount**").

For this purpose, each Series B Investor hereby undertakes, subject to the conditions precedent set forth in Section 7.2 being satisfied or waived, to execute and deliver to the Company on or prior to the Closing Date a Subscription Form as required by Swiss corporate law substantially in the form attached hereto as **Appendices 4.1 (a)** to **(q)**.

**4.2     Cash Contribution**

Within five Business Days from the date of this Agreement:

(a)     Series A Investor 1 shall pay in cash the Series A Investor 1 Subscription Amount;

(b)     Series A Investor 2 shall pay in cash the Series A Investor 2 Subscription Amount;

(c)     Series A Investor 3 shall pay in cash the Series A Investor 3 Subscription Amount;

(d)     Series A Investor 4 shall pay in cash the Series A Investor 4 Subscription Amount;

(e)     Series A Investor 5 shall pay in cash the Series A Investor 5 Subscription Amount;

(f)     Series A Investor 6 shall pay in cash the Series A Investor 6 Subscription Amount;

(g)     Series B Investor 1 shall pay in cash the Series B Investor 1 Subscription Amount;

(h)     Series B Investor 2 shall pay in cash the Series B Investor 2 Subscription Amount;

(i)    Series B Investor 3 shall pay in cash the Series B Investor 3 Subscription Amount;

(j)    Series B Investor 4 shall pay in cash the Series B Investor 4 Subscription Amount;

(k)    Series B Investor 5 shall pay in cash the Series B Investor 5 Subscription Amount;

(l)    Series B Investor 6 shall pay in cash the Series B Investor 6 Subscription Amount;

(m)    Series B Investor 7 shall pay in cash the Series B Investor 7 Subscription Amount;

(n)    Series B Investor 8 shall pay in cash the Series B Investor 8 Subscription Amount;

(o)    Series B Investor 9 shall pay in cash the Series B Investor 9 Subscription Amount;

(p)    Series B Investor 10 shall pay in cash the Series B Investor 10 Subscription Amount;

(q)    Series B Investor 11 shall pay in cash the Series B Investor 11 Subscription Amount; and

(r)    Series B Investor 12 shall pay in cash the Series B Investor 12 Subscription Amount;

in each case, with a value date at latest on the fifth Business Day from the date of this Agreement, to the following blocked capital account of the Company (*Kapitaleinzahlungssperrkonto; compte de capital bloqué*):

| | |
|---|---|
| Bank: | Credit Suisse AG, Zurich/Lausanne |
| In favor of: | Mediterra Holdings SA |
| Account No: | ███████████ |
| IBAN No: | |
| Clearing No: | |
| Swift: | |
| Reference: | Share Capital Increase of Mediterra Holdings SA |

## 5. OWNERSHIP STRUCTURE AFTER THE CAPITAL INCREASE

After completion of the Capital Increase, the ownership structure of the Company shall be as specified in the cap table set forth in **Appendix 5**.

## 6. CONDUCT OF BUSINESS UNTIL CLOSING

The Company and the Subsidiary shall, and the Founder Shareholder hereby undertakes to procure that the Company and the Subsidiary will, until Full Consummation of the Capital Increase, operate their business in the ordinary course in accordance with past practice.

## 7. CLOSING

### 7.1 Place and Date of Closing

The Closing shall take place by March 31, 2015, at the offices of the notary Laurent Besso, Lausanne, or such other date or place as the Parties mutually agree ("**Closing Date**").

### 7.2 Conditions Precedent to Closing

The Closing shall be subject to the prior fulfillment (or waiver by each Series B Investor) of each of the following conditions precedent:

(a) the execution and delivery of all documents to be exchanged at Closing (other than those to be executed and delivered by the relevant Series B Investor) in accordance with Section 7.3;

(b) the absence of any breach by any Party (other than the relevant Series B Investor) of any material provision of this Agreement, including, but not limited to, the payment obligations set out in Section 4.2 and the representations and warranties given by any other Party under Section 9;

(c) the absence of a Material Adverse Change with respect to the Company; and

(d) the compliance by the Founder Shareholder and the Company with Section 6.

### 7.3 Closing Actions

7.3.1 At Closing, the relevant Party shall deliver the following documents, duly executed and in form and substance satisfactory to the Parties:

(a) proxies from each Existing Shareholder for the Extraordinary General Meeting authorizing the Proxy Holder to vote on and approve all resolutions set forth in Section 3.1, substantially in the form attached hereto as **Appendix 7.3.1(a)**;

(b) a duly signed application to the Register of Commerce of the Canton of Vaud regarding: (1) the increase of the share capital to reflect the Capital Increase, (2) the creation of Preferred B Shares (*Vorzugsaktien; actions privilégiées*) as a new class of shares, (3) the creation of an authorized share capital; (4) the increase of the conditional share capital, and (5) the adoption of the Articles, substantially in the form attached hereto as **Appendix 7.3.1(b)** ("**Application**");

(c) Shareholders Agreement duly executed by all Parties substantially in the form attached hereto as **Appendix D**;

(d) confirmation from Credit Suisse evidencing that all Subscription Amounts have been paid in cash and fully credited to the Company's blocked account specified in Section 4.2; and

(e) circular resolutions or minutes evidencing the Board resolution regarding the registration of the Series B Investors as owners with voting rights of the rele-

vant number of Preferred B Shares subscribed by the respective Series B Investors in the Company's share register upon Full Consummation.

In addition to the above, the Company and each of the Existing Shareholder undertakes to each Series B Investor Shareholder to execute or perform such other documents, instruments, certificates or acts as may be reasonably requested by each Series B Investor and/or the Company in order to complete, perfect and consummate the transactions contemplated by this Agreement, including, but not limited to, the increase of the share capital of the Company and the issuance of the respective number of Preferred B Shares to the Series B Investors as set forth in this Agreement.

7.3.2   Upon the delivery of the documents listed in Section 7.3.1, the following actions shall be performed:

(a)   The Extraordinary General Meeting shall be held in the presence of a public notary approving: (1) the increase of the share capital (including waivers of preferential subscription rights), (2) the creation of Preferred B Shares as set forth herein, (3) the increase of conditional share capital in the amount of CHF 3,385.-, (4) the creation of an authorized share capital in the amount of up to CHF 5,321.-[3], and (5) the adoption of the Articles.

(b)   Each Series B Investor, by the Proxy Holder, shall deliver a duly signed original of its/his/her Subscription Form in accordance with Section 4.1.

(c)   The Board shall issue the report of the Board regarding the capital increase (*Kapitalerhöhungsbericht; rapport d'augmentation*) and take the resolutions on the ascertainment and the execution of the Capital Increase (*Feststellungsbeschluss; constatations relatives à l'augmentation du capital*) in the presence of a public notary.

7.3.3   The Company shall file the Application with the Register of Commerce of the Canton of Vaud immediately after receipt of the above documents.

7.3.4   If the cash equity injection at Closing Date is lower than USD 3,250,000.-, a second share capital increase could occur but not later than six months after the Closing, in which case Sections 7.3.2(b) and (c) and Section 7.3.3 will apply *mutatis mutandis*, it being expressly specified that such second share capital increase shall be deemed to be part of the Financing Round B.

## 7.4  Issuance of New Shares and Registration in Share Register

7.4.1   The Company shall deliver to the Parties a copy of the updated share register of the Company evidencing each Party as legal and beneficial owner of the appropriate number of Preferred B Shares, Preferred A Shares and/or Common Shares immediately upon receipt of the certified extract and/or express confirmation of the Register of Commerce of the Canton of Vaud evidencing the registration of the Capital Increase and the adoption of the Articles.

---

[3] Such amount to represent the difference in nominal value between a total cash injection of USD 3.25M as contemplated and the currently confirmed cash equity injection of USD 2.505M..

13

## 8.    TERMINATION AND RESCISSION

### 8.1    Termination and Rescission by a Series B Investor

In case of no Full Consummation of the Capital Increase until the earlier to occur of: 20 Business Days after the Closing or June 30, 2015, then each Series B Investor who did not cause such delay by a breach of any of its material obligations under this Agreement , shall have the right (but not the obligation) to terminate and rescind this Agreement, the Shareholders Agreement and any documents, instruments or deeds executed by any such Series B Investor (including, but not limited to, the Subscription Forms) with immediate effect by written notice to all other Parties.

In case notice of termination and rescission is made in accordance with the preceding paragraph:

(a)    each of the Parties acknowledges and agrees that this Agreement (subject to Section 11.8), the Shareholders Agreement (subject to Section 11.8), and any documents, instruments or deeds executed by any of the Series B Investors (including, but not limited to, the Subscription Forms) shall be deemed terminated and shall be without any further effect;

(b)    each of the Existing Shareholders and the Company hereby undertakes to the Series B Investors to procure that the application to the Register of Commerce of the Capital Increase (if already filed) shall be withdrawn and that the respective Subscription Amounts paid by the Series B Investors for new Preferred B Shares hereunder shall be immediately repaid to each of the Series B Investors in cash out of the blocked bank account of the Company.

### 8.2    Termination and Rescission by the Founder Shareholder

In the event that any of the Series B Investors shall not pay the Subscription Amount in accordance to the provisions of section 4.2. and/or does not proceed with the Closing Actions as per Section 7.3., but provided that no other Series B Investor has exercised its right of termination and rescission as per the preceding section, then the Founder Shareholder shall have the right (but not the obligation) to terminate and rescind this Agreement, the Shareholders Agreement and any documents, instruments or deeds executed by any such Series B Investor (including, but not limited to, the Subscription Forms) with immediate effect by written notice to any such Series B Investor; in such an event, the other Parties shall then amend this Agreement, the Shareholders Agreement and any documents, instruments or deeds to the extent necessary to reflect the fact that such Series B Investor is not anymore an investor and that the Consummation of the Capital Increase is only partial.

## 9.    REPRESENTATIONS AND WARRANTIES

### 9.1    Representations and Warranties of the Company and of Founder Shareholder

Subject to the limitations set forth in this Section 9 (including **Appendix 9.1**) and Section 10, the Company and the Founder Shareholder hereby represent and warrant to each of the Series B Investors that the representations and warranties set forth in **Appendix 9.1** are true and ac-

14

curate in all material respects both as of the date of this Agreement and the Closing Date, except for those representations and warranties which are explicitly made as of a specific date.

### 9.2 Representations, Warranties, Covenants and Acknowledgements of Series B Investors

Subject to the limitations set forth in this Section 9 (including **Appendix 9.2**) and Section 10, each of the Series B Investors hereby represents and warrants to the Existing Shareholders and the Company that the representations and warranties set forth in **Appendix 9.2** are true and accurate in all material respects both as of the date of this Agreement and the Closing Date, except for those representations and warranties which are explicitly made as of a specific date and the Founder Shareholder and Company are fully entitled and directed to rely thereon .

### 9.3 Representations and Warranties of the Other Shareholder

Subject to the limitations set forth in this Section 9 (including **Appendix 9.3**) and Section 10, the Other Shareholder hereby represents and warrants to each of the Series B Investors, to the Founder Shareholder and to the Company that the representations and warranties set forth in **Appendix 9.3** are true and accurate in all material respects both as of the date of this Agreement and the Closing Date, except for those representations and warranties which are explicitly made as of a specific date.

### 9.4 Exclusive Representations and Warranties

The Parties acknowledge that none of the Parties has made, and none of the Parties has relied upon, any representation or warranty, express or implied, pertaining to the subject matter of this Agreement other than as expressly provided in this Agreement. In particular, and without limiting the generality of the foregoing, each Series B Investor acknowledges that no Existing Shareholder is making any representations as to budgets, business plans, forward-looking statements, the future development or success of the Company and its business or other projections of a financial, technical or business nature relating to the business of the Company.

Without prejudice to the foregoing, the Founder Shareholder hereby acknowledges that each Series B Investor has entered into this Agreement and will pay the Subscription Amount in reliance on each of the representations and warranties set forth in this Section 9 (including **Appendix 9.1**).

### 10. INDEMNIFICATION; REMEDIES

### 10.1 Time Limitations

10.1.1 Notice of Breach (*Rügefrist; avis de violation*)

A Series B Investor shall deliver to the Company (which shall receive such notice on behalf of the Existing Shareholders) a notice in writing describing the underlying facts of a claim for misrepresentation or breach of warranty in reasonable detail to the extent then known within 60 calendar days after that Series B Investor has obtained reasonable knowledge of the circumstances which are likely to give rise to a claim for misrepresentation or breach of warranty under this Agreement.

Failure to provide notice of claim consistent with this Section 10.1.1 shall not relieve an Existing Shareholder of any liability it/he may have under Section 9.1 or Section 9.3; provided, however, that an Existing Shareholder shall not be liable for any damage, loss, expense, or cost to the extent that the same is attributable to, or caused or aggravated by, or could not be remedied due to, that Series B Investor's failure to timely provide notice in accordance with this Section 10.1.1. The Parties explicitly waive the application of Article 201 CO.

10.1.2  Time Limitations on Claims

Except in the case of gross negligence or willful misconduct, the representations and warranties given by the Existing Shareholders as set forth in Sections 9.1 and 9.3 and Appendixes 9.1 and 9.3 shall expire, and any claim of a Series B Investor for misrepresentation or breach of warranty shall be time barred, forfeited and precluded from being made (*Verjährung; prescription*) as of the expiry of a period of 18 months from the Closing Date.

