UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | : |
|  | : |
|  | : |
| v. | : |
|  | : |
| GEORGIOS NIKAS et al., | : |
|  | : |
| Defendants. | : |
|  | : |

Case No. 19-cr-00716 (DLC)

---

**DEFENDANT TELEMAQUE LAVIDAS'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION *IN LIMINE* TO EXCLUDE CERTAIN HEARSAY TESTIMONY AND EVIDENCE OF DOWNSTREAM TRADING**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 2

ARGUMENT ......................................................................................................................... 4

I.    Applicable Law Regarding the Scope of a Conspiracy ...................................................... 4

II.   Nikas's Hearsay Statement Is Not Admissible ................................................................. 6

      A.    Nikas's Statement Was Not in Furtherance of Any Conspiracy Mr.
            Lavidas Allegedly Joined........................................................................................ 6

      B.    Nikas's Purported Statement Is Not a Statement Against Penal Interest.............. 12

III.  Trading Records of the Downstream Tippees Are Not Admissible ................................. 15

      A.    The Downstream Tippees Are Not a Part of the Alleged Conspiracy ................. 16

      B.    The Trading Records of the Downstream Tippees Are Unfairly Prejudicial ....... 17

CONCLUSION.................................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant:small-caps">Cases</span>

*Gill v. Arab Bank*,
   893 F. Supp. 2d 542 (E.D.N.Y. 2012) .......................................................................13, 14, 15

*United States v. Al-Moayad*,
   545 F.3d 139 (2d Cir. 2008)......................................................................................................12

*United States v. Alessi*,
   638 F.2d 466 (2d Cir. 1980).......................................................................................................4

*United States v. Carpenter*
   791 F.2d 1024 (1986).................................................................................................4, 5, 10, 16

*United States v. Clark*,
   18 F.3d 1337 (6th Cir. 1994) .....................................................................................................8

*United States v. Geibel*,
   369 F.3d 682 (2d Cir. 2004)............................................................................................ passim

*United States v. Gigante*,
   166 F.3d 75 (2d Cir. 1999).....................................................................................................7, 8

*United States* v. *Gupta*,
   747 F. 3d 111 (2d. Cir. 2014)...........................................................................................11, 15

*United States v. James*,
   712 F.3d 79 (2d Cir. 2013)..........................................................................................................7

*United States v. Marcus Schloss*
   710 F. Supp. 944 (S.D.N.Y. 1989) ..........................................................................................18

*United States v. McDermott*,
   245 F.3d 133 (2d Cir. 2001)..........................................................................................4, 5, 16

*United States v. Medina*,
   No. S3 13 CR. 272 PGG,
   2014 WL 3384630 (S.D.N.Y. July 10, 2014) ........................................................................13

*United States v. O'Hagan*,
   521 U.S. 642 (1997).....................................................................................................................14

*United States v. One 1975 Lincoln Cont'l*,
   72 F.R.D. 535 (S.D.N.Y. 1976) ...............................................................................................11

*United States v. Russo,*
  302 F.3d 37 (2d Cir. 2002)............................................................................7

*United States v. Saget,*
  377 F.3d 223 (2d. Cir. 2004)........................................................................12

*United States v. Salvador,*
  820 F.2d 558 (2d. Cir. 1987)..................................................................13, 15

*United States v. Tracy,*
  12 F.3d 1186 (2d Cir. 1993).........................................................................7

*United States v. Yildiz,*
  85 F. App'x 239 (2d Cir. 2004)....................................................................14

*Williamson v. United States,*
  512 U.S. 594 (1994)........................................................................12, 13, 14

## RULES AND OTHER AUTHORITIES

Fed R. Evid. 403 ...................................................................................17, 18, 19

Fed R. Evid. 801 .............................................................................*Passim*

Fed R. Evid. 804 ...................................................................................12, 13, 15

## PRELIMINARY STATEMENT

Faced with the prospect of having to rely on dubious circumstantial evidence to prove its case that Telemaque Lavidas conveyed material non-public information to George Nikas, the Government seeks to admit hearsay evidence and other conduct that is not part of the conspiracy Mr. Lavidas allegedly joined.  Specifically, the Government seeks to have an alleged downstream tippee, ███████████████████████ known as CC-4 in the Indictment), testify that ████████████████████████████████████████████████████████████ ████████████████████████████████████████.  Second, the Government seeks to introduce voluminous trading records of ████████ and sixteen other alleged downstream traders – trading about which Mr. Lavidas knew nothing.  Mr. Lavidas moves to preclude the Government from offering, eliciting, or referencing this hearsay evidence and evidence of downstream trading that is not part of the conspiracy in which he allegedly participated.

