**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| vs. | ) | |
| | ) | Case No.: S1 19-cr-00716 (DLC) |
| TELEMAQUE LAVIDAS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## SENTENCING MEMORANDUM ON BEHALF OF
## TELEMAQUE LAVIDAS

Jonathan R. Streeter
Brian C. Raphel
Siobhan M. Namazi
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036-6797
Jonathan.streeter@dechert.com
Brian.raphel@dechert.com
Siobhan.namazi@dechert.com
Tel.: (212) 698-3826
Fax: (212) 314-0046

*Attorneys for Defendant*
*Telemaque Lavidas*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................... iii

I.     PRELIMINARY STATEMENT ................................................................ 1

II.    TELEMAQUE'S PERSONAL HISTORY AND CHARACTERISTICS .................. 2

    A.    Hard Work And Familial Support Have Been The Pillars Of Telemaque's Life From A Very Young Age ............................................................. 3

    B.    Telemaque Works Diligently Through College And Makes "Warmth And Kindness" His Hallmark Traits In Business ............................................ 5

    C.    Rather Than Rely On The Family Business, Telemaque Works Hard To Build A Successful Business On His Own ................................................ 7

    D.    Telemaque Has Always Given Back To His Community ..................................... 8

    E.    Telemaque Is A Devoted Husband And Father .................................................. 13

    F.    Telemaque Has Continued To Support His Community Even While in Custody ............................................................................................ 14

    G.    The Harsh Conditions of Telemaque's Confinement ......................................... 16

III.   THE GOVERNMENT'S EVIDENCE AT TRIAL, EVEN ACCEPTED ENTIRELY AS TRUE, SHOWED ONLY THAT TELEMAQUE PLAYED A MINIMAL ROLE IN THE CRIMINAL ACTIVITY OF GEORGE NIKAS AND MARC DEMANE DEBIH ........................................................ 18

IV.   THE ADVISORY GUIDELINES CALCULATION ......................................... 26

    A.    The Probation Department Recommendation .................................................... 27

    B.    The Guidelines Calculation Should Be Reduced Based On Telemaque's Minimal Role In Nikas's And Demane's Criminal Activity .............................. 28

    C.    The Guidelines Calculation Substantially Overstates Telemaque's Culpability Because It Is Almost Entirely Based On Gains Realized By Others Through Trading Outside Of Telemaque's Control ................................ 35

V.    A BALANCED CONSIDERATION OF ALL RELEVANT FACTORS UNDER 18 U.S.C. § 3553(a) DEMONSTRATES THAT A SENTENCE WELL BELOW THE GUIDELINES RANGE IS SUFFICIENT, BUT NO GREATER THAN NECESSARY, TO ACHIEVE THE GOALS OF SENTENCING ........................................................................................ 36

# TABLE OF CONTENTS
(continued)

Page

A.   A Sentence Well Below the Guidelines Range Is Consistent With Sentences Imposed On Substantially Similar Defendants Convicted Of Similar Conduct ........................................................................................... 37

B.   Telemaque's Life Of Service To His Community, Charities, Employees, Friends and Family Warrant Leniency ............................................... 49

C.   The Government Has Already Shown Extreme Leniency Towards Other Participants In Nikas's Schemes ...................................................... 52

D.   A Sentence Well Below The Guidelines Range Will Be More Than Sufficient To Achieve The Goals Of Specific And General Deterrence ............ 54

E.   An Extended Period Of Incarceration Will Impose Substantial Burdens On Telemaque's Wife, Two-Year Old Daughter, And Newborn Son In The Middle Of A Global Pandemic ........................................................... 57

F.   Telemaque Has Already Been Punished More Severely Than Similarly Situated Defendants .......................................................................... 63

G.   A Sentence of Time Served, Possibly With Some Period of Home Confinement, Serves the Interests of the Federal Prison System and Is Fair to Telemaque ....................................................................................... 66

VI.   **CONCLUSION** .............................................................................. 69

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Dirks v. S.E.C.*,
    463 U.S. 646 (1983)................................................................................................22

*Rita v. U.S.*,
    551 U.S. 338 (2007)................................................................................................36

*U.S. v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2013)..............................................................35, 49

*U.S. v. Bills*,
    401 Fed. Appx 622 (2d Cir. 2010)...........................................................................57

*U.S.* v. *Booker*,
    543 U.S. 220 (2005)................................................................................................57

*U.S. v. Bowers*,
    9-cr-496 (S.D.N.Y. Sept. 16, 2009) ........................................................................41

*U.S. v. Chin Chong*,
    13-cr-570, 2014 WL 4773978 (E.D.N.Y. Sept. 24, 2014).......................................66

*U.S. v. Chow*,
    17-cr-667, Dkt. 161 (S.D.N.Y. Jan. 17, 2019).......................................38, 39, 40, 41

*U.S. v. Collins*,
    18-cr-567, Dkt. 173 (S.D.N.Y. Feb. 5, 2020) ...........................................46, 47, 48

*U.S. v. Collotta*,
    7-cr-143 (S.D.N.Y. Oct. 4, 2007) ............................................................................48

*U.S. v. Cooper*,
    394 F.3d 172 (3rd Cir. 2005) ...................................................................................50

*U.S. v. Corsey*,
    723 F.3d 366 (2d Cir. 2013)....................................................................................35

*U.S. v. Crosby*,
    397 F.3d 103 (2d Cir. 2005)........................................................................26, 27, 36

*U.S. v. Diaz*,
    884 F.3d 911 (9th Cir. 2018) ...................................................................................32

*U.S. v. Dorvee*,
    616 F.3d 174 (2d Cir. 2010)........................................................................37

*U.S. v. Emmenegger*,
    329 F. Supp. 2d 414 (S.D.N.Y. 2004).....................................................35

*U.S. v. Gansman*,
    8-cr-471, Dkt. 45 (S.D.N.Y. Feb. 8, 2010) ......................................42, 43

*U.S. v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012).......................................35, 51, 54

*U.S. v. Holzer*,
    9-cr-470 (S.D.N.Y. Sept. 29, 2009) ........................................................48

*U.S. v. Isola*,
    548 Fed. Appx 723 (2d Cir. 2013)...........................................................57

*U.S. v. Johnson*,
    964 F.2d 124 (2d Cir. 1992).....................................................................57

*U.S. v. Johnson*,
    No. 16-cr-457-1 (NGG), 2018 WL 1997975 (E.D.N.Y. April 27, 2018).............35

*U.S. v. Kirk Tang Yuk*,
    885 F.3d 57 (2d Cir. 2018).......................................................................28

*U.S. v. Nguyen*,
    12-cr-495, Dkt. 34-1 (S.D.N.Y. Mar. 14, 2013) ..............................45, 46

*U.S. v. Ng*,
    11-cr-161 (S.D.N.Y. May 9, 2012) ..........................................................41

*U.S. v. Nkanga*,
    18-CR-713 (JMF), 2020 WL 1529535 (SDNY Mar. 31,
    2020), reconsideration denied, 18-CR-713 (JMF), 2020 WL 1695417 (SDNY
    Apr. 7, 2020) ...........................................................................................67

*U.S. v. Perez*,
    08-cr-429, 2016 WL 4775536 (S.D.N.Y. Sept. 14, 2016) (Cote, J.) ................28, 29

*U.S. v. Peterson*,
    11-cr-665 (S.D.N.Y. Oct. 11, 2011) ........................................................41

*U.S. v. Pinto-Thomaz*,
    18-cr-579, Dkt. 154 (S.D.N.Y. July 29, 2019).................................43, 44

*U.S. v. Soborski*,
    708 Fed. Appx. 6 (2d Cir. 2017) ................................................................................29, 34

*U.S. v. Tomko*,
    562 F.3d 558 (3rd Cir. 2009) .................................................................................................50

*U.S. v. Tsai*,
    19-cr-675 (S.D.N.Y. Jan. 10, 2020) ......................................................................................48

*U.S. v. Velazquez*,
    No. 16-cr-233, 2017 WL 2782037 (S.D.N.Y. May 26, 2017) ..............................................56

**STATUTES**

18 U.S.C. § 3553(a) ............................................................................................... passim

18 U.S.C. § 3554(a) ................................................................................................36, 40

**OTHER AUTHORITIES**

U.S.S.G. amend. 794, Nov. 1, 2015 ....................................................................28, 30, 34

U.S.S.G. § 2B1.4(a) ......................................................................................................26

U.S.S.G, § 2B1.4(b)(1) ..................................................................................................26

U.S.S.G § 3B1.2 ............................................................................................................28

Annie Correal and Joseph Goldstein, "It's Cold as Hell": Inside a Brooklyn Jail's
    Weeklong Collapse.  *New York Times* (Feb. 9, 2019), *available at*
    https://www.nytimes.com/2019/02/09/nyregion/brooklyn-jail-no-heat-
    inmates.html ....................................................................................................................64

Aratani, Lauren, Rats and raw sewage: Jeffrey Epstein jail blighted by 'horrible'
    conditions, *The Guardian* (Aug. 17, 2019), *available at*
    https://www.theguardian.com/us-news/2019/aug/17/jeffrey-epstein-new-york-
    metropolitan-correctional-center-jail .............................................................................63

Brown, Stephen Rex, Federal Jail where Jeffrey Epstein killed himself gets new
    leadership, including lawyer at center of heating crisis in Brooklyn lockup,
    *Daily News* (Jan. 12, 2020), *available at* https://www.nydailynews.com/new-
    york/ny-mcc-epstein-warden-20200112-ydboox34k5cxpbi5lzx2mc3gvu-
    story.html ........................................................................................................................64

Buble, Courtney, Federal Bureau of Prisons Goes Into National Lockdown Over
    Protests, *Government Executive*, (June 1, 2020) *available at*
    https://www.govexec.com/management/2020/06/federal-bureau-prisons-goes-
    national-lockdown-over-protests/165820/ .......................................................................17

CDC, Information on COVID – 19 and Pregnant Women and Children (Feb. 24, 2010), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/pregnant-women-and-children.html ................................................................................58

Dienst, Jonathan, Memo: MCC Enters 7th Day of Lockdown, Unclear When Operations Will Return to Normal, *NBC New York* (Mar. 4, 2020), *available at* https://www.nbcnewyork.com/news/local/crime-and-courts/mcc-enters-7th-day-of-lockdown-unclear-when-operations-will-return-to-normal-memo-shows/2312475/?amp ..........................................................................................63

Faulders, Katherine, Former Trump Campaign Chairman Paul Manafort Released to Home Confinement Amid Coronavirus Concerns, *ABC News*, (May 13, 2020) *available at* https://abcnews.go.com/Health/trump-campaign-chairman-paul-manafort-released-home-confinement/story?id=70642927 ..............................................68

Former St. Gabriel mayor released early from federal prison, *WAFB9*, (May 28, 2020) *available at* https://www.wafb.com/2020/05/28/former-st-gabriel-mayor-released-early-federal-prison/ .......................................................68

Goldstein, Joseph, Manhattan Jail That Holds El Chapo Is Called Tougher Than Guantanamo Bay, *New York Times* (Jan 23, 2017), available at https://www.nytimes.com/2017/01/23/nyregion/el-chapo-guzman-manhattan-jail.html .................................................................................................63

Gurman, Sadie, Trump's Lawyer Michael Cohen Released To Home Confinement, *The Wall Street Journal* (May 21, 2020) *available at* https://www.wsj.com/articles/trumps-former-lawyer-michael-cohen-released-to-home-confinement-11590075443 ..................................................67

Killman, Curtis, Former Arrow Trucking CEO released from prison to go to home confinement, *Tulsa World*, (May 7, 2020) *available at* https://www.tulsaworld.com/news/local/crime-and-courts/former-arrow-trucking-ceo-released-from-prison-to-go-to-home-confinement/article_e51e30a4-2f4f-5f24-9a4e-9280ae9d5cc8.html .....................................68

Kudnani, Arun, The Guantanamo In New York You're Not Allowed to Know About, *The Intercept* (Feb. 5, 2016), *available at* https://theintercept.com/2016/02/05/mahdi-hashi-metropolitan-correctional-center-manhattan-guantanamo-pretrial-solitary-confinement/ .................................63

Richard A. Frase, *A More Perfect System: Twenty-five Years of Guidelines Sentencing Reform (Punishment Purposes)*, 58 Stan. L. Rev. 67, 80 (2005) .........................56

Stahl, Aviva, Prisoners Endure A Nightmare 'Gulag' In Lower Manhattan Hidden In Plain Sight, Gothamist (June 19, 2018), available at https://gothamist.com/news/prisoners-endure-a-nightmare-gulag-in-lower-manhattan-hidden-in-plain-sight; ................................................................63

United States Sentencing Commission, Recidivism Among Federal Offenders: A
       Comprehensive Overview (Mar. 2016), available at
       https://www.ussc.gov/sites/default/files/pdf/research-and-
       publications/research-publications/2016/recidivism_overview.pdf at 20 .............................55

United States Sentencing Commission, Recidivism And The "First Offender"
       (May 2004), available at https://www.ussc.gov/sites/default/files/pdf/research-
       and-publications/research-
       publications/2004/200405_Recidivism_First_Offender.pdf ..................................................55

I.      **PRELIMINARY STATEMENT**

Defendant Telemaque Lavidas respectfully submits this memorandum in connection with his sentencing.  We ask this Court to consider Telemaque's exceptional life of service to others, which is described in detail in the more than 140 letters of support that have been submitted along with this memorandum.[1]  We ask the Court to consider that, even according to the government, Telemaque's conduct in this case was far less culpable than that of other participants in the offense, and, indeed, far less culpable than that of most insider trading defendants sentenced in this district.  We also ask Your Honor to consider that many other Judges in this district have sentenced insider trading defendants similarly situated to Telemaque to sentences well below the advisory sentencing guidelines range, and to sentences similar to the one we request here.  We also ask Your Honor to consider the severe burden that Telemaque's incarceration places on his wife who gave birth last month, his 2 year-old daughter and his newborn son.  This is a burden made much worse by a global pandemic that has separated his wife and children from the rest of their family, and that makes the conditions of Telemaque's confinement to date at the MCC and MDC that much more harsh.  We ask Your Honor to impose a sentence of time served, which, as of this filing is approximately eight months imprisonment, and will be longer on the date of sentencing, as well as some period of home confinement.  We submit that such a sentence is just and fair, because it takes account of the history and characteristics of the defendant, the facts and circumstances of the offense, the sentences imposed on others who have been convicted of similar crimes, and meets the statutory

---

[1] The compilation of letters is attached as Exhibit A.  For the Court's convenience, each letter is individually numbered.  Citations to specific letters in this memorandum are referred to as Letter of Support ("Ltr") No. ___.

requirement of 18 U.S.C. § 3553(a) that a court impose a sentence that is "not greater than necessary" to achieve the goals of punishment.

## II.      TELEMAQUE'S PERSONAL HISTORY AND CHARACTERISTICS

Telemaque Lavidas is a good person.  He is a unique soul who has strong empathy for others and who sees it as his duty to help those who are in need.  Telemaque has never shied away from life's burdens and responsibilities, but rather has carried them with pride and determination.  This is the man described in more than 140 letters of support from people who know him that have been submitted to this Court along with this memorandum.  Those letters are based on the insights and observations from many people who have been deeply affected by Telemaque's acts of kindness, charity, hard work, humility and exceptional commitment to the community around him.  They are written not just by immediate family members, friends, and colleagues but also by distant family members, employees of both his family's business and his own business, community leaders, teachers, investors in the business that he founded, as well as other people whose lives he has touched in large ways and small.  The fact that so many people from his life have come forward to support him at the time of his sentencing is testament to decades of service and support that Telemaque has provided and continues to provide to his community, and to the simple fact that he is a remarkably good person to everyone around him. They describe Telemaque's generous spirit and his true character.

