# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                       :

UNITED STATES OF AMERICA      :

                                         :     S1 19 Cr. 741 (WHP)

           - v. -             :

                                         :

BRYAN COHEN,                 :

                                         :

                       Defendant.   :

                                         :

------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING SUBMISSION

                                    AUDREY STRAUSS
                                      Attorney for the United States,
                                      Acting Under Authority Conferred by
                                      28 U.S.C. § 515

Richard Cooper
Daniel Tracer
Drew Skinner
Assistant United States Attorneys
     *- Of Counsel -*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND .................................................................................................................... 2

    Cohen's Relationship with Demane ................................................................................. 2

    Trading in Syngenta ......................................................................................................... 5

    Trading in Buffalo ............................................................................................................ 7

PROCEDURAL HISTORY .................................................................................................... 8

DISCUSSION ........................................................................................................................ 9

    Applicable Law ............................................................................................................... 10

    The Seriousness of the Offense ...................................................................................... 10

    The Widespread Insider Trading and Illicit Profits ....................................................... 12

    Nature and Circumstances of the Defendant ................................................................. 14

    Comparable Sentences in Insider Trading Cases ........................................................... 17

CONCLUSION .................................................................................................................... 19

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in advance of the sentencing of Bryan Cohen ("Cohen" or the "defendant") scheduled for June 4, 2020.

Cohen is a sophisticated investment banker who worked at a prestigious global investment bank for nearly ten years. During that time, Cohen well understood the importance of maintaining client confidentiality and received training on the laws strictly prohibiting insider trading. Notwithstanding his privileged background and coveted employment, the defendant chose to engage in criminal conduct in order to line his pockets. Over a multi-year period, the defendant betrayed his employer and his corporate clients by secretly stealing confidential business information that had been entrusted to him, and providing that information to a securities trader, Marc Demane Debih ("Demane") so that Demane could place timely, profitable securities trades based on that information and share those profits with Cohen.

Contrary to the defendant's attempt to paint himself as Demane's puppet who attempted to resist participating in this scheme at every turn (*see* defendant's sentencing submission, Dkt. No. 43 ("Def. Sub.")), the defendant knowingly and repeatedly engaged in this scheme for a simple reason: to receive a portion of Demane's trading profits in cash. The defendant's participation in the scheme was cunning and calculated; he communicated his stolen information over unregistered burner phones in order to evade law enforcement and he arranged for his cash payments to be picked up in person. Through his conduct, the defendant evinced a clear disregard for the law, betrayed the confidences that were placed in him by his employer and his clients, and undermined the integrity of our capital markets. Accordingly, and for the reasons set forth below, the Court should impose a sentence of 37 months' imprisonment, a sentence at the upper end of the agreed-upon range pursuant to the United States Sentencing Guidelines (the "Guidelines" or "USSG").

1

Such a sentence is sufficient but not greater than necessary to serve the legitimate ends of sentencing.

## **BACKGROUND**

Between 2010 and 2019, the defendant was employed as an investment banker at Goldman Sachs ("Goldman"), first as an associate in London, and then as a vice president in New York. (*See* 3/26/20 Presentence Investigation Report ("PSR"), Dkt. No. 36, ¶ 12). During that time, Cohen had access to material non-public information ("MNPI") about Goldman's clients by virtue of his work focusing on mergers and acquisitions. (*Id.*). At Goldman, Cohen was trained on the rules and requirements of confidentiality and understood that it was illegal to share MNPI, including for the purpose of engaging in securities trading. (*Id.*). From at least 2015 through 2017, however, the defendant repeatedly violated his duties and shared MNPI about a number of Goldman clients with Demane, knowing that Demane intended to use the information to engage in insider trading. (*Id.*). In exchange, Demane provided Cohen with a portion of his insider trading profits in cash. (*Id.*).