It is understood and agreed that any notice of claim for misrepresentation or breach of warranty shall be delivered to the Company (which shall receive such notice on behalf of the Existing Shareholder) on or by the applicable date set forth in the preceding paragraphs, in which case the resolution of such claim may be effected after such date; provided, however, that notwithstanding the foregoing, the Series B Investor's claim shall be time-barred, forfeited and precluded from being made (*verjährt; prescrit*) unless the relevant Series B Investor initiates proceedings on the claim against the Existing Shareholders in accordance with Section 12 within one year from the date of that Series B Investor's notice of claim to the Company.

10.1.3  Remedies for the Series B Investors

With respect to a misrepresentation or a breach of warranty notified by a Series B Investor to the Company in accordance with Section 10.1, the Existing Shareholders shall have the right, within a reasonable period of time not exceeding 30 calendar days after receipt of such notice of breach from the Company, to put the Company or that Series B Investor at the Series B Investor's option (in case the damage, loss, expense, or cost was incurred by that Series B Investor and not by the Company), at the Existing Shareholder's own expense, in the position it would have been in had no such misrepresentation or breach of warranty occurred.

If and to the extent the remedy set forth in the preceding paragraph cannot be effected or is not effected within such period of time, then that Series B Investor, subject to the exclusions and limitations set forth in this Agreement, shall have the right to claim that the Founder Shareholder pays, and shall be, subject to Section 10.2, liable to that Series B Investor to pay, damages to the Company (or, if the damage, loss, expense, or cost is incurred by that Series B Investor and that Series B Investor so elects, to that Series B Investor) in the amount which is necessary to put the Company (or, subject to the foregoing requirements, that Series B Investor) in the position it would have been in had no such misrepresentation or breach of warranty occurred. Such damages shall include all duly documented external costs and reasonable expenses of the Company (or, subject to the foregoing requirements, that Series B Investor) including reasonable attorneys' fees, but shall exclude lost profits.

**10.2    Limitations on Liability**

Notwithstanding anything contained in this Agreement to the contrary, it is acknowledged and agreed that, except in case of gross negligence or willful misconduct, the liability of the Exist-

ing Shareholders towards each Series B Investor for misrepresentations or breaches of warranties under this Agreement shall not exceed, in the aggregate, an amount equal to the sum of: (1) 100% percent of that Series B Investor's Subscription Amount, and (2) reasonable costs and fees incurred by an Series B Investor in connection with the examination of a possible misrepresentation or breach of warranty and any proceedings brought against the Existing Shareholders in connection with any misrepresentation or breach of warranty.

The Existing Shareholders' liability for misrepresentation or breach of warranty under this Agreement shall be excluded or reduced, as the case may be, if and to the extent that:

(a)     the relevant Series B Investor has failed to use commercially reasonable best efforts to mitigate its loss or damage in respect thereof;

(b)     the relevant Series B Investor or the Company have actually recovered or, using commercially reasonable best efforts, could recover or could have recovered, as the case may be, from any third person, including but not limited to an insurer, any sum in respect of any matter to which a claim made relates, after deduction of all duly documented costs and expenses incurred in making such recovery;

(c)     such liability is attributable to any act, omission, transaction or arrangement of the Series B Investors after the signing of this Agreement;

(d)     any tax payable by the Company is reduced as a result of a matter giving rise to a claim for misrepresentation or breach of warranty;

(e)     such claim arises or is increased as a result of any legislation, regulation, rule of law or practice not in force at the date hereof, or as a result of any change made or introduced on or after the date hereof in any legislation, regulation, rule of law or practice of any relevant authority, whether or not such change purports to be effective retrospectively in whole or part.

### 10.3     Remedies of Existing Shareholders

The provisions of Sections 10.1 and 10.2 shall apply by analogy to any claim by the Existing Shareholders that a Series B Investor is liable for any misrepresentation or breach of warranty under Section 9.2 and Appendix 9.2.

### 10.4     Remedies Exclusive

The remedies in this Section 10 for any misrepresentation or breach of warranty under this Agreement shall be in lieu of, and not in addition to, the remedies provided for under statutory law. All other remedies including, without limitation, the right to rescind this Agreement shall, subject to the right of termination and rescission in accordance with Section 8, not apply and are expressly excluded and waived.

11.    **MISCELLANEOUS**

11.1    **Nature of Parties' Rights and Obligations**

Except as specifically provided otherwise in this Agreement, the rights and obligations of the Parties hereunder shall be several (and not joint). Each of the Investors Shareholder may exercise and enforce its rights hereunder individually in accordance with this Agreement, and the non-performance by the Company or another Shareholder ("**Defaulting Party**") shall neither relieve the Company nor any other Shareholder from performing its obligations under this Agreement, nor shall the Company (provided it is not the Defaulting Party) or any other Shareholder be liable for the non-performance by the Defaulting Party.

The obligations of the Parties hereunder are contractual in nature and the Parties agree that they do not form, and this Agreement shall not be deemed to constitute, a simple partnership (*einfache Gesellschaft; société simple*) pursuant to Art. 530 et seq. CO.

11.2    **Confidentiality**

The existence as well as the terms and conditions of this Agreement, and any information exchanged among the Parties (including their respective representatives or advisors) during the negotiation of the definitive agreements for the Financing Round B and/or pertaining to the business and the operation of the Company (all such information collectively "**Confidential Information**"), shall be kept strictly confidential by each Party. The Parties shall neither use in any form nor disclose to any third party any Confidential Information unless explicitly authorized by this Agreement. The Parties shall ensure that their employees, directors and any other representatives as well as the advisors of each Party to whom any such Confidential Information is entrusted comply with these restrictions.

Without limiting the generality of the foregoing, the term Confidential Information shall include in particular:

(a)    any information regarding this Agreement, the investments made or to be made by each Series B Investor in the Company and the commercial terms and conditions of the investments; and

(b)    any trade secrets, financial or confidential information of the Company or any of the Shareholders.

The term Confidential Information shall not include any information: (1) which as of the time of its disclosure by a Party was already lawfully in the possession of the receiving Party as evidenced by written records, or (2) which at the time of the disclosure was in the public domain, or (3) which after disclosure falls in the public domain through no fault or omission of receiving Party; or (4) the disclosure of which was previously explicitly authorized by the respective Party.

The non-disclosure obligation shall not apply to any disclosure of Confidential Information required by law or regulations. In the event a disclosure of Confidential Information is required by law or regulations (including, without limitation, for tax, audit or regulatory purposes), the disclosing Party shall use all reasonable efforts to arrange for the confidential treatment of the materials and information so disclosed.

18

Each Party may use any Confidential Information in accordance with this Agreement. But, subject to the terms hereof and the terms of the Shareholders Agreement, each Party acknowledges and agrees that any Confidential Information made available to it (including to any representative or advisor of such Party) by the Company or any other Party (including their representatives or advisors) hereunder shall not be used by such Party other than (1) as permitted under this Agreement and the Shareholders Agreement, (2) for the benefit of the Company, or (3) for the respective Party's assessment of the Company, and shall not be exploited by or for the benefit of such Party or any of its Affiliates or third party.

Finally, it is acknowledged and agreed that each of the Series B Investors will report regularly to its investors and/or any of its Affiliates on all information pertaining to the Company and the equity investment made or to be made in the Company in accordance with its reporting obligations under its fund investment documents or to the extent required for legal, tax, audit or regulatory purposes.

No announcement or press releases regarding the matters contemplated by this Agreement shall be made by the Company and/or the Series B Investors without the prior written consent of the Board and each Series B Investor (such consent of the Series B Investors to be given entirely at their discretion).

Nothing herein shall restrict the Company from granting third parties customary due diligence access for purposes of financial, commercial, strategic or similar transactions based on appropriate non-disclosure and non-use agreements.

### 11.3    Successors and Assigns

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective permitted successors and assigns; provided, however, that no Party shall be entitled to assign or transfer any of the rights or obligations hereunder to any other party except with the prior written consent of each of the other Parties.

### 11.4    Costs and Expenses, Taxes

Subject to the immediately following paragraph, it is agreed that each Party shall bear its own costs and expenses arising out of or incurred, and any taxes imposed on it, in connection with this Agreement and all transactions contemplated hereby.

The Company shall bear all Swiss issuance and stamp taxes arising out of the Financing Round.

### 11.5    Notices

All notices and other communications made or to be made under this Agreement shall be given in writing by fax or courier or mailed by registered or certified mail, return receipt requested to the following addresses:

If to Series A Investor 1:    Re Gotham LLC
767 Fifth Avenue, 40th floor
c/o Lisa Somar
New York, NY 10153, USA

Fax nr +1 (212) 573 6633

If to Series A Investor 2:    Demergon Funds S.A.,
28-32, Place de la Gare,
1616 Luxembourg, Grand Duchy of Luxembourg

Fax nr [+352 475112]

If to Series A Investor 3:    Yannis Valambous
Flat 9 Greycoat House, 27 Greycoat Street
London SW1P 2QF, UK

Fax nr [                    ]

If to Series A Investor 4:    David Steinhardt
120 East End Ave, Apt 7a
New York, NY 10028

Fax nr [                    ]

If to Series A Investor 5:    Ioannis Pipilis
8 Hollywood Road
London, SW10 9HY, UK

Fax nr [                    ]

If to Series A Investor 6:    Hellas Geniki Investments SA
c/o Mr, Ricardo A. Durling Jr.
Edificio Vallarino
Penthouse
Calle 52 y Elvira Mendez
P.O. Box 0816-06805, Panama, R.P.

Fax nr (507) 263-8234

If to Series B Investor 1:    Tamal LLC
40 East 80th Street, Apt 20A
NewYork, NY 10075

Fax nr [                    ]

If to Series B Investor 2:    Antonio Jose Gracias
875 N. Michigan Avenue, Suite 3214
Chicago, IL 60611

Fax nr [                    ]

If to Series B Investor 3:

Fax nr [                    ]

If to Series B Investor 4 4:

Sarissa Capital Domestic Fund LP
c/o  Sarissa Capital Management LP
660 Steamboat Road, 3rd Floor
Greenwich, CT 06830

Fax nr [                    ]

If to Series B Investor 5:

Nikolaos Fragkistas
23, Yakinton Street, Palaio Psychico
Athens, Greece, 15452

Fax nr [                    ]

If to Series B Investor 6:

Nicole Sabrina Gertner
254 Park Avenue South, Apt 7d
New York, NY 10010

Fax nr [                    ]

If to Series B Investor 7:

Georgios Dionysios Bekatoros
Stratigou Kallari 26-28
Athens 154 52, Greece

Fax nr [                    ]

If to Series B Investor 8:

Miranta Patera,
Em. Benaki 10,
15452 P. Psyhiko, Athens
Greece

Fax nr [                    ]

If to Series B Investor 9:

John Galantic
230 Stuyvesant Avenue
Rye, NY 10580

Fax nr [                    ]

21

If to Series B Investor 10:          Cepheus Hellas Investments SA
c/o Mr. Ricardo A. Durling Jr.
Edificio Vallarino
Penthouse
Calle 52 y Elvira Mendez
P.O. Box 0816-06805, Panama, R.P.

Fax nr (507) 263-8234

If to Series B Investor 11:          Eleni Zarakoviti Fragkista
2, Gounari Street, Kifisia
Athens, Greece, 14561

Fax nr [                ]

If to Series B Investor 12:          Sarissa Capital Offshore Master Fund LP
c/o  Sarissa Capital Management LP
660 Steamboat Road, 3rd Floor
Greenwich, CT 06830

Fax nr [                ]

If to Founder Shareholder:         T & A HOLDINGS LUXEMBOURG SARL
9, Place Claire Fontaine
1341 Luxembourg,

[attn. legal department]

Fax nr [                ]

If to Other Shareholder           Spyros Foteinos
48 G. Lyra street
145-61, Kifisia
Attica, Greece

Fax nr [                ]

If to the Company:               Mediterra Holdings SA
Attn. Chairman of the Board
Boulevard de Grancy 1
1003 Lausanne

Fax nr +41 21 643 71 01

In case of the delivery of a notice to the Company on behalf of an Existing Shareholder in accordance with this Agreement, receipt by the Company of the notice shall be relevant for the

compliance with the applicable deadlines. Each Existing Shareholder hereby appoints the Company as receiver of such notices on behalf of it. The Company shall send copies of such notices to the Existing Shareholder timely upon receipt.

Each Party may change or amend the addresses given above or designate additional addresses for the purposes of this Section 11.5 by giving the other Parties written notice of the new address in the manner set forth in this Section 11.5.

### 11.6    Entire Agreement

With the exception of the Shareholders Agreement and of the Articles, this Agreement including its Appendices constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes any agreement or understanding that may have been concluded with respect to the subject matter hereof between any of the Parties prior to the date of this Agreement. For the avoidance of doubt, this Agreement is without prejudice to that certain investment and subscription agreement that was made by and between the Series A Investors, the Founder Shareholder and the Company on September 9, 2013.

The Parties confirm that in addition to this Agreement, there are no side agreements relating to the subject matter hereof between any of them.

### 11.7    Severability

If at any time any provision of this Agreement or any part thereof is or becomes invalid or unenforceable, then neither the validity nor the enforceability of the remaining provisions or the remaining part of the provision shall in any way be affected or impaired thereby. The Parties agree to replace the invalid or unenforceable provision or part thereof by a valid or enforceable provision which shall best reflect the Parties' original intention and shall to the extent possible achieve the same economic result.

### 11.8    Survival

Notwithstanding any termination and rescission of this Agreement (and the Shareholders Agreement and any documents, instruments or deeds executed by any of the Investors Shareholder including, but not limited to, the Subscription Forms) pursuant to Section 8, it is acknowledged and agreed that Sections 8, 11, and 12 shall survive any such termination and rescission and continue to be effective as if no such termination and rescission had occurred.