Neither the Indictment nor the millions of documents produced in discovery supports the Government's theory that Mr. Lavidas was part of a conspiracy that included ██████ and multiple other downstream tippees.  This Court should preclude the admission at trial of ████████ testimony about Nikas's out-of-court statement because what Nikas allegedly told ██████ is hearsay that did nothing to further the conspiracy Mr. Lavidas allegedly joined.  In addition, the trading records of ██████ and sixteen other downstream traders should also be excluded at trial.  The Government has no evidence – and has not even alleged in the Indictment – that the scope of the alleged conspiracy between Mr. Lavidas and Nikas included an agreement that Nikas would tip others.  There is absolutely no evidence that Mr. Lavidas knew anything about this alleged downstream tipping, much less that he agreed to it in any way.  Moreover, allowing the Government to admit the records of the many remote tippees and millions of dollars

in trading would prejudice Mr. Lavidas, confuse the jury, and unnecessarily complicate the issues at trial.

## STATEMENT OF FACTS

On November 25, 2019, the grand jury returned a Superseding Indictment against Mr. Lavidas and his alleged co-conspirator, George Nikas. The Indictment alleges two conspiracies: the Ariad Scheme and the Corporate Acquisitions Scheme. As part of the Ariad Scheme, Nikas and Mr. Lavidas are alleged to have agreed "to steal confidential information from Ariad for their personal use" from "in or about 2013 up to and including in or about 2015." Superseding Indictment at ¶ 13. The Indictment further alleges that Mr. Lavidas "used his connection to [his father] to learn MNPI about Ariad, and then provided that information to Nikas, who reaped millions of dollars in profits by trading based on that information." *Id.* It also alleges that Nikas passed the Ariad information on to CC-4 ████████, "who also reaped substantial profits by trading on the information." *Id.* But the Indictment does not allege that Mr. Lavidas knew anything about the fact that Nikas shared MNPI with ████████. And the Indictment is completely silent regarding any further downstream tippees.

The Indictment also sets forth a larger and more complex Corporate Acquisitions Scheme. Mr. Lavidas is not implicated in the Corporate Acquisitions Scheme; in fact, the Government has expressly stated that it will not be alleging that the defendant participated in that scheme. October 23, 2019 Tr. at 4. Nor does the Indictment allege that Mr. Lavidas had any knowledge of the Corporate Acquisition Scheme. In sharp contrast, Nikas and ████████ are central players in the Corporate Acquisitions Scheme. The Indictment alleges that Nikas "participated in a large-scale international insider trading ring," through which he "received MNPI concerning acquisitions and potential acquisitions of publicly traded companies" from

████. Superseding Indictment ¶ 32. Nikas and █████ are alleged to have begun "trading together based on MNPI that ██████ collected from investment banking insiders," as early as 2010 and to have conspired with at least six people identified by code names in this five-year long conspiracy. *Id.* ¶¶ 32-39.

On November 6, 2019, the Government informed the defendant that ████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

Streeter Decl. Ex. A. ██████ is a cooperating witness for the Government.

On December 4, 2019, the Government further informed the defendant that it is planning to claim that, in addition to Nikas and Mr. Lavidas's father, ██████ and seven other individuals are Mr. Lavidas's "co-conspirators" in this case. Streeter Decl. Ex. B. The Government has also provided defense counsel with a proposed trading records stipulation showing that it intends to introduce as evidence against Mr. Lavidas at trial thousands of pages of trading records of ██████ and sixteen other remote traders. Streeter Decl. Ex. C. ██████████████████

██████████████████████████████████████████████████████████████

Although the Indictment does not allege Mr. Lavidas knew anything about any of these individuals or any of this downstream trading, the Government asserted for the first time in a brief last week, without citing any support, that Mr. Lavidas provided MNPI to Nikas "so that Nikas could trade on the MNPI *and pass it to others*." Gov. Mem. In Opp. to Def. Motions, ECF No. 43, ("Gov't Memo") at 2 (emphasis added). There is no factual basis either in the Indictment or in the millions of documents provided in discovery that one of the purposes of the conspiracy Mr. Lavidas joined was for Nikas to tip others.

## ARGUMENT

## I.   Applicable Law Regarding the Scope of a Conspiracy

"In order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal" *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001) ("*McDermott I*"). All of the alleged conspirators must have agreed on the essential nature of the scheme and have been aware of its "general nature and extent." *United States v. Alessi*, 638 F.2d 466, 473 (2d Cir. 1980). "Additionally, it is a long-standing principle of this Court's law of conspiracy that 'nobody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it; if later comers change that,  he is not liable for the change; his liability is limited to the common purposes while he remains in it." *McDermott I*, 245 F.3d at 137-138 (citing *United States v. Peoni*, 100 F.2d 401, 403 (2d Cir. 1938)).