In particular, these letters draw attention to both the public and the quiet acts of service that seem to define Telemaque's life.  Nearly every one of these letters references a particular instance when Telemaque assisted people in his community, including friends, teachers, colleagues, employees, and family members, as well as the broader public through many acts of charity.  Included are instances when Telemaque went out of his way to help out those he barely knew, such as the family members of employees of his family's business, and now fellow prison

inmates at the Metropolitan Correctional Center ("MCC") and Metropolitan Detention Center ("MDC").  The letters attest to Telemaque's sense of his place in the world as a family man, a husband, a father, and a person who always wants to give back to the larger community.  They describe a diligent person who worked hard from the lowest to the highest levels of his family's company before choosing the more challenging path of starting his own business.  Significantly, he is a man who, even in his current situation, takes time out of every day to reflect on what he is grateful for and what he can do for those around him, including now his fellow inmates.  At the same time, Telemaque is cognizant of his own privileged upbringing and has used his position to help those who need it.

Although it would not be practical to recite every word of these letters in this memorandum, the following summary of Telemaque's life is drawn from the heartfelt words of those whose lives Telemaque has improved.

### A.   Hard Work And Familial Support Have Been The Pillars Of Telemaque's Life From A Very Young Age

Telemaque was born in 1981 in New York City.  He spent much of his childhood in Athens, Greece, where he attended an American/Greek school.  During that time, both he and his family also spent considerable time in New York and the United States, as his family operated a pharmaceutical business in Princeton, New Jersey called Lavipharm Labs.

From an early age, Telemaque knew and understood the value of a hard day's work.  Even though his father was the CEO of Lavipharm, Telemaque spent his childhood summers working in the company warehouse, filling and pushing garbage bins, packing orders, and doing the work of a warehouse employee.  (Ltr. No. 127).

During high school Telemaque was a constant source of support for his peers.  As one of his high school teachers recalled, Telemaque "always aspired to be a productive citizen, who

would positively contribute to society." (Ltr. No. 60).  His classmates describe him as a "loyal and compassionate friend," (Ltr. No. 47) "selfless and responsible" and a "positive influence on everyone" (Ltr. No. 21).  Even at a young age, Telemaque was the type of person who motivated those around him to achieve their fullest potential by, for example, encouraging his friends to attend academic summer sessions and apply to American universities for college.  (Ltr. Nos. 122, 132).  During Telemaque's sophomore year of high school, he was elected to serve on the student body council and as president of his International Baccalaureate class.  (Ltr. Nos. 129, 56).  In that position he advocated for his classmates' interests and ensured that they were communicated to the school administration.  And while he embraced this sort of public service, it was also Telemaque's quiet acts of generosity that showed his character.  For example, Telemaque defended classmates he hardly knew from bullying and provided daily emotional and academic support to a classmate dealing with the death of his father.  (Ltr. No. 60).

Telemaque also had an "old fashioned sense" of strong family values at a young age, many years before starting a family of his own.  (Ltr. Nos. 38, 94, 132).  For Telemaque, most of his time not spent on his studies or extracurricular activities was spent with his parents and his older sister Elli Maria.  When Telemaque was 17 years old, his twin sisters Danae and Phaidra were born.  While many teenage boys would be past the point of focusing on a younger sister (much less two), Telemaque wholeheartedly embraced the role, insisting on feeding and reading to the babies and caring for them almost as if he was their father, rather than their older brother.  (Ltr. Nos. 84, 133).  Telemaque has maintained that unique, almost parental bond with the twins throughout their childhood years (and today), despite the fact that he had moved to New York and they were in Athens.  (Ltr. Nos. 24, 108).  Even from thousands of miles away, Telemaque constantly checked in on the girls' studies and motivated them to do well in school.  On one

occasion when Telemaque was on holiday break from work in New York, he took his twin

sisters, who were 7 years old at the time, away to the mountains.  This was clearly not a typical

vacation for a young man in his early twenties.  The bond between the three siblings only grew

stronger as the twins transitioned into adulthood, with Telemaque encouraging them to go to

college at UCLA in California and more recently to come to New York City for graduate school

at Columbia and NYU, respectively.  (Ltr. Nos. 24, 108).  Danae recalled a particular college

summer when she was interning in New York City and felt extremely sad and isolated from

Phaidra, from whom she was separated for the first time, and from her friends and family in

Greece.  It was Telemaque who helped her through this difficult time, taking time out of his busy

day just to take Danae for a walk across the Brooklyn Bridge.  About halfway into the walk,

Telemaque stopped, turned to her and said, "[t]ake a deep breath, look around, look at the sky,

appreciate the smell of fresh air, the vibrant city—be proud of the person you are and appreciate

where life has taken you today."  (Ltr. No. 24).  These words represent Telemaque's character;

reflective and humble.

### B.  Telemaque Works Diligently Through College And Makes "Warmth And Kindness" His Hallmark Traits In Business

While Telemaque could have easily coasted through life based on the financial

advantages of his family, he instead chose to work hard to get into a top American university so

that he could succeed based on his own merit.  He pushed himself to work hard in high school in

Greece, enrolling in the International Baccalaureate Programme, an international college prep

program.  Telemaque's hard work paid off and he was accepted into Columbia University in

New York.  He took his studies very seriously at Columbia and regularly made the Dean's List.

(Ltr. No. 84).  When other students relaxed during the summers, Telemaque went to work at the

family business and also at Johnson & Johnson and another pharmaceutical company called

Sanofi-Aventis.  Telemaque was always committed to hard work.  He graduated from Columbia with immense pride and went on to encourage other younger Greek high school students to study in the United States, including by signing up to interview potential Columbia candidates.  (Ltr. Nos. 84, 88).

Telemaque was also always very conscious of the fact that his family had invested over 100 years in Lavipharm and he never once took his obligations within the company lightly. Even during his college years, Telemaque spent much of his spare time working at Lavipharm. Upon graduating from Columbia, Telemaque immediately began working at Lavipharm's New Jersey headquarters.  While working to sustain Lavipharm's success, Telemaque had his own vision; he wanted the company's success to be measured not just by profits, but by the principle that consumers (in Lavipharm's case, doctors and patients) and employees should be top priority. For example, at Lavipharm Telemaque spent many years driving the development of a drug to treat cancer pain, which every year brings relief to hundreds of thousands of cancer patients during their final months.  On another project, he drove the acquisition of a cardiovascular drug targeted to the elderly population that was about to be discontinued and that would have left many patients without the right treatment.  Of course Lavipharm is a for-profit business, but Telemaque always also viewed it as a way to serve others.  Telemaque is very different from the typical insider trading defendant, steeped in the world of finance, whose focus is almost entirely on money.

Telemaque was also keenly aware that his actions at Lavipharm would be closely scrutinized by employees and colleagues because he was the boss's son.  Telemaque knew that he would need to earn their respect through his actions.  For example, Telemaque never asked his colleagues to do something he would not do himself.  (Ltr. No. 78).  As a boss, Telemaque

embodied modesty and generosity, treating everyone at the company with "warmth and kindness, from the top management to the entry-level employee." (Ltr. No. 5).  He ate his lunch in the cafeteria every single day with the factory workers and all other employees.  (Ltr. No. 79).  And in 2008 when financial crisis hit Greece, he placed Lavipharm's employees and their families as his first priority.  (Ltr. No. 140).

### C. Rather Than Rely On The Family Business, Telemaque Works Hard To Build A Successful Business On His Own

From when he graduated college in 2003 to 2013, Telemaque had a safe job at Lavipharm with guaranteed advancement opportunities.  Most young adults would be reluctant to give up that type of security.  But Telemaque made the difficult choice to leave the family business and strike out on his own because, as one longtime friend recalls, "[Telemaque's] dream was to follow his own path." (Ltr. No. 56).  Telemaque wanted to start his own company in the United States because, as he told his friends, "the US is great, if you work hard, you can thrive."  (Ltr. No. 53).  Accordingly, Telemaque founded Mediterra in the fall of 2013.  As Mediterra's former CEO explains, Mediterra was the end result of "Telemaque's vision" to create something that would "introduce the healthful Mediterranean Diet to American consumers."  (Ltr. No. 103).

For the first few years—during all three instances when the jury determined Telemaque was providing insider tips to George Nikas[2]—Mediterra was a huge success.  As a result of Telemaque's diligence, the company grew rapidly, and was offered at major grocery stores

---

[2] In late 2016, with all efforts focused on the potential Pepsi acquisition rather than on operating the company, Mediterra began to experience some financial strain and sought bridge loans from four different sources, including Nikas.  At trial, the government introduced a single email into evidence from September 2016 that reflected the financial strain that Mediterra was experiencing at that time.  Tr. at 833:7-11; 836:11-16.  Notably, this strain occurred more than a year after the last time the jury found Telemaque provided any material non-public information ("MNPI") to Nikas.

including Whole Foods, GNC, CVS, Wegmans, and 7-Eleven.  Trial Transcript ("Tr.") at

811:20-22.  Mediterra trademarks were registered around the world.  *Id.* at 809:5-14.  Mediterra

attracted combined investments of more than $6 million from more than 20 different investors.

*Id.* at 815:14-16; 819:16-19; 826:7-10.  The company was so successful from 2013 through the

beginning of 2016 that PepsiCo engaged in substantive negotiations to buy it beginning around

September 2016.  *Id.* at 809:18-810:6; Ex. G.  Later, the food company Ferrero also negotiated to

buy Mediterra.  Tr. at 827:6-13.

 But once again Mediterra was more than a company to Telemaque.  It was a means for

him to offer healthy food to address broader obesity and nutritional problems in society.  And it

was a way for Telemaque to forge his own path in the world.  Telemaque devoted the next five

years of his life to developing the Mediterra brand and always worked very hard at it.  (Ltr. Nos.

31, 103, 109).  But even amidst the stresses that come along with starting a new company,

Telemaque stayed true to his character and treated all of the Mediterra employees as if they were

his own family.  (Ltr. No. 72).  In one instance, Mediterra had to let an employee go, but he

made sure it was done in the most caring and humane way possible.  (Ltr. No. 114).  After

attempts to sell the company to PepsiCo and then Ferrero fell through, and after the birth of his

first child, Mediterra wound down in late 2018 and Telemaque went back to work for the family

business both in Europe and the United States.  Even though Mediterra did not ultimately reach

its goals, multiple business people who invested in it have written letters of support for

Telemaque.  *See*, *e.g.*, Ltr. Nos. 28, 61 and 82.

 **D.** **Telemaque Has Always Given Back To His Community**

 Charity has always been a big part of Telemaque's life.  From an early age, he was aware

that he was extremely fortunate and should give back to the community.  His desire to help

others, particularly vulnerable children, began in high school when he spent weekends

volunteering at a center for visually-impaired children in Athens called Kekipro.  (Ltr. No. 56).
As a teenager, Telemaque also became very involved in working with the Pinelopeio
Foundation, a government-funded charity that provides daycare for new parents who are
employed or are unemployed and looking for jobs.  (Ltr. No. 82).  Because the charity had
limited resources, Telemaque fundraised to help install heating in the building.  During his
volunteer work with the foundation, Telemaque also developed a very close bond with a child
who had a speech impediment and provided the child with much-needed mental and emotional
support.  (Ltr. No. 82).

In 2000, while Telemaque was in college, his mother, Vana, founded the Muscular
Dystrophy Association (MDA) Hellas, an organization dedicated to the care of people with
neuromuscular diseases.  Telemaque worked diligently at the organization.  (Ltr. No. 14).  In
2012, Telemaque ran the Athens Marathon to raise money for MDA, which allowed the
organization to pay for the operating costs for three neuromuscular disease units in Greek
hospitals in Athens, Thessaloniki, and Patras.  (Ltr. No. 133; Ex. B).

In 2013, as part of a separate charity effort, Telemaque traveled to a Mexican village to
help build a home for a poor family with his own hands.  (Ex. C).  And, once he founded
Mediterra, he used that company to give back, donating the nutrition bars to low income families
in the United States and to ELPIDA, a charity for children with cancer.  (Ltr. No. 21).  Indeed,
shortly before his arrest, Telemaque spoke with his wife's stepfather about creating a fund to
support the sick families of Lavipharm employees.  (Ltr. No. 97).

Telemaque is also very involved in an organization called DESMOS, which is a non-
profit foundation that collects donations from companies and individuals and uses those funds to
distribute goods and services to hundreds of social welfare organizations throughout Greece.  In

one instance, while participating in a DESMOS program that supports unemployed youth in paid positions at NGOs, Telemaque not only mentored and financially supported one of those youths throughout the year-long program, but continued to mentor and support the young man after the program was over until he was able to find a full time job.  (Ltr. No. 3).  Telemaque also was always looking to give back in small ways as well.  For example, one friend recounts instances when Telemaque organized groups of people to pick up trash from beaches while he was on vacation.  (Ltr. No. 57).

Telemaque has also led his family businesses to contribute a great deal to charity.  For example, when Telemaque went back to work for the family business after Mediterra wound down, one of his responsibilities was to run its U.S. company.  That company obtained the U.S. rights to a transdermal medicine that was also used in Canada to treat a life threatening condition in children.  The company had no license in Canada and therefore could not sell the product there, but Telemaque figured out a way to give it away *for free* through an agreement with the Canadian government, which was just finalized earlier this year.  (Exhibit II at Part 2, Point 18).  Similarly, in July 2018, there were wild fires in the village of Mati in Greece.  More than 100 people died and many others were injured.  Telemaque worked with Lavipharm to donate antiseptics to help treat burn victims and to volunteer help for those who lost everything in the fires.  On another occasion, Telemaque had Lavipharm donate antiseptics to Syrian refugees at the EU border.

Nonetheless, Telemaque's sense of altruism goes beyond acts of public charity; it is most evident in his more quiet acts of kindness towards the people in his life, even those with whom he was not close.  If somebody had a problem, Telemaque would go out of his way to try and find a solution. ████████████████████████████████████

10

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

     The Letters of Support are filled with many more examples of Telemaque helping

colleagues, friends, employees and family around him. ████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

 As summarized by the former CEO of Mediterra, "Telemaque is the reliable, loyal, and responsible friend you want by your side in times of need.  In short, he cares."  (Ltr. No. 103).

What is most striking about Telemaque's generosity is how quietly and unassumingly he goes about his good deeds.  He is not a man who seeks credit for helping others.  This selflessness is summarized by an instance described by one his friends when he, Telemaque, and several other friends traveled from New York to Greece.  For the duration of the trip, Telemaque quietly treated all of his friends and refused to accept anything in return.  The friend was later told by another friend that Telemaque had behaved this way because one of the members of the group was going through a hard time financially and Telemaque did not want him to feel embarrassed by not being able to split tabs.  (Ltr. No. 26).

Telemaque has also served as a mentor and advocate for children and young adults.  The letters of support reference examples of these acts, which include helping others with college and graduate school applications, assisting with work projects, writing reference letters, and providing college internships at Mediterra.  Similarly, Telemaque has a special bond with his two young nephews in Greece.  At one point, one of the young boys was bullied at school. Telemaque enrolled him in martial arts lessons, which not only taught the boy skills and strengthening, but also increased his confidence and enabled him to resolve issues at school

without conflict.  (Ltr. Nos. 49, 95).  At other times Telemaque simply takes time to talk with young people about life's daily struggles.  (Ltr. No. 11).  It is worth noting that many of these were people Telemaque did not know well – they were younger siblings of friends and other acquaintances.  (Ltr. Nos. 74, 100).  Recognizing that Telemaque is such a positive influence, six different sets of parents have entrusted him to be the godparent to their children.  (Ltr. Nos. 56, 64, 84).

###### E.     Telemaque Is A Devoted Husband And Father

While Telemaque dedicated much of his early life to working hard, in recent years he has also become a devoted husband and a father.  His wife Caterina knew Telemaque was her soulmate because he was somebody who wanted more than anything to raise a family and to teach his children the value of generosity, compassion and respect for others.  (Ltr. No. 15). Caterina also quickly realized that Telemaque was the type of man who would be unwavering in his support for her through every challenge.  Telemaque's sense of loyalty and protection towards Caterina also quickly became clear to Caterina's mother and to her friends, whom Telemaque also embraced.  (Ltr. Nos. 41, 85, 18).  The two began dating in late 2015 (after the offense conduct charged in this case) and were married in January 2017 at City Hall in New York City.  They later had a religious ceremony in Greece.  Even in the days leading up to their wedding, Telemaque was constantly searching for ways to be better for Caterina.  While having dinner in Athens with Caterina's close friend and maid of honor, Telemaque explained to her that according to Greek tradition, she was to be the caretaker of their marriage and help them work through life's problems.  But Telemaque specifically explained to the friend that he wanted more than just her support; he wanted her to help him be the best husband for Caterina, to make her laugh every day, and to make her happy for the rest of her life.  (Ltr. No. 41).  As Telemaque's sister Danae has explained about their marriage: "Telemaque showed me the beauty of loving

13

and caring for a partner unconditionally, embracing one's flaws and respecting one another."
(Ltr. No. 24).  This really embodies who Telemaque is as a spouse.