*Cohen's Relationship with Demane*

Cohen and Demane embarked on their illicit scheme after meeting through another London-based investment banker at Goldman in or about 2014. (*Id.* ¶ 13).[1] At that time, Cohen learned that Demane was a stock trader and Demane learned that Cohen was an investment banker with access to MNPI. (*Id.*). A short time later, Cohen and Demane met at a friend's destination wedding in the south of France in or about the summer of 2014. (*Id.*). Cohen and Demane spoke

---

[1] In his sentencing submission, Cohen notes that he had also met Demane briefly in or about late 2011 but that meeting did not lead to any meaningful relationship between the two. (Def. Sub. at 6, 10). Cohen also disputes that he knew that Demane was a securities trader at the wedding in 2014. (*Id.* at 10). It is undisputed, however, that Cohen understood Demane's intention to trade when he provided MNPI to Demane from 2015 through 2017.

numerous times during that trip and developed a sense of their mutual friends and their respective business activities. (*Id.*). During these conversations, Cohen provided additional information about his work at Goldman, including the kind of client information he had access to, and Demane attempted to recruit Cohen as a source of MNPI, telling Cohen that if Cohen provided information to Demane, Demane could buy securities on Cohen's behalf and share the profits with Cohen. (*Id.*).

Following these conversations at the wedding, Cohen and Demane agreed to meet again in London. (*Id.* ¶ 14). In or about October 2014, Cohen and Demane met for dinner at the Chiltern Firehouse hotel in London. (*Id.*). At that meeting, Cohen and Demane picked up where they left off from their conversations – Demane reiterated that Cohen should pass any inside information he could get through work and they could share profits from insider trading. (*Id.*). In furtherance of their budding illicit relationship, Demane gave Cohen an envelope with a prepaid, unregistered "burner phone" (that already had Demane's burner phone number saved) and approximately $10,000-$15,000 in cash. (*Id.*). Although Cohen had not yet passed any MNPI, this payment was an inducement for Cohen to enter into the relationship. (*Id.*). Demane also explained to Cohen not to call Demane on his real phone, but rather to only use burner phones like the one Demane had provided. (*Id.*).

Sometime later, Demane got a call from Cohen and Cohen stated that he had something for Demane. (*Id.* ¶ 15). Demane and Cohen then met at a bar in London where Cohen provided his first tip to Demane. (*Id.*). Cohen continued providing inside information to Demane from approximately early 2015 through approximately late 2017. (*Id.*). At the beginning of their relationship, Demane and Cohen met in person when Cohen was working at Goldman in London. (*Id.*). Cohen later moved to New York at which point he and Demane continued sharing inside

information over burner phones. (*Id.*).[2] Once Cohen moved to New York, Demane arranged for Cohen to pick up the burner phones from the New York restaurant of Demane's friend, Georgios Nikas, the owner of a Greek food franchise in New York and also an insider trader. (*Id.*). In particular, Nikas (through an employee identified herein as the "Nikas Employee") would secure the burner phones and call Cohen to tell him that his "uncle" (a codename for Demane) had a package or "gift" for him to pick up. (*Id.* ¶ 16). Between deals, Cohen and Demane would switch burner phones to avoid detection by law enforcement. (*Id.*). In addition, when they texted or exchanged information over burner phones, they would use a code; for example, they would shift the digits by 3 places in a number being provided such that 212 would become 545, or 934 would become 267. (*Id.*). During the scheme, Demane told Cohen that he would only use the MNPI to trade himself and not pass it to others. (*Id.*).

In total, Cohen passed MNPI relating to a number of deals to Demane and Demane provided a substantial amount of cash to Cohen as compensation. (*Id.* ¶ 17). In particular, Cohen or Cohen's brother would pick up the cash in the South of France (where Cohen's family lived) once the money was brought there by associates of Demane. (*Id.*). Demane recalls providing at least approximately $1 million worth of cash to Cohen in this fashion. Cohen kept that cash in a safe in his parents' house in the south of France and used some of the cash to buy real estate. (*Id.*).[3] After receiving tips from Cohen, Demane traded in the stock and passed the tips to others

---

[2] Cohen's submission notes that when he moved to New York he had had not "spoken with Demane for more than a year." (Def. Sub. at 10). Records obtained by the Government and produced to Cohen demonstrate, however, that Cohen picked up his first burner phone within approximately a month of moving to New York and had no problem providing MNPI to Demane shortly thereafter, despite Demane being halfway around the world. These facts suggest—contrary to the self-serving suggestion by Cohen—that there was never any real gap in Cohen and Demane's illicit relationship.