### 11.9    Amendments

This Agreement (including this Section 11.9) may be amended only in writing by an instrument signed by all Parties.

### 11.10    Waiver of Rights

No waiver by a Party of a failure of any other Party to perform any provision of this Agreement shall operate or be construed as a waiver in respect of any other or further failure whether of a similar or different character.

23

## 12.   GOVERNING LAW AND ARBITRATION

### 12.1   Governing Law

THIS AGREEMENT SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH MATERIAL SWISS LAW.

### 12.2   Arbitration

ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, INCLUDING ITS CONCLUSION, VALIDITY, BINDING EFFECT, AMENDMENT, BREACH, TERMINATION OR RESCISSION SHALL BE RESOLVED DEFINITIVELY BY ARBITRATION IN ACCORDANCE WITH THE SWISS RULES OF INTERNATIONAL ARBITRATION OF THE SWISS CHAMBERS OF COMMERCE IN FORCE ON THE DATE WHEN THE NOTICE OF ARBITRATION IS SUBMITTED IN ACCORDANCE WITH THESE RULES; THE PARTIES WAIVE ALL RIGHTS OF APPEAL, RECOURSE OR ANNULMENT AS PER ARTICLE 192 OF THE FEDERAL STATUE ON PRIVATE INTERNATIONAL LAW. THE NUMBER OF ARBITRATORS SHALL BE THREE. THE SEAT OF THE ARBITRATION SHALL BE GENEVA AND THE ARBITRAL PROCEEDINGS SHALL BE CONDUCTED IN ENGLISH.

* * * * *

[Signature pages to follow]

24

IN WITNESS WHEREOF, the Parties have signed this Agreement on the date first written above

**Re Gotham LLC**

By: _Joanmeir_

Names: _Re Gotham-La-Sona_

Titles: _President_

**Demergon Funds on behalf of
Demergon Private Equity Fund**

By: _____

Names: _____

Titles: _____

**Yannis Valambous**

_____

**David Steinhardt**

_____

**Ioannis Pipilis**

_____

**Hellas Geniki Investments SA**

By: _____

Names: _____

Titles: _____

**Tamal LLC**

By: _____

Names: _____

Titles: _____

~~Carlos Eduardo Nuñez Blandin~~

_____

24

IN WITNESS WHEREOF, the Parties have signed this Agreement on the date first written above

**Re Gotham LLC**

By: _____

Names: _____

Titles: _____

**Demergon Funds on behalf of**
**Demergon Private Equity Fund**

By: _____

Names: PANDELI ECONOMO & GEORGE PAPOUTSIS

Titles: DIRECTORS

**Yannis Valambous**

_____

**David Steinhardt**

_____

**Ioannis Pipilis**

_____

**Hellas Geniki Investments SA**

By: _____

Names: _____

Titles: _____

**Tamal LLC**

By: _____

Names: _____

Titles: _____

~~Carlos Eduardo Nuñez Blandin~~

_____

24

IN WITNESS WHEREOF, the Parties have signed this Agreement on the date first written above

**Re Gotham LLC**

By: _____

Names: _____

Titles: _____


**Demergon Funds on behalf of
Demergon Private Equity Fund**

By: _____

Names: _____

Titles: _____


**Yannis Valambous**

_____


**David Steinhardt**

_____


**Ioannis Pipilis**

_____


**Hellas Geniki Investments SA**

By: _____

Names: _____

Titles: _____


**Tamal LLC**

By: _____

Names: _____

Titles: _____

~~Carlos Eduardo Nuñez Blandin~~

_____

24

**IN WITNESS WHEREOF**, the Parties have signed this Agreement on the date first written above

**Re Gotham LLC**

By: _____

Names: _____

Titles: _____

**Demergon Funds on behalf of
Demergon Private Equity Fund**

By: _____

Names: _____

Titles: _____

**Yannis Valambous**

_____

**David Steinhardt**

_____

**Ioannis Pipilis**

_____

**Hellas Geniki Investments SA**

By: _____

Names: _____

Titles: _____

**Tamal LLC**

By: _____

Names: _____

Titles: _____

~~Carlos Eduardo Nuñez-Blandia~~

_____

24

**IN WITNESS WHEREOF**, the Parties have signed this Agreement on the date first written above

**Re Gotham LLC**

By:      _____

Names: _____

Titles: _____


**Demergon Funds on behalf of
Demergon Private Equity Fund**

By:      _____

Names: _____

Titles: _____


**Yannis Valambous**

_____


**David Steinhardt**

_____


**Ioannis Pipilis**

_____


**Hellas Geniki Investments SA**

By:      _____

Names: _____

Titles: _____


**Tamal LLC**

By:      _____

Names: _____

Titles: _____


~~**Carlos Eduardo Nuñez Blandin**~~

_____

24

IN WITNESS WHEREOF, the Parties have signed this Agreement on the date first written above

**Re Gotham LLC**

By: _____

Names: _____

Titles: _____


**Demergon Funds on behalf of
Demergon Private Equity Fund**

By: _____

Names: _____

Titles: _____


**Yannis Valambous**

_____


**David Steinhardt**

_____


**Ioannis Pipilis**

_____


**Hellas Geniki Investments SA**

By: _____

Names: *Ricardo A. Hurling*

Titles: *President*


**Tamal LLC**

By: _____

Names: _____

Titles: _____

~~Carlos Eduardo Nuñez Blandin~~

_____

24

**IN WITNESS WHEREOF**, the Parties have signed this Agreement on the date first written above

**Re Gotham LLC**

By: _____

Names: _____

Titles: _____


**Demergon Funds on behalf of
Demergon Private Equity Fund**

By: _____

Names: _____

Titles: _____


**Yannis Valambous**

_____


**David Steinhardt**

_____


**Ioannis Pipilis**

_____


**Hellas Geniki Investments SA**

By: _____

Names: _____

Titles: _____


**Tamal LLC**

By: _____

Names: _____  JUAN A. SABATER

Titles: _____  MANAGING MEMBER

~~Carlos Eduardo Nuñez Blandin~~

_____

25

**Antonio Jose Gracias**

**Sarissa Capital Domestic Fund LP**

By: _____

Names: _____

Titles: _____

**Nikolaos Fragkistas**

By: _____

Names: _____

Titles: _____

**Nicole Sabrina Gertner**

By: _____

Names: _____

Titles: _____

**Georgios Dionysios Bekatoros**

_____

**Miranta Patera**

_____

**John Galantic**

_____

25

**Antonio Jose Gracias**

_____

**Sarissa Capital Domestic Fund LP**

By: _____

Names: _____

Titles: _____

**Nikolaos Fragkistas**

By: _____

Names: _____

Titles: _____

**Nicole Sabrina Gertner**

By: _____

Names: _____

Titles: _____

**Georgios Dionysios Bekatoros**

_____

**Miranta Patera**

_____

**John Galantic**

_____

25

**Antonio Jose Gracias**

_____

███████████████████████

**Sarissa Capital Domestic Fund LP**

By: _Mark S. DiPaolo_

Names: _Mark Di Paolo_

Titles: _Authorized Person_

**Nikolaos Fragkistas**

By: _____

Names: _____

Titles: _____

**Nicole Sabrina Gertner**

By: _____

Names: _____

Titles: _____

**Georgios Dionysios Bekatoros**

_____

**Miranta Patera**

_____

**John Galantic**

_____

25

**Antonio Jose Gracias**

_____

**Sarissa Capital Domestic Fund LP**

By:      _____

Names: _____

Titles:   _____

**Nikolaos Fragkistas**

By:      _____

Names: _____

Titles:   _____

**Nicole Sabrina Gertner**

By:      _____

Names: _____

Titles:   _____

**Georgios Dionysios Bekatoros**

_____

**Miranta Patera**

_____

**John Galantic**

_____

25

**Antonio Jose Gracias**

_____

**Sarissa Capital Domestic Fund LP**

By:     _____
Names:  _____
Titles: _____


**Nikolaos Fragkistas**

By:     _____
Names:  _____
Titles: _____


**Nicole Sabrina Gertner**

By:     _____
Names:  _____
Titles: _____


**Georgios Dionysios Bekatoros**

_____


**Miranta Patera**

_____


**John Galantic**

_____

25

**Antonio Jose Gracias**

_____

[black redaction box]

**Sarissa Capital Domestic Fund LP**

By:      _____

Names: _____

Titles:  _____

**Nikolaos Fragkistas**

By:      _____

Names: _____

Titles:  _____

**Nicole Sabrina Gertner**

By:      _____

Names: _____

Titles:  _____

**Georgios Dionysios Bekatoros**

_____

**Miranta Patera**

_____

**John Galantic**

_____

25

**Antonio Jose Gracias**

_____

**Sarissa Capital Domestic Fund LP**

By:      _____

Names: _____

Titles:  _____

**Nikolaos Fragkistas**

By:      _____

Names: _____

Titles:  _____

**Nicole Sabrina Gertner**

By:      _____

Names: _____

Titles:  _____

**Georgios Dionysios Bekatoros**

_____

**Miranta Patera**

_____

**John Galantic**

_____

25

**Antonio Jose Gracias**

_____

**Sarissa Capital Domestic Fund LP**

By:      _____

Names: _____

Titles:  _____


**Nikolaos Fragkistas**

By:      _____

Names: _____

Titles:  _____


**Nicole Sabrina Gertner**

By:      _____

Names: _____

Titles:  _____


**Georgios Dionysios Bekatoros**

_____


**Miranta Patera**

_____


**John Galantic**

26

**Cepheus Hellas Investments SA**

By: _____

Names: _Ricardo A. Alushing_

Titles: _President_

**Eleni Zarakoviti Fragkista**

_____

**Sarissa Capital Offshore Master Fund LP**

By: _____

Names: _____

Titles: _____

**T & A HOLDINGS LUXEMBOURG SARL**

By: _____

Names: _____

Titles: _____

**Spyros Foteinos**

_____

solely in respect of the obligations of the Company under Sections 3(b), 3.1.1(a), 3.1.2, 6, 7.3.3, 7.4, 8, 11 to 12:

**Mediterra Holdings SA:**

By: _____

Names: _____

Titles: _____

26

**Cepheus Hellas Investments SA**

By: _____

Names: _____

Titles: _____

Eleni Zarakoviti Tragkista
_____

**Sarissa Capital Offshore Master Fund LP**

By: _____

Names: _____

Titles: _____

**T & A HOLDINGS LUXEMBOURG SARL**

By: _____

Names: _____

Titles: _____

**Spyros Foteinos**

_____

solely in respect of the obligations of the Company under Sections 3(b), 3.1.1(a), 3.1.2, 6, 7.3.3, 7.4, 8, 11 to 12:

**Mediterra Holdings SA:**

By: _____

Names: _____

Titles: _____

26

**Cepheus Hellas Investments SA**

By: _____

Names: _____

Titles: _____


**Eleni Zarakoviti Fragkista**

_____


**Sarissa Capital Offshore Master Fund LP**

By: _____

Names: _Mark Di Paolo_

Titles: _Authorized Person_


**T & A HOLDINGS LUXEMBOURG SARL**

By: _____

Names: _____

Titles: _____


**Spyros Foteinos**

_____


solely in respect of the obligations of the Company under Sections 3(b), 3.1.1(a), 3.1.2, 6, 7.3.3, 7.4, 8, 11 to 12:

**Mediterra Holdings SA:**

By: _____

Names: _____

Titles: _____

26

**Cepheus Hellas Investments SA**

By: _____

Names: _____

Titles: _____


**Eleni Zarakoviti Fragkista**

_____


**Sarissa Capital Offshore Master Fund LP**

By: _____

Names: _____

Titles: _____


**T & A HOLDINGS LUXEMBOURG SARL**

By: _____

Names: Telemaque Lavidas

Titles: Director


**Spyros Foteinos**

_____


solely in respect of the obligations of the Company under Sections 3(b), 3.1.1(a), 3.1.2, 6, 7.3.3, 7.4, 8, 11 to 12:

**Mediterra Holdings SA:**

By: _____

Names: _____

Titles: _____

26

**Cepheus Hellas Investments SA**

By: _____

Names: _____

Titles: _____

**Eleni Zarakoviti Fragkista**

_____

**Sarissa Capital Offshore Master Fund LP**

By: _____

Names: _____

Titles: _____

**T & A HOLDINGS LUXEMBOURG SARL**

By: _____

Names: _____

Titles: _____

**Spyros Foteinos**

_____

solely in respect of the obligations of the Company under Sections 3(b), 3.1.1(a), 3.1.2, 6, 7.3.3, 7.4, 8, 11 to 12:

**Mediterra Holdings SA:**

By: _____

Names: _____

Titles: _____

26

**Cepheus Hellas Investments SA**

By: _____

Names: _____

Titles: _____

**Eleni Zarakoviti Fragkista**

_____

**Sarissa Capital Offshore Master Fund LP**

By: _____

Names: _____

Titles: _____

**T & A HOLDINGS LUXEMBOURG SARL**

By: _____

Names: _____

Titles: _____

**Spyros Foteinos**

_____

solely in respect of the obligations of the Company under Sections 3(b), 3.1.1(a), 3.1.2, 6, 7.3.3, 7.4, 8, 11 to 12:

**Mediterra Holdings SA:**

By: _____

Names: _Telemaque Lavidas_

Titles: _Chairman_

27

## List of Appendices

Appendix E):            Shareholders Agreement

Appendix 1:             Defined Terms

Appendix 3.1.3(a):      Articles

Appendix 4.1(a) to (q): Subscription Form for Series B Investors

Appendix 5:             Ownership Structure after Completion of Capital Increase (Cap Table)

Appendix 7.3.1(a):      Form of Proxies

Appendix 7.3.1(b):      Form of Application to Commercial Register

Appendix 7.3.1(e):      Form of Board Resolutions (Share Register)

Appendix 7.3.2(a):      Form of Public Deed of Extraordinary General Meeting of Shareholders

Appendix 9.1:           Representations and Warranties of Company and of Founder Shareholder

Appendix 9.2:           Representations and Warranties of Series B Investors

Appendix 9.3            Representations and Warranties of Other Shareholder

28

**Appendix 1**

## Defined Terms

"**Affiliate**" shall mean any person or entity that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the person or entity specified and includes funds, investment vehicles or other entities formed or incorporated in any jurisdiction which are managed by the relevant person or entity.