In *United States v. Carpenter*, a reporter agreed to provide two stockbrokers with securities-related information prior to its publication in the *Wall Street Journal*. 791 F.2d 1024, 1026 (1986).  On several occasions, however, one of the stockbrokers, without the reporter's knowledge, passed the information to his friend, Stephen Spratt, with whom the reporter "had no agreement or knowledge." *Id.* at 1035–36.  The Second Circuit reversed the conspiracy conviction for the reporter to the extent that it was based on trades made by Spratt.  *Id.* at 1026. The *Carpenter* court set forth "three hypothetical avenues" for establishing a single conspiracy: (1) if the scope of the trading agreement were broader "to include trading by or for persons other than the small group of conspirators"; (2) if the conspirators reasonably foresaw, as a necessary or natural consequence of the unlawful agreement, information being passed to remote tippees; and (3) actual awareness of the remote tippees.  *Id.* at 1036.  The court held that the reporter

could not be liable for the trades of the unknown remote tippee as to whom he had no agreement or knowledge.  *Id.* at 1036 (citing *Pinkerton v. United States*, 328 U.S. 640 (1946)).

In *McDermott I*, the Second Circuit had another opportunity to consider whether a tipper conspired with a remote tippee in a single conspiracy.  245 F.3d at 137.  James McDermott was the president and CEO of an investment bank who began having an affair with Kathryn Gannon. *Id.* at 136.  During the course of their affair, McDermott made several stock recommendations to Gannon.  *Id.*  Unbeknownst to McDermott, Gannon was also having an affair with Anthony Pomponio and passing McDermott's recommendations to him.  *Id.*  McDermott, Gannon, and Pomponio were indicted in a single conspiracy to commit insider trading, and McDermott was convicted on circumstantial evidence consisting of phone records and Gannon's and Pomponio's trading activities.  Applying the test articulated in *Carpenter*, the Second Circuit reversed McDermott's conviction because there was no evidence that "McDermott's agreement with Gannon encompassed a broader scope than the two of them."  *Id.* at 138.  Moreover, it was "not obvious that it was or should have been within McDermott's frame of reference that Gannon would share stock information with others similarly situated, or even that there existed others similarly situated."  *Id.*

The Second Circuit reached a similar conclusion in *United States v. Geibel*, 369 F.3d 682, 690-92 (2d Cir. 2004).  In *Geibel*, the Second Circuit reversed the insider trading conspiracy convictions of three remote tippees because the government failed to establish that they were in a single conspiracy with the tipper.  *Id.*  Applying the *Carpenter* analysis, the court noted that none of the remote tippees ever communicated directly with the tipper, and that it was not reasonably foreseeable that disclosures to remote tippees were a necessary or natural consequence of the trading scheme.  *Id.* at 690-91.  The court explained that "the reason that [the tipper and the

direct tippee] endeavored to avoid unauthorized sharing by remote tippees was because they knew that trading by numerous individuals on [the tipper's] tips would directly undermine the scheme by increasing their chance of detection." *Id.* at 691. Moreover, although the defendant tippees were aware of the tipper's role in the conspiracy, the tipper was not aware of the remote tippees. *Id.* at 692. Finally, there was no mutual dependence among the alleged conspirators because "the sharing of information inured only to the benefit of the defendants, not the insider." *Id.*

## II. Nikas's Hearsay Statement Is Not Admissible

In a discovery letter dated November 6, 2019, the Government made the following disclosure to the defense:



Streeter Decl. Ex. A. Nikas's statement to ███████ is inadmissible hearsay because it was not made in furtherance of Nikas's alleged conspiracy with Mr. Lavidas, and because it is not a statement against penal interest.

    A.    <u>Nikas's Statement Was Not in Furtherance of Any Conspiracy Mr. Lavidas Allegedly Joined</u>

        (i)    Applicable Law

Federal Rule of Evidence 801(d) provides:

**Statements That Are Not Hearsay.**

**(2)** The statement is offered against an opposing party and:

**(E)** was made by the party's co-conspirator during and in furtherance of the conspiracy.

The rationale for the rule that statements of co-conspirators in furtherance of the conspiracy are not hearsay is based on principles of agency. "When two persons engage jointly

in a partnership for some criminal objective, the law deems them agents for one another . . .
[e]ach is deemed to have authorized the acts and declarations of the other undertaken to carry out
their joint objective." *United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002).  These agency
principles only apply, such that the statements of an agent can be deemed to be authorized by the
principal, when the agent acts within the "scope of his authority"—in other words, if the
statement is made in furtherance of the common purpose of the conspiracy.  *Id.* (quoting *United
States v. Olweiss*, 138 F.2d 798, 800 (2d Cir. 1943)).  To admit statements under this rule, the
Government must establish first that a conspiracy existed, second that its members included the
declarant and the party against whom the statement is offered, and third, that the statement was
made in furtherance of the conspiracy.  *United States v. James*, 712 F.3d 79, 105 (2d Cir. 2013).