One of the first real tests of Telemaque's strength as a husband was Caterina's pregnancy
with their first child.  ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Caterina gave birth to a baby girl, ████████████████ on June 29th, 2018.  The sheer joy
that ████ brings to Telemaque's life is obvious to everyone who knows them.  One spring day
Telemaque, his wife, and their good friends, who also have a daughter ████ age, went for a
walk in Central Park with their children.  Nothing out of the ordinary happened that afternoon,
but, out of nowhere, Telemaque turned to his friend and told her how his life was forever
changed because of ████ and how being a father was better than he could have imagined.  (Ltr.
No. 116).  Numerous letters describe how Telemaque doted on his daughter before his arrest,
how every day he took time away from work to be with her, and that he came home every night
to put her to bed.  (Ltr. Nos. 78, 137).

### F.   Telemaque Has Continued To Support His Community Even While in Custody

Even within the confines of the MCC and MDC, Telemaque continued to support others.
He has continued to live life the way he always had—by doing any small act he could to help
others and by making the best of the situation.  Accordingly, Telemaque spent his three months
prior to trial at MCC teaching mathematics and English to inmates like Augustin Hernandez and
Joshua Ikejimba so that they could prepare for earning their GEDs, helping inmates study for
their certificates in marketing or business, typing letters for elderly or non-English speakers, and

counseling inmates who were struggling to see the light at the end of the tunnel.  (Ltr. Nos. 9, 58, 138).  As described by MCC inmate Joshua Ikejimba, Telemaque is "good at heart, a nice and friendly human, helpful, and positive-minded."  Even in the prison environment, which can easily break one's character, several of his MCC inmates remarked that Telemaque actually sought out ways to help people.  (Ltr. Nos. 68, 138).  In one instance he even reached out to his older sister, who is a psychotherapist, for her opinion on how he could help an inmate who was having family issues.  (Ltr. No. 84).  As one fellow inmate named Vitaly Voronjuk explained about Telemaque, "When he suddenly noticed that somebody needed something, he would always be one of the first to come to their aid.  He helped people sincerely and disinterestedly, not asking for anything in return."  (Ltr. No. 138).  When Telemaque was moved to the MDC after his conviction, he requested that he be placed on the inmate companion group's suicide watch so that he could spend time looking out for others.  Because of the pandemic he was never able to do this service, but it is yet another example of Telemaque trying to find ways to contribute to the community around him.

Telemaque's separation from his daughter ██████ has deeply affected him.  However, true to his character, he has been able to transform the profound sadness he feels into trying to help others.  While in prison, Telemaque has written a children's book called "Daddy, You are Back!"  The book is a bedtime story for children whose fathers are away from home and sends a message of hope to the reader that their father will return.  Attached as Exhibit F is one of the handwritten versions Telemaque wrote while in custody, along with a more final version that has been printed and that he plans to give away to others for free.

In addition, during his incarceration and at the outset of the pandemic, Telemaque had the idea that Lavipharm, which manufactures antiseptics and disinfecting agents, should donate

those products to the Greek government to aid in the fight against coronavirus.  He recommended that to the Chief Operating Officer of the company, and Lavipharm followed through with a significant donation.  Attached hereto as Exhibit HH is a letter from the Prime Minister of Greece, written in Greek with an English translation, thanking Lavipharm for this donation.

### G.        The Harsh Conditions of Telemaque's Confinement

As of the date of the filing of this memorandum, Telemaque has been in custody for eight months; first at the MCC and then at the MDC.  These are very difficult facilities for anyone, especially non-violent financial crime offenders.  But with the onset of COVID-19, the terms of Telemaque's confinement have become brutally harsh.

Beginning on April 1, 2020, and extending for 52 days until May 21, 2020, the MDC was placed on full lockdown.  (April 21, 2020 BOP Memorandum for Inmate Families, ("BOP Memo") Ex. BB at 2).[3]  During this period, inmates were only allowed out of their cells for between fifteen minutes and one hour per day, three days a week, in order to shower, do laundry, and perhaps to make a short phone call to a relative.  Other than those 45 minutes to three hours per week, Telemaque and the other inmates at MDC were confined entirely to their cells, in the equivalent of solitary confinement with one cellmate.  This continued for more than seven weeks, all amidst the fear of the virus spreading rapidly both inside and outside the MDC.  On May 21, 2020 those lockdown conditions were eased slightly, allowing inmates out of their cells for three hours per day, five days a week.  Nonetheless, even after that easing, complete lockdown resumes during weekends, and these conditions continue as of the date of this

---

[3] This lockdown began on April 1, 2020, after the March 27, 2020, due date that Your Honor gave for filing any objection to the first adjournment of Telemaque's sentencing from April 17, 2020 to June 22, 2020.  *U.S. v. Lavidas*, 19-cr-716, [Dkt. 108] Order (March 23, 2020).

submission.  Moreover, full lockdown is frequently re-imposed.  For example, a few days after the 52-day coronavirus lockdown was eased somewhat, a new even more restrictive lockdown was imposed on June 1 in response to the recent protests in New York and elsewhere.[4]  That new lockdown continues as of the date of this filing on June 8, and future lengthy lockdowns due to coronavirus are likely.  In addition, beginning on March 13, 2020, approximately three months before the filing of this memorandum, and continuing indefinitely into the future, all family, social and legal visits were entirely terminated at MDC and other BOP facilities.  (BOP Memo, Ex. BB at 1).  This means that during this global pandemic, Telemaque and other inmates at MDC have not seen their loved ones (or anyone else from outside the facility) for almost three months as of this filing, and it appears that visits will not resume for the foreseeable future, despite BOP's recognition of the importance of such visits during this trying time.  *Id.* ("The BOP recognizes how important it is for families to keep in touch, especially during these uncertain times.  You need to know how your loved one is doing and they need to know how the virus is affecting you and their community.").

While these steps were necessary to prevent the spread of COVID-19, the result is that Telemaque has already been severely punished in this case, having already served more than two months in what amounts to near isolation.  And his wife and children are suffering and will continue to suffer harshly so long as he is in prison.  As discussed above, Telemaque is very close to his wife and two-year-old daughter.  They have not seen him, and he has not seen them, in more than three months, and it is unlikely that visitation rights will be restored to BOP

---

[4] Buble, Courtney, Federal Bureau of Prisons Goes Into National Lockdown Over Protests, *Government Executive*, (June 1, 2020) *available at* https://www.govexec.com/management/2020/06/federal-bureau-prisons-goes-national-lockdown-over-protests/165820/

facilities any time soon.  At most they get to speak for a few moments on the phone a few days a week.

Even more importantly, in the middle of this pandemic, on May 28, 2020, his wife Caterina gave birth to their son, after enduring a difficult pregnancy while raising their two-year-old daughter alone.  Telemaque has not yet seen or met his newborn son, and he lives every day with the knowledge he has left his wife with the prospect of raising their two children completely by herself, an ocean away from either of their families in the midst of a pandemic.  This weighs on him more heavily than any other aspect of his current detention.  Telemaque will forever be forced to live with the knowledge that his incarceration placed a severe burden on his blameless wife and young children.  And he has already missed out on many developmental milestones for ███ and fears the same will happen with his son, whose birth he has already missed.

To add to the difficulty, Caterina's family, which essentially consists of her mother who lives in Italy, and Telemaque's entire family, which is located almost entirely in Greece, have been prohibited since early March from traveling to the United States due to the coronavirus.  There is no indication that these restrictions will be lifted soon.  And Caterina and Telemaque's New York friends have been instructed to avoid social contact, leaving Caterina, ███ and their newborn son alone without any family or friends.  (Ltr. No. 84).  This imposes enormous hardship on all of them.

### III.  THE GOVERNMENT'S EVIDENCE AT TRIAL, EVEN ACCEPTED ENTIRELY AS TRUE, SHOWED ONLY THAT TELEMAQUE PLAYED A MINIMAL ROLE IN THE CRIMINAL ACTIVITY OF GEORGE NIKAS AND MARC DEMANE DEBIH

At trial, the jury concluded that on three occasions, twice in late 2013 and once in mid-2015, Telemaque Lavidas provided material non-public information ("MNPI") to George Nikas about Ariad Pharmaceuticals.  The jury concluded that Telemaque obtained this information

from his father, who was on the board of directors of Ariad and therefore owed a fiduciary duty

to that company and its shareholders.  The government presented evidence that Nikas shared this

information with Marc Demane Debih and others, and that Demane also shared the information

with others, all of whom profitably traded Ariad securities.  The government claims for purposes

of this sentencing that Nikas and Demane were co-conspirators with Telemaque and that Nikas

and Demane themselves earned profits or avoided losses totaling $8,118,757.[5]  *See* Presentence

Investigation Report ("PSR") at ¶¶ 18-21.  The government submits that this amount earned by

Nikas and Demane is relevant conduct in calculating the gain for which Telemaque is

responsible under the Sentencing Guidelines.  *See* PSR ¶¶ 24, 35.

      The government does not claim that Telemaque Lavidas ever traded Ariad stock or

earned any profits by trading Ariad stock.  PSR ¶23.  Indeed, Telemaque has never himself

traded stock of any kind and has no experience in the stock market.[6]  Moreover, there is

absolutely no evidence that Nikas or Demane shared any of their profits with Telemaque, or that

there was any agreement they would do so, or that Telemaque had any expectation that Nikas or

anyone else would share profits with him.

      Prior to trial, the government stated in a Bill of Particulars and other briefings that it

intended to show that Nikas made cash payments to Telemaque in exchange for inside

information.  Ex. V.  However, it is clear that in the final preparation for trial, the government

learned from its cooperating witness Demane that his only basis for saying so was his

---

[5] All gain amounts referred to herein are from Government Exhibit 605 (Ex. X), which was
admitted at trial.

[6] When he was younger, Telemaque's father gave him shares of Lavipharm and another
company but his father managed those investments and Telemaque never traded those or any
other securities.

*assumption* that because Demane paid *his* inside sources for information, Nikas must also have paid Telemaque.  Tr. at 353:18-354:5.  Demane had no personal knowledge of any such payment occurring, or even of Nikas ever telling him that such a payment had occurred.  That assumption is all that Demane testified to at trial, and there was absolutely no evidence of any such payments presented at trial.  To its credit, the government never stated in its opening, nor argued in its closing, that Nikas paid Telemaque cash for tips or in any way shared trading profits with him.  And, in the government's offense conduct presentation to the Probation Department, it did not claim that any such payments occurred.  PSR ¶¶ 13-27.  This makes sense since other than Demane's assumption to which he testified, there is absolutely no evidence in the millions of pages of discovery or in any other evidence in this case that Nikas made cash payments to Telemaque.

Prior to trial the government also suggested that an investment by Nikas's wife in Mediterra in 2015 and a loan Nikas made to Mediterra in 2016 were payments for insider tips Telemaque provided to Nikas.  *See* Ex. W.  However, the government, again to its credit, did not make this argument at trial.  Instead, with the benefit of a fuller understanding of the evidence, the government argued only at trial that these investments in Mediterra were evidence of the close and mutually beneficial business and personal relationship that Nikas and Telemaque enjoyed – essentially that as friends they helped each other.  *See* Tr. at 869:14-22.  Thus, in its closing argument the government stated "the defendant gave this information to Nikas because Nikas was his friend[.]"  *Id.* at 867:15-19.  The government never argued to the jury that the investments in Mediterra were compensation to Telemaque for tipping Nikas.  Indeed, instead, the government asked for and the defense agreed to a stipulation that Nikas and Telemaque had a "very close, personal relationship" and that they had "overlapping business interests" and

"sought to conduct, and conducted, business together." *Id.* at 653:13-654:14.  In its closing argument the government sought only to portray the investment and the loan to Mediterra as "benefits" *of the friendship between Telemaque and Nikas*.  *See Id.* at 869:14-22 (arguing that Nikas provided "assistance to Mediterra" because "[t]hat's the relationship they had.  That's the benefit the defendant got").

This made sense in light of the evidence, which showed that Nikas's wife Miranda Patera, who is independently wealthy and who makes her own financial decisions (Tr. at 817:1-16), made a completely independent and legitimate investment in Mediterra for her own reasons having nothing to do with tips received by her husband.  She made that investment in March 2015, more than a year after the government claims Telemaque tipped Nikas in 2013, and well before he allegedly tipped Nikas later in 2015.  Tr. at 815:22-816:4.  Patera made a $500,000 investment that was fully documented and disclosed alongside almost 20 other investors who invested a total of more than $6 million in Mediterra.  Tr. 815:22-816:25; 819:16-18, Ex. V at 1-5 (listing other investors).  And she received shares in the company in exchange.  There is nothing about the timing or substance of this investment – by Nikas's wife – that suggests it was in any way compensation for tips.  Moreover, Telemaque did not personally receive any of the money as it all went into the company.

Similarly, in September 2016, almost three years after the first alleged tip and more than a year after the last, Nikas, as well as three other business people unconnected to Nikas, made loans to Mediterra while it was going through a cash crunch during a due diligence process with PepsiCo.  Tr. at 823:6-824:11.  Nikas's loan and the three others were fully documented and disclosed.  *Id.* at 823:10-824:11; 827:14-24.  Again, this money went into the company, not to Telemaque personally.  In addition, Mediterra paid back $100,000 of that $200,000 Nikas loan

well before Telemaque's arrest in this case.  *Id.* at 826:14-827:4.  In short, there was nothing about the timing or substance of that loan that suggested it was "payment" for tips, nor would paying the loan back make sense if it were.  Accordingly, the government only argued that these two investments in Mediterra showed the type of mutually beneficial personal and financial relationship that Nikas and Telemaque enjoyed, and that Telemaque provided tips to Nikas to give "the gift of information" [7] to a friend.

In short, these investments were not part of any *quid pro quo* for tips.  At most, the government's evidence established only that Telemaque tipped Nikas as a favor to someone whom he considered to be a close personal friend—a favor for which Telemaque did not expect to receive, and did not receive, anything tangible directly in return.  Providing this favor was not the result of greed on Telemaque's part or any similar motive that is so commonly seen in other insider trading cases.  Indeed, while such greed was clearly on display in the evidence about Nikas, Demane, and other participants in their insider trading scheme, it was not, even according to the government, part of Telemaque's motive.

It is also important that even according to the government's view of the evidence, Nikas clearly took advantage of Telemaque.  Nikas is 15 years older than Telemaque.  A close friend of Telemaque's was surprised by his friendship with a person like Nikas, calling it "unnatural." The friend thought that Telemaque gravitated toward Nikas when he was living in New York because Nikas was "charming" and because Telemaque was looking for companionship with other people from Greece.  (Ltr. No. 90).  Telemaque's brother-in-law points out that Telemaque fell in with Nikas at a time when Telemaque was vulnerable, lonely and depressed in New York.

---

[7] *See Dirks v. S.E.C.*, 463 U.S. 646, 664 (1983) (recognizing that the benefit element of insider trading can be met when "an insider makes a gift of confidential information to a trading relative or friend").