[3] The defendant disputes storing money at his parent's house and asserts that his family had no knowledge of his wrongdoing. (Def. Sub. at 11). Whether or not Cohen ever told his family

4

to trade including Georgios Nikas. (*Id.*). Demane and Nikas also traded on these tips together through an investment fund they owned called "Argo." (*Id.*). Through its investigation, the Government identified two such deals about which Cohen passed MNPI: Syngenta AG ("Syngenta") and Buffalo Wild Wings ("Buffalo").

*Trading in Syngenta*

From at least approximately 2015 through 2016, Syngenta was a client of Goldman. (*Id.* ¶ 18). Syngenta is a Swiss company whose stock trades in Swiss francs (CHF) on a Swiss exchange. In addition, Syngenta has U.S. dollar-denominated securities, which are called American Depository Shares ("ADSs") that trade in the U.S. (*Id.*). At various times, Cohen was assigned to work on potential corporate transactions on behalf of Syngenta and, in doing so, learned MNPI about the company. (*Id.*). Cohen then passed that MNPI to Demane who traded and/or passed that information to others including Nikas. (*Id.*).

For example, in April 2015, Cohen learned that Syngenta had received an offer of purchase from another company called Monsanto. (*Id.* ¶ 19). The offer represented an approximately 35 percent premium over Syngenta's then-share price. (*Id.*). Cohen passed that information to Demane, who in turn passed it to Nikas and other securities traders residing overseas. (*Id.*). Nikas then proceeded to make timely purchases of Syngenta securities in April and May 2015 based on the MNPI from Cohen. (*Id.*). In particular, Nikas bought Syngenta ADSs and contracts for difference ("CFDs")[4] that were based on Syngenta's ADSs. (*Id.*). On or about

about his insider trading, he told Demane that he kept money there and that he was investing the proceeds in real estate. More fundamentally, there is no dispute that Cohen received substantial amounts of cash for his crimes, and the Government would be prepared to prove any additional facts about the receipt of that cash at a hearing.

[4] A contract for difference is a contract between two parties, typically described as "buyer" and "seller," stipulating that the seller will pay to the buyer the difference between the current value of an asset and its value at contract time. A CFD relating to a company's stock is a financial

May 8, Syngenta publicly announced the details of the offer and premium from Monsanto and that Syngenta had rejected that offer. (*Id.*). This announcement caused Syngenta's stock price as well as the price of its ADSs to rise by approximately 19 percent and 11 percent, respectively. (*Id.*). After the announcement, Nikas made approximately $780,000 in profits from his Syngenta securities. (*Id.*).[5]

By way of further example, in or about the summer of 2015, Syngenta began to receive acquisition offers from the China National Chemical Corp. ("ChemChina"). (*Id.* ¶ 20). Over the next few months, from the fall of 2015 through February of 2016, Syngenta's board of directors engaged in discussions with ChemChina about a potential acquisition. (*Id.*). During that same time period, Cohen passed MNPI about these discussions to Demane, who passed it to Nikas. (*Id.*). Based on that MNPI, Demane, Nikas, and the Argo fund made numerous purchases of Syngenta shares, ADSs, and CFDs. (*Id.*).[6] On or about February 2, 2016, news of the ChemChina acquisition began appearing in the press. (*Id.*). This caused Syngenta's stock price – and the price of its ADSs and CFDs – to increase significantly. (*Id.*). In the days and weeks following this announcement, Demane, Nikas, and the Argo fund made substantial profits. (*Id.*). For example, on or about February 3, 2016, Demane sold his Syngenta Swiss CFDs for over CHF

---

instrument tied to the value of the underlying stock. In general terms, a CFD allows a trader to speculate on share price movements in the underlying security without actually owning the underlying shares. CFDs do not trade in the United States, and therefore provide a means for individuals to trade in securities listed on exchanges in the United States, without actually taking ownership of the shares in their own names.

[5] Although Nikas made substantial profits based on MNPI provided by Cohen in both Syngenta and Buffalo, those profits are not cognizable for Guidelines purposes because Demane told Cohen that he would not share the MNPI further.