"**Agreement**" shall mean this investment and subscription agreement.

"**Application**" shall have the meaning set forth in Section 7.3.1(f).

"**Articles**" shall mean the articles of association (*Statuten; statuts*) of the Company substantially in the form attached to this Agreement as Appendix 3.1.3(a) and as amended from time to time in accordance with this Agreement and the Shareholders Agreement.

"**Authorizations**" shall mean all official authorizations, orders, permissions, product registrations, certifications, certificates, approvals, notices or consents (including all written amendments, supplements or replacements).

"**Board**" shall mean the board of directors of the Company, as appointed from time to time in accordance with the terms of this Agreement and the Shareholders Agreement.

"**Board Regulations**" shall mean the organizational regulations (*Organisationsreglement; règlement d'organisation*) of the Board that may from time to time be adopted by the Board pursuant to Article 716b CO.

"**Business**" shall have the meaning set forth in Preamble B).

"**Business Day**" shall mean any day other than Saturday or Sunday on which banks are open for business in Lausanne (Switzerland).

"**Business IP**" shall mean all Intellectual Property which is being used, and/or is required, in or in relation to the business operations of the Company.

"**Capital Increase**" shall have the meaning set forth in Preamble C).

"**Claim**" shall mean any claim, legal action, proceeding, suit, litigation, prosecution, investigation, enquiry or arbitration, whether actual or threatened, whether as claimant or as defendant, whether domestic or foreign, whether civil, criminal or administrative.

"**Closing**" shall mean the closing of the Capital Increase as set forth in Section 7.

"**Closing Date**" shall have the meaning set forth in Section 7.1.

"**CO**" shall mean the Swiss Code of Obligations as of March 30, 1911, as amended from time to time.

"**Company**" shall mean Mediterra Holdings SA.

"**Confidential Information**" shall have the meaning set forth in Section 11.2.

"**Defaulting Party**" shall have the meaning set forth in Section 11.1.

"**Encumbrance**" shall mean any claim, charge, pledge, mortgage, security, lien, option, equity, power of sale, hypothecation, usufruct, retention of title, right of pre-emption, right of first refusal or other third party rights or security interest of any kind or an agreement to create any of the foregoing.

"**Existing Articles**" shall mean the existing articles of incorporation (*Statuten; statuts*) of the Company as in effect and in force as per the date of this Agreement.

"**Founder Shareholder**" shall have the meaning set forth on Page 1.

"**Existing Shareholder(s)**" shall have the meaning set forth on Page 1.

"**Existing Shares**" shall have the meaning set forth in Section 2.

"**Extraordinary General Meeting**" shall have the meaning set forth in Section 3.1.1(a).

"**Financing Round**" shall have the meaning set forth in Preamble C).

"**Full Consummation**" shall mean that the Preferred B Shares issued in connection with the Capital Increase have been registered in the commercial register in accordance with Section 7.3.3 with respect to a cash equity injection of at least USD 2,500,000.-.

"**Intellectual Property**" shall mean any trademarks, service marks, trade names, domain names, logos, patents, inventions, trade secrets and other rights in know-how, design rights, utility models, copyrights, software, rights in databases and all other similar proprietary rights anywhere in the world, including, where such rights are obtained or enhanced by registration, any registration of such rights and applications and rights to apply for such registrations.

"**Issue Price**" shall have the meaning set forth in Section 3.1.3(b).

"**Material Adverse Change**" shall mean any adverse change relating to the structure, business, financial condition, prospects, assets and liabilities, or results of operations of or other material adverse effect on the Company that would cause, or is likely to cause, a reasonable investor to abstain from entering into and/or consummating the transactions contemplated under this Agreement.

"**Page**" shall mean a page of this Agreement.

"**Party**" and "**Parties**" shall have the meaning set forth on Page 1.

"**Preamble**" shall mean a preamble of this Agreement.

"**Preferred A Shares**" shall mean preferred shares (*Vorzugsaktien; actions privilégiées*) with a nominal value of CHF 1.00 per Preferred A Share, having the preferences set forth in the Articles and the Shareholders Agreement.

"**Preferred B Shares**" shall mean preferred shares (*Vorzugsaktien; actions privilégiées*) with a nominal value of CHF 1.00 per Preferred B Share, having the preferences set forth in the Articles and the Shareholders Agreement each to be fully paid-in in cash pursuant to the terms of this Agreement.

"**Proxy Holder**" shall mean the proxy holder whose name is entered in the proxy as the person who is appointed to represent and act for the issuer of the proxy.

"**Section**" shall mean a section of this Agreement.

"**Series A Investor(s)**" shall have the meaning set forth on Page 1.

"**Series B Investor(s)**" shall have the meaning set forth on Page 1.

"**Share Certificates**" shall mean all shares and share certificates which as of the date of this Agreement validly represent the Shares.

"**Shareholder**" shall mean each shareholder of the Company.

"**Shareholders Agreement**" shall have the meaning set forth in Preamble E).

"**Stock Plan**" shall mean the Stock Incentive Plan that has been adopted on June 11, 2014, by the Company, for the purpose of attracting, retaining and incentivizing selected persons by offering such selected persons an opportunity to acquire a proprietary interest in the success of the Company, or to increase such interest, by acquiring common shares of the Company's share capital, as may be amended from time to time.

"**Subscription Amount**" shall mean the total of the subscription amounts payable by the respective Series B Investor for all of its/his Preferred B Shares in accordance with Section 4.1(a) to (r).

"**Subscription Form**" shall mean the subscription forms to be executed by the Series B Investors in accordance with the terms of this Agreement, substantially in the form attached to this Agreement as Appendices 4.1(a) to (r).

"**Subsidiary**" shall mean Mediterra Inc., a corporation organized and existing under the laws of the State of Delaware, incorporated on July 17th, 2013, and which is a fully owned subsidiary of the Company.

Appendix 3.1.3.(a)

# STATUTS

### TITRE I : RAISON SOCIALE - SIEGE - BUT - DUREE ──────────────

Article 1. **Raison sociale** ──────────────────────────────

Il est formé sous la raison sociale ──────────────────────────

---- Mediterra Holdings SA ----
---- (Mediterra Holdings AG) ----
---- (Mediterra Holdings Ltd) ----

une société anonyme qui est régie par les présents statuts et par le titre XXVI du Code des obligations. ──────────────────────────────

Article 2. **Siège** ──────────────────────────────────

Le siège de la société est à Lausanne. ──────────────────────

Article 3. **But** ──────────────────────────────────────

La société a pour but le développement, la promotion et la distribution de barres nutritionnelles, de suppléments nutritionnels, de produits alimentaires sains et d'autres produits touchants à la santé et au bien-être ainsi que l'acquisition, la gestion et l'aliénation de participation dans des entreprises de toute nature en Suisse et à l'étranger. ──────────────────────

La société peut : ────────────────────────────────────

- exercer toute activité financière, commerciale et industrielle en rapport direct ou indirect avec son but, ──────────────────────
- créer des succursales ou des filiales en Suisse et à l'étranger, ──────────
- participer à toutes entreprises ayant un rapport direct ou indirect avec son but, ──
- accorder des prêts ou des garanties à des actionnaires ou des tiers, si cela favorise ses intérêts, ──────────────────────────
- détenir et gérer des droits de propriété intellectuelle. ──────────────

Article 4. **Durée** ─────────────────────────────────

La durée de la société est indéterminée. ───────────────────

## TITRE II : CAPITAL-ACTIONS - ACTIONS

Article 5. **Montant nominal - division - nature des titres**

Le capital-actions est fixé à la somme de CHF 147'751.00.

Il est divisé en :

a) 100'000 actions nominatives ordinaires de CHF 1.00, valeur nominale chacune,
b) 28'572 actions nominatives privilégiées quant au produit de liquidation dites de type « A » de CHF 1.00, valeur nominale chacune, et
c) 19'179 actions nominatives privilégiées quant au produit de liquidation dites de type « B » de CHF 1.00, valeur nominale chacune,

entièrement libéré.

Article 5bis. **Capital-actions conditionnel**

Le capital-actions pourra être augmenté à concurrence d'un montant maximum de CHF 26'074.00 par l'émission d'un maximum de 26'074 actions nominatives ordinaires d'une valeur nominale de CHF 1.00 chacune, devant être intégralement libérées, par l'exercice de droits d'option accordés à certains employés, consultants ou administrateurs de la société ou de ses filiales, étant précisé qu'aucun bénéficiaire ne peut se voir attribuer au total plus de 5% du capital-actions de la société.

Le droit de souscription préférentiel des actionnaires sera exclu en ce qui concerne ces actions.

Les conditions d'octroi des options par la société telle que les modalités et le prix d'exercice, la date à compter de laquelle les actions donnent droit au dividende, la nature des apports seront fixés par le conseil d'administration dans le cadre de règles spécifiques (telles que plans d'intéressement). Le prix d'exercice ne pourra pas être inférieur à USD 70.00. Ces actions seront soumises aux restrictions prévues aux articles 7 et 8 ci-dessous.

Article 5ter. **Capital-actions autorisé**

Le Conseil d'administration est autorisé à augmenter le capital-actions d'un montant maximum de CHF 5'321.00, par l'émission d'un maximum de 5'321 actions nominatives privilégiées quant au produit de liquidation dites de type « B » d'une valeur nominale de CHF 1.00 chacune devant être entièrement libérées, et soumises aux restrictions statutaires de transmissibilité.

Cette autorisation est accordée jusqu'au 30 septembre 2015.

Le Conseil d'administration pourra procéder à cette augmentation en une ou plusieurs tranches.

Le Conseil d'administration est autorisé à supprimer le droit de souscription préférentiel des actionnaires si les actions nouvelles sont utilisées pour l'acquisition d'entreprises, de parties d'entreprises ou de participation à une entreprise.

2

Le prix d'émission, la nature des apports, la date à compter de laquelle les actions donnent droit au dividende ainsi que les conditions de l'exercice du droit de souscription préférentiel seront fixés par le Conseil d'administration. ————————

Article 6. **Actions - certificats - registre des actions** ——————————————

Les actions sont numérotées et signées par un membre du conseil d'administration. —

En lieu et place d'actions, il peut être émis des certificats numérotés représentant une ou plusieurs actions. Le conseil d'administration peut décider de remettre aux actionnaires de simples attestations prouvant leurs droits sociaux au lieu d'émettre des papiers-valeurs.————————————————————————————

Les actions nominatives peuvent être converties en actions au porteur et inversement. ———————————————————————————

La société tient un registre des actions nominatives qui mentionne le nom et l'adresse des propriétaires et des usufruitiers. ————————————————

Article 7. **Transfert des actions** ————————————————————

La cession des actions s'opère par voie d'endossement, ou à défaut par une déclaration écrite de cession, et est subordonnée à l'approbation du conseil d'administration et à son inscription au registre des actions. ————————

Le conseil d'administration peut refuser le transfert en invoquant un juste motif au sens de l'article 685b alinéa 2 CO notamment si le ou les nouveaux acquéreurs du capital-actions mettent en péril le but social ou l'indépendance économique de l'entreprise par le fait qu'ils exercent en tant que membres du conseil d'administration, directeurs ou propriétaires de sociétés ou d'entreprises, une activité concurrente. ——————————————————————————

La société peut en outre refuser l'inscription au registre des actions si l'acquéreur n'a pas expressément déclaré qu'il reprenait les actions en son propre nom ou pour son propre compte. ———————————————————————————

L'approbation peut aussi être refusée sans indication de motif si le conseil d'administration reprend les actions à leur valeur réelle au moment de la demande d'approbation, pour le compte de la société, d'autres actionnaires ou de tiers. ———

Si les actions ont été acquises par succession, partage successoral, en vertu du régime matrimonial ou dans une procédure d'exécution forcée, la société ne peut refuser son approbation que si elle offre à l'acquéreur de reprendre les actions en cause à leur valeur réelle. ——————————————————————

L'approbation de la cession, son refus ou l'offre de reprise doit être notifié par le conseil d'administration au cédant dans les trois mois dès la réception de la requête. -

3

Le droit de préemption constitué par l'article 8 ci-après au profit des actionnaires prime le droit du conseil d'administration de reprendre les actions pour le compte de la société ou de tiers.

La valeur réelle des actions sera déterminée conformément à l'article 8.

## Article 8. Droit de préemption

Si un actionnaire se propose de vendre à un tiers tout ou partie de ses actions, il fera parvenir aux autres actionnaires et au conseil d'administration les conditions d'achat arrêtées avec ce tiers.