In order to be "in furtherance" of a conspiracy, the statements "must in some way have
been designed to promote or facilitate achievement of the goals of the ongoing conspiracy."
*United States v. Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993).  Recognizing the agency-principal
relationship that is inherent in this rule, courts have consistently held that the conspiratorial
objective being furthered by the declarant's statement must in fact be the objective of a
conspiracy agreed upon between the defendant and the declarant; "conspiracies between them
that do not so coincide . . . will not be sufficient." *United States v. Russo*, 302 F.3d 37, 45–46 (2d
Cir. 2002); *see also United States v. Gigante*, 166 F.3d 75, 83 (2d Cir. 1999) ("it is the *unity of
interests* stemming from a specific shared criminal task that justifies Rule 801(d)(2)(E).")
(emphasis added).  And of course, a statement in furtherance of a conspiracy (such as, in this
case, a separate conspiracy between ████ and Nikas) that the defendant did not join are not
admissible against the defendant.  *See Gigante*, 166 F.3d at 83 (statements of other individuals

about alleged murder conspiracy in which Mafia member refused to get involved were not admissible under coconspirator exception).

Federal Rule of Evidence 801(d) also states that the statement must be considered but does *not by itself* establish the existence of the conspiracy or participation in it.  Fed R. Ev. 801(d)(2)(E) (emphasis added).  The Rule thus requires some independent evidence, which is "not merely a scintilla, but rather enough to rebut the presumed unreliability of hearsay." *United States v. Clark*, 18 F.3d 1337, 1341-42 (6th Cir. 1994).

(ii)    Analysis

There is not a single piece of evidence indicating that Mr. Lavidas and Nikas explicitly or implicitly agreed that as a part of the alleged conspiracy, Nikas would share Ariad MNPI with others, including ███████.  The alleged conspiracy functioned as an exchange of information among three individuals, Mr. Lavidas's father, Mr. Lavidas and Nikas.  Mr. Lavidas's father allegedly provided information to Mr. Lavidas, and Mr. Lavidas in turn allegedly shared it with Nikas.  Nikas traded and profited, and allegedly provided personal benefits to Mr. Lavidas and his father.  Nowhere in the Indictment does the Government allege that any other individuals besides Mr. Lavidas, his father, and Nikas were involved in or necessary to the theft of Ariad MNPI.  While the Indictment does allege that Nikas shared Ariad MNPI with ███████, nowhere in the Indictment does the Government allege that Mr. Lavidas knew anything about this fact, and there are no facts alleged in the Indictment suggesting Mr. Lavidas could have contemplated or foreseen that Nikas would share information with downstream tippees.  Nor has the Government alleged that by virtue of Nikas's side arrangements with other tippees such as ███████, any benefit accrued to Mr. Lavidas.

The Government has never even hinted that Mr. Lavidas knew of the existence of downstream tippees until a recent court filing, in which, in one line, the Government baldly

asserts, without any support, that Mr. Lavidas "provided that MNPI to Nikas, a close personal friend, so that Nikas could trade on the MNPI *and pass it to others*." Gov't Memo at 2 (emphasis added).  This is pure conjecture.  The Government did not allege it in the Indictment.  And it is clear why.  The Government cannot, by even a scintilla of evidence, prove that Mr. Lavidas knew anything about this downstream tipping or that Nikas was acting within the scope of the conspiracy Mr. Lavidas allegedly joined when Nikas talked about or exchanged MNPI with remote tippees such as ███████.

Unlike drug, organized crime or bribery conspiracies where the activity itself suggests the need for multiple participants, here, no other participants were needed to bring the alleged plan to fruition.  This is not a narcotics distribution conspiracy in which, by necessity, other co-conspirators would have to be involved to grow the drugs, process them, transport them, sell them, collect the money, etc.  And it is not an organized crime case where by definition other members of the "family" carried out different roles in the conspiracy.  Per the Indictment, Mr. Lavidas and his father allegedly understood that the MNPI would be shared with Nikas, so that he could trade on it, in exchange for Nikas providing personal benefits to them.  It would be entirely unnecessary, and in fact, counterproductive, to involve other tippees like ███████.  And the Government has not even suggested that Mr. Lavidas received any benefit as a consequence of Nikas involving ███████ or other people.[1]