(Ltr. No. 49).   And the evidence at trial made clear Nikas is a slick and selfish operator, while the more than 140 letters submitted along with this memorandum make clear Telemaque is not. Nikas participated in a global insider trading network for at least a decade, involving hundreds of insider trades, in dozens upon dozens of companies, from many inside sources, earning tens of millions of profits.   Tr. at 307:24-308:25.   Nikas's network included a wide assortment of criminals, including his frequent co-conspirator Demane, who admitted to earning over $70 million from insider trading.   *Id.* at 377:21-23   Nikas and Demane often shared in the profits of their illicit activities.   *Id.* at 308:18-25; 312:13-313:4.   Nikas and Demane went to great lengths to cover their illicit activity, including using "burner" phones, making secret cash payments, planting fake news articles, creating fraudulent paper trails to provide false explanations for payments, "papering the file" with analyst reports to justify their trading, and setting up sham shell corporations to receive payments.   *Id*. at 364:10-20; 405:18-23; 406:12-407:7.   Telemaque had absolutely no involvement in or knowledge of any of this conduct.   Indeed, for example, Nikas's cousin, Panos Giatrakos, a government-called witness who was responsible for handing out burner phones to Nikas's inside sources, testified Nikas never asked him to give a burner phone to Telemaque, he never gave one of those phones to Telemaque, and he never saw anything to suggest Telemaque ever used one.   *Id.* at 637:14-22.

In order to fuel their ongoing schemes, Nikas and Debih would employ a variety of deceptive means to pull MNPI about public companies from both witting and unwitting sources. This included developing personal relationships with potential sources.   Indeed, Demane testified that he pursued a romantic relationship with a woman who worked for Goldman Sachs so that he could steal MNPI from her and that he and Nikas traded on that information in 2010 and 2011. Tr. at 302:15-303:21.   At trial, Demane testified that Nikas similarly viewed Telemaque as a

potential source to be cultivated.  Thus, according to Demane, Nikas told him in February 2011,

shortly after Demane met Telemaque at a birthday party – the one and only time Telemaque met

Demane – that Nikas would be able to use his friendship with Telemaque to extract inside

information out of him.  *Id.* at 324:4-325:13.  Even according to the government, it was not until

two and half years later that Nikas finally succeeded in taking advantage of Telemaque in this

way, with the first alleged insider tips in late 2013.

In addition, there was absolutely no evidence presented at trial, or included in the

millions of pages of discovery and Jencks Act material produced by the government before trial,

that showed Telemaque had any knowledge of or insight into the extensive trading that Nikas

and others would or did perform in Ariad.  Telemaque had no way of knowing what trading they

would do, and certainly had no control over it.  For example, according to the government, Nikas

made $3,282,200, alone by shorting Ariad stock in October 2013.  This amounts to almost half of

Nikas's total profits for which the government now seeks to hold Telemaque responsible at

sentencing.  But Telemaque has and had no experience trading securities, and never knew until

this case what shorting was or that one could make money when a stock goes down – as opposed

to simply avoiding losses in that situation.  The government has offered no evidence Telemaque

had knowledge of or control over these shorting gains, for which he is now being held

accountable, and offered no evidence he could have foreseen it.  Similarly, the government

offered absolutely no evidence Telemaque had knowledge of or control over any of the other

non-shorting gains made by Nikas and Demane.

In addition there was absolutely no evidence presented at trial, and no evidence contained

in the discovery or Jencks Act materials, that Telemaque knew or could have known Nikas

would share inside information with any "downstream tippees."  With respect to Demane, whose

profits the government includes in Telemaque's relevant conduct for sentencing, Demane

testified that he and Telemaque met only once socially at a birthday party at a nightclub in

February 2011.  Tr. at 317:3-9; 319:11-16; 371:16-18.  As noted, that was two and half years

before the government claims Telemaque first became involved in any way in this scheme.

Demane testified that he and Telemaque had no discussion then or at any other time about stocks

or trading.  *Id.* at 372:5-9.  Demane testified, and the documentary evidence showed, that in the

days after that meeting, he proposed a business transaction that Telemaque at first ignored then

quickly declined.  *Id.* at 373:24-374:24.  Even Demane admitted they never again had any

contact.  *Id.* at 374:15-375:2.  There is not a shred of evidence anywhere that Telemaque had any

reason to believe Nikas and Demane were involved in a massive scheme together, or that Nikas

would share information about Ariad with Demane.

The same is true of the other downstream tippees who were a part of Nikas and Demane's

massive scheme.  According to the government, in addition to Demane, Nikas provided

confidential information about Ariad to George Kordakis, Steve Makris and Yannis Xylas, all of

whom traded on it.  Tr. at 349:12-19; 430:18-434:14; 434:18-438:17.  There is absolutely no

evidence Telemaque had any knowledge of this, could have foreseen it, or controlled it.  Indeed,

while Telemaque met Makris socially on a few occasions, there is no evidence he ever met or

knew either of these two other people.  And there is no evidence whatsoever Telemaque knew

anything about trading by Makris, Kordakis or Xylas.  Similarly, Demane testified that he shared

Ariad information with Yomi Rodrig, Dov Malnik and Tomer Fiengold, all of whom paid him

for the information and traded on it.  *Id.* at 337:22-338:1; 341:5-342:10; 347:23-348:4.  Again,

there is absolutely no evidence Telemaque knew of the existence of these people, their trading, or knew or could have known about their involvement in Demane's and Nikas's scheme.[8]

Finally, while the jury's verdict necessarily includes a finding that Telemaque knew his father had a duty to Ariad as one of its board members, it is undisputed Telemaque was not a director of Ariad and had no such fiduciary duty himself.  As will be discussed in more detail below, this distinguishes his offense conduct from many other convicted "tippers" who had fiduciary duties themselves and directly breached those duties.

In short, even accepting as true every allegation made by the government, Telemaque's offense conduct involved tipping Nikas on a few occasions as part of a selfless but misguided effort to help a "friend" in exchange for nothing other than the mutual benefit of continued friendship and overlapping business interests.  It is clear that even according to the government, Nikas took advantage of Telemaque and Telemaque had no control over, or knowledge of, the gains Nikas and Demane reaped, and for which the government now seeks to hold Telemaque responsible.

## IV.    THE ADVISORY GUIDELINES CALCULATION

The government has calculated an offense level of 26 for Telemaque under the Sentencing Guidelines.  This offense level was calculated by taking a base offense level of 8 under U.S.S.G. § 2B1.4(a) and adding an additional 18 points under U.S.S.G. § 2B1.4(b)(1) because the total gain realized by Nikas and Demane is more than $3,500,000 but less than $9,500,000.  Because Telemaque has no criminal history, an offense level of 26 results in a

---

[8] While the government seeks to hold Telemaque accountable for Nikas and Demane's trading gains, it has acknowledged that the trading of these other downstream tippees is not relevant conduct for purposes of sentencing.

Guidelines range of 63-78 months.  This range is purely advisory.  *U.S. v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).

### A.        The Probation Department Recommendation

The Probation Department has adopted the government's proposed Guidelines range of 63-78 months.  Nonetheless, Probation recommends a significant variance downward from this Guidelines range to a sentence of 18 months in custody.  PSR Sentencing Recommendation, pg. 26.  It also recommends 200 hours of community service, a $50,000 fine and two years' supervised release.  *Id.*  Telemaque greatly appreciates that the Probation Department has considered some of the factors discussed in this memorandum that justify a downward variance from the Guidelines.  But we respectfully submit that the Probation Department did not properly consider all of them, and when one does so, the appropriate sentence should be time served followed by a period of supervision and community service.

For example, the Probation Department made its recommendation even though it rejected the role reduction discussed below, which the defense submits applies in this case, and which would reduce the advisory Guidelines range to 41-51 months.  We submit that if one starts with the appropriate Guidelines range of 41-51 months, the resulting recommended sentence should be lower.  The Probation Department also made its recommendation in this case on April 6, 2020, only a few days after the lockdown conditions described herein began, when the severity of the punishment that Telemaque will have already faced at the time of his sentencing was not yet clear.  We submit that a full consideration of the harsh terms of Telemaque's incarceration to date should result in a lower sentence than that recommended by Probation.  In addition, the Probation Department's recommendation does not account for the sentences discussed at length below that were issued to similarly situated defendants, or the fact that during the pandemic many defendants are being released to complete a significant part of the their sentences on home

27

confinement.  We submit that when those sentences imposed on others are considered, along with all the other factors discussed in this memorandum, the appropriate custodial sentence in this case is time served, which as of the date of this filing is approximately eight months and will be more on the date of sentencing.

**B.**   <u>**The Guidelines Calculation Should Be Reduced Based On Telemaque's Minimal Role In Nikas's And Demane's Criminal Activity**</u>

Telemaque Lavidas objects to the calculation of an offense level of 26 because, even accepting the government's allegations as true, Telemaque was no more than a minimal participant in Nikas's and Demane's criminal activity.  As such, he is entitled to a four-level reduction in the calculated offense level under U.S.S.G § 3B1.2.[9]

1.   <u>Applicable Law</u>

In order to determine whether a defendant is entitled to an adjustment under section 3B1.2, the Sentencing Guidelines instruct that the Court must consider whether the defendant "play[ed] a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity."  U.S.S.G § 3B1.2 cmt. 3.A.  The Second Circuit has recognized that "the average participant" language "specifically refers to the defendant's 'co-participants in the case at hand.'"  *U.S. v. Kirk Tang Yuk*, 885 F.3d 57, 88 n. 16 (2d Cir. 2018) (quoting U.S.S.G. Amendment 794, Nov. 1, 2015); see also *U.S. v. Perez*, 08-cr-429, 2016 WL

---

[9] U.S.S.G § 3B1.2 provides, in full, as follows:

  Based on the defendant's role in the offense, decrease the offense level as follows:

  (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels

  (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels

In cases falling between (a) and (b), decrease by 3 levels.

4775536, *2 (S.D.N.Y. Sept. 14, 2016) (Cote, J.) (recognizing that "the relevant comparison for a minor role reduction was between the defendant and other actual participants in the crime").  In this case, the government alleges that Nikas and Demane were participants in the criminal activity with Telemaque, and the government therefore includes their activity for relevant conduct purposes.

The commentary to this Guidelines provision instruct a Court to consider five factors in evaluating whether an adjustment applies:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity;

> (ii) the degree to which the defendant participated in planning or organizing the criminal activity;

> (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

> (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and

> (v) the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G § 3B1.2 cmt. 3.C.

The commentary goes on to state that "a defendant who does not have a proprietary interest in the criminal activity . . . *should be considered for an adjustment under this guideline*." *Perez*, 2016 WL 4775536, at *2 (quoting U.S.S.G § 3B1.2 cmt. 3.C) (emphasis added).  Further, the Guideline commentary states: "The fact that a defendant performs an essential or indispensable role in the criminal activity is *not determinative*.  Such a defendant may receive an adjustment under this Guideline if he or she is substantially less culpable than the average participant in the criminal activity."  U.S.S.G § 3B1.2 cmt. 3.C (emphasis added).  Thus, a defendant's role can be *both* essential and also minimal, thus warranting a reduction.  *See U.S. v.*

*Soborski*, 708 Fed. Appx. 6, 11 (2d Cir. 2017) ("[A] defendant with an essential or indispensable role may still receive a role reduction").

The commentary also states:

> A defendant who is accountable under § 1B1.3 (Relevant Conduct) only for the conduct in which the defendant was personally involved and who performs a limited function in the criminal activity may receive an adjustment under this guideline.  For example . . . a defendant who is accountable under § 1B1.3 for a loss amount under 2B1.1 . . . that greatly exceeds the defendant's personal gain from a fraud offense or who has limited knowledge of the scope of the scheme may receive an adjustment under this guideline.

U.S.S.G § 3B1.2 cmt. 3.A.

Indeed, the Sentencing Commission significantly amended the role reduction provision and its commentary effective November 1, 2015, in order to make several clarifications, namely (1) that a defendant should be compared to co-participants in the same criminal activity when considering a minor role reduction and (2) that even participants who serve "integral" or "indispensable" roles in the offense can still be considered minor participants.  *See* U.S.S.G. Amendment 794, Nov. 1, 2015, *available at* https://www.ussc.gov/guidelines/ amendment/794.   The amendment also added the list of factors, cited above, that a court should consider when determining whether to apply a mitigating role adjustment.  *Id.* The Commission stated that these changes were made based on a study finding "that mitigating role is applied inconsistently and more sparing than the Commission intended."  *Id.* at Reason for Amendment.

The commentary also explains the circumstance under which a minimal role adjustment is appropriate: a defendant who is "plainly among the least culpable of those involved in the conduct of a group" is a "minimal participant" and a four-level reduction is warranted.  U.S.S.G § 3B1.2(a); *id.* cmt. 4.  "Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant."  *Id.*

2.     <u>Telemaque was a minimal participant in the criminal activity</u>

In this case, all five factors listed in the commentary strongly weigh in favor of a minimal role adjustment.  Under U.S.S.G § 3B1.2 cmt. 3.C, the first factor to consider is "the degree to which the defendant understood the scope and structure of the criminal activity."  Here, as set forth above, even assuming all the facts alleged by the government, Telemaque did not understand the scope and structure of the criminal activity, even that confined to what the government calls the "Ariad Scheme," which it claims involved Nikas, Demane and Telemaque. Telemaque had no way of knowing that Nikas would tip or involve Demane, whom he only met once many years before at a social function.  He had no way of knowing how Nikas and Demane would trade or how much profits they would earn.  Indeed, he had absolutely no participation in or knowledge of any of that activity.  He had no knowledge about all the deceptive conduct in which Nikas and Demane engaged to hide their criminal conduct, including burner phones, cash payments and money laundering.  And he had no way of knowing that they would tip others such as Makris, Kordakis, Rodrig, Xylas, Fiengold, and Malnik.

For the same reasons, Telemaque played no role in the "planning or organizing of the criminal activity" (factor two).  Those decisions were made *exclusively* by Nikas, Demane and others.  And Telemaque never "exercised decision-making authority or influenced the exercise of decision-making authority" over the criminal activity (factor three).  Fourth, "the nature and extent of [Telemaque's] participation in the commission of the criminal activity" was minimal. Indeed, according to the jury's verdict, Telemaque shared MNPI about Ariad on three occasions over a two year period and only with Nikas.  Telemaque was not himself a board member who had fiduciary duties.  And he never traded a single share of Ariad stock either based on inside information or otherwise.

The final factor is "the degree to which the defendant stood to benefit from the criminal activity." As discussed at length above in Section II, the government's own theory of "benefit" in this case was Telemaque's mutually beneficial "friendship" and "overlapping business interests" with Nikas. There is no evidence suggesting Telemaque received a single penny of the profits from Nikas and Demane's trading. And, as discussed above, while the government initially alleged in this case a direct connection between Telemaque's tips and the investment by Nikas's wife in Mediterra (for which she received shares) and Nikas's loan to Mediterra (half of which was paid back), the government did not argue such a direct connection at trial because the evidence showed those investments were entirely independent from any alleged tips by Telemaque, both in their timing and purpose.[10] At most, the government argued that Nikas and Telemaque were friends, that Telemaque sought to give the gift of information to his friend, and that they had mutually beneficial business interests. There was certainly no evidence that when Telemaque allegedly provided tips he did so with the expectation of a loan to be made years later by Nikas to Mediterra.

In stark contrast, according to the government, Nikas and Demane reaped more than $8 million in gains from their Ariad trading. The commentary to the minimal role adjustment guideline says that this is precisely the circumstance in which a role reduction is appropriate.

---

[10] Even if Nikas's wife's investment in and Nikas's loan to Mediterra could be treated as after-the-fact payments intended to compensate Telemaque for tips provided years earlier, that still would not establish Telemaque had any proprietary interest in the criminal enterprise. U.S.S.G. § 3B1.2 cmt. 3.C ("a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline"). A "proprietary interest" requires an "ownership interest or other stake in the outcome" of the criminal enterprise. *U.S. v. Diaz*, 884 F.3d 911, 917 (9th Cir. 2018). The government has never offered any evidence that Telemaque had the type of profit-sharing agreement that might have given him a proprietary interest similar to those of Nikas and Demane.

U.S.S.G § 3B1.2 cmt 3.A ("a defendant who is accountable . . . for a loss amount . . . that greatly exceeds the defendant's personal gain from a fraud offense or who had limited knowledge of the scope of the scheme may receive an adjustment under this guideline").