[6] Much of the trading and profits based on Syngenta MNPI occurred in Swiss shares and through Swiss-based CFDs. Those profits did not result from U.S.-exchange based trading, and therefore they are considered extraterritorial conduct and are not cognizable for Guidelines purposes.

3.5 million in profits. (*Id.*). Likewise, the Argo fund made over CHF 4 million in profits from selling Syngenta securities. (*Id.*).[7]

*Trading in Buffalo*

In or about August 2017, Cohen transferred to Goldman's New York office. (*Id.* ¶ 21). Almost immediately thereafter, Cohen began receiving burner phones from Nikas to engage in insider trading. For example, on or about September 12, 2017, the Nikas Employee called Cohen about picking up a phone at Nikas's restaurant on Fulton Street, near Goldman's New York office. (*Id.*). About an hour later, Cohen swiped out of Goldman's office, returning approximately one hour later. (*Id.*). With his burner phones, Cohen was able to provide MNPI to Demane from New York about, at least, the acquisition of Buffalo. (*Id.*).

Beginning in or about October 17, 2017, Buffalo began working with Goldman about the possibility of an acquisition. (*Id.* ¶ 22). Buffalo's stock traded on the NASDAQ in New York. (*Id.*). In October and November 2017, Cohen was assigned to work on that deal and provided information about the ongoing discussions to Demane, who provided that information to Nikas. (*Id.*). Demane and Nikas then engaged in timely, profitable securities trading based on that MNPI. (*Id.*). On or about November 28, 2017, Buffalo announced that it would be acquired, causing its stock to jump by over 6 percent and thereby causing Demane and Nikas to earn considerable profits. (*Id.*). For example, on November 21, 2017, the Argo fund bought 20,000 shares of Buffalo. (*Id.*). Then on November 28, 2017, the Argo fund sold all 20,000 shares immediately following the announcement of Buffalo's acquisition for approximately $260,000 in profits. (*Id.*). Likewise, Nikas sold his position of Buffalo shares after the November announcement for a profit of over $970,000. (*Id.*).

---

[7] In and around February 2016, one Swiss Franc was equal to approximately one U.S. Dollar.

In addition, and notwithstanding Cohen's repeated references to his decision to voluntarily cease engagement in this criminal scheme "nearly two years before his arrest," (*see, e.g.*, Def. Sub. at 1, 8, 45), phone records obtained from the Nikas Employee and produced to the defendant demonstrate that Cohen was in communication with the Nikas Employee – a worker at a Greek restaurant and Cohen's source of burner phones for the scheme – at least as late as April 2018, thereby suggesting that Cohen's participation in the scheme likely continued into 2018.

## PROCEDURAL HISTORY

On October 16, 2019, the grand jury returned an indictment charging Cohen with two counts of conspiracy to commit securities fraud.  Cohen was arrested on October 18, 2019 and released that day on bail.  (*Id.* ¶ 23).  At the time of his arrest, Federal agents conducted a search of Cohen's residence in New York and recovered $24,000 in cash bundled together in a glasses case that was stored in a closet at the residence.  (*Id.*).

On December 11, 2019, the grand jury returned a superseding indictment charging Cohen in five counts of conspiracy and substantive securities fraud and wire fraud for his participation in this scheme.  At the defendant's arraignment on the superseding indictment on December 16, 2019, the Court set this case for trial on February 4, 2020.  On January 7, 2020, the defendant pleaded guilty to count one of the superseding indictment charging him with conspiracy to commit securities fraud pursuant to a plea agreement with the Government.  This Court accepted the defendant's plea on January 28.  (Dkt. No. 33).  Sentencing was initially set for April 3, 2020. Given the onset of the COVID-19 pandemic, however, the sentencing was adjourned to May 28, and then to June 4, 2020, and is scheduled to proceed by video pursuant to the terms of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). Pub. L. No. 116-136, 134 Stat. 281.   (Dkt. No. 42).