Les actionnaires restant auront alors un droit de préemption qui devra s'exercer dans un délai de trente jours dès réception des conditions d'achat, proportionnel au nombre d'actions qu'ils possèdent. Si l'un ou l'autre des actionnaires renonce à son droit, les droits des autres se trouveront augmentés d'autant, proportionnellement au nombre d'actions que chacun possède. L'absence de réponse dans le délai imparti vaut renonciation au droit de préemption.

En cas de désignation par la société d'un organe de révision, la valeur des actions est fixée par ce dernier. Si l'un ou plusieurs actionnaires contestent le prix fixé par l'organe de révision, le prix des actions sera alors déterminé par une fiduciaire choisie à l'unanimité des actionnaires, laquelle fiduciaire tranchera définitivement. En cas de désaccord des actionnaires quant au choix de la fiduciaire, cette dernière sera désignée par le président du Tribunal de première instance du lieu du siège de la société.

Si la société renonce à la désignation d'un organe de révision, la valeur des actions sera déterminée par la fiduciaire désignée conformément à l'alinéa qui précède.

Si, dans un délai d'un mois, aucun des actionnaires ne se déclare prêt à acheter les titres aux conditions fixées par l'organe de révision, ou le cas échéant, par une fiduciaire, le cédant pourra, sous réserve du droit de reprise du conseil d'administration, céder les actions à l'acquéreur de son choix.

## Article 9. Indivisibilité des titres - droits attachés aux actions

Chaque action est indivisible à l'égard de la société, qui ne reconnaît qu'un propriétaire pour une action.

Chaque action donne droit à une part de bénéfice résultant du bilan et du produit de liquidation en proportion des versements opérés au capital-actions.

Les actionnaires ne sont tenus que des prestations statutaires et ne répondent pas personnellement des dettes sociales.

## Article 10. Augmentation du capital - droit préférentiel de souscription

4

L'augmentation du capital-actions est décidée par l'assemblée générale; elle doit être exécutée par le conseil d'administration dans les trois mois. ————————————

Il ne peut être émis de nouvelles actions qui primeraient les actions privilégiées existantes qu'avec l'approbation tant d'une assemblée spéciale des actionnaires atteints que d'une assemblée générale de tous les actionnaires. ————————

Tout actionnaire a droit à la part d'actions nouvellement émises qui correspond à sa participation antérieure. La décision prise par l'assemblée générale d'augmenter le capital-actions ne peut supprimer ou limiter le droit préférentiel de souscription que pour de justes motifs. ————————————

## TITRE III : ASSEMBLEE GENERALE ————————————————————

Article 11. **Décisions** ————————————————————————

L'assemblée générale est le pouvoir suprême de la société. ——————————

Ses décisions sont obligatoires pour tous ses actionnaires, même non présents ou non représentés. ————————————————————————

Les décisions de l'assemblée générale qui violent la loi ou les statuts peuvent être attaquées par le conseil d'administration ou chaque actionnaire dans les conditions prévues par les articles 706, 706a et 706b du Code des obligations. ——————

Article 12. **Attributions** ————————————————————————

L'assemblée générale des actionnaires a le droit intransmissible : ——————————

1.  d'adopter ou de modifier les statuts, ————————————————
2.  de nommer et révoquer les membres du conseil d'administration et l'organe de révision éventuel, ————————————————————————
3.  d'approuver le rapport annuel et les comptes consolidés, ——————————
4.  d'approuver les comptes annuels et de déterminer l'emploi du bénéfice résultant du bilan, en particulier de fixer le dividende et les tantièmes, ——————————
5.  de donner décharge aux membres du conseil d'administration, ——————————
6.  de prendre toutes les décisions qui lui sont réservées par la loi ou les statuts. ——

Article 13. **Réunions** ————————————————————————

L'assemblée générale se tient au siège social ou en tout autre lieu, en Suisse ou à l'étranger, désigné par l'organe qui convoque. ————————————————

L'assemblée générale ordinaire se réunit chaque année dans les six mois qui suivent la clôture de l'exercice annuel. ————————————————————

Une assemblée générale des actionnaires peut être réunie extraordinairement, aussi souvent qu'il est nécessaire. ————————————————————

5

Les dispositions qui suivent s'appliquent aux assemblées générales ordinaires et extraordinaires.

### Article 14. Convocations

L'assemblée générale est convoquée par le conseil d'administration et, au besoin, par les réviseurs. Les liquidateurs et, le cas échéant, les représentants des obligataires ont également le droit de la convoquer.

Un ou plusieurs actionnaires, représentant dix pour cent au moins du capital-actions, peuvent aussi requérir la convocation de l'assemblée générale.

### Article 15. Mode de convocation

L'assemblée générale est convoquée vingt jours au moins avant la date de sa réunion par une seule notification selon la procédure prévue à l'article 40 des présents statuts.

Sont mentionnés dans la convocation de l'assemblée générale les objets portés à l'ordre du jour, ainsi que les propositions du conseil d'administration et des actionnaires qui ont demandé la convocation de l'assemblée ou l'inscription d'un objet à l'ordre du jour.

Les avis de convocation à l'assemblée générale ordinaire doivent informer les actionnaires que le rapport de gestion et le rapport de révision, pour les sociétés ayant l'obligation de faire contrôler leurs comptes annuels, sont mis à leur disposition au siège de la société et des succursales vingt jours au plus tard avant l'assemblée générale.

Aucune décision ne peut être prise sur des objets qui n'ont pas été dûment portés à l'ordre du jour à l'exception des propositions de convoquer une assemblée générale extraordinaire, d'instituer un contrôle spécial ou d'élire un organe de révision.

Il n'est pas nécessaire d'annoncer à l'avance les propositions entrant dans le cadre des objets portés à l'ordre du jour, ni les délibérations qui ne doivent pas être suivies d'un vote.

### Article 16. Assemblées universelles

Les propriétaires ou les représentants de la totalité des actions peuvent, s'il n'y a pas d'opposition, tenir une assemblée générale sans observer les formes prévues pour sa convocation.

Aussi longtemps qu'ils sont tous présents, cette assemblée a le droit de délibérer et de statuer valablement sur tous les objets qui sont du ressort de l'assemblée générale.

### Article 17. Représentation

6

Un actionnaire peut faire représenter ses actions par une personne, actionnaire ou non, munie d'un pouvoir écrit.

Article 18. **Bureau**

L'assemblée générale est présidée par le président du conseil d'administration ou, à défaut de celui-ci, par un autre membre du conseil désigné par l'assemblée.

S'il n'y a aucun membre du conseil d'administration présent, l'assemblée désigne un président du jour.

Le président désigne le secrétaire et éventuellement un ou plusieurs scrutateurs, qui ne doivent ni l'un ni les autres nécessairement être actionnaires.

Article 19. **Droit de vote**

Les actionnaires exercent leur droit de vote à l'assemblée générale, proportionnellement à la valeur nominale de toutes les actions qui leur appartiennent.

Chaque actionnaire a droit à une voix au moins, même s'il ne possède qu'une action.

Article 20. **Délibérations**

L'assemblée générale est valablement constituée quel que soit le nombre des actionnaires présents ou représentés.

Elle prend ses décisions et procède aux élections à la majorité absolue des voix attribuées aux actions représentées.

Si un second tour de scrutin est nécessaire, la majorité relative est suffisante. En cas de partage des voix, celle du président est prépondérante lorsqu'il s'agit de décisions. Pour les élections, c'est le sort qui décide.

En général, les votations se font à main levée, les élections au scrutin secret, à moins que l'assemblée n'en décide autrement.

Une décision de l'assemblée générale recueillant au moins les deux tiers des voix attribuées aux actions émise est nécessaire pour la modification du but social.

Une décision de l'assemblée générale recueillant au moins les deux tiers des voix attribuées aux actions représentées et la majorité absolue des valeurs nominales représentées est nécessaire pour :

1. l'introduction d'actions à droit de vote privilégié,
2. l'introduction, la suppression ou la limitation de la restriction de la transmissibilité des actions nominatives,
3. l'augmentation autorisée ou conditionnelle du capital-actions,
4. l'augmentation du capital-actions au moyen des fonds propres, contre apport en nature ou en vue d'une reprise de biens et l'octroi d'avantages particuliers,
5. la limitation ou la suppression du droit de souscription préférentiel,

7

6. le transfert du siège de la société, ————————————————————
7. la dissolution de la société, ————————————————————
8. la conversion des actions nominatives en actions au porteur. ——————

La suppression ou la modification des privilèges accordés aux détenteurs d'actions privilégiées ne peuvent pas s'effectuer sans l'accord de tous les actionnaires concernés, les dispositions de l'article 654 du Code des obligations demeurent réservées. ————————————————————

## Article 21. **Procès-verbaux** ————————————————————

Il est dressé procès-verbal des séances de l'assemblée générale qui mentionne les indications sur la représentation des actionnaires, les décisions prises, les nominations, les demandes de renseignements et les réponses données de même que les déclarations dont les actionnaires demandent l'inscription. ——————

Le procès-verbal est signé par le président, par le secrétaire et éventuellement par les scrutateurs. ————————————————————

Les extraits qui en sont délivrés sont certifiés conformes par un membre du conseil d'administration. ————————————————————

Demeure réservée la forme authentique des décisions qui modifient les statuts selon l'article 647 du Code des obligations. ————————————————————

## TITRE IV : LE CONSEIL D'ADMINISTRATION ————————————————————

## Article 22. **Composition** ————————————————————

La société est administrée par un conseil d'administration composé d'un ou plusieurs membres, nommés par l'assemblée générale. ————————————————————

Les titulaires d'actions privilégiées ont le droit de disposer d'un représentant au conseil d'administration. ————————————————————

## Article 23. **Durée des fonctions - organisation** ————————————————————

La durée des fonctions des membres du conseil d'administration est d'un an. ——————

Ils sont rééligibles. Le membre nommé en remplacement d'un autre demeure en fonction pour la durée du mandat de son prédécesseur. ————————————————————

En cas de pluralité de membres du conseil d'administration, celui-ci désigne un président et un secrétaire, lequel peut être choisi en dehors de son sein. ——————

## Article 24. **Délibérations** ————————————————————

Si le conseil d'administration se compose de plusieurs membres, ses décisions sont prises à la majorité des membres présents, pourvu toutefois que ceux-ci forment la majorité du conseil. ————————————————————

8

En cas de partage égal des voix, celle du président est prépondérante.

Le quorum ci-dessus n'est toutefois pas nécessaire lorsqu'il s'agit de constater la libération ultérieure du capital ou l'exécution d'une augmentation de capital et de décider la modification des statuts en résultant.

Les décisions du conseil d'administration peuvent également être prises en la forme d'une approbation donnée par écrit à une proposition à moins que la discussion ne soit requise par l'un des membres.

Article 25. **Procès-verbal**

Il est tenu un procès-verbal des décisions du conseil d'administration, même lorsqu'une seule personne est chargée de l'administration.

En cas de pluralité de membres du conseil d'administration, le procès-verbal de chaque séance est signé par le président et le secrétaire. Il doit mentionner les membres présents et les décisions circulaires.

Article 26. **Convocation - droit aux renseignements**

Le conseil d'administration siège aussi souvent que les affaires l'exigent, sur convocation de son président.

Chaque membre du conseil d'administration peut exiger du président, en indiquant les motifs, la convocation immédiate du conseil d'administration à une séance.

Chaque membre du conseil d'administration a en plus le droit d'obtenir les renseignements conformément à l'article 715 a du Code des obligations.

Article 27. **Pouvoirs**

Le conseil d'administration a les pouvoirs les plus étendus pour la gestion de la société et représente la société à l'égard des tiers. Il peut prendre des décisions sur toutes les affaires qui ne sont pas attribuées à l'assemblée générale ou aux autres organes sociaux.

Il gère les affaires de la société dans la mesure où il n'en a pas délégué la gestion.

Il a les attributions intransmissibles et inaliénables suivantes :

1. exercer la haute direction de la société et établir les instructions nécessaires,
2. fixer l'organisation,
3. fixer les principes de la comptabilité et du contrôle financier ainsi que le plan financier pour autant que celui-ci soit nécessaire à la gestion de la société,
4. nommer et révoquer les personnes chargées de la gestion et de la représentation,

9

5. exercer la haute surveillance sur les personnes chargées de la gestion pour s'assurer notamment qu'elles observent la loi, les statuts, les règlements et les instructions données, ——————————————————————————————

6. établir le rapport de gestion, préparer l'assemblée générale et exécuter ses décisions, ——————————————————————————————

7. informer le juge en cas de surendettement. ——————————————————————————————

En outre, il prend les décisions concernant l'appel ultérieur d'apports relatifs à des actions non entièrement libérées ainsi que les décisions relatives à la constatation d'augmentations de capital et aux modifications des statuts qui en résultent. ——————

Il peut déléguer à certains de ses membres, pris individuellement ou groupés en comités, la charge de préparer et d'exécuter ses décisions ou de surveiller certaines affaires. ——————————————————————————————

## Article 28. **Délégation de la gestion** ——————————————————————————————

Le conseil d'administration peut déléguer tout ou partie de la gestion à un ou plusieurs de ses membres (délégués) ou à des tiers (directeurs) conformément au règlement d'organisation qu'il établit. ——————————————————————————————

## Article 29. **Représentation** ——————————————————————————————

Le conseil d'administration peut déléguer le pouvoir de représentation à un ou plusieurs de ses membres (délégués) ou à des tiers (directeurs, fondés de procuration, mandataires commerciaux). ——————————————————————————————

Il fixe le mode de signature. ——————————————————————————————

La société doit pouvoir être représentée par une personne domiciliée en Suisse, un membre du conseil d'administration ou un directeur doit satisfaire à cette exigence. ——

Si la société est représentée par la personne avec laquelle elle conclut un contrat, celui-ci doit être passé en la forme écrite. Cette exigence ne s'applique pas aux opérations courantes pour lesquelles la prestation de la société ne dépasse pas CHF 1'000.00. ——————————————————————————————

## Article 30. **Indemnité** ——————————————————————————————

Chaque membre du conseil d'administration a droit, en sus du remboursement de ses dépenses, à une indemnité fixée par le conseil d'administration en raison de l'activité déployée pour la société. ——————————————————————————————

## TITRE V : ORGANE DE REVISION ——————————————————————————————

## Article 31. **Révision** ——————————————————————————————

L'assemblée générale élit un organe de révision. ——————————————————————————————

Elle peut renoncer à l'élection d'un organe de révision lorsque : ——————————————

10

1.  la société n'est pas assujettie au contrôle ordinaire;
2.  l'ensemble des actionnaires y consent; et
3.  l'effectif de la société ne dépasse pas 10 emplois à plein temps en moyenne annuelle.