Furthermore, there is not a single document indicating that Mr. Lavidas knew or contemplated the existence of any other downstream tippees, much less an explicit or implicit

---

[1] The narrow scope of this alleged agreement is further evidenced by the Government's newly reframed narrative of the conspiracy, whereby Mr. Lavidas allegedly provided Nikas with MNPI not necessarily in exchange for payments, but in order to "build and promote his friendship with a successful businessman." [Nikas] *See* Gov't Memo at 3.  If, as the Government alleges, Mr. Lavidas shared MNPI with Nikas in order to cultivate their friendship, Mr. Lavidas would have no motive to have this information shared with ███████ whom the Government has never alleged provided Mr. Lavidas with any benefit.

agreement between Mr. Lavidas and Nikas that Nikas would talk about with others or pass along

inside information.  The separate conspiracy between Nikas and ███████ as alleged in the

Corporate Acquisitions Scheme, whereby the two would exchange MNPI from their various

sources, in no way makes ███████ a joint member of the conspiracy allegedly involving Mr.

Lavidas and Nikas.  *See Carpenter*, 791 F.2d at 1036 (fact that one of the co-conspirators "used

the information ... beyond the scope of the agreement" did not make the remote tippee a joint

member of the conspiracy).  Moreover, here, the success of the alleged scheme depended on

secrecy.  Expanding the pool of individuals who possessed Ariad MNPI would run the risk of

detection and make it less likely to succeed.  *See Geibel*, 369 F.3d at 691 (coconspirator's

sharing of inside information with remote tippees was contrary to the purpose of the insider

trading scheme as it directly undermined the secrecy of the venture.).  If Nikas talked about

Ariad inside information with ███████, he acted on his own accord and not in furtherance of any

conspiracy Mr. Lavidas allegedly joined.

 Accordingly, Nikas's statement to ███████ that he received Ariad information from Mr.

Lavidas cannot be attributed to Mr. Lavidas under Rule 801(d)(3).  It did not advance the

objectives of any conspiracy he allegedly joined.  There is no evidence that he knew anything

about it or authorized it either implicitly or otherwise.  There is no evidence Mr. Lavidas got any

benefit as a result of it.  And, indeed, if Nikas made that statement to ███████, it ran counter to

the goals of the alleged conspiracy with Mr. Lavidas since it only increased the chances of

detection.  Under the agency principles that provide the foundation for this evidentiary rule, it

must not be admitted.  Nikas simply was not Mr. Lavidas's agent when he made this alleged

hearsay statement.  It would be grossly unfair to admit it into evidence under these

circumstances, when the defendant will have no opportunity to cross examine the declarant, Mr. Nikas, about it.

Nor is *United States* v. *Gupta*, 747 F. 3d 111 (2d. Cir. 2014), to the contrary. In that case, the court held that wiretap recorded statements of a tippee, Raj Rajaratnam, to two employees at his hedge fund, were admissible against Rajat Gupta, his tipper. In that case it was undeniable that Rajaratnam, who was the founder and owner of a hedge fund, would need to share information with his employees so that they could take advantage of it, including executing trades. *Id.* at 124-126. And it was clear that Gupta understood Rajaratnam would do so. Indeed, one of Rajaratnam's employees to whom he spoke in the admitted recorded calls was the portfolio manager running a part of the hedge fund in which Gupta was a 15% owner. *Id.* at 126. Therefore Gupta was fully aware and understood that as a natural consequence of him tipping Rajaratnam, Rajaratnem would pass that information on to his employees so that they could take advantage of it, including for Gupta's benefit. *Id.* In the case of Mr. Lavidas and Nikas, the opposite is true. There is nothing about their alleged conspiracy that suggested to Mr. Lavidas that Nikas would tip other people or that he needed to do so for the conspiracy to function. Indeed, as discussed above, and as the Second Circuit recognized in *Geibel*, 369 F.3d at 691, such downstream tipping was contrary to the goals of the conspiracy.

Finally, the Government cannot rely on Nikas's statement alone to satisfy the "in furtherance" requirement and sidestep its evidentiary burden. The Government is precluded from doing so by Rule 801(d), which provides that "[t]he statement must be considered but *does not by itself establish* . . . the existence of the conspiracy or participation in it under (E) (emphasis added); *see also United States v. One 1975 Lincoln Cont'l*, 72 F.R.D. 535, 539 (S.D.N.Y. 1976) ("[T]he Government must establish that there was in fact a conspiracy

involving the declarant . . . and that the declarant's statement was made 'in furtherance' of that conspiracy. Furthermore, these propositions must be demonstrated by evidence independent of the declarations themselves.")  The Indictment does not allege, and the Government has offered no evidence suggesting Mr. Lavidas knew about this downstream tipping or this statement, contemplated or authorized it, or that it was in furtherance of a conspiracy to which Mr. Lavidas agreed.  Therefore, this court should find Nikas's out-of-court, hearsay statement that the Government proposes to put in through its cooperator inadmissible.  *See United States v. Al-Moayad*, 545 F.3d 139, 173–74 (2d Cir. 2008) (finding no basis to admit hearsay form stating defendant had sponsored a mujahidin fighter to attend an Al-Qaeda training camp as a coconspirator statement when other than the form itself, there was no evidence that the two individuals knew each other or were part of a joint conspiracy.).