Without question, Telemaque is the least culpable of the participants by a substantial margin. He was the only one with no knowledge of the scope of the criminal activity, he was the only one who did not receive or expect to receive any portion of the illicit profits realized, and he is the only one whose participation was motivated by a misguided act of friendship rather than the naked greed of Nikas and Demane. Accordingly, he meets the definition of a "minimal participant" under U.S.S.G § 3B1.2 cmt. 4 (minimal role applies to those who are "least culpable … [T]he defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant."), and a four-level reduction is warranted. Therefore, rather than a total offense level of 26, his offense level should be 22, and the advisory Guidelines range should be 41-51 months.

In the PSR, the Probation Department explains that it sought the government's views on the defendant's proposed role reduction and the government responded as follows: "the crux of the instant case was the passing of MNPI from Athanasios Lavidas to Telemaque Lavidas to George Nikas. Through its conviction, the jury found that Telemaque passed the MNPI knowing that Nikas would trade, thus confirming his understanding of the scheme. The defendant's conduct enabled the scheme to happen and there is absolutely no evidence that the sharing of MNPI was anything other than voluntary on the defendant's part in order to further his friendship with Nikas." PSR Responses to Objections, pg. 23.

This response by the government does not undermine Telemaque's claim to a role reduction. Instead, it is an argument that there was sufficient evidence to convict. The

conclusion that "Telemaque passed the MNPI knowing that Nikas would trade" is minimally required to convict, and does nothing to undermine his argument for a minor role.  Similarly, the conclusions that Telemaque's sharing of information was "voluntary" "in order to further his friendship with Nikas" are also two required elements to be guilty of the crime (knowing and voluntary conduct and tipping for some "benefit"), not evidence that his role was anything other than minimal.  If the government's argument were correct, any time there was sufficient evidence to convict, a role reduction would not be available.  This of course cannot be.  Finally, the Sentencing Commission and the Second Circuit have both specifically determined that the fact that Telemaque's conduct "enabled the scheme to happen" is not a reason to deny a role reduction.  *See* U.S.S.G § 3B1.2 cmt. 3.C ("The fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative.  Such a defendant may receive an adjustment under this Guideline if he or she is substantially less culpable than the average participant in the criminal activity."); *Soborski*, 708 Fed. Appx. at 11 ("[A] defendant with an essential or indispensable role may still receive a role reduction").

For the same reason, the Probation Department's rationale for not adopting a role reduction is also wrong on the law.  Specifically, Probation rejected the role reduction because "[i]f it was not for the defendant sharing this information, the co-conspirators would not have been able to unlawfully generate gains and avoid losses in the offense."  PSR Response to Objections, pg. 23.  This too depends on a mistaken understanding, rejected by the Sentencing Commission and the Second Circuit, that if a person is essential to a scheme's success, he cannot receive a role reduction.  Indeed, both the Probation Department's and the government's approach do not account for the amendments made in 2015, which the Commission specifically stated were designed to result in more common application of role reductions.  *See* U.S.S.G.

Amendment 794, Nov. 1, 2015, *available at* https://www.ussc.gov/guidelines/ amendment/794,

Reason for Amendment.

### C.   The Guidelines Calculation Substantially Overstates Telemaque's Culpability Because It Is Almost Entirely Based On Gains Realized By Others Through Trading Outside Of Telemaque's Control

Regardless of whether this Court adjusts Telemaque's offense level based on a minimal

role, the vast majority of his Guidelines offense level in this case results from the gain

calculation.  Many judges in the Southern District of New York and elsewhere have recognized

that a significant variance from the Guidelines is appropriate under such circumstances.  *See*,

*e.g.*, *U.S. v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2013) (varying from the Guidelines

because they place an "inordinate emphasis . . . on the amount of actual or intended loss."); *U.S.*

*v. Johnson*, No. 16-cr-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. April 27, 2018) (same);

*U.S. v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013)  (J. Underhill, concurring) ("the loss guideline

[is] fundamentally flawed, especially as loss amounts climb.  The higher the loss amount, the

more distorted is the guideline's advice to sentencing judges.").

The extreme emphasis on gain makes even less sense in a case such as this where the

gain was realized entirely by Nikas and Demane.  The theory behind imposing harsher sentences

based on the amount of realized gain is that "all else being equal, large thefts damage society

more than small ones, creating a greater temptation for potential offenders, and thus generally

require greater deterrence and more serious punishment."  *U.S. v. Emmenegger*, 329 F. Supp. 2d

414, 627 (S.D.N.Y. 2004).  But this rationale does not apply in a case such as this one where

Telemaque did not receive the gains, had no control over their size, and did not even know what

they were.  Whereas a *trader* such as Nikas or Demane decides how many trades to make and

how large a position to take based on inside information—and therefore might be disincentivized

from placing more trades or taking a larger position if he faces a larger penalty—a *tipper* often

plays no role in that decision, and Telemaque played none here.  *See U.S. v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012).

Accordingly, the Guidelines calculation in this case, which is driven almost entirely by gains that Telemaque did not control and did not know about, grossly overstates his culpability. We therefore respectfully request that this Court impose a sentence that is well below the Guidelines range.

## V.      A BALANCED CONSIDERATION OF ALL RELEVANT FACTORS UNDER 18 U.S.C. § 3553(a) DEMONSTRATES THAT A SENTENCE WELL BELOW THE GUIDELINES RANGE IS SUFFICIENT, BUT NO GREATER THAN NECESSARY, TO ACHIEVE THE GOALS OF SENTENCING

18 U.S.C. § 3553(a) directs that a court "shall impose a sentence *sufficient*, *but not greater than necessary*, to comply with the purposes set forth in paragraph (2) of this subsection," which include: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," "(B) to afford adequate deterrence to criminal conduct," "(C) to protect the public from further crimes of the defendant," and "(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2) (emphasis added). In addition to considering each of these purposes, the court also "shall consider" "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3554(a)(1)), "the kinds of sentences available" (18 U.S.C. § 3554(a)(3)), "the kinds of sentence and the sentencing range established" under the applicable Sentencing Guidelines (18 U.S.C. § 3554(a)(4)), and "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct" (18 U.S.C. § 3554(a)(6)).

Accordingly, the range calculated under the Guidelines is purely advisory and serves as just one of many factors that the Court is required to "consider" when fashioning an appropriate

sentence.  *U.S. v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).  "[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."  *Rita v. U.S.*, 551 U.S. 338, 351 (2007).  Indeed, "[e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the [18 U.S.C.] § 3553(a) sentencing factors."  *U.S. v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010).

After thorough consideration of all the relevant factors, Telemaque Lavidas respectfully submits that an appropriate custodial sentence in this case would be time served (approximately eight months' imprisonment in the MCC and MDC as of the date of this filing on June 9, 2020, and longer by the date of sentencing).  As is set forth below, such a sentence is consistent with sentences imposed on similarly situated defendants, takes account of the other circumstances of this case discussed herein, and is "sufficient, but not greater than necessary" to achieve the goals of criminal punishment under 18 U.S.C. § 3553(a).

A.      **A Sentence Well Below the Guidelines Range Is Consistent With Sentences Imposed On Substantially Similar Defendants Convicted Of Similar Conduct**

18 U.S.C. § 3553(a)(6) directs this Court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  Defense counsel is not aware of *any* case in the Southern District of New York in which a defendant with no prior criminal history was convicted of insider trading solely for tipping (not for trading), received modest compensation for the tips, and nevertheless received a sentence within the Guidelines range.  To the contrary, such cases in this District have *always* resulted in sentences substantially below the Guidelines range.  Indeed, in each of the cases discussed below, a defendant convicted of conduct substantially similar to the conduct the government attributes to Telemaque received a sentence significantly below the Guidelines

range.  This is so even though many of these cases involve aggravating factors that do not apply to Telemaque, including evidence that the defendant intentionally obstructed justice.  The following cases show that a sentence well below the Guidelines is just and appropriate for Telemaque.

<u>Benjamin Chow – <i>U.S. v. Chow</i></u>, 17 CR 667

Chow was the founder of a private equity investment firm that was hired to assist in negotiating a potential acquisition of Lattice Semiconductor Corporation ("Lattice").  (Ex. H at 2).  Despite signing multiple non-disclosure agreements with Lattice, Chow repeatedly leaked confidential information about the potential acquisition to a friend and business associate, Michael Yin, between March 2016 and February 2017.  <i>Id.</i> at 2-3, 5-6.  Chow also passed confidential information to Yin about a second acquisition involving another company, which Chow had received from an insider at that company.  <i>Id</i>.  In all, Chow leaked information to his friend Yin on at least eight occasions.  <i>Id.</i> at 3-7.  Yin regularly traded on the information, which eventually attracted scrutiny from FINRA.  <i>Id</i>. at 7-8.  In response to an inquiry from FINRA, Chow falsely stated that he had never discussed Lattice with Yin, only had social conversations with Yin, and had no knowledge of how Yin "may have gained knowledge" about the acquisition.  <i>Id</i>.  In total, Yin earned over $5 million trading on the information he received from Chow but Chow received nothing concrete in return aside from Yin's continued friendship and the potential for future business opportunities.  <i>Id</i>. at 4.

Chow went to trial and was eventually found guilty of one count of conspiracy to commit securities fraud and seven substantive counts of securities fraud.  At sentencing, Judge Woods determined that the applicable offense level under the Sentencing Guidelines was 26, consisting of a base offense level of 8 and an 18 level enhancement for a gain between $3.5 million and

$9.5 million, resulting in a Guidelines range of 63-78 months.  (Ex. I at 37:23 - 40:13).  In other words, Chow's Guidelines range was exactly the same as the range the government claims applies to Telemaque in this case.  However, rather than mechanically impose a sentence within that range, Judge Woods considered all of the § 3553(a) factors and decided to impose a sentence of only three months' imprisonment, plus two years of supervised release.  *Id*. at 73:2-11.

As Judge Woods stated at the sentencing hearing on January 17, 2019, it was Yin, not Chow, who was the "ringmaster" of the scheme and had "aggressively pursued Dr. Chow for information[.]"  *Id.* at 75:7-10.  Although Chow "in a very profoundly misguided now criminal act, chose to provide that information in response," Judge Woods held that it would be inequitable to follow the Guidelines and impose a lengthy prison sentence based almost entirely on *Yin*'s trading.  *Id*.   Indeed, Judge Wood's primary reason for a variance was his determination that "the sentencing guidelines calculation here has a substantially disproportionate and harsh effect on the defendant's sentence." *Id.* at 81:17-19.  As he explained, "Dr. Chow is being held responsible for over $5 million in losses. . . . At the same time, he did not benefit in anywhere near that amount.  As I said earlier, he received no cash at all and limited other tangential benefits.  In this context, this specific case-specific context, I believe that the 18 offense level adjustment has an excessive impact on the guidelines recommended sentence."  *Id.* at 81:23-82:5.  Although the government had provided "evidence that Dr. Chow was aware that Mr. Yin was a substantial trader in this area," the government did not provide any "specific information that Dr. Chow had specific information regarding the *volume* of the trades that Mr. Yin was placing." *Id.* at 75:12-16 (emphasis added).  The government provided "no evidence" indicating "that Dr. Chow controlled the trades that Mr. Yin [made] or the manner in which they were made."  *Id*. at 75:10-12.  Further, because Chow received nothing other than Yin's continued

39

friendship and the potential for future business opportunities, Judge Woods held that "Dr. Chow does not seem to have been motivated by greed or desire to aggrandize himself, the kind of toxic motivations that one frequently sees.  Perhaps it was a misguided desire to please Mr. Yin to maintain that potentially valuable relationship is what led Dr. Chow to this violation."  *Id.* at 74:16-22.

For the purposes of sentencing, Telemaque is practically indistinguishable from Chow. Both Telemaque and Chow were "aggressively pursued" by individuals (Nikas of Telemaque and Yin of Chow) who wished to cultivate a friendship for the purpose of acquiring confidential information from them.  Both Chow and Telemaque went to trial and each was convicted of providing confidential information to a friend who then used that information to earn millions of dollars in illicit trading.  In both cases, the Sentencing Guidelines called for an 18-point enhancement based on the profits realized by the illicit trading even though neither Telemaque nor Chow had any control over the volume or profitability of Nikas's or Yin's trading.  Neither Telemaque nor Chow received any direct financial benefit for their actions and, instead, the government argued that they were each motivated by a misguided effort to help their friends or to receive potential future business opportunities.  Both Telemaque and Chow are first-time offenders.  Given the similarities in the underlying conduct, a sentence similar to the three months' imprisonment imposed on Chow would be appropriate for Telemaque.  18 U.S.C. § 3554(a)(6) (describing "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct").

If anything, Chow's conduct was worse than Telemaque's.  Whereas Chow had signed multiple NDAs with Lattice and then violated those NDAs by sharing Lattice's confidential information, Telemaque had no similar contractual or fiduciary duty to Ariad.  Further, Chow

made multiple false statements to FINRA about his relationship and communications with Yin, thereby undermining the investigation.  Telemaque did no such thing.  Lastly, although the jury determined that Telemaque tipped Nikas on three occasions, the evidence showed that Chow shared confidential information with Yin on at least eight occasions.  *See* Ex. H at 3-7.

Notably, Judge Woods's decision to sentence Chow to only three months in prison is fully consistent with numerous other cases in the Southern District of New York imposing minimal or non-custodial sentences on tippers who did not trade and who received little direct pecuniary benefit.  *See*, *e.g.*, *U.S. v. Peterson*, 11-cr-665 (S.D.N.Y. Oct. 11, 2011) [Dkt. 14] (member of the board of directors told his son to buy stock in the target of an acquisition; son did so and also shared the information with others who generated millions in profits; court sentenced board member to two years' probation); *U.S. v. Bowers*, 9-cr-496 (S.D.N.Y. Sept. 16, 2009) [Dkt. 23] (Bowers shared confidential information with a client on two occasions resulting in approximately $120,000 in gains; Bowers received a $12,000 payment for the first tip and no pecuniary benefit for the second; sentenced to three years' probation); *U.S. v. Ng*, 11-cr-161 (S.D.N.Y. May 9, 2012) [Dkt. 150] (sentencing tipper who shared information with a colleague on multiple occasions for no pecuniary benefit to two years' probation).  Although the amount at issue in *Chow* was higher than the amounts at issue in these latter cases, the court in *Chow* imposed a similar sentence because Chow had no knowledge of or control over the amount of trading by his tippee, and therefore that amount was a poor measure of his culpability for sentencing.[11]  The same analysis applies to Telemaque:  he had no knowledge of or control over

---

[11] In each of these cases, the defendants pleaded guilty, wheareas Chow maintained his innocence through trial.  This difference was already reflected in the Guidelines calculations and Chow ultimately received a three-month prison sentence, unlike the other defendants listed in this paragraph who received probation.

the trading profits generated by Nikas and Demane, and therefore those profits are not an appropriate basis on which to increase his sentence.

James Gansman – *U.S. v. Gansman*, 08 CR 471

James Gansman was a lawyer and partner at Ernst & Young who, for nearly two years, regularly leaked confidential information from his clients about more than a dozen corporate M&A transactions to a woman, Donna Murdoch, with whom he was having an extramarital affair.  *See* Ex. Y at 981:24-982:9; 999:7-22.  Gansman knew that Murdoch intended to trade on that information and Murdoch did, in fact, generate hundreds of thousands of dollars in illicit gains.  Ex. Z at 15:6-17.  In exchange for the information, Murdoch continued to engage in the affair with Gansman but she did not share any of her financial gains with him.  Ex. Y at 987:13-24.  At trial the jury found him guilty of leaking information about five different corporate transactions to Murdoch.  Ex. Z at 15:6-17.

Judge Cederbaum calculated an offense level under the Sentencing Guidelines of 20 (8 points for insider trading and an additional 12 points for the gain realized by Murdoch), which called for a sentence of 33-41 months in prison.  Ex. Z at 3:20-25.  However, Judge Cerbaum found "consideration must be given . . . to the fact that the defendant did not personally gain, make a financial gain from this case[.]"  *Id.* at 17:8-10.  Additionally, she determined that leniency was also required because of the risks that lengthy incarceration could have significant consequences on Gansman's health and could cause significant hardship to his wife and children. *Id.* at 47:12-19.  Based on a full consideration of the relevant § 3553(a) factors, Judge Cederbaum determined that "the sentence provided for by the guidelines is greater than necessary to comply with the purposes set forth in the sentencing statute and I do not want to impose a sentence that is greater than necessary to keep other people from doing what you

yourself have done[.]" *Id.* at 48:4-8.  Judge Cederbaum sentenced Gansman to a prison sentence of 12 months and 1 day.  *Id.* at 48:14-17.