The parties as well as the U.S. Probation Office agree on the Guidelines calculation in this case. In particular, the offense level is 19 calculated as follows: a base offense level of 8 pursuant to USSG § 2B1.4(a); a 12-level enhancement based on a cognizable gain of $260,000 pursuant to USSG §§ 2B1.4(b)(1) and 2B1.1(b)(1)(G); a 2-level enhancement because the offense involved the abuse of a position of trust pursuant to USSG § 3B1.3; and a 3-level reduction for acceptance of responsibility pursuant to USSG §§ 3E1.1(a) and 3E1.1(b). (PSR ¶ 9). The defendant has no known criminal history. Accordingly, the recommended USSG range is 30-37 months' imprisonment. (*Id.*). The Court has imposed an order of forfeiture for $260,000 and the defendant has already agreed to forfeit his bail money and the funds seized from his apartment in order to satisfy that obligation. (Dkt. Nos. 34, 37, 38). Through its supplement to the PSR, the Probation Office has recommended a sentence of 24 months' imprisonment as well as a voluntary surrender. (PSR at 22, 27). In summary, the Probation Office concluded that, "[n]o reason other than greed presents itself for the defendant's motivation to commit this offense. Based on this information, a significant term of imprisonment is warranted in this case. However, based on the defendant's lack of criminal history and history of gainful employment, a sentence below the advisory Guidelines range is also warranted." (*Id.* at 23).

## DISCUSSION

The Government recommends that the Court impose a sentence of 37 months' imprisonment. Given the intentional and continuing nature of his offense, the widespread illegal trading occasioned by his repeated breaches, and the defendant's personal history and characteristics, this substantial term of imprisonment is necessary to meet the statutory ends of sentencing, including just punishment, specific and general deterrence, and promoting respect for the law. The defendant's requested dramatic departure to a sentence of community service would

send the wrong message about the seriousness and wrongfulness of the defendant's conduct and would be contrary to the sentencing goals of 18 U.S.C. § 3553.

*Applicable Law*

Once the Court has calculated the applicable sentencing guidelines, it must consider an appropriate sentence under the totality of factors set forth under Title 18, United States Code, Section 3553(a). While the Court must calculate the Guidelines, it is "emphatically clear that the Guidelines are guidelines--that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). "A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *Id.* at 188. "A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *Id.* 189; *United States v. Genao*, 869 F.3d 136, 141 (2d Cir. 2017) ("The sentencing court must make an individualized assessment based on the facts presented.").

*The Seriousness of the Offense*

The crime that the defendant committed was very serious. For one thing, this was no momentary lapse or fleeting failure. The defendant engaged in a protracted course of conduct over a multi-year period. He communicated MNPI to Demane about at least two substantial corporate acquisitions. And the defendant passed along multiple updates about those acquisitions as he learned them in real time. For example, the trading in Syngenta described above shows that the defendant passed MNPI to Demane over an approximately year-long period, including as the company was receiving confidential offers from Monsanto in the Spring of 2015 and continuing through the consummation of an acquisition with ChemChina in early 2016. Demane (and his tippees) thus had a steady stream of secret information, enabling them to profit – and therefore Cohen to profit – at each step of the way. And while Demane may have made more profits

10

through this scheme, it is people like the defendant – with their access to inside information – that make the entire criminal enterprise of insider trading possible.

The way the defendant committed this crime can only be described as brazen. Shortly after arriving in New York, Cohen literally walked a few blocks from Goldman's offices in Manhattan to a Greek restaurant to pick up a pre-paid, unregistered "burner" phone from a complete stranger. He then used that phone to speak in complex code to Demane, and even switched phones between deals. The defendant then arranged to be paid in cash overseas for his crimes. These are not the trappings of some amateur, thoughtless crime; they are the actions of someone who knew what he was doing was wrong and took every precaution to evade detection. Sentencing in this case should mirror the type of criminality evidenced by the defendant.