Lorsque les actionnaires ont renoncé au contrôle restreint, cette renonciation est également valable les années qui suivent. Chaque actionnaire a toutefois le droit d'exiger un contrôle restreint et l'élection d'un organe de révision au plus tard 10 jours avant l'assemblée générale. Dans ce cas, l'assemblée générale ne peut prendre les décisions mentionnées à l'art. 12 chi. 3 et 4 qu'une fois que le rapport de révision est disponible.

Sont tenues de soumettre leurs comptes annuels et, le cas échéant, leurs comptes consolidés au contrôle ordinaire :

1.  les sociétés ouvertes au public, soit les sociétés :

    a.  qui ont des titres de participation côtés en bourse,
    b.  qui sont débitrices d'un emprunt par obligations,
    c.  dont les actifs ou le chiffre d'affaire représentent 20% au moins des actifs ou du chiffre d'affaires des comptes consolidés d'une société au sens des let. a et b;

2.  les sociétés qui, au cours de deux exercices successifs, dépassent deux des valeurs mentionnées à l'article 727, chiffre 2 CO,

3.  les sociétés qui ont l'obligation d'établir des comptes consolidés.

Un contrôle ordinaire des comptes est également requis lorsque des actionnaires représentent ensemble au moins 10% du capital-actions l'exigent.

Article 32. **Exigences relatives à l'organe de révision**

Sont éligibles comme organe de révision une ou plusieurs personnes physiques ou morales ainsi que les sociétés de personnes.

Au moins un membre de l'organe de révision doit avoir en Suisse son domicile, son siège ou une succursale inscrite au registre du commerce. Lorsque la société a plusieurs organes de révision, l'un au moins doit satisfaire à cette exigence.

Lorsque la société est tenue de soumettre ses comptes annuels au contrôle ordinaire d'un organe de révision en vertu de :

1.  l'art. 727 al. 1 chi. 2 ou chi. 3
2.  l'art. 727 al. 2 CO,

l'assemblée générale élit un expert-réviseur agréé au sens de la loi fédérale sur la surveillance des réviseurs du 16 décembre 2005 comme organe de révision.

11

Lorsque la société est tenue de soumettre ses comptes annuels au contrôle restreint d'un organe de révision, l'assemblée générale élit un réviseur agréé au sens de la loi fédérale sur la surveillance des réviseurs du 16 décembre 2005 comme organe de révision. La renonciation à l'élection d'un organe de révision en vertu de l'art. 31 demeure réservée. —————

L'organe de révision doit être indépendant au sens de l'art. 728 CO en cas de contrôle ordinaire et de l'art. 729 CO en cas de contrôle restreint. —————

L'organe de révision est élu pour une durée d'un exercice. Son mandat prend fin avec l'approbation des derniers comptes annuels. Il peut être reconduit dans ses fonctions. L'assemblée générale peut, en tout temps, révoquer l'organe de révision avec effet immédiat. —————

Article 33. **Attributions** —————

En cas de contrôle ordinaire, l'organe de révision vérifie : —————

1. Si les comptes annuels, le cas échéant, les comptes consolidés sont conformes aux dispositions légales, aux statuts et au cadre de référence choisi. —————
2. Si la proposition du conseil d'administration à l'assemblée générale concernant l'emploi du bénéfice est conforme aux dispositions légales et aux statuts. —————
3. S'il existe un système de contrôle interne. —————

Il établit à l'intention du conseil d'administration un rapport détaillé conformément à l'article 728b, alinéa 1$^{er}$ du Code des Obligations. —————

Il établit à l'intention de l'assemblée générale, conformément à l'article 728b, alinéa 2, du Code des Obligations, un rapport écrit sur le résultat de sa vérification et il recommande l'approbation des comptes annuels avec ou sans réserves ou leur refus. —————

Si l'organe de révision constate des violations de la loi ou des statuts ou d'un éventuel règlement d'organisation, il en avertit par écrit le conseil d'administration. En cas de violation grave de la loi ou des statuts et en cas d'omission du conseil à prendre des mesures adéquates, après un avertissement écrit, l'organe de révision avertit l'assemblée générale. —————

En cas de surendettement manifeste, il avise le juge, si le conseil d'administration omet de le faire. —————

L'organe de révision, en cas de contrôle ordinaire, doit être présent à l'assemblée générale ordinaire sauf si celle-ci l'en dispense par une décision unanime. —————

En cas de contrôle restreint, l'organe de révision vérifie s'il existe des faits dont il résulte que : —————

1. les comptes annuels ne sont pas conformes aux dispositions légales et aux statuts; —————

12

2.  la proposition du Conseil d'administration à l'Assemblée générale concernant l'emploi du bénéfice n'est pas conforme aux dispositions légales et aux statuts. —

Il établit à l'attention de l'Assemblée générale un rapport écrit qui résume le résultat de la révision conformément à l'article 729b du Code des Obligations. ——————————

## TITRE VI : COMPTES ANNUELS - RESERVE - DIVIDENDES ——————————

Article 34. **Exercice comptable** ——————————————————————————

Les exercices comptables sont annuels. Le Conseil d'administration décide de la date du bouclement. ——————————————————————————

Article 35. **Rapport de gestion** ——————————————————————————

Il est dressé chaque année, en conformité des articles 957 et suivants du Code des obligations un rapport de gestion qui se compose d'un bilan, d'un compte de résultats de la société, arrêtés à la date décidée par le Conseil d'administration, et d'une annexe selon l'article 959c CO, du rapport annuel ainsi que, lorsque la loi le prescrit, du rapport annuel et des comptes consolidés. ——————————————————————————

Article 36. **Affectation du bénéfice** ——————————————————————————

Les dispositions impératives de l'article 671 du Code des obligations traitant des versements obligatoires à la réserve générale doivent être respectées. ——————————

Le solde du bénéfice résultant du bilan est réparti conformément aux décisions de l'assemblée générale. ——————————————————————————

Article 37. **Paiement du dividende** ——————————————————————————

Le paiement du dividende a lieu à l'époque fixée par le conseil d'administration. Tout dividende qui n'a pas été réclamé dans les cinq ans dès son exigibilité est acquis de plein droit à la société. ——————————————————————————

## TITRE VII : LIQUIDATION ——————————————————————————

Article 38. **Liquidation** ——————————————————————————

En cas de dissolution de la société pour d'autres causes que sa faillite ou une décision judiciaire, la liquidation en est opérée par le conseil d'administration, à moins de décision contraire de l'assemblée générale. ——————————————————————————

L'un au moins des liquidateurs doit être domicilié en Suisse et avoir qualité pour représenter la société. ——————————————————————————

Article 39. **Pouvoirs des liquidateurs - répartition** ——————————————————————————

13

Pendant la liquidation, les pouvoirs des organes sociaux sont restreints aux actes qui sont nécessaires à cette opération et qui, de par leur nature, ne sont point du ressort des liquidateurs. —————————————————————————————————

L'assemblée générale des actionnaires conserve le droit d'approuver les comptes de la liquidation et d'en donner décharge. ————————————————————————

Les actions nominatives privilégiées dites de types « B » sont privilégiées quant au produit de liquidation, en ce sens qu'en cas de liquidation, les actionnaires titulaires d'actions nominatives privilégiées dites de type « B » auront droit, préalablement à toute distribution aux autres actionnaires, à une part privilégiée du produit de liquidation équivalent à la totalité des versements opérés par les actionnaires titulaires d'actions nominatives privilégiées dites de type « B » pour la souscription desdites actions, prime d'émission comprise, moins les dividendes perçus. Si des versements ont été effectués en monnaie étrangère, le cours moyen du jour de l'exécution de l'augmentation du capital-actions ayant donné lieu aux présents privilèges sera retenu. L'excédent éventuel du produit de liquidation sera réparti exclusivement entre les actionnaires titulaires d'actions nominatives privilégiées dites de types « A » et d'actions nominatives ordinaires, en respectant les privilèges des actions nominatives privilégiées dites de types « A ». ——————————————————

Les actions nominatives privilégiées dites de types « A » sont privilégiées quant au produit de liquidation, en ce sens qu'en cas de liquidation, les actionnaires titulaires d'actions nominatives privilégiées dites de type « A » auront droit, après distribution aux actionnaires titulaires d'actions nominatives privilégiées dites de types « B » conformément au paragraphe précédent, mais préalablement à toute distribution aux autres actionnaires, à une part privilégiée du produit de liquidation équivalent à la totalité des versements opérés par les actionnaires titulaires d'actions nominatives privilégiées dites de types « A » pour la souscription desdites actions, prime d'émission comprise, moins les dividendes perçus. Si des versements ont été effectués en monnaie étrangère, le cours moyen du jour de l'exécution de l'augmentation du capital-actions ayant donné lieu aux présents privilèges sera retenu. L'excédent éventuel du produit de liquidation sera réparti exclusivement entre les actionnaires titulaires d'actions nominatives ordinaires, en proportion du nombre d'actions nominatives ordinaires détenues. ————————————————————

## TITRE VIII : PUBLICATION - FOR ——————————————————————

### Article 40. Publications ———————————————————————————————

Les publications de la société sont valablement faites dans la Feuille Officielle Suisse du Commerce. —————————————————————————————————————

Les communications de la société aux actionnaires se font par lettre recommandée, à l'adresse de chacun des actionnaires inscrits sur le registre des actions. —————————

### Article 41. For ————————————————————————————————————————

Toutes les contestations qui pourront s'élever pendant la durée de la société ou sa liquidation, soit entre les actionnaires et la société ou les membres du conseil

14

d'administration et réviseurs, soit entre les actionnaires eux-mêmes en raison des affaires de la société, seront soumises aux tribunaux du canton de son siège. ———

STATUTS MODIFIES le ... 2015. ————————————————————————

L'atteste :

La traduction anglaise des présents statuts est indicative ; en cas de divergence entre les versions, la version française fait foi. ——————————————

# ARTICLES

## SECTION I: CORPORATE NAME - HEADQUARTERS - OBJECT - DURATION ——

Article 1. **Corporate name** ———————————————————

A limited company is formed under the following corporate name ———————

---- <u>Mediterra Holdings SA</u> ----
---- (<u>Mediterra Holdings AG</u>) ----
---- (<u>Mediterra Holdings Ltd</u>) ----

It is governed by these articles and by section XXVI of the Code of obligations. ———

Article 2. **Headquarters** ——————————————————————

The company's headquarters are at Lausanne. ————————————————

Article 3. **Object** ———————————————————————

The object of the company shall be the development, marketing and distribution of nutritional bars, nutritional supplements, health foods and other products related to general health and wellness and the acquisition, management and disposal of participations in undertakings of all kinds in Switzerland and abroad. ——————

It may : ———————————————————————————

- Exercise any financial, commercial and industrial activity in direct or indirect relation with its object; ———————————————————————

15

- Create any branches or subsidiaries in Switzerland or overseas; ——————
- Own holdings in any companies which have a direct or indirect relationship with its object; ——————
- Grant loans or guarantees to shareholders or to third parties, if this is in the company's interest, ——————
- Hold and manage intellectual property rights. ——————

Article 4. **Duration** ——————

The duration of the company is indefinite. ——————

## SECTION II : SHARE CAPITAL - SHARES ——————

Article 5. **Nominal total – division – nature of securities** ——————

The share capital is set at the sum of CHF 147'751.00. ——————

It is divided into : ——————

a)  100'000 ordinary registered shares of CHF 1.00 each, and ——————
b)  28'572 "A" registered shares with liquidation preference of CHF 1.00 each, ———
c)  19'179 "B" registered shares with liquidation preference of CHF 1.00 each, ———

wholly paid up. ——————

Article 5bis. **Conditional Capital** ——————

The share capital shall be able to be increased up to a maximum amount of CHF 26'074.00 through the issuance of a maximum of 26'074 ordinary registered shares with a nominal value of CHF 1.00 per share, which must be fully paid up, by the exercise of option rights granted to certain employees, consultants or directors of the company or of its subsidiaries, being specified that no beneficiary shall be granted in the aggregate more than 5% of the Company's share capital.——————

The preferential right of the shareholders shall be excluded in relation to these shares. ——————

Conditions for the granting of options by the company, such as the method, the strike price, the date from which share give right to a dividend and the nature of contributions shall be established by the Board of Directors within the framework of specific rules (such as profit sharing plans). The strike price shall not be lower than USD 70.00. These shares shall be subject to restrictions of Articles 7 and 8. ———

Article 5ter. Authorised capital ——————

The Board of Directors is authorized to increase the share capital with an amount of maximum CHF 5'321.00, by means of the issuance of a maximum of 5'321 "B" registered shares with liquidation preference with a nominal value of CHF 1.00 per share, which must be fully paid up. ——————

16

The aforementioned authority is valid until September 30, 2015.