B.   Nikas's Purported Statement Is Not a Statement Against Penal Interest

(i)   Applicable Law

Federal Rule of Evidence 804(b)(3) provides that an out of court statement by an unavailable declarant is admissible if the statement is one that: (1) is contrary to the declarant's proprietary or pecuniary interest, and (2) is supported by corroborating circumstances that clearly indicate its trustworthiness.  *See* Fed. R. Evid. 804(b)(3).  This rule is founded on the notion that people tend not to make self-inculpatory statements unless they believe them to be true. *Williamson v. United States*, 512 U.S. 594, 599 (1994).

A statement is against a declarant's penal interest within the meaning of Rule 804(b)(3) if "a reasonable person in the declarant's shoes would perceive the statement as detrimental to his or her own penal interest." *United States v. Saget*, 377 F.3d 223, 231 (2d. Cir. 2004).  Rule 804(b)(3) only supports the admission of the *self-inculpatory portions* of a hearsay statement.  In *Williamson*, the Supreme Court cautioned that "the fact that a statement is collateral to a self-

inculpatory statement says nothing at all about the collateral statement's reliability." 512 U.S. at 600 (emphasis added). This is especially true when the statement implicates someone else. *Id.* at 599.

Furthermore, Rule 804(b)(3) and the Confrontation Clause of the U.S. Constitution require that the statement contain "particularized guarantees of trustworthiness." *Id. at* 605. This is so because if admitted, the defendant will have no opportunity to confront or cross-examine the declarant about the truthfulness of the statement. The "inference of trustworthiness from the proffered 'corroborating circumstances' must be strong, not merely allowable." *United States v. Salvador*, 820 F.2d 558, 561 (2d. Cir. 1987), and is "negated when the declarant has ulterior motives for admitting conduct," *Gill v. Arab Bank*, 893 F. Supp. 2d 542, 569 (E.D.N.Y. 2012). In assessing the trustworthiness requirement, courts consider (1) the time of the declaration and the party to whom the declaration was made; (2) the existence of corroborating evidence in the case; (3) the extent to which the declaration is really against the declarant's penal interest; [and] (4) the availability of the declarant as a witness.' *United States v. Medina*, No. S3 13 CR. 272 PGG, 2014 WL 3384630, at *3 (S.D.N.Y. July 10, 2014).

(ii)     Analysis

Nikas's statement is not clearly inculpatory and thus cannot be admitted pursuant to Rule 804(b)(3). The Government states that ███████████████████████████████

████████████████████████████████████████████████████████████

████ Streeter Decl. Ex. A. But that proffered statement does not reveal whether Nikas knew the information was the result of any breach of a duty by Mr. Lavidas or his father, or whether Nikas obtained this information through some negligence or accident by Mr. Lavidas. If the information came to Nikas through negligence or an accident, under U.S. insider trading law, neither Nikas nor Mr. Lavidas would be guilty of insider trading, since the law requires an

intentional breach of a duty to prove fraud.  And it requires that Nikas know of that breach.

Thus, the statement on its face does not inculpate Nikas as a tippee of inside information.  *See*

*United States v. O'Hagan*, 521 U.S. 642, 675 (1997) (requiring proof not only that the insider

source breached a fiduciary duty, but that the tippee knew or should have known of that breach);

*United States v. Yildiz*, 85 F. App'x 239 (2d Cir. 2004) (co-defendant's statement that he did not

discuss robbery with defendant did not in any way expose him to criminal liability).

Importantly, the specific portion of the statement that identified Mr. Lavidas as the source of

MNPI was *not* self-inculpatory.  Therefore, under *Williamson*, the statement cannot be admitted

because the justification underlying the rule does not apply.  *Id.* at 599–600.