Telemaque deserves leniency for all the same reasons.  Even accepting each of the government's allegations as true, Telemaque, like Gansman, provided confidential information only to a single person as part of a personal relationship.  Additionally, as is addressed in more detail in Section V.E. below, a lengthy period of incarceration will impose significant hardship on Telemaque's wife and children, who are now alone in the United States and unable even to visit with him, and are far away from their families and support systems.  If anything, Telemaque is even more deserving of leniency because he never violated a position of trust similar to the position that Gansman violated as a lawyer and partner at Ernst & Young who stole his clients' confidential information.  And Telemaque —even according to the government—tipped Nikas only about a single company on just a few occasions, whereas Gansman tipped Murdoch about five different M&A transactions involving an assortment of companies on more than a dozen occasions.

<u>Sebastian Pinto-Thomaz – *U.S. v. Pinto-Thomaz*, 18 CR 579</u>

Sebastian Pinto-Thomaz worked for the Standard & Poor's credit ratings agency, where he acquired confidential information about an upcoming acquisition of a public company called Valspar Corporation.  (Ex. J at 1).  He passed that information to two co-defendants with the expectation that they would trade on the information.  *Id*.  They did and made a combined profit of $300,000.[12]  *Id*. at 6.  One of the co-defendants paid Pinto-Thomaz 10% of the after-tax profits

---

[12] As explained by numerous courts and discussed above, the fact that there was a lower amount of gain in *Pinto-Thomaz* does not significantly distinguish that cases from Telemaque's. Telemaque had no knowledge or control over the amount of trading or profiting achieved by Nikas and Demane, and therefore their gain is not a fair measure of his culpability.

that he realized from these trades in cash in a plastic bag. *Id.* With respect to the other co-defendant, Pinto-Thomaz intended that the tip would serve as compensation for the services and companionship that co-defendant had already provided to Pinto-Thomaz's mother. (Ex. K at 7:2-25). When FINRA investigators began to scrutinize the trading of the two co-defendants, Pinto-Thomaz lied and said he did not know them. (Ex. J at 6-7). At trial, Pinto-Thomaz maintained his innocence and actually accused his mother of being the source of the two co-defendants' information. *Id.* at 7. After the jury convicted him, Pinto-Thomaz then decided to confess to his crime, and, in doing so, admitted that he had knowingly allowed his counsel to lie to the jury when he knew his mother was not the source of the information. (Ex. K at 6:16-19).

Judge Rakoff calculated an offense level of 20, which called for a Guidelines range of 33 to 41 months.[13] *Id.* at 13:13-15. The Court then expressed frustration that over half of the offense level was based on the amount of money made by the co-defendants since Pinto-Thomaz had no control over that amount and Pinto-Thomaz had received only a small portion (10%) of it. *Id.* at 13:16-23. The Court ruled that it was "totally irrational to give it that kind of weight." *Id.* at 13:24-14:2. Judge Rakoff also specifically compared Pinto-Thomaz to a defendant in another case who had "a much more egregious breach of fiduciary duty" because that other defendant was himself a member of the board of directors of multiple public companies and because he tipped a hedge fund manager whom the defendant knew traded in massive quantities. *Id.* at 33:16-19. Accordingly, Judge Rakoff imposed a sentence of 14 months in prison on Pinto-Thomaz. *Id.* at 44:3-7.

---

[13] The calculation included a base level of 8, a 12 point enhancement for the amount of money at issue, a 2 point enhancement for breach of a position of trust, and a 2 point reduction for acceptance of responsibility granted by Judge Rakoff even though Pinto-Thomaz went to trial.

If anything, Pinto-Thomaz's conduct was much more egregious than Telemaque's. Pinto-Thomaz got a 10% cut of the profits through cash paid in a plastic bag. He also breached his duty to the credit rating agency for which he worked and he breached a duty to its clients. On May 7, 2020, in response to coronavirus and pursuant to statutory authority conferred under the CARES Act, Pinto-Thomaz was released after serving seven months of his fourteen month sentence. Ex. AA at 3. Pinto-Thomaz, who is 34 years old, will serve the remainder of his sentence on home confinement.

Tai Nguyen – *U.S. v. Nguyen*, 12 CR 495

Nguyen was the President and sole employee of an investment research firm that purported to provide advisory services to hedge funds and money managers in exchange for substantial consulting fees. (Ex. N at 2). In truth, Nguyen was stealing confidential information from his sister about the public company where she worked so that Nguyen could then pass this information to the firm's clients in exchange for the fees. *Id.* For over three years, Nguyen fed this information to employees at three different hedge funds, who used the information to generate profits of over $6.2 million. *Id.* at 3-4. The hedge funds paid as much as $15,000 *per month* to Ngyuen's firm, of which he was the sole employee, for this information. *Id.* Additionally, Nguyen was not merely a tipper but also *traded on this information himself*, generating additional illicit profits of over $147,000. *Id.* at 4.

Nguyen pled guilty prior to trial to one count of conspiracy to commit wire fraud and securities fraud. *Id.* He stipulated to an offense level under the Guidelines of 23, which included a base offense level of 8, an 18 point enhancement for the amount of money at issue, and a 3 point reduction for acceptance of responsibility. *Id.* at 6. The resultant Guidelines range was 46-57 months. Nonetheless, Judge Buchwald refused to impose such a harsh sentence because

Nguyen had no control over the amount of money that the hedge funds generated from the inside information.  In Judge Buchwald's words, there was "no way" that Nguyen "actually knew how piggy they were going to be."  (Ex. O at 18:22-19:3).  She observed that generally in other cases the government is "not getting and *shouldn't be getting* guidelines sentences based on what the recipients do with the inside information they get" because "[t]here really isn't a way for the defendant to actually know what they're going to do."  *Id*. at 19:3-16 (emphasis added).

Accordingly, Judge Buchwald imposed a sentence of a year and day on Nguyen.  Her reasoning for giving a sentence substantially below the Guidelines applies equally to Telemaque.  He, like Nguyen, had no knowledge of or control over the trading profits of the tippees that almost entirely drives his Guidelines calculation.  But also in many ways Nguyen's conduct was much more egregious than Telemaque's.  First, he himself profited directly and significantly from the conduct because his consulting firm was paid $15,000 per month to provide the tips.  In addition, Nguyen himself traded on the inside information, earning profits in excess of $147,000.  Finally, Nguyen sold the inside information directly to hedge funds, entities he knew would make significant trades, whereas even according to the government Telemaque gave information to a single friend.[14]

<u>Cameron Collins – *U.S. v. Collins*, No. 18 CR 567</u>

One of the most recent insider trading sentences bears striking similarities to the instant case.  Like Telemaque, Cameron Collins is the son of a man who served on the board of a pharmaceutical company, Christopher Collins, who at the time was a member of the U.S. Congress.  (Ex. P at 1).  Cameron acquired MNPI about the company from his father and passed

---

[14] The fact that Nguyen pled guilty was, of course, a mitigating factor at sentencing.  However, for the reasons stated above Nguyen's offense conduct was significantly more culpable than Telemaque's.

it to a family friend.  However, unlike Telemaque, Cameron also traded on the information

himself, *personally* realizing a gain of $571,000 in avoided losses.  *Id*. at 3.  Cameron's tippees

realized a gain of an additional $186,620 in avoided losses.  *Id.*  These gains were realized

through "dozens of trades placed over several days."  *Id.* at 7.  When the FBI investigated the

trades, Cameron chose to lie to them about his reasons for executing the trades.  *Id.* at 3.

Cameron ultimately pled guilty prior to trial.

Cameron's Guidelines offense level was 21, resulting in a Guidelines range of 37-41

months' imprisonment.[15]  *Id.* at 21.  Cameron argued that nonetheless he should be sentenced to

probation and no jail time because of his lifetime of good works, the fact that his offense was

aberrant conduct, and the Guidelines overstated the seriousness of his offense.  (Ex. P).  On

January 23, 2020, Judge Broderick granted the defense request and imposed a sentence of five

years' probation with no imprisonment whatsoever.  (Ex. Q).  As demonstrated at length above,

Telemaque has also led an otherwise exemplary life – he has over and over again dedicated

himself to the service and support of others.  Moreover, even assuming all of the conduct alleged

by the government, his tipping of Nikas was clearly aberrant conduct in an otherwise admirable

personal and professional history.  And for all the reasons discussed herein, the Guidelines range

also overstates his culpability in this case.  Indeed, in many ways, Cameron's offense conduct

was significantly more egregious than Telemaque's, since he himself traded on the inside

information obtained from his father and thereby avoided losses of $571,000.  And, even though

he was the son of a sitting congressman, when the FBI came to interview Cameron, he lied about

---

[15] Again, Cameron's guideline range was lower than Telemaque's namely because the gains were lower, but as noted, Telemaque had no control over or knowledge of Nikas and Demane's gains, whereas much of Cameron's gain was from his own trading and therefore he clearly knew it and controlled it.

the reasons for his trades.  The fact that a similarly situated defendant was given probation for similar behavior several months ago should be considered under 18 U.S.C. § 3553(a)(6) when fashioning an appropriate sentence for Telemaque.

In addition, it is important to note that Cameron's probationary sentence is not unique in this district.  To the contrary, courts in the Southern District of New York have regularly imposed minimal or non-custodial sentences even on defendants who, unlike Telemaque, realized substantial profits by trading on inside information.  For example, earlier this year Judge Marrero imposed a purely probationary sentence on an investment banker, Bill Tsai, even though Tsai pleaded guilty to the government's allegations that he had "orchestrated three different insider trading schemes" in which he earned substantial personal profits, tipped a relative who also traded (together earning a profit of approximately $126,000), and "lied to his employer about the existence of the brokerage account in which he made the illegal trades."  *U.S. v. Tsai*, 19-cr-675 (S.D.N.Y. Jan. 10, 2020) [Dkt. 23], Government's Sent. Submission at 6, 10.  In June 2019, Judge Kaplan similarly imposed a sentence of only 3 months incarceration on Woojae Jung, an investment banker who earned substantial profits by trading on, and tipping his brother about, inside information obtained from his clients concerning nearly a dozen different corporate transactions.  *U.S. v. Jung*, 18-cr-518 (S.D.N.Y. June 3, 2019) [Dkt. 51], Government's Sent. Submission at 1-3.  Together Jung and his brother earned profits totaling $130,000 and Jung tried to conceal his illicit activity by having his brother execute the trades.  *Id.  See also*, *U.S. v. Holzer*, 9-cr-470 (S.D.N.Y. Sept. 29, 2009) [Dkt. 26] (attorney who earned approximately $120,000 through insider trading on multiple occasions sentenced to five years' probation); *U.S. v. Collotta*, 7-cr-143 (S.D.N.Y. Oct. 4, 2007) [Dkt. 30] (attorney in Morgan Stanley's compliance department and her husband earned $9,000 trading on inside information and

provided the information to downstream tippees who realized $600,000 in illegal gains; attorney was sentenced to 60 days in prison and four years' probation and her husband was sentenced to three years' probation).

### B.     Telemaque's Life Of Service To His Community, Charities, Employees, Friends and Family Warrant Leniency

One of the first factors identified for consideration under 18 U.S.C. § 3553(a) is "the history and characteristics of the defendant."  As recognized by this Court in *U.S. v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006):

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics" of the defendant.

Telemaque is not the typical defendant in an insider trading case.  He does not work in the financial services industry, is not a corporate insider, and has never traded stocks.  Although his father had access to confidential information about Ariad, it is undisputed that Telemaque never attempted to trade on that information.  Telemaque is not a man motivated by greed or self-interest.  He is a man whose actions, both professionally and privately, are motivated by a genuine desire to help others.

The more than 140 letters of support confirm Telemaque's boundless generosity.  Many of them recount stories of the worst moments in their lives—deaths of family members, diagnoses of serious illnesses—and the common theme for each of them is that Telemaque is the one who supported them when they were at their lowest.  (Ltr. Nos. 29, 47, 50, 64, 100, 104, 105).  Telemaque never viewed his family's company as a source of prestige or a reason to take it easy.  Rather, he has worked incredibly hard his whole life, from summers in the factory of

that business, to studying hard in school, to founding his own business. And he has done it with humility and respect for everyone around him from the lowest level employees to prominent members of the Greek community. Indeed, he has viewed the family business always as a vehicle for helping others, whether it was by covering employees' family members exorbitant medical expenses, (Ltr. Nos. 104, 105), or providing internships to young adults, or donating medicines for free to those in need. He has devoted significant amounts of his time to charity, from working with sick and vulnerable children to supporting people suffering from muscular dystrophy. (Ltr. No. 133). *U.S. v. Tomko*, 562 F.3d 558, 572 (3rd Cir. 2009) (affirming a variance to a sentence of probation due largely to the defendant's exceptional charitable acts and good works); *U.S. v. Cooper*, 394 F.3d 172, 177-78 (3rd Cir. 2005) (affirming a downward departure from the Guidelines based on good works that included "hands on, personal sacrifices" which have had a "positive impact on the lives of others.").

Unlike the cold securities traders motivated exclusively by profits who so often appear in insider trading cases, including Nikas, Demane and the countless other participants in their vast criminal schemes, letter after letter shows that Telemaque is fulfilled by his personal relationships, not profits. His co-workers agree that his defining characteristics in business are "warmth and kindness" for every employee. (Ltr. No. 5). At Lavipharm, even though his family owned the business, he never acted like "the boss's son." (Ltr. No. 79). And Telemaque could have lived a very comfortable life working inside his family's company for his whole career. But he struck out on his own to create a business that would bring healthy food to people in the battle against diabetes and obesity. (Ltr. No. 103). And when his company Mediterra became successful, Telemaque donated its nutrition bars to low-income families and a charity supporting children with cancer. (Ltr. No. 21). Telemaque has never put profits first.

In his family he has served as a father figure to his two younger twin sisters for their entire lives, imparting guidance and support as they transitioned to adulthood.  (Ltr. Nos. 24, 84, 108).  He is the godfather to six children whose parents have entrusted him to be a positive influence in their lives.  (Ltr. Nos. 56, 64).  Now, he is the father of a 2-year old daughter and a 1-month-old son.  These children, along with his loving wife Caterina, are the priorities in his life.  At only 39 years old, Telemaque has much more to offer to the world.  An extended incarceration does not serve the ends of justice here.  *See Gupta*, 904 F. Supp. 2d at 353 (issuing below-Guidelines sentence based on letters of support describing defendant's "big heart and helping hand, which he extended without fanfare or self-promotion, to all with whom he came in contact"); Ex. I at 82:6-12 (issuing below-Guidelines sentence where the defendant's "life, apart from this offense . . ., really appears to have been extraordinary in a positive way.  He has achieved a lot, been a role model for his colleagues, friends, and for his family[.]").

Even according to the government, it is clear Nikas, who is fifteen years older than Telemaque, sought to take advantage of Telemaque's generosity and, indeed, viewed him as an exploitable source of information.  This case is comparable to *Chow*, where the defendant was "aggressively pursued" for inside information by a friend and then, "in a profoundly misguided now criminal act, chose to provide that information in response."  Ex. I at 75:5-10.  In that case, the court recognized that "Dr. Chow's decision to participate in this criminal activity was inconsistent with his broader record and in so many ways very contrary to his own best interest[.]"  *Id*. at 82: 13-20.  Accordingly, Judge Woods determined that there was no need for a "substantial incarceratory sentence" and sentenced him to three month's imprisonment.  *Id.*  The same analysis applies here.