The sophistication of this scheme, including the means described above, and others like it, make the crime of insider trading particularly difficult to detect and prosecute. *See United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) ("As this Court has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail."). This conviction, the third to date in this larger insider trading network, is the result of an investigation that has been ongoing for many years and has required the expenditure of significant law enforcement resources. For that reason, when crimes like this one are uncovered and successfully prosecuted, it is critical that they serve as examples to other insider trading criminals and would-be criminals. (*See id.*). Here, the imposition of a significant term of incarceration is critical to that end. It is that element of punishment that is necessary to effectively prevent people from engaging in such crime in the first place. *Cf. United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009) ("[I]t is difficult to imagine a would-be white-collar criminal being deterred from stealing millions of dollars from his

company by the threat of a purely probationary sentence."). Moreover, the sentence must be sufficient lengthy to achieve its goals, including just punishment and deterrence. *See generally* USSG §1A1.1 (Policy Statement) ("Third, Congress sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity."); *Robles v. United States*, No. 14 Civ. 9311 (LAP), 2017 WL 1025993, at *3 (S.D.N.Y. Mar. 16, 2017) (noting that "a longer sentence" may be appropriate "given the seriousness of the offense" and "for the purpose of deterrence").

In addition, the defendant continues to minimize his conduct. As described above, the suggestion in his sentencing submission that his will was overborne by Demane is nothing more than an attempt to avoid responsibility, while in fact he was a well-educated and sophisticated investment banker who was a key player in this crime and who made a series of calculated decisions to break the law and cover his tracks. In addition, his claims that he voluntarily terminated his criminal conduct before his arrest (*see, e.g.*, Def. Sub. 53), ring hollow in light of the evidence that he picked up burner phones from a criminal associate in 2018 even after he supposedly voluntarily withdrew from the scheme. (*see supra* at 8). These attempts at minimization are not fully consistent with the defendant's claim that he "wholly accepts responsibility for his conduct and does not attempt to make any excuses for it." (Def. Sub. 6).

*The Widespread Insider Trading and Illicit Profits*

The defendant's perpetration of this crime also had far-reaching and significant consequences. When the defendant began his insider trading relationship with Demane, he knew Demane was a securities trader and he knew that Demane was wealthy. Based on the context in which he met and interacted with Demane, the defendant likewise understood that Demane was well-connected in the banking and finance community. It is thus unsurprising that passing MNPI to Demane resulted in the fueling of a vast and wide-ranging insider trading scheme.

For one thing, the defendant's passing of MNPI enabled Demane to illicitly trade in a wide variety of securities and financial instruments related to the stock of Syngenta and Buffalo. As explained above, that trading led to significant profits for Demane, including hundreds of thousands of dollars from the U.S. exchange traded securities of Buffalo, and over $7 million dollars in profits from the foreign CHF-based securities of Syngenta. While the amounts of these Syngenta-related gains are not cognizable under the Guidelines because they were the results of non-U.S. securities trading by Demane, they provide context for the scope of the criminal enterprise in which the defendant and Demane engaged, and they are thus helpful in determining a fair and just sentence. *See* U.S.S.G. §1B1.4 ("In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law.").

Moreover, by providing MNPI to Demane, the defendant enabled insider trading by a network of insider traders who received that information from Demane. For example, as described above, Demane shared MNPI with Nikas as well as the manager of the Argo Fund, which led to exponentially greater insider trading activity and the corruption of the market for at least Syngenta and Buffalo's securities. Thus, the defendant is held responsible for a smaller amount of gain under the Guidelines, but by sharing the MNPI in the first place, he remains the but-for cause for additional illegal profits generated through the scheme. In short, through his actions the defendant enabled a far-reaching insider trading scheme and the Court should take that context into consideration in imposing sentence. The defendant's sentencing submission notes that "loss enhancements" are a poor indicator of moral seriousness. (Def. Sub. at 42). That is true of this case but not for the reason given by the defendant; the relatively small dollar amount of gain does

not fully capture the scope of the defendant's crime, his culpability, and the substantial market dislocations he caused.