The Board of Directors can proceed with the aforementioned capital increase in one or more tranches.

The Board of Directors is authorized to withdraw or limit the preferential right of subscription of the shareholders if the new shares are used for the acquisition of companies, parts of companies or participation in a company.

The Board of Directors will determine the subscription price, the nature of the contribution, the date from which shares give right to a dividend and the conditions of the exercise of any preferential subscription rights.

Article 6. **Shares - certificates - register of shares**

The shares are numbered and signed by a member of the board of directors.

Instead of shares, numbered certificates may be issued representing one or more shares. The Board of Directors may decide to issue to the shareholders, in lieu of securities, simple documentary evidence for their membership.

The nominal shares may be converted into bearer shares and vice versa.

The company keeps a register of the nominal shares which mentions the names and the addresses of the owners and the beneficial owners.

Article 7. **Transfer of shares**

The transfer of shares is carried out by means of endorsement, or otherwise by a written declaration of transfer, and is subject to the approval of the board of directors and to the transaction being recorded on the register of shares.

The board of directors may refuse the transfer by invoking reasonable grounds under article 685b paragraph 2 CO, in particular if the new owner or owners of the share capital endanger the corporate object or the economic independence of the company due to the fact that they are acting as members of the board of directors, are directors or owners of companies or enterprises which are engaged in a competing activity.

The company may also refuse to record shares on the register if the purchaser has not expressly declared that he or she is taking over the shares in his or her own name or on his or her own behalf.

The approval may also be refused with no grounds being given if the board of directors purchases the shares at their true value at the time of the request for approval, on behalf of the company, other shareholders or third parties.

If the shares have been acquired by succession, the sharing out of a succession, in virtue of the matrimonial system or in a forced execution procedure, the company

17

may only refuse its approval if it offers to buy the shares in question from the purchaser at their true value. ⸺

The approval of the transfer, its refusal or the purchase offer must be notified by the board of directors to the transferor within three months from the receipt of the request. ⸺

The pre-emptive right constituted by article 8 below in favour of shareholders gives precedence to the right of the board of directors to purchase the shares on behalf of the company or third parties. ⸺

The true value of the shares shall be determined in accordance with article 8. ⸺

Article 8. **Pre-emptive right** ⸺

If a shareholder offers to sell all or some of his or her shares to any third party, he shall send the other shareholders and the board of directors the conditions of purchase with this third party. ⸺

The remaining shareholders shall then have a pre-emptive right which must be exercised within a period of thirty days from receipt of the conditions of purchase, proportional to the number of shares which they own. If one or other of the shareholders waives his or her right, the rights of the others shall thus be increased in proportion to the number which each person owns. The lack of a response within the deadline given shall be equivalent to the waiving of the pre-emptive right. ⸺

The value of the shares is set by the auditors. If one or more shareholders should dispute the price set by the auditors, the price of the shares shall thus be determined by a fiduciary chosen unanimously by the shareholders, this fiduciary shall rule definitively. In the case of any disagreement on the part of the shareholders with regard to the choice of the fiduciary, this latter shall be designated by the president of the civil Court of the district in which the headquarters are located. ⸺

If, within a period of one month, none of the shareholders have declared themselves to be ready to purchase the securities under the conditions set by the auditors or, if need be, by a fiduciary, the transferor may, under reservation of the board of directors' right to purchase, transfer the shares to the purchaser of his or her choice. ⸺

Article 9 **Indivisibility of the securities – rights attached to the shares** ⸺

Each share is indivisible with regard to the company, which only recognises one owner per share. ⸺

Each share gives the right to a part of the profits resulting from the balance sheet and the liquidation product in proportion to the payments made to the share capital. ⸺

The shareholders are only bound to the statutory services and are not personally responsible for corporate debts. ⸺

18

Article 10. **Increase of capital – preferential subscription right**

Any increase in the share capital shall be decided upon by the general meeting, it must be executed by the board of directors within three months.

It will not be possible to issue new shares which take precedence over existing preference shares except with the approval both of a special meeting of the shareholders affected and of a general meeting of all the shareholders.

Any shareholder has the right to a quota of newly issued shares corresponding to his or her previous holding. Any decision taken by the general meeting to increase the share capital cannot remove or limit the preferential subscription right except for just reasons.

## SECTION III: GENERAL MEETING

Article 11. **Decisions**

The general meeting is the company's supreme power.

Its decisions are binding for all shareholders, even if they are not present or not represented.

Any decisions taken by the general meeting which breach the law or the statutes may be contested by the board of directors or any of the shareholders under the conditions laid down by articles 706, 706a and 706b of the Code of obligations.

Article 12. **Allocations**

The general shareholders meeting has the inalienable right to do the following :

1. To adopt or to modify the statutes.
2. To appoint or remove members of the board of directors and the auditors.
3. To approve the annual report and the consolidated accounts.
4. To approve the annual accounts and to determine the use to be made of the profit resulting from the balance sheet, in particular to set the dividend and the percentages of profits.

5. To discharge members of the board of directors.
6. To take any decisions which are reserved to it by law or by the statutes.

Article 13. **Meetings**

The general meeting is held at the corporate headquarters or in any other place, in Switzerland or overseas, as designated by the body which convenes the meeting.

The ordinary general meeting meets every year within the six months following the closure of the financial year.

A general shareholders meeting may be convened extraordinarily, as often as may be necessary. ————————

The provisions which follow apply to both ordinary and extraordinary general meetings. ————————

Article 14. **Notice** ————————

The general meeting is convened by the board of directors and, if need be, by the auditors. The liquidators, and, if need be, the representatives of the holders of redeemable shares also have the right to convene. ————————

One or more shareholders, representing at least ten per cent of the share capital, may also require the convening of the general meeting. ————————

Article 15. **Form of notice** ————————

The General Meeting shall be called subject to at least twenty days' prior notice by a single notification according to the procedure envisaged in article 40 below. ————

Notice of the General Meeting shall be accompanied by a list of the items on the agenda and by any proposals by the Board of Directors and any shareholders who asked that the meeting be called or an item be included on the agenda. ————

Notice of the ordinary General Meeting must inform shareholders that the annual report and, for companies required to have their annual accounts audited, the auditor's report are being held at their disposal at the head office and branches of the Company twenty days at the latest before the General Meeting. ————

No decision can be taken on items not duly placed on the agenda save for proposals to convene an extraordinary General Meeting, to conduct a special audit or to elect auditors. ————————

Prior notice is not necessary for proposals relating to the items on the agenda, nor for discussions that are not to be followed by a vote. ————————

Article 16. **Universal meetings** ————————

The owners or the representatives of all of the shares may, if there is no opposition, hold a general meeting without observing the precise forms for the convening of the latter. ————————

As long as they are all present, this meeting has the right to deliberate and to validly rule on all items which fall within the competence of the general meeting. ————

Article 17. **Representation** ————————

A shareholder may have his shares represented by a person, who may or may not be a shareholder, provided with a written power of proxy. ————————

20

Article 18. **Board** —————————————————————————————————

The general meeting is chaired by the Chair of the board of directors or, failing this, by another member of the board designated by the meeting. ——————————

If there is no member of the board of directors present, the meeting designates a temporary Chair. ——————————————————————————————

The Chair designates the secretary and, where applicable, one or more scrutineers, who do not necessarily need to be shareholders. ————————————————

Article 19. **Voting rights** —————————————————————————

The shareholders exercise their voting rights at the general meeting, in proportion to the nominal value of all of the shares which belong to them. —————————

Each shareholder has the right to at least one vote, even if he or she only owns one share. ——————————————————————————————————

Article 20. **Discussions** ——————————————————————————

The General Meeting shall have a quorum whatever the number of shareholders present or represented. ———————————————————————————

It shall adopt its decisions and conduct its elections by an absolute majority of the votes allotted to the shares represented. ——————————————————

If a second ballot is necessary, a relative majority shall suffice. In the event of a draw, the Chairman shall have the casting vote in the case of decisions. For elections, the decision shall be taken by the drawing of lots. ——————————

In general, voting shall be by a show of hands and elections by secret ballot, unless the Meeting decide otherwise. ———————————————————————

A General Meeting decision by at least two-thirds of the votes allotted to the shares issued is necessary to amend the purpose of the Company. ——————————

A General Meeting decision by at least two-thirds of the votes allotted to the shares represented and an absolute majority of the face values represented is necessary to :

1.  introduce privileged voting shares, ——————————————————
2.  abolish or limit the restriction on the transmissibility of registered shares, ————
3.  effect an authorised or conditional increase in share capital, ————————
4.  increase the share capital by means of shareholders' equity, by a contribution in kind or by assuming assets and granting particular advantages, ——————
5.  limit or abolish preferential subscription rights, —————————————
6.  transfer the registered office of the Company, ——————————————
7.  wind-up the Company, —————————————————————————
8.  convert the registered shares into bearer shares. ————————————

21

The removal or modification of the privileges afforded to the holders of preference shares cannot take place without the agreement of all the shareholders concerned, without prejudice to the provisions of Article 654 of the Code of Obligations. ———

Article 21. **Minutes** ———

Minutes are drawn up for sessions of the general meeting which mention the details on the representation of shareholders, the decisions taken, appointments, requests for information and the answers given and declarations made when shareholders request that they be recorded. ———

The minutes are signed by the chair, by the secretary and, where applicable, by the scrutineers. ———

The abstracts issued are certified as accurate by a member of the board of directors.

The authentic form of any decisions which modify the statutes is reserved according to article 647 of the Code of obligations. ———

## SECTION IV: THE BOARD OF DIRECTORS ———

Article 22. **Composition** ———

The Company shall be administered by a Board of Directors comprising one or more members, appointed by the General Meeting. ———

The holders of preference shares are entitled to have a representative on the board of directors. ———

Article 23. **Duration of positions – organisation** ———

The duration of the positions of the members of the board of directors is one year. ——

They can be re-elected. Any member appointed to replace another remains in his position for the length of the mandate of his predecessor. ———

In the case of plurality of members of the board of directors, the latter designates a chair and a secretary, who may be chosen from outside the board. ———

Article 24. **Deliberations** ———

If the board of directors is made up of various members, its decisions are taken by a majority of the members present, provided that these are the majority of the board. ——

In the case of a split vote, the chair has the casting vote. ———

The quorum above is not necessary for the subsequent releasing of the capital or the execution of an increase in capital and deciding on the modification of the statutes resulting from this. ———

22

The decisions of the board of directors may also be taken in the form of an approval given in writing to a proposal unless the discussion is required by one of the members.

Article 25. **Minutes**

The minutes of the decisions of the board of directors are taken, even if only one person is in charge of the administration.

In the case of plurality of members of the board of directors, the minutes of each session are signed by the chair and by the secretary. It must mention the members present and any circular decisions.

Article 26. **Convening – right to information**

The board of directors sits as often as business requires, when convened by its chair.

Each member of the board of directors may require from the chair, by giving his or her reasons, the immediate convening of the board of directors to a session.

Each member of the board of directors also has the right to obtain information in accordance with article 715a of the Code of obligations.

Article 27. **Prerogatives**

The Board of Directors shall exercise the fullest powers for the administration of the Company and shall represent the Company in its relations with third parties. It may adopt decisions on all matters not reserved for the General Meeting or the other corporate bodies.

It shall administer the business of the Company insofar as it does not delegate the administration.

It shall exercise the following non-transmissible and inalienable prerogatives :

1. exercise the overall management of the Company and establish any necessary instructions,
2. determine the organisation of the Company,
3. set the principles of accountancy and financial audit as well as the budget insofar as that be necessary for the management of the Company,
4. appoint and dismiss the people charged with managing and representing the Company,
5. exercise overall supervision of the people responsible for management to ensure in particular that they observe the law, these Articles and any regulations and instructions given,
6. draft the annual report, prepare the General Meeting and implement its decisions,
7. inform the courts should the Company overextend itself.