But even if Nikas's statement was sufficiently self-incriminating, the statement still fails

to meet the trustworthiness requirement, which is critical given the defendant will have no

opportunity to cross-examine Nikas as contemplated by the Confrontation Clause.  The statement

was made to ███████, one of Nikas's key sources in the massive Corporate Acquisitions

Scheme.  Nikas had every incentive to exaggerate or puff about the quality of his sources so that

███████ would in turn provide him with tips from that lucrative scheme, which involved inside

information from over a dozen other companies.  Clearly the "inference of trustworthiness" on

which the evidentiary rule is based is "negated when the declarant has ulterior motives for

admitting conduct."  *See Gill v. Arab Bank*, 893 F. Supp. 2d at 569, 571 (finding that the terrorist

leader of small operation had incentive to claim a connection to a larger militant force, in order

to recruit individuals to join his specialized cause).  That inference is negated here.  Indeed, the

vast majority of the inside information that Nikas traded on to earn tens of millions through the

Corporate Acquisitions Insider Trading Scheme he obtained directly from ███████.  (*See*

November 29, 2019 Streeter Decl. Ex. E).  ███████ was a critical source of information for

Nikas.  He had every incentive, even if he only had legitimate conversations with Mr. Lavidas about public information relating to pharmaceutical companies – a subject on which Mr. Lavidas had deep expertise and understanding – to exaggerate and claim to ███████████████ ████████████████████████  According to the Government's description in the Indictment and in disclosures to defense counsel about the Corporate Acquisitions Scheme, Nikas had almost no opportunities to be the source of inside information.  *Id.*  He would have wanted to claim whenever he could, even it was not true, that he had inside information to share with ███████ in order to keep that information flowing from ███████.  Given that the defendant will have no opportunity to cross examine Nikas on it, this Court must ensure that statement is trustworthy. FRE 804(b)(3)(B); *Salvador*, 820 F.2d at 561.  It is not and should not be admitted.[2]

Furthermore, the Government has not disclosed the identity of any other witnesses that will corroborate Nikas's statements, either through direct testimony or written statements.  As such, the circumstances surrounding Nikas's statement do not provide for a "strong inference of trustworthiness" as required by the Federal Rules of Evidence and the Confrontation Clause. Therefore, this Court should also find that the statement is inadmissible under the penal interest exception to the hearsay rule.

## III.    Trading Records of the Downstream Tippees Are Not Admissible

At the trial of Mr. Lavidas, the Government intends to introduce the trading records of Nikas and seventeen additional remote traders.  These remote traders include people and entities

---

[2] The *Gupta* case is again not to the contrary.  In that case, the Second Circuit, said, in *dicta*, that certain statements may have been admissible as statements against penal interests.  747 F.3d at 127-129.  In *Gupta*, the statements at issue were highly incriminating, and therefore appeared to meet the first requirement of Rule 804(b)(3).  *Id.*  And there was no credible challenge to the trustworthiness of the statements, as they were recorded by wiretap and the declarant, Rajaratnam, had no incentive to lie or exaggerate to his employees to whom he was talking.  *Id.* As discussed above, Nikas's statement here is not clearly incriminating and he had strong incentives to exaggerate his sources to ██████████.

associated with the following individuals: ████████████████████████

████████████████████████████████████████████████.  Streeter

Decl. Ex. B.  These records are not relevant to the charges against Mr. Lavidas because none of

these people were part of any conspiracy he allegedly joined.  Moreover, these voluminous

trading records are prejudicial because they will only serve to confuse and mislead the jury by

increasing dramatically and unfairly the dollar amounts the Government presents at trial.

        A.      <u>The Downstream Tippees Are Not a Part of the Alleged Conspiracy</u>

        (i)     Applicable Law

As discussed at length above, the Second Circuit has repeatedly and clearly held that

remote tippees about which the original tipper had no awareness or knowledge are not part of the

tipper's conspiracy.  *Geibel*, 369 F.3d at 690-92; *McDermott I*, 245 F.3d at 137; *Carpenter*, 791

F.2d at 1036.

        (ii)    Analysis

The Government does not allege in the Indictment, and there is no evidence in the

discovery to suggest, that Mr. Lavidas had any knowledge of, or even any reason to anticipate,

Nikas's downstream tipping.  The Indictment does not even allege that Mr. Lavidas knew of the

other tippees' existence, or even that he knew facts from which their existence could reasonably

be inferred.  Further, there is nothing in the millions of pages of discovery to suggest that Mr.

Lavidas authorized or knew that Nikas shared information with other people.  The scope of the

conspiratorial agreement (to the extent an agreement existed) between Mr. Lavidas and Nikas did

not encompass disclosure of inside information to unknown remote tippees.  If Nikas was

sharing information, he did so without Mr. Lavidas's knowledge or authorization.