### C.    The Government Has Already Shown Extreme Leniency Towards Other Participants In Nikas's Schemes

In Section V.A. above, we demonstrate that many defendants in other cases who are similarly situated to Telemaque have received sentences well below the Guidelines range from other Judges in the Southern District of New York.  In this case, though, there are also numerous individuals who participated in Nikas's schemes and who are substantially more culpable than Telemaque, yet the prosecutors in this case have agreed that they will receive little or no jail time at all.  These facts should be taken into account in upholding "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

For example, the Court heard testimony from Marc Demane Debih, a career criminal who made over $70 million from insider trading in countless companies for more than ten years beginning as early as 2005.  Tr. at 278:11-13; 377:21-23.  He testified that it was his common practice to share inside information with other people in order to "maximize [his] profits."  *Id.* at 269:16-18.  He went to great lengths to cover his illicit activity, including using middlemen to receive tips, communicating through burner phones, planting fake news articles, creating fraudulent paper trails to provide false explanations for payments, and setting up sham shell corporations to receive those payments.  *Id.* at 364:10-20; 405:18-23; 406:12-407:7.  And yet, on January 29, 2020, just two weeks after he testified against Telemaque at trial, the government agreed to his release on bail.  *See* Ex. R.  He is now on home confinement in an apartment in Manhattan with his family, having served just over eight months in prison since his arrest on May 9, 2019.  *Id.*[16]

---

[16] The government agreed that Demane could post $1 million cash bail, pay for a Manhattan residence with amenities, and pay for the cost of his home monitoring by Pretrial Services despite the fact that he has only forfeited $49 million of the $70 million in insider trading profits

At trial, the jury also heard testimony about one of Demane's primary sources of inside information, John Dodelande.  Tr. at 354:15-21.  Dodelande was an art dealer with access to investment bankers at Centerview Partners and Moelis, both of which worked on merger and acquisition transactions for publicly traded companies.  *Id.* at 354:24-355:18.  Over many years Dodelande served as the middle man passing highly confidential inside information from Darina Windsor (at Centerview) and her boyfriend Benjamin Taylor (at Moelis) to Demane, who then traded on it and passed it to countless others in his scheme, including Nikas.  Dodelande leaked information to Demane about more than 15 M&A transactions from which Demane, Nikas and others earned many tens of millions in illegal profits.  Demane could not even remember all the companies about which Dodelande tipped him.  *Id.* at 359:17-19; 360:22-361:3.  Demane paid Dodelande more than $12 million in cash for these tips.  *Id.* at 362:14-19.  Demane and Dodelande used burner phones to avoid detection by the authorities.  *Id.* at 359:20-360:3.  Dodelande created fraudulent art invoices in order to create a false explanation for the cash he was receiving from Demane.  *Id.* at 405:18-23.  If prosecuted, Dodelande's Sentencing Guidelines range would be over 100 months and he would be required to forfeit the $12 million in cash he received for tips.  Instead, the government entered into a non-prosecution agreement with John Dodelande, pursuant to which he will not be prosecuted, he will serve no jail time, he will not forfeit any of the $12 million, and he will not even have a felony on his record.  (Ex. S).

In addition, the government entered into a non-prosecution agreement with John Dodelande's brother, Kevin Dodelande.  (Ex. T).  Kevin also served as a middleman who passed

---

he admitted to earning.  Tr. at 377:18-23; Ex. R.  His trial testimony made clear he has had no legitimate source of income for many years.  Therefore, he is using the $20 million in illegal profits he has been allowed to retain to fund these bail and living expenses in Manhattan. Demane is also free to leave that apartment for, among other things, shopping and errands, religious services, and other activities approved by Pretrial Services.  Ex. R.

inside information from inside sources to traders as part of Demane's larger scheme.  (Ex. U).
He too was paid millions of dollars by Demane and others for inside information.  *Id*.  And, like
his brother John, the government entered into an agreement with him pursuant to which he will
not be prosecuted, will not serve any jail time, will not forfeit any of the millions in cash he was
paid for inside information, and will not even have a felony on his record.  (Ex. T).

The fact that the government has extended such leniency to Demane, John Dodelande,
and Kevin Dodelande, all three of whom are unquestionably much, much more culpable than
Telemaque, should be considered in fashioning a just sentence for Telemaque Lavidas.
Moreover, none of the other "downstream tippees" presented at trial, about whom Telemaque
had no knowledge, including George Kordakis, Steve Makris, Yannis Xylas, Yomi Rodrig, Dov
Malnik and Tomer Fiengold, have been prosecuted.

### D.    A Sentence Well Below The Guidelines Range Will Be More Than Sufficient To Achieve The Goals Of Specific And General Deterrence

18 U.S.C. §3553(a)(2) requires this Court also to consider the need to "afford adequate
deterrence to criminal conduct" and to "protect the public from further crimes of the defendant,"
which courts have interpreted to mean both specific and general deterrence.  *See Gupta*, 904 F.
Supp. 2d at 352.

It seems clear that there is no need for specific deterrence in this case as Telemaque is
extremely unlikely to be a repeat offender.  Telemaque is a first-time offender who has been
convicted of providing inside information to a single perceived friend who cultivated that
relationship for the purpose of acquiring inside information.  Telemaque certainly has no
intention of maintaining his prior friendship with Nikas and the government has not alleged that
Telemaque ever considered sharing MNPI with anyone else.  Telemaque is not someone who
works in the financial services industry and he has traded no securities in his lifetime.

In addition, this case has of course already cost him dearly. As of the date of this filing, he has served approximately eight months' imprisonment first at the MCC and then at the MDC. These are high security facilities that hold the most dangerous offenders. Because of COVID-19, to date almost two months of that time was served on lockdown, when he could leave his cell only three days a week for at most an hour, and often less. And, so far, for three months of that time he was allowed no visits whatsoever with his family, lawyers, or anyone else. He has been publicly shamed among his friends, family, and business associates in the United States and Greece. Even more important to him, he has now missed his opportunity to watch his daughter learn to walk and talk and he has missed the birth of his son last month. Telemaque would never do anything to jeopardize missing more time with his wife and children. He also knows he has left his wife with an incredibly heavy burden to bear in his absence, giving birth and raising their very young children half a world away from either of their families in the middle of a global pandemic. He knows the emotional and psychological toll that his infant children will be forced to pay if a portion of their formative years are spent without a father. (Ex. D). These are costs for which he will spend the rest of his life atoning.

Statistics also show that Telemaque is highly unlikely to be a repeat offender. Publications by the U.S. Sentencing Commission confirm that true "first offenders" like Telemaque, with no prior convictions or arrests, have an "extremely low recidivism rate".[17] The

---

[17] United States Sentencing Commission, *Recidivism And The "First Offender"* (May 2004), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf at page 17 (reporting a 6.8% recidivism rate for true first time offenders). This study notably does *not* differentiate between different types of crime even though defendants convicted of fraud are the least likely to recidivate.

U.S. Sentencing Commission has also reported that defendants convicted of fraud-related crimes are less likely to recidivate than defendants convicted of any other crimes.[18]

Although Telemaque understands that the Court must also consider the needs of general deterrence when fashioning an appropriate punishment, we respectfully submit that the goals of general deterrence have already been achieved and that further prison time will not advance those goals.  As discussed above and below, as of this filing he has already served eight months' in prison under very harsh conditions and has been punished much more severely than the typical non-violent financial crimes offender serving the same amount of time.  Moreover, scholars have consistently concluded that it is the *certainty* of punishment, rather than its *severity*, that is the most effective deterrent for financial crimes.  *See U.S. v. Velazquez*, No. 16-cr-233, 2017 WL 2782037, *4 (S.D.N.Y. May 26, 2017) ("Current empirical research on general deterrence shows that while certainty of punishment has a deterrent effect, 'increases in severity of punishments do not yield significant (if any) marginal deterrent effects . . . Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence.'") (citation omitted).  This is especially true with white-collar offenders.  *See*, Richard A. Frase, *A More Perfect System: Twenty-five Years of Guidelines Sentencing Reform (Punishment Purposes)*, 58 Stan. L. Rev. 67, 80 (2005).  Thus, there is no empirical reason to believe that Telemaque's continued incarceration beyond the time he has already served will provide more effective general deterrence.  For example in *Chow*, Judge Woods determined that even a "short-term of incarceration," just three months, would "be effective to dissuade others from engaging in

---

[18] United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* (March 2016), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf at 20

similar conduct" without "being excessive in light of the other sentencing factors."  (Ex. I at

80:3-13).  Judge Woods explained that there would be a "very low positive value of an extended

jail stay for Dr. Chow."  *Id.* at 81:8-9.  The same is true for Telemaque.

**E.**     **An Extended Period Of Incarceration Will Impose Substantial Burdens On**
          **Telemaque's Wife, Two-Year Old Daughter, And Newborn Son In The**
          **Middle Of A Global Pandemic**

Even before the Supreme Court's ruling in *U.S. v. Booker*, 543 U.S. 220 (2005), clarified

that the Sentencing Guidelines are only advisory, the Second Circuit held that "extraordinary

family circumstances" were a valid basis for granting a downward departure from the Sentencing

Guidelines.  *See U.S. v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992).  Post-Booker, the Second

Circuit has continued to recognize that Courts should consider the burden a sentence will impose

on innocent family members when fashioning an appropriate sentence.  *See*, *e.g.*, *U.S. v. Isola*,

548 Fed. Appx 723, 725 (2d Cir. 2013) (identifying "[defendant's] family circumstances and the

effects of his incarceration on his daughter" as one of the factors to be considered under 18

U.S.C. § 3553(a)); *U.S. v. Bills*, 401 Fed. Appx 622, 624 (2d Cir. 2010) (holding that "the likely

effects of [defendant's] incarceration on her daughter" were one of the "mitigating factors" that

was appropriately considered under 18 U.S.C. § 3553(a)).  Consistent with this guidance, judges

within the Southern District have repeatedly issued sentences well below the Guidelines range in

comparable cases based, in part, on determinations that lengthy incarcerations would place

significant burdens on the defendants' family members.

For example, in *United States v. Blaszczak*, Judge Kaplan recently imposed a sentence

well below the Guidelines range on an insider trading defendant who was convicted after trial

based upon the burden that lengthy incarceration would impose on his wife and child.  The facts

were as follows: For six years, David Blaszczak sold inside information to hedge fund clients

that they used to realize over $7 million dollars in gains.  Ex. L at 2-3.  Blaszczak was paid more

than $700,000 for that information.  *Id*. at 9.  Judge Kaplan determined that Blaszczack had

"aggressively" pursued sources of inside information that he could sell and was "bold,

unapologetic, and giddy about what he was doing."  Ex. M at 62:15-24.  Under the Sentencing

Guidelines, Judge Kaplan calculated an offense level of 26, resulting in a sentencing range of 63-

78 months, *id.* at 22:19-23:1, the same range that the government has calculated for

Telemaque.  And yet, Judge Kaplan sentenced Blaszczak to only 12 months and one day in jail,

plus two years of supervised release.  *Id.* at 72:6-13.  The sole reason offered on the record for

this substantial deviation from the Guidelines was that Blaszczak's wife, who had a degenerative

eye disease, and child would be severely burdened by his absence.  Judge Kaplan stated: "[t]he

wreckage that a long period of incarceration would wreak on her and on your son is horrifying to

me.  And the sentence I am going to impose on you is going to reflect that."  *Id.* at 70:19-22.

Similarly, in *Chow* discussed above, Judge Woods stated the following when explaining

some of his reasons for issuing a sentence of three month's imprisonment after trial, even though

the Guidelines range was 63-78 months:

> I also emphasize that Dr. Chow is a father with a family with young children, he
> has elderly parents who he supports. . . Here, Dr. Chow's commitment to, in
> particular his parents given their deteriorating health, I think is a significant factor
> that weighs in favor of a downward variance.

(Ex. I at 82:24-83:6).

In Telemaque's case, an additional period of incarceration beyond the time he has already

served will impose additional severe burdens on his wife Caterina, his 2-year-old daughter, and

his newborn son.  These burdens are made extreme by the worldwide outbreak of coronavirus. [19]

---

[19] *See* CDC, Information on COVID – 19 and Pregnant Women and Children (February 24,
2010), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/pregnant-women-and-
children.html (warning that "[p]regnant women experience immunologic and physiologic

First, the support network that his wife Caterina previously had available to her to help raise the children is now totally unavailable. Caterina's mother, with whom she is very close, was planning to come to New York to assist her in taking care of their infant daughter and with the birth of their son. However, Caterina's mother, along with the rest of Caterina's family, are from Italy, which has been devastated by the virus, and none of them will be able to travel to the United States for the foreseeable future. Similarly, virtually all of Telemaque's family are currently located in Greece and cannot travel to the United States for the foreseeable future. If Telemaque remains in jail, Caterina will be left to take care of their newborn along with their infant daughter without the help of her husband, much less any other family. Many of the letters of support reinforce the important, active and loving role Telemaque played on a daily basis with his wife and daughter. (Ltr. Nos. 78, 90, 118, 119, 137).[20]

These circumstances have been made worse by the fact that all family (and other) visits were terminated at BOP facilities on March 13, 2020. This means that as of the date of this submission, Caterina and the children have not seen Telemaque for three months and, if he remains in custody, will not see him for the foreseeable future, as there is no indication social visits will resume at BOP any time soon. In addition, the months-long lockdowns imposed on BOP prisoners in the pandemic, during which Caterina only gets to speak to Telemaque on the phone for a few minutes three days a week, exacerbate the problem further.

Caterina has written eloquently to Your Honor about the impact her husband's incarceration has had on her and their children. A portion of her letter is excerpted below:

_____

changes which might make them more susceptible to viral respiratory infections, including COVID-19.").

[20] Telemaque and Caterina met, were married and had children long after the offense conduct that was charged in this case.

From the morning of his arrest on October 18th, 2019 until visits were terminated in March 2020, I visited my husband every single opportunity that I could both at the Metropolitan Correctional Center and subsequently at the Metropolitan Detention Center. It filled my heart with pride to see my husband continue to be an incredibly positive figure in many people's lives. No matter what life had thrown at us, he kept his head high and did what he had always done: help others – in this case, his fellow inmates. … No matter the hardships, and the tears shed, Telemaque was always the one reminding me of the many blessings life had given us: our love, our children, our health and the simple gifts of life like a walk under a cloudless sky. The power of faith he has discovered during his incarceration has given him immense strength and courage. He has found a new spiritual side to himself which is absolutely stunning to observe.

Even during Telemaque's darkest hours, the infinite adoration he feels for ▬▬▬▬▬ guided him to write a beautiful book for her. "Daddy, You are Back!" is a wonderful ode to the limitless love a father feels for his child. … ▬▬▬▬▬ and I read the book daily to keep Daddy's memory as alive and vivid as possible in her young and ever-changing mind. Every time as we finish reading the book, when in the book Daddy finally makes his way back home, my daughter screams "Daddy! Daddy… back!" and she then dashes to the door of our apartment to see if it actually is true… if Daddy really is going to emerge from behind that wooden door. It is heart-wrenching for a mother to see the disappointment in her daughter's eyes when she does not see her father behind that door. Yet, day after day, she repeats her actions hopeful that one day he will, in fact, return.

Throughout his incarceration, Telemaque has helped me immensely to get through troubling times, to stay focused on the light at the end of the tunnel. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬ The effects his incarceration will have on our children is something we will all have to live with for the rest of our lives and, unfortunately, we still do not know how deeply it will affect their delicate psyches.

The anxiety we were dealing with was terribly exacerbated with the arrival of Covid-19 in February 2020. Our life took an even darker turn. The country which was initially hit the hardest was Italy, my home country, and in particular Milan, the city I was raised in. Many friends and family members contracted the virus. Some didn't make it. I have since then been separated not only from my husband but also from the only support I had left – my family – my mother especially who was prohibited from traveling to New York. The United States closed its borders in early March and from that moment on, I knew that I was going to have to give birth completely by myself, isolated from all those I love in the midst of a tragic pandemic. New York City later on became the epicenter of the epicenter. ▬▬▬▬▬▬▬▬▬▬▬

When March 13th came around – the day the Metropolitan Detention Center suspended social visitations and I was no longer able to see Telemaque – it made everything harsher. We understood the importance of protecting the health of at-risk inmates and correctional staff but it made our life

so much more dire.  My daughter and I have not been able to see my husband since and, what I find even more worrying, is that we do not know when we will be able to see each other again, as there is no end in sight to the pandemic or the termination of visits at Bureau of Prisons jails.