*Nature and Circumstances of the Defendant*

The defendant understandably spends the overwhelming majority of his submission focusing on his personal life and characteristics, rather than the facts described above. Without detracting from the defendant's achievements in other aspects of his life, a couple of points are worth noting. First, the defendant's submission makes clear that the defendant had a wholesome family life, is highly intelligent, and consistently attained top academic achievements. (*See, e.g.*, Def. Sub. at 13 ("Bryan . . . ranked consistently 'at the top of his class' during his entire education.")). These are not mitigating circumstances; they exacerbate the defendant's culpability. Unlike others who appear before this Court for sentencing after living a life of limited opportunities, the defendant had every opportunity to achieve success ethically and lawfully. Instead, he engaged in behavior he knew to be unlawful in order to line his pockets. By the time of his termination from Goldman, the defendant was already in the top one-percent of income earners in the United States and yet he felt comfortable cheating and breaking the law to accumulate even more profit. It was a crime of greed and arrogance. The defendant wanted to increase his already substantial wealth, and was brazen enough to think he could do so illegally and with impunity. The only way to meaningfully deter people in his position from breaking the law in that fashion is to impose a meaningful sentence of imprisonment.

The defendant's submission also paints him as a man of conviction and with a strong sense of ethical duty. (*See, e.g.*, Def. Sub. at 17 (describing "Bryan as someone with an acute sense of right and wrong.")). This characterization is inconsistent with the suggestion earlier in his submission that the defendant was pressured into this offense by Demane's prodding and "inducement strategy." (Def. Sub. at 7, 45 (noting that "it was Demane who lobbied and pursued

Bryan for tips.")). In fact, the defendant was no puppet of Demane--he knew what he was doing at every step of this scheme—and his ethical duty was cast aside for greed. While the defendant claims to have exhibited ethics and values in other areas of life, his conduct in this case shows a different side of his character: a willingness to cheat and ignore his duties of confidence for personal profit. Given his history and circumstances, the defendant should not escape a substantial term of imprisonment commensurate with his culpability.

The defendant also argues that he should not be given a custodial sentence because he has underlying health conditions and thus would be at risk under the current pandemic circumstances caused by COVID-19. (Def. Sub. at 64 ("[P]lacing Bryan into the federal prison population at the present time presents significant health risks.")). The Court should not, however, give the defendant a COVID-19-related windfall. It was the defendant who sought to move forward with sentencing at this time, over the Government's objection. And now the defendant seeks to use the circumstances of the pandemic to ask for a significant break at sentencing. The defendant cannot have it both ways. He should not get special treatment by virtue of the timing of his sentencing; for the reasons set forth above, the Court can and should impose a substantial term of imprisonment and that term can be delayed until it is safe to serve. The defense argues that this would effectively mean "[s]entencing Bryan to a term of incarceration with an indefinite reporting date," which represents "an untenable solution." (Def. Sub. 67). That reasoning is unpersuasive. The Court should reject the defendant's attempt to use the current pandemic to avoid a sentence that is fair and just.

The Court should also reject the suggestion that the Court outsource the defendant's punishment to a private security firm in France that the defendant proposes to monitor a sentence of time served, home detention, and/or community service in France. (*See, e.g.*, Def. Sub. 72-73 ("[W]e have worked with a private security company in order to identify a proposal that would

allow for a sentence of home confinement to be administered in France under the same conditions as that would apply to United States residents")).   This proposal offends the criteria set forth in 18 U.S.C. § 3553 for multiple reasons, including that it is not a type of custodial sentence authorized by law, there is no way for the Court to enforce it, and it would lead to treating similarly situated defendants differently.   To the extent the defendant is suggesting that his hiring private security guards in France is an adequate substitute for incarceration in the United States, the Court should reject that proposal as "a less onerous form of detention available only to the wealthy." *United States v. Banki*, 369 Fed. App'x. 152, 153 (2d Cir. 2010) (summary order).

This Court should also not outsource its supervision of the defendant's sentence to France. There are mechanisms already in place, where appropriate, for a defendant to make an application to serve a portion of his sentence in a foreign country.   *See* 28 CFR § 527.40 *et seq.* (Transfer of Offenders to or from Foreign Countries).   The defendant, instead, seeks to short-circuit that process and in support of that request, the defendant cites a series of cases where defendants were ordered to serve *non-custodial* sentences in foreign countries.   (Def. Sub. 69 and n.29).   He does not cite an example where a defendant was ordered to serve a term of imprisonment in a foreign country, and the Government is aware of no such example.   To the extent the defendant is seeking a non-custodial sentence to be served in a foreign country, the Court should similarly reject that request to obtain a double unearned benefit; no jail time and a swift release to his native country. In particular, the defendant's request that he be permitted to return to France and engage in tutoring (Def. Sub. 69-70) is utterly inconsistent with, among other things, 18 U.S.C. 3553's focus on the kinds of sentences available under the Guidelines and the need to avoid disparities in sentencing. 18 U.S.C. § 3553(a)(4) & (a)(6).   For one thing, neither congressionally enacted statutes nor the Guidelines provide for any such punishment.   Moreover, the defendant's proposal to return to

16

France to mentor children would effectively turn the criminal justice into an opportunity for convicted felons to decide on individualized, humanitarian projects as their "punishment."