23

Moreover, it shall take any decisions concerning the calling up of any balances outstanding on partly paid-up shares as well as decisions relating to new capital issues and the consequent amendments to these Articles. ————————————

It may delegate some of its members, individually or grouped in committees, to prepare and implement its decisions or to supervise certain items of business. ————

Article 28. **Delegation of management** ————————————————————————

The board of directors may delegate all or part of the management to one or more of its members (delegates) or to third parties (directors) in accordance with the organisation regulation which it draws up. ————————————————

Article 29. **Representation** ————————————————————————————

The Board of Directors may delegate the power of representation to one or more of its members (managing-directors) or to third parties (managers, authorised clerks, commercial agents). ————————————————————————

It shall determine their signing rights. ————————————————————

The Company must be represented by a person domiciled in Switzerland; a member of the Board of Directors or a manager must satisfy this requirement. ————————

If the Company is represented by a person with whom it concludes a contract, that contract must be set down in writing. This requirement shall not apply to current operations committing the Company for less than CHF 1'000.00. ————————————

Article 30. **Indemnity** ————————————————————————————————

Each member of the board of directors has the right, in addition to the reimbursement of his or her expenses, to an indemnity set by the board of directors according to the activity carried out for the company. ————————————————————

## SECTION V: AUDITORS ————————————————————————————

Article 31. **Audit** ————————————————————————————————

The General Meeting shall elect an external auditor. ————————————————

It may waive the election of an auditor when : ————————————————————

1.  the Company is not subject to an ordinary audit; ————————————————
2.  all the shareholders so agree; and ————————————————————————
3.  the average annual staff of the Company does not exceed 10 full-time employees. ————————————————————————————————

Once the shareholders have waived a restricted audit, that waiver shall also hold valid for the following years. Each shareholder shall, however be entitled to request a restricted audit and the election of an auditor at the latest 10 days before the

24

General Meeting.  In this case, the General Meeting cannot adopt the decisions mentioned in Art. 12 (3) and (4) until the auditor's report is available. ———————

Annual accounts and, if necessary, consolidated accounts are to be submitted to an ordinary audit by: ————————————————————————————————

1.  companies open to the public, i.e. companies : ———————————————————

    a. whose shares are listed on the Stock Exchange, ——————————————
    b. that are debtors under a debenture loan, ————————————————
    c. whose assets or turnover account for at least 20% of the assets or turnover of the consolidated accounts of a company within the meaning of a. and b. above; ————————————————————————————

2.  companies which, during two successive financial years, exceed two of the values described in article 727, number 2 CO ———————————————

3.  companies which have to produce consolidated accounts. ——————————

An ordinary audit of the accounts is also necessary when shareholders jointly accounting for at least 10% of the share capital so require. ——————————

Article 32. **Requirements relating to the auditors** —————————————————

One or more persons or entities as well as partnerships are eligible as auditors. ———

At least one member of the auditing board must be domiciled, have its head office or a branch entered in the Commercial Register in Switzerland.  When the Company has several auditors, one at least must satisfy this requirement. ——————————

When the Company is required to submit its annual accounts to an ordinary audit by an auditing board under the terms of : ——————————————————————

1.  Art. 727(1(2) or (3)) ——————————————————————————————
2.  Art. 727(2) of Swiss Contract Law (Code of Obligations – CO), ——————————

the General Meeting shall elect as its auditor an approved chartered accountant within the meaning of the federal Auditors Monitoring Act of 16 December 2005. ——————

When the Company is required to submit its annual accounts to a restricted audit by an auditing board, the General Meeting shall elect as its auditor an approved auditor within the meaning of the federal Auditors Monitoring Act of 16 December 2005. This is subject to the auditor election waiver under the terms of Art. 31 above. ——————

The auditing board must be independent within the meaning of Art. 728 CO in the event of an ordinary audit and of Art. 729 CO in the event of a restricted audit. ———

The auditing board is elected for a term of one financial year.  Its term shall end with the adoption of the final annual accounts. It may be re-elected.  The General Meeting may, at any time, dismiss the auditing board with immediate effect. ——————————

25

Article 33. **Prerogatives**

In the event of an ordinary audit, the auditing board shall check :

1. That the annual accounts and, if necessary, the consolidated accounts comply with the legal provisions, these Articles and the selected framework of reference.
2. That the proposal by the Board of Directors to the General Meeting concerning the utilisation of profits complies with the legal provisions and these Articles.
3. That there exists an internal audit system.

It shall, for the Board of Directors, draw up a detailed report in accordance with article 728b (1) of the Code of Obligations.

It shall, for submission to the General Meeting, in accordance with article 728b (2) of the Code of Obligations, prepare a written report on the result of its audit and it shall recommend the adoption of the annual accounts with or without reservations – or their refusal.

If the auditing board notes violations of the law or these Articles or any existing organisational regulations, it shall inform the Board of Directors thereof in writing. In the event of a serious violation of the law or these Articles and should the Board of Directors fail to take adequate remedial measures after a written warning, the auditing board shall inform the General Meeting.

It shall inform the courts if the Company becomes manifestly over-indebted and if the Board of Directors fails to do so.

The auditors, in the event of an ordinary audit, must be present at the ordinary General Meeting unless the Meeting excuses it by a unanimous decision.

In the event of a restricted audit, the auditors shall check to see whether there are any facts that indicate that :

1. the accounts do not comply with the legal provisions and these Articles;
2. the proposal by the Board of Directors to the General Meeting concerning the utilisation of profits does not comply with the legal provisions and these Articles. –

It shall, for the attention of the General Meeting, prepare a written report summarising the result of the audit in accordance with article 729b of the Code of Obligations.

## SECTION VI: ANNUAL ACCOUNTS - RESERVE - DIVIDENDS

Article 34. **Accounting year**

The accounting year is annual; the Board of Directors decide of the date of its closing.

Article 35. **Management report**

26

Every year, a Management Report shall be prepared in accordance with Articles 957 and following of the Code of Obligations, which shall consists of a Profit and Loss Accounts of the Company, drawn up at the date decided by the Board of Directors as well as Appendix in accordance with Article 959c of the CO, to the Annual Report, and where the Law requires, to the Annual Report and Consolidated Accounts. ———

Article 36. **Assignment of the profit** ———————————————————————

The imperative provisions of article 671 of the Code of obligations dealing with obligatory payments to the general reserve must be respected. ——————————

The balance of the profit resulting from the balance sheet is distributed in accordance with the decisions of the general meeting. -

Article 37. **Payment of the dividend** ———————————————————————

The dividend shall be paid at the time set by the Board of Directors.  Any dividend which is not claimed within five years of falling due shall automatically revert to the Company. ——————————————————————————————————

**SECTION VII: LIQUIDATION** ——————————————————————————

Article 38. **Liquidation** ——————————————————————————————

In the case of dissolution of the company for reasons other than its bankruptcy or a legal decision, the liquidation is carried out by the board of directors, unless there is a decision to the contrary made by the general meeting. ——————————

At least one of the liquidators must be resident in Switzerland and be empowered to represent the company. ————————————————————————————

Article 39. **Powers of the liquidators – allocation** ——————————————

During the liquidation, the powers of corporate bodies are restricted to deeds which are necessary to this operation and which, by their very nature, do not fall within the competence of the liquidators. ———————————————————————

The general shareholders meeting retains the right to approve the accounts for the liquidation and to release them. —————————————————————————

Registered preference shares known as type "B" shares shall enjoy preference as regards the proceeds of liquidation, in that, in the event of liquidation, the shareholders holding type "B" registered preference shares shall be entitled, prior to any distribution to the other shareholders, to a preferential share of the proceeds of liquidation equivalent to the totality of the payments made by shareholders owning type "B" registered preference shares for the subscription of the said shares, including share premium, less dividends received. If payments have been made in foreign currency, the average rate ruling on the date of implementation of the increase of share capital giving rise to the present privileges shall be adopted.  Any surplus proceeds of liquidation shall be shared exclusively between shareholders

27

holding type "A" registered preference shares and shareholders holding ordinary registered shares, in compliance with privileges granted to type "B" registered preference shares .

Registered preference shares known as type "A" shares shall enjoy preference as regards the proceeds of liquidation, in that, in the event of liquidation, the shareholders holding type "A" registered preference shares shall be entitled, after distribution to shareholders owning type "B" registered preference shares pursuant to the preceding paragraph, but prior to any distribution to the other shareholders, to a preferential share of the proceeds of liquidation equivalent to the totality of the payments made by shareholders owning type "A" registered preference shares for the subscription of the said shares, including share premium, less dividends received. If payments have been made in foreign currency, the average rate ruling on the date of implementation of the increase of share capital giving rise to the present privileges shall be adopted. Any surplus proceeds of liquidation shall be shared exclusively between shareholders holding ordinary registered shares, in proportion to the numbers of ordinary registered shares held.

## SECTION VIII: PUBLICATION - JURISDICTION

Article 40. **Publications**

The company's publications are validly published in the Feuille Officielle Suisse du Commerce (Swiss Trade Bulletin).

The company's communications to shareholders are sent by registered letter, to the address of each shareholder as recorded on the register of shares.

Article 41. **Jurisdiction**

Any disputes which may arise during the life of the company or its liquidation, either between shareholders and the company or members of the board of directors and auditors, or between shareholders themselves due to the company's affairs, shall be subject to the courts of the canton in which the headquarters are located.

ARTICLES OF INCORPORATION MODIFIED on ..., the ..., 2015.

L'atteste :

In case of difference between the French and the English versions ; the French one will be sole applicable.

28

*Appendix 4.1 (a)*

## <u>BULLETIN DE SOUSCRIPTION</u>

### Mediterra Holdings SA à Lausanne

L'assemblée générale extraordinaire des actionnaires tenue le ... 2015 en l'Etude des notaires Patrick de Preux, Laurent Besso & Jean Schmidt à Lausanne a décidé une augmentation de son capital-actions aux conditions suivantes : ————————————

**Montant de l'augmentation** : CHF 19'179.00. ———————————————

**Genre d'actions émises** : 19'179 actions nominatives privilégiées quant au produit de liquidation dites de type « B » de CHF 1.00 nominal chacune. ——————————

**Prix d'émission** : a) 6448 actions à USD 112.00 chacune, soit : ——

- CHF 1.00 pour les nouvelles actions de CHF 1.00 valeur nominale chacune, ————
- environ USD ..., représentant une contre-valeur en francs suisse d'environ CHF ..., par action nouvelle représentant l'agio, soit un agio total d'environ USD ..., représentant une contre-valeur en francs suisse d'environ CHF ... ——————————————

b) 12731 actions à USD 140.00 chacune, soit : ——

- CHF 1.00 pour les nouvelles actions de CHF 1.00 valeur nominale chacune, ————
- environ USD ..., représentant une contre-valeur en francs suisse d'environ CHF ..., par action nouvelle représentant l'agio, soit un agio total d'environ USD ..., représentant une contre-valeur en francs suisse d'environ CHF ... ——————————————

**Libération** : en espèces. ——————————————

Les nouvelles actions émises donneront droit pour la première fois au dividende éventuel de l'exercice clos à la date décidée par le Conseil d'administration. ————————————

**Souscripteur** : Re Gotham LLC, société dont le siège est à New-York (Etats-Unis d'Amérique) ———————————

qui souscrit 1339 actions nouvelles de CHF 1.00 nominal chacune, aux conditions décrites ci-dessus. ——————————————————————————————

Le souscripteur soussigné prend l'engagement inconditionnel d'effectuer un apport correspondant au prix total d'émission, par le versement de USD 150'000.00, représentant une contre-valeur en francs suisse de CHF ..., en espèces, soit : ————————————

- CHF 1'339.00 pour les nouvelles actions de CHF 1.00 chacune, ————————————
- environ USD ..., représentant une contre-valeur en francs suisse d'environ CHF ... représentant le montant global de l'agio, ————————————————

selon prix d'émission mentionné à la lettre « a » ci-dessus. ————————————

Lausanne, le ... 2015.  ─────────────────────────

Pour Re Gotham LLC,
*Monsieur Olivier Cherpillod*                                    ...................................

*Apendix 4.1.(B)*

## BULLETIN DE SOUSCRIPTION

### Mediterra Holdings SA à Lausanne

L'assemblée générale extraordinaire des actionnaires tenue le ... 2015 en l'Etude des notaires Patrick de Preux, Laurent Besso & Jean Schmidt à Lausanne a décidé une augmentation de son capital-actions aux conditions suivantes : —————————————

**Montant de l'augmentation** : CHF 19'179.00. —————————————

**Genre d'actions émises** : 19'179 actions nominatives privilégiées quant au produit de liquidation dites de type « B » de CHF 1.00 nominal chacune. —————————

**Prix d'émission** : a) 6448 actions à USD 112.00 chacune, soit : ———

- CHF 1.00 pour les nouvelles actions de CHF 1.00 valeur nominale chacune, ————
- environ USD ..., représentant une contre-valeur en francs suisse d'environ CHF ..., par action nouvelle représentant l'agio, soit un agio total d'environ USD ..., représentant une contre-valeur en francs suisse d'environ CHF ... —————————————

b) 12731 actions à USD 140.00 chacune, soit : ———

- CHF 1.00 pour les nouvelles actions de CHF 1.00 valeur nominale chacune, ————
- environ USD ..., représentant une contre-valeur en francs suisse d'environ CHF ..., par action nouvelle représentant l'agio, soit un agio total d'environ USD ..., représentant une contre-valeur en francs suisse d'environ CHF ... —————————————

**Libération** : en espèces. —————————————

Les nouvelles actions émises donneront droit pour la première fois au dividende éventuel de l'exercice clos à la date décidée par le Conseil d'administration. —————————————

**Souscripteur** : Demergon Funds on behalf of Demergon Private Equity Fund, société dont le siège est à Luxembourg (Luxembourg) —————————

qui souscrit 2586 actions nouvelles de CHF 1.00 nominal chacune, aux conditions décrites ci-dessus. —————————————

Le souscripteur soussigné prend l'engagement inconditionnel d'effectuer un apport correspondant au prix total d'émission, par le versement de USD 300'000.00, représentant une contre-valeur en francs suisse de CHF ..., en espèces, soit : —————————————

- CHF 2'217.00 pour les nouvelles actions de CHF 1.00 chacune, —————————
- environ USD ..., représentant une contre-valeur en francs suisse d'environ CHF ... représentant le montant global de l'agio, —————————————

selon prix d'émission mentionné à la lettre « a » ci-dessus, et ————————————

-   CHF 369.00 pour les nouvelles actions de CHF 1.00 chacune, ————————
-   environ USD ..., représentant une contre-valeur en francs suisse d'environ CHF ... représentant le montant global de l'agio, ————————————

selon prix d'émission mentionné à la lettre « b » ci-dessus, et ————————————

Lausanne, le ... 2015. ————————————————————

Pour Demergon Funds on behalf of
Demergon Private Equity Fund,
*Monsieur Olivier Cherpillod*

..............................................