Further, Mr. Lavidas could not have foreseen that disclosure to remote tippees was a

necessary or natural consequence of the alleged trading scheme.  As discussed above, unlike, for

example, a drug conspiracy in which other participants are required for the scheme to succeed, the opposite is true in the conspiracy alleged here.  As the Second Circuit recognized in *Geibel*, "trading by numerous individuals on Freeman's tips would directly undermine the scheme by increasing their chance of detection."  369 F.3d at 691.  Even assuming the allegations are true, Mr. Lavidas would have reasonably expected Nikas "to be discrete with the precious information because the success of the conspiratorial scheme depended on exclusivity."  *Id.*  Moreover, nothing about the "personal benefit" that the Government alleges Mr. Lavidas received supports the conclusion he knew or anticipated Nikas was communicating Ariad MNPI to downstream tippees.  The Government alleges Mr. Lavidas provided Nikas with MNPI to cultivate a close friendship and to receive personal and business benefits from Nikas.  There is no reason why Mr. Lavidas would agree Nikas should tip others, and there is no logic why it would help Mr. Lavidas.  Nor is there any evidence showing Mr. Lavidas received anything from the downstream tippees' trading.  Because the Government cannot show that the downstream tippees are part of a conspiracy Mr. Lavidas allegedly joined, the trading records of the downstream tippees should be excluded.

> B.   The Trading Records of the Downstream Tippees Are Unfairly Prejudicial

> > (i)   Applicable Law

Federal Rule of Evidence 403 provides:

**Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons.**

The Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

(ii)     Analysis

The trading records of downstream tippees should be excluded under Federal Rule of Evidence 403 because any probative value of that evidence would be substantially outweighed by its prejudicial effect.  The probative value of the trading records of the downstream tippees is low because the Government does not need them to prove the trading.  As alleged in Indictment, Nikas traded Ariad extensively each time the Government alleges Mr. Lavidas provided him with MNPI.  Introduction of these trading records will have no effect other than to prejudice the jury against Mr. Lavidas by "running up the numbers."

In *United States v. Marcus Schloss*, the tipper "David" provided information to a number of people, including two particular defendants, Marcus Schloss and Ronald Yagoda.  710 F. Supp. 944, 952-53 (S.D.N.Y. 1989).  Although all of the tippees were originally charged in the same indictment, the Government agreed to sever the trial against Schloss and Yagoda.  *Id.* at 945.  Schloss and Yagoda then sought to exclude evidence of the other tippees' trading at their trial.  *Id.* at 946. The court concluded that the trading activities of David's other tippees should be excluded under Rule 403, even if the Government could prove that all of the tippees had entered a single conspiracy.  *Id.* at 954.  The court held:

> Rule 403 is essentially a rule of fairness. It is fair to require the government to prove its conspiracy and substantive charges against Yagoda and Schloss *on the basis of their own acts, and not the acts of others*.  It would be unfair to require Yagoda and Schloss to explain and defend not only their own acts, but the acts of others….

*Id.*  at 954 (emphasis added).

Here as in *Marcus Schloss*, there is no evidence suggesting that Mr. Lavidas and the remote tippees, "had specific knowledge of each other's existence and acts, and worked together to make the conspiracy succeed."  *Id.*  Allowing the other tippees' records into evidence would therefore unfairly prejudice Mr. Lavidas by introducing an unrelated sideshow of millions of

dollars in trading that is not alleged in the Indictment and not connected to any alleged conspiracy Mr. Lavidas joined.  Given the high likelihood that this evidence will confuse and mislead the jury, the records of the downstream tippees should be excluded.

## **CONCLUSION**

For all of the reasons described above, this Court should exclude Nikas's out-of-court hearsay statements and all evidence related to downstream trading.

Dated: December 11, 2019                         Respectfully submitted,

DECHERT LLP

By: /s/ Jonathan R. Streeter
Jonathan R. Streeter
Siobhan M. Namazi
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036-6797
Jonathan.streeter@dechert.com
Siobhan.namazi@dechert.com
Tel.: (212) 698-3826
Fax: (212) 314-0046

Reed Smith LLP
Eric H. Sussman
Jennifer L. Achilles
599 Lexington Ave., Floor 22
New York, NY 10022
Telephone: (212) 521-5400
esussman@reedsmith.com
jachilles@reedsmith.com

*Attorneys for Defendant*
*Telemaque Lavidas*

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on the 11th day of December 2019, I electronically filed this Memorandum of Law in Support of Defendant Telemaque Lavidas's Motion *In Limine* To Exclude Certain Hearsay Testimony and Evidence of Downstream Trading, along with the accompanying Notice of Motion, Declaration of Jonathan R. Streeter, and the exhibits annexed thereto, using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

<u>*/s/* Jonathan R. Streeter</u>
Jonathan R. Streeter

*Attorney for Defendant Telemaque Lavidas*