At the end of March Telemaque was put on complete lockdown due to the pandemic.  Up until that day, I could at least talk to him over the phone every day for 10 minutes and we could communicate by email.  This provided a comforting and reassuring ritual and something that ████████ and I would avidly look forward to.  My daughter and I would wait by the phone longing to hear my husband's voice.  But since late March, he has been locked inside his cell.  He is allowed out only 3 brief hours a week so that he can update me on his mental and physical state, take a shower and do his laundry.  On most days I have no knowledge of his well-being during a pandemic and he has no knowledge about the well-being of me, our daughter, our son, or of his aging parents and family in Greece.

He has not seen me during the last months of my pregnancy.  We cannot rely any longer on the few things that made our life bearable: weekly visits and short daily phone calls.

On May 27th I slowly waddled to the hospital in the middle of the night with my hospital bag. A memory, a feeling of sadness, I will never unfortunately forget. . . . On May 28th at 7.51 a.m. I gave birth to a beautiful and healthy baby boy. . . . Giving birth completely by yourself during a global pandemic was a surreal and unpleasant experience – something I wouldn't wish on anyone. . . . His father was not there when he was born and what is worse is that we do not know when his father will be able to hold him for the first time. . .

It has been eight long months since Telemaque's arrest.  He beats himself up for not having been there to take care of his family during the times they needed him the most.  Our daughter is strong and fearless… but whenever we talk about her father she breaks down.  She misses her father terribly, she understands and feels that I am heartbroken too because of his absence, she screams "Daddy!" every time my phone rings hoping that the voice on the other end of the line is his.

I try to be the best mother possible considering the situation.  I am 28 years old, alone, in another continent, in the middle of a global pandemic we still know very little about, very far from my mother, family, friends and connections.  I am now also isolated from the connections I had in the city due to the strict rules of social distancing.  I desperately miss having my husband by my side. I do not know when I will see him next.  I deeply hope that we will be reunited soon, that he'll be able to hold his daughter, and that he will be able to meet his newborn son and treat him the same way he treated his daughter when she was born.

Telemaque and I built a dream together, to raise our children lovingly as partners and as equals. To create a family of respectful, morally upright and loving children.

Your honor, I respectfully beg you to consider leniency with my husband.  I ask you to consider us as a young, loving and growing family.  A wife and children who desperately need their husband and father at home with them because they miss him so much.

(Ltr No. 15).

There can be no doubt that Telemaque's absence imposes an enormous burden on his wife and children. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

We submit that a sentence of time served (8 months as of this filing), perhaps followed by some period of home confinement, instead of extended incarceration, would mitigate these risks to his family while satisfying the requirements of Section 3553(a).

### F.   Telemaque Has Already Been Punished More Severely Than Similarly Situated Defendants

18 U.S.C. § 3553(a)(6) directs this Court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  The conditions under which Telemaque has been in custody for the last eight months have been much more punitive than those ordinarily imposed on non-violent, first time financial crime offenders.  This fact should be considered in fashioning a fair sentence that is equivalent to the sentences typically imposed on such offenders.  Most first time white collar crime offenders – and indeed almost certainly all of the defendants discussed above in Section V.A who were convicted of crimes similar to Telemaque – self surrender after sentencing to a minimum security BOP camp.  But the MCC and the MDC, where Telemaque has been housed are, according to the BOP, designed to hold "extremely dangerous, violent, or escape-prone inmates."[21]  For example, in February of this year, prior to any coronavirus lockdown, the MCC went into lockdown because an inmate was hiding a gun in the facility.[22]  The MCC is severely overcrowded, houses nearly 50% more inmates than it was built to contain, and has extensive problems with rat and roach infestation.[23]  It has been likened to a "gulag" or the infamous prison at Guantanamo Bay.[24]  With respect to the MDC, a former warden stated that it is "one of the

---

[21] https://www.bop.gov/about/facilities/federal_prisons.jsp?device=mobile

[22] Dienst, Jonathan, Memo: MCC Enters 7th Day of Lockdown, Unclear When Operations Will Return to Normal, *NBC New York* (Mar. 4, 2020), *available at* https://www.nbcnewyork.com/news/local/crime-and-courts/mcc-enters-7th-day-of-lockdown-unclear-when-operations-will-return-to-normal-memo-shows/2312475/?amp

[23] Aratani, Lauren, Rats and raw sewage: Jeffrey Epstein jail blighted by 'horrible' conditions, *The Guardian* (Aug 17, 2019), *available at* https://www.theguardian.com/us-news/2019/aug/17/jeffrey-epstein-new-york-metropolitan-correctional-center-jail.

[24] Stahl, Aviva, Prisoners Endure A Nightmare 'Gulag' In Lower Manhattan Hidden In Plain Sight, *Gothamist* (June 19, 2018), *available at* https://gothamist.com/news/prisoners-endure-a-

most troubled, if not the most troubled facility in the Bureau of Prisons."[25]  In recent winters,

both the MCC and MDC have gone for periods without heat or light in the cells.[26]  Judge

Berman at a recent sentencing stated the following about both facilities:

> I've personally become acutely aware of the deficiencies at both the MDC, particularly everybody remembers that last winter, the absence of heat, light, hot water.  It was just a disaster over there during one of the coldest weeks of the winter. . . . Frankly it was unacceptable, beyond unacceptable, conditions of an emergency to be sure, but based on a seriously deficient system at core, which I frankly think is still deficient. . . To my knowledge, there have been no forthcoming serious reviews of the living conditions at either the MCC or the MDC. . . It is an outrage, I have to say, and I'm very disappointed that the Attorney General . . . has not implemented appropriate changes. . .  Those of us on the bench in the Southern District and Eastern District were fully – not fully, I would say – but anecdotally, for each of our cases, apprised of the unfortunate terrible conditions in these two federal facilities.  They are dirty.  They are infused with drugs. . . There is violence that goes on…

Ex. CC at 13:5-15:19.

The pre-existing harsh conditions at the MDC and MCC have only been exacerbated by

the outbreak of COVID-19.  As is explained above, beginning April 1, 2020, all inmates were

placed on lockdown for almost two months, only permitted to leave their cells three days a week

---

nightmare-gulag-in-lower-manhattan-hidden-in-plain-sight; Kudnani, Arun, The Guantanamo In New York You're Not Allowed to Know About, *The Intercept* (Feb. 5, 2016), *available at* https://theintercept.com/2016/02/05/mahdi-hashi-metropolitan-correctional-center-manhattan-guantanamo-pretrial-solitary-confinement/; Goldstein, Joseph, Manhattan Jail That Holds El Chapo Is Called Tougher Than Guantanamo Bay, *New York Times* (Jan 23, 2017), *available at* https://www.nytimes.com/2017/01/23/nyregion/el-chapo-guzman-manhattan-jail.html.

[25] Annie Correal and Joseph Goldstein, "It's Cold as Hell": Inside a Brooklyn Jail's Weeklong Collapse.  *New York Times* (Feb. 9, 2019), *available at* https://www.nytimes.com/2019/02/09/nyregion/brooklyn-jail-no-heat-inmates.html

[26] *See* Brown, Stephen Rex, Federal Jail where Jeffrey Epstein killed himself gets new leadership, including lawyer at center of heating crisis in Brooklyn lockup, *Daily News* (Jan. 12, 2020), *available at* https://www.nydailynews.com/new-york/ny-mcc-epstein-warden-20200112-ydboox34k5cxpbi5lzx2mc3gvu-story.html (noting heating issues at both MCC and MDC); *see also* Annie Correal and Joseph Goldstein, "It's Cold as Hell": Inside a Brooklyn Jail's Weeklong Collapse.  *New York Times* (February 9, 2019), *available at* https://www.nytimes.com/2019/02/09/nyregion/brooklyn-jail-no-heat-inmates.html

for between 15 minutes and an hour to attend to basic needs like bathing, doing laundry, and calling family members briefly. After those restrictions were briefly relaxed during weekdays, they were then imposed again in early June in response to recent protests related to George Floyd. And with all family and social visitations terminated since March 13, 2020, Telemaque has been cut off from his pregnant wife, two-year-old daughter and newborn baby for more than three months with no date in site for resumption of visits.

Telemaque has already experienced much harsher conditions than similarly situated defendants who serve their sentences in less restrictive facilities and circumstances. Although the specific hardships created by COVID-19 are relatively new, judges within the Southern and Eastern Districts regularly consider at sentencing factors beyond a defendant's control that would increase the severity of the sentence. For example, in *United States v. Connolly*, Chief Judge McMahon was confronted at sentencing with a defendant who, because of his status as a non-citizen, would be forced to serve his sentence at a more restrictive facility than similarly situated defendants and would also be detained by ICE after his sentence for deportation, where he would also face harsh conditions of confinement. Even though the government was demanding a lengthy sentence, Judge McMahon sentenced the defendant to probation and nine months home confinement in order to avoid subjecting him to this disparate treatment:

> If I could sentence Mr. Black to a term of incarceration – a brief term of incarceration – knowing that he would go to a facility appropriate to his criminal conduct, I would do it. But I know that I can't. I know that simply because he is a non citizen . . . because he is a non citizen, he will not be eligible to serve his sentence in the same way that any American citizen who stood convicted of this crime would serve. And that's not right...

Ex. DD at 91:8-16 Accordingly, Judge McMahon acknowledged that in considering the appropriate sentence, the conditions in which the defendant would be imprisoned must be considered to avoid unfair disparities in sentencing. Similarly, in *United States v. Millul*, Judge

Rakoff sentenced a defendant to less time in prison because, as an alien, he would not be able to serve his time in a BOP camp and he would be subject to detention in an ICE facility prior to deportation.  Ex. EE at 26:3-16.  For the same reasons Judge Weinstein held it was appropriate to sentence non-citizens to more lenient sentences because of the much more harsh conditions of confinement faced by non-citizens.  *U.S. v. Chin Chong*, No. 13-CR-570, 2014 WL 4773978 (E.D.N.Y Sept. 24, 2014).  These cases make clear that external factors that would unavoidably increase the severity of any imposed sentences are relevant considerations when fashioning an appropriate sentence.  In this case, we submit that this Court should consider the harsh conditions Telemaque has already faced, and will continue to face during any further incarceration, in considering whether further incarceration is needed to impose punishment that is "not greater than necessary" for the convicted offense.

Additionally, it is important to note that, despite the harsh conditions of his confinement, Telemaque has been a model prisoner.  He has used his time productively to help fellow inmates study for their GEDs, learn English or math, or even just solve other daily problems of life.  (Ltr. Nos. 9, 58, 68, 138).  He has also used his time to write a book to help young children deal with separation from their fathers.  (Ex. F).

    **G.**    **<u>A Sentence of Time Served, Possibly With Some Period of Home Confinement, Serves the Interests of the Federal Prison System and Is Fair to Telemaque</u>**

Sentencing Telemaque to time served also serves two other important interests.  First, releasing him to home confinement will greatly reduce his risk of contracting coronavirus, which

has spread widely in the federal prison system, where more than 5900 prisoners have tested

positive as of this filing date and 78 have died.[27]

Second, both courts and the Attorney General of the United States have acknowledged

that reducing the population inside crowded BOP facilities will reduce the spread of the virus.

*See U.S. v. Nkanga*, 18-CR-713 (JMF), 2020 WL 1529535 *1 (SDNY Mar. 31,

2020), reconsideration denied, 18-CR-713 (JMF), 2020 WL 1695417 (SDNY Apr. 7, 2020)

(Judge Furman) ("the best – perhaps the only -- way to mitigate the damage and reduce the death

toll is to decrease the jail and prison population by releasing as many people as possible").

Along those lines, on March 26, 2020, the Attorney General issued a directive to the Bureau of

Prisons stating that "One of the BOP's tools to manage the prison population and keep inmates

safe is the ability to grant certain eligible prisoners home confinement in certain circumstances."

He directed the BOP to consider releasing "inmates who are non-violent and pose minimal

likelihood of recidivism" to home confinement, and listed several factors to consider, including

the CDC health risk factors of the inmate, whether the inmate was in a low security facility, the

inmate's conduct in prison, the inmates score on BOP's recidivism scoring system, whether the

inmate has a verifiable reentry plan (including a stable place to serve home confinement) and the

inmate's crime of conviction.  (Ex. FF).  On April 3. 2020, the Attorney General issued another

directive, making the finding under the CARES Act that BOP faces "emergency conditions,"

thereby granting BOP statutory authority to expand the group of inmates who could be

considered for home confinement. (Ex. GG).  The AG further directed that "time is of the

essence" and that eligible inmates should be transferred home immediately if they can

---

[27] Federal Bureau of Prisons COVID-19 Resource Page, available at
https://www.bop.gov/coronavirus/index.jsp.

successfully quarantine at home and even if electronic monitoring was not currently available.

*Id.*  Pursuant to these directives, as of the date of this filing, BOP has released more than 3800

federal inmates to home confinement.[28]  In addition, hundreds others have been granted

compassionate release either by courts or by BOP.  Many of those being released have served

only a fraction of their sentence, including, for example, Michael Cohen, who is 53 and was

released to home confinement for the remainder of his three year sentence after serving only one

year,[29] Paul Manafort, who was released to home confinement after serving only three of his

seven year sentence,[30] a former mayor who was sentenced to 20 years for bribery but was

released to home confinement after only eight years,[31] and a 51-year-old CEO released to home

confinement after serving only 4 years of his 7.5 year sentence for tax evasion.[32]

 We submit that under these circumstances, a sentence of time served that releases

Telemaque to home confinement serves the ends of punishment and is consistent with BOP's

---

[28] *Id.*

[29] Gurman, Sadie, Trump's Lawyer Michael Cohen Released To Home Confinement, *The Wall Street Journal*, (May 21, 2020) *available at* https://www.wsj.com/articles/trumps-former-lawyer-michael-cohen-released-to-home-confinement-11590075443

[30] Faulders, Katherine, Former Trump Campaign Chairman Paul Manafort Released to Home Confinement Amid Coronavirus Concerns, *ABC News*, (May 13, 2020) *available at* https://abcnews.go.com/Health/trump-campaign-chairman-paul-manafort-released-home-confinement/story?id=70642927

[31] Former St. Gabriel mayor released early from federal prison, *WAFB9*, (May 28, 2020) *available at* https://www.wafb.com/2020/05/28/former-st-gabriel-mayor-released-early-federal-prison/

[32] Killman, Curtis, Former Arrow Trucking CEO released from prison to go to home confinement, *Tulsa World*, (May 7, 2020), *available at* https://www.tulsaworld.com/news/local/crime-and-courts/former-arrow-trucking-ceo-released-from-prison-to-go-to-home-confinement/article_e51e30a4-2f4f-5f24-9a4e-9280ae9d5cc8.html

current efforts to reduce the prison population, especially with respect to non-violent offenders who present a low risk of recidivism.

## VI.    CONCLUSION

Telemaque Lavidas is an exceptional man who has already been punished extensively as a result of his indictment and conviction in this case.  Given his history and characteristics, the facts of his crime, comparable sentences issued to similarly situated defendants, and the severe burdens that lengthy incarceration will have on his wife and young children, we respectfully request that the Court impose a sentence of time served, followed by a reasonable period of supervised release and community service that the Court deems appropriate.

Dated: June 8, 2020                               Respectfully submitted,


                                                  DECHERT LLP

                                                  By:  /s/ Jonathan R. Streeter
                                                  Jonathan R. Streeter
                                                  Brian C. Raphel
                                                  Siobhan M. Namazi
                                                  Three Bryant Park
                                                  1095 Avenue of the Americas
                                                  New York, New York 10036-6797
                                                  Jonathan.streeter@dechert.com
                                                  Brian.raphel@dechert.com
                                                  Siobhan.namazi@dechert.com
                                                  Tel.: (212) 698-3826
                                                  Fax: (212) 314-0046

                                                  *Attorneys for Defendant*
                                                  *Telemaque Lavidas*

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on the 8th day of June 2020, I electronically filed this Sentencing Memorandum On Behalf Of Telemaque Lavidas, and the exhibits annexed thereto, using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

<u>/s/ Jonathan R. Streeter</u>
Jonathan R. Streeter

*Attorney for Defendant Telemaque Lavidas*