For the reasons set forth above, the Court should impose a custodial sentence at the upper end of the applicable Guidelines range – 37 months – and the defendant should be required to serve that term here in the United States. He committed a crime from within the United States; he defrauded a multi-national company (Goldman Sachs) that is headquartered in New York; and he took active steps to further and to conceal his crime while sitting in downtown Manhattan. Just punishment requires that the defendant serve his sentence in the United States.[8]

*Comparable Sentences in Insider Trading Cases*

Finally, the defendant asserts that a non-custodial sentence is warranted based on a comparison to other recent insider trading cases in this District. (Def. Sub. 52-54). He is incorrect. His conduct is more serious than the cases he cites, and it merits more significant punishment. First, the defendant in *United States v. Jung*, 18 Cr. 518 (LAK), faced a stipulated Guidelines range (18 to 24 months) substantially below the range applicable to the defendant, and the scheme only generated $130,000 in profits, a mere fraction of the profits that the defendant's scheme generated. Second, the defendant in *United States v. Tsai*, 19 Cr. 675 (VM), was in a substantially different position from the defendant. Tsai was 23 years old at the time of the offense, worked for his investment bank for less than a year as an analyst and profited by only

---

[8] The Court should also reject the defendant's argument about the conditions of confinement due to his status as a non-citizen. (Def. Sub. 59). The defendant's argument would lead to a nonsensical "non-citizen bonus" whereby non-citizens would not be sent to prison because their conditions of confinement have, at times, been more onerous. Moreover, the defendant's reliance on Black's sentencing in *United States v. Connolly* is misplaced. In that case, Chief Judge McMahon, in describing the defendant's conduct, noted that "the defendants, these two men, were very minor participants in that crime." (16 Cr. 370, Dkt. No. 457 (10/24/19 Sent. Tr.) at 86). Cohen, by contrast, was a central player in the charged scheme and was personally responsible for passing MNPI to Demane.

$125,000, and the Probation Department recommended a non-custodial sentence. Third, the defendant in *United States v. Chow*, 17 Cr. 667 (GHW), provided a tip of inside information on only one deal, did not use burner phones, and—importantly—did not receive cash or anything of pecuniary value in exchange for the inside information he provided.

The differences between these cases and Cohen's case are abundantly clear. His conduct was more serious, more prolonged, more profitable, and involved calculated deception through the use of burner phones. Accordingly, the comparisons the defendant attempts to make between his case and these others are inapt.

Instead, the defendant's conduct is more comparable to the defendant in *United States v. Stewart*, 15 Cr. 287. In that case, Judge Swain sentenced defendant Sean Stewart to 36 months' imprisonment for insider trading crimes. Stewart, like Cohen, was an investment bank insider who misappropriated MNPI from his employer on multiple occasions. Unlike Cohen, Stewart received no direct pecuniary gain and did not utilize burner phones or other calculated means to evade law enforcement. Stewart's sentence is thus more analogous to the instant case than those cited by the defendant; serves as a better point of reference for sentencing the defendant; and strongly suggests that a sentence in excess of 36 months is fair and appropriate in this case.

## **CONCLUSION**

The Court should sentence the defendant to 37 months' imprisonment.

Dated: New York, New York
May 27, 2020

                                                  Respectfully submitted,

                                                  AUDREY STRAUSS
                                                  Attorney for the United States,
                                                  Acting Under Authority Conferred by
                                                  28 U.S.C. § 515

By:        /s/
                                    Richard Cooper/Daniel Tracer/Drew Skinner
                                    Assistant United States Attorneys
                                    Tel. (212) 637-1027/2329/1587