UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
: 
UNITED STATES OF AMERICA :
: S1 19 Cr. 716 (DLC)
- v. - :
:
TELEMAQUE LAVIDAS, :
:
                Defendant. :
:
------------------------------------------------------x

# THE GOVERNMENT'S SENTENCING SUBMISSION

                                              AUDREY STRAUSS
                                              Attorney for the United States,
                                              Acting Under Authority Conferred by
                                              28 U.S.C. § 515

Richard Cooper
Daniel Tracer
Drew Skinner
Assistant United States Attorneys
    *- Of Counsel -*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ............................................................................................................................ 1

    Insider Trading in October 2013.................................................................................................. 2

    Insider Trading in Winter 2013 ................................................................................................... 3

    Insider Trading in Summer 2015 ................................................................................................ 3

PROCEDURAL HISTORY............................................................................................................. 3

DISCUSSION ................................................................................................................................ 4

    Applicable Law ........................................................................................................................... 5

    The Seriousness of the Offense ................................................................................................... 5

    The Widespread Insider Trading and Illicit Profits .................................................................... 9

    Nature and Circumstances of the Defendant ............................................................................ 10

    Comparable Sentences in Insider Trading Cases...................................................................... 11

    The Court Should Reject the Defendant's Request for a Minimal Role Adjustment............... 13

    The Court Should Order Restitution to the Victim of the Defendant's Crimes ....................... 14

CONCLUSION............................................................................................................................. 15

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum of law in advance of the sentencing of Telemaque Lavidas ("Lavidas" or the "defendant"), scheduled for June 25, 2020.

Lavidas is a sophisticated businessman who well understood the duties and responsibilities to keep confidential corporate information. Despite a stellar education, his family's extraordinary wealth, and all the advantages he was given in life, the defendant chose to engage in criminal conduct multiple times over a three-year period. In that time, he took corporate secrets of Ariad Pharmaceuticals, Inc. ("Ariad") and provided them to one of his best friends, securities trader George Nikas ("Nikas"), so that Nikas could make millions of dollars by placing timely, profitable securities trades based on that information.

Contrary to the defendant's attempt to paint himself as someone who "fell in with Nikas" (Def. Sub. at 22) and was a "minimal participant" in the offense (Def. Sub. at 28), at the time he committed the instant offense the defendant was a mature, sophisticated business executive who operated from a position of privilege. His conduct was knowing and repeated, and exhibited a complete disdain for the business ethics he now claims to uphold. Accordingly, and for the reasons set forth below, the Court should impose a substantial term of imprisonment; one that is below the applicable United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range of 63 to 78 months, but that is substantially in excess of the Probation Department's recommendation of 18 months. Such a sentence is sufficient but not greater than necessary to serve the legitimate ends of sentencing.

**BACKGROUND**

Between 2013 and 2015, the defendant served as the middleman and vital link in an insider trading scheme that involved corruption at the highest levels of Ariad and resulted in millions of dollars of illicit profits. Prior to the start of the conspiracy, the defendant was an executive at his

1

family's Greek pharmaceutical business, Lavipharm, which was publicly traded on the Athens Stock Exchange, and was also the founder of a U.S.-based snack bar company named Mediterra. (*See* Presentence Investigation Report ("PSR"), Dkt. No. 109, ¶ 14). During that time, the defendant's father Athansios Lavidas ("Athanasios") was a member of Ariad's board of directors. (*Id*. ¶ 15). As a result of his membership on the board of directors, Athanasios had regular access to material, non-public information ("MNPI") relating to Ariad's business affairs. (*Id*.).

During three separate periods within the conspiracy period, the defendant obtained MNPI from his father relating at first to developments with respect to Ariad's blockbuster drug and later to another company's buyout offer for Ariad. On each of those occasions, the defendant provided the stolen MNPI to Nikas, his close personal friend and an active securities trader, who personally earned over $6.5 million in profits and avoided nearly $800,000 in losses from the illegal trading. (*Id*. ¶¶ 17-18, 20-21). As part of their close, personal friendship, the defendant and Nikas spent significant amounts of time together, and the Government presented evidence at trial that the defendant understood Nikas had been involved in insider trading in the past in the securities of AmerisourceBergen Corporation.

*Insider Trading in October 2013*

As of early October 2013, Nikas had accumulated a long position in the securities of Ariad. (*Id*. ¶ 18). When Athanasios—as a result of his membership on the Ariad board—learned that the U.S. Food and Drug Administration ("FDA") had expressed significant safety concerns relating to Ariad's main leukemia drug, Iclusig, he breached his duty to Ariad and shared the information with the defendant, who in turn passed the information to Nikas. (*Id*.)

After receiving this information, Nikas reversed his long position in Ariad and established a substantial short position. (*Id*.). When Ariad later announced the safety issues with Iclusig to

the investing public, its stock dropped by approximately 67 percent and Nikas made over $3.2 million in profits and avoided losses of nearly $800,000.  (*Id*.).

   *Insider Trading in Winter 2013*

Shortly after the negative announcement described above, Ariad removed its drug Iclusig from the market, and then in late November and December 2013, Ariad made remarkable progress in returning Iclusig to distribution.  (*Id*. ¶ 20).  During that time, Athanasios learned of the progress, and in breach of his duties to Ariad, passed this information to the defendant.  (*Id*.).  The defendant, in turn, provided the MNPI to Nikas, who used it to earn approximately $1.3 million in profits from trading Ariad securities.  (*Id*.).

   *Insider Trading in Summer 2015*

In late July 2015, Ariad received an unsolicited acquisition offer from another company named Baxalta.  (*Id*. ¶ 21).  As before, Athanasios learned this MNPI as a result of his membership on the Ariad board, and in breach of his duties to Ariad, passed the information to the defendant.  (*Id*.).  The defendant passed it to Nikas, who acquired substantial amounts of Ariad securities.  (*Id*.).  When news of the acquisition offer became public and Ariad's stock price increased markedly, Nikas profited by approximately $2 million.

Nikas shared the MNPI he learned from the defendant with various associates, including Marc Demane Debih ("Demane").  Demane, who had met the defendant through Nikas a few years earlier, used the information to earn approximately $640,000 and avoid losses of approximately $3,500.

## PROCEDURAL HISTORY

On October 7, 2019, the grand jury returned an indictment charging Lavidas in nine counts with conspiracy to commit securities fraud, conspiracy to commit wire fraud, substantive securities fraud, and substantive wire fraud.  Lavidas was arrested on October 18, 2019 and has been

detained since that time.  (*Id.* ¶ 23).   Lavidas was arrested while staying at Nikas's Manhattan apartment.

On November 25, 2019, the grand jury returned a superseding indictment charging Lavidas in seven counts.   On January 6, 2020, the defendant proceeded to trial and on January 15, 2020, a unanimous jury convicted the defendant on all counts after less than one full day of deliberations.  Sentencing was initially set for April 17, 2020.   Given the onset of the COVID-19 pandemic, however, the sentencing was subsequently adjourned (Dkt. No. 108, 110, 113), and is scheduled to proceed by video on June 25, 2020, pursuant to the terms of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). Pub. L. No. 116-136, 134 Stat. 281.

The Government agrees with the U.S. Probation Office on the Guidelines calculation in this case.   In particular, the offense level is 26 calculated as follows: a base offense level of 8 pursuant to U.S.S.G. § 2B1.4(a) and an 18-level enhancement based on a cognizable gain of $7.3 million pursuant to U.S.S.G. §§ 2B1.4(b)(1) and 2B1.1(b)(1)(J).   (PSR ¶¶ 34-39). [1]  The defendant has no known criminal history.  Accordingly, the recommended Guidelines range is 63-78 months of imprisonment.  (PSR ¶ 80).   Through its supplement to the PSR, the Probation Office has recommended a sentence of 18 months of imprisonment.   (PSR at 26).

## DISCUSSION

The Government recommends that the Court impose a substantial term of imprisonment.  In particular, the Court should impose a sentence that is below the applicable Guidelines range of 63 to 78 months, but that is substantially in excess of the Probation Department's recommendation of 18 months.   Given the intentional and continuing nature of his offense, the extensive illegal

---

[1] Although the Government's evidence at trial established that as a result of the defendant's tips, Nikas and his various associates earned at least approximately $15.6 million (GX-605), the Government's Guidelines calculation relies solely on profits earned by traders where the evidence at trial demonstrated Lavidas's awareness of their involvement in the scheme.

4

gains made by Nikas—the defendant's direct tippee and close criminal associate, and the defendant's continuing failure to show any remorse or accept responsibility for his criminal conduct, a substantial term of imprisonment is necessary to meet the statutory ends of sentencing, including just punishment, specific and general deterrence, and promoting respect for the law. The defendant's requested dramatic departure to a sentence of time served would send the wrong message about the seriousness and wrongfulness of the defendant's conduct and would be contrary to the sentencing goals of 18 U.S.C. § 3553.

*Applicable Law*

Once the Court has calculated the applicable sentencing guidelines, it must consider an appropriate sentence under the totality of factors set forth under Title 18, United States Code, Section 3553(a).   While the Court must calculate the Guidelines, it is "emphatically clear that the Guidelines are guidelines--that is, they are truly advisory."  *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008).  "A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime."  *Id.* at 188.  "A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense."  *Id.* 189; *United States v. Genao*, 869 F.3d 136, 141 (2d Cir. 2017) ("The sentencing court must make an individualized assessment based on the facts presented.").

*The Seriousness of the Offense*

The crime that the defendant committed was very serious.  For one thing, this was no momentary lapse or fleeting failure.  The defendant engaged in a protracted course of conduct over a multi-year period and involved a family member and a close friend in his scheme.   On three separate occasions, knowing full well that Ariad's MNPI had to be kept confidential, he took the MNPI that his father had stolen and passed it to Nikas.  His conduct was the proximate cause of

approximately $6.5 million of illegal profits (by Nikas), and the but-for cause of millions of dollars of additional profits (by other downstream traders).  The defendant's conduct undermines faith in the integrity of the capital markets, and he provided a privileged few with an illegal and unfair advantage over the general investing public.

       The defendant's attempts to minimize the seriousness of his offense, and the extent of his role in that offense, should be rejected.  First, he contends that a sentence of time served is warranted because he is "very different from the typical insider trading defendant, steeped in the world of finance, whose focus is almost entirely on money" (Def. Sub. 6), and because greed was not part of the defendant's motive, (Def. Sub. 22).  However, the evidence at trial demonstrated that the defendant is very much akin to typical insiders and middlemen in insider trading schemes, and that committed this crime based on sheer arrogance.  He was a child of a privilege who was afforded every opportunity—a Columbia University education, an executive role at his family's publicly traded pharmaceutical company, and significant family funds that were used to seed his startup company.  He was steeped in the world of pharmaceutical companies and the importance of maintaining corporate secrets, and he understood the significance of the particular corporate secrets that he and his father stole from Ariad.  It is incorrect to say that his offense was not "focus[ed] almost entirely on money" (Def. Sub. at 6) or that he did not commit this crime based on greed.  The defendant was laser-focused on helping Nikas earn as much money as possible through this illegal scheme.  The fact that his greed operated to enrich his close friend and business associate, and not himself, is of no moment.  In fact, the defendant, through his close personal and business relationship with Nikas, stood to benefit financially from Nikas's business successes.  *See, e.g.*, GX 700 (stipulation that the defendant and Nikas "had overlapping business interests" and "conducted [] business together").  Indeed, the defendant did receive financial benefits from his relationship with Nikas—including substantial funding that Nikas and Nikas's

6

family provided to the defendant's startup company. *See, e.g.*, GX 501-35 (email chain reflecting a $500,000 investment by Nikas's wife in defendant's startup business Mediterra in March 2015, which Nikas's wife forwards to Nikas); GX 1305 (September 2016 email discussing obtaining a $200,000 loan from Nikas, where defendant writes "[h]e [Nikas] trusts us, but needs to have a document in place in case his bank asks where the money is going" and expresses Mediterra's dire position and need for the money by writing "[w]e are extremely tight at the moment with liquidity and have some very important invoices to pay"); Tr. 353 (Demane testimony that he believed Nikas was paying the defendant and the defendant's father in exchange for Ariad MNPI).

Second, the defendant argues that his offense is less serious than other insider trading schemes because he tipped Nikas based on their friendship, and not in exchange for money. (*See* Def. Sub. at 19-21). Even if, contrary to the evidence presented at trial, one were to conclude that the defendant had no pecuniary motive, the law makes no distinction between those who illegally tip in exchange for cash and those who illegally tip based on friendship or personal relationships. Indeed, insider trading defendants in this District who tipped based on friendship and personal relationships have received significant custodial sentences. *See, e.g.*, *United States v. Stewart*, 15 Cr. 287 (defendant Sean Stewart, an investment banking insider, illegally tipped his father and received no monetary compensation, and received a 36-month sentence from the Honorable Laura Taylor Swain after trial, and then a 24-month sentence from the Honorable Jed S. Rakoff after re-trial).

Third, the defendant claims that the "slick and selfish" Nikas took advantage of him. (*See* Def. Sub. 22-23, 26). This contention strains credulity. The record is bereft of any evidence that Nikas somehow hoodwinked the defendant into working with his father to illegally spill Ariad's corporate secrets. Instead, the record shows that this was a calculating crime and that the defendant was an equal and willing participant. For example, in December 2013, when Nikas

7

returned to the United States from abroad, the defendant rushed to Nikas's apartment the next morning, presumably to continue their in-person discussions about Ariad's MNPI. *See* GX-606. Likewise, the jury heard a number of examples where the defendant hung up the phone with his father and then immediately called Nikas, again presumably to illegally transmit Ariad's MNPI. *See, e.g.*, GX-604.  These are not the acts of an ignorant or unwitting lackey who was hoodwinked by Nikas.

A substantial term of imprisonment is also warranted because schemes like this—where the defendant committed the crime with his father and one of his close friends—are difficult to detect and prosecute. *See United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) ("As this Court has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail."). The defendant's conviction, the third to date in this larger insider trading network, is the result of an investigation that has been ongoing for many years and has required the expenditure of significant law enforcement resources.  For that reason, when crimes like this one are uncovered and successfully prosecuted, it is critical that they serve as examples to other insider trading criminals and would-be criminals.  (*See id.*).  Here, the imposition of a significant term of incarceration is critical to that end.  It is that element of punishment that is necessary to effectively prevent people from engaging in such crime in the first place. *Cf. United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009) ("[I]t is difficult to imagine a would-be white-collar criminal being deterred from stealing millions of dollars from his company by the threat of a purely probationary sentence.").  Moreover, the sentence must be sufficient lengthy to achieve its goals, including just punishment and deterrence. *See generally* U.S.S.G. §1A1.1 (Policy Statement) ("Third, Congress sought proportionality in sentencing through a system that imposes

8

appropriately different sentences for criminal conduct of differing severity."); *Robles v. United States*, No. 14 Civ. 9311 (LAP), 2017 WL 1025993, at *3 (S.D.N.Y. Mar. 16, 2017) (noting that "a longer sentence" may be appropriate "given the seriousness of the offense" and "for the purpose of deterrence").

*The Widespread Insider Trading and Illicit Profits*

The defendant's perpetration of this crime also had far-reaching and significant consequences. The defendant knew exactly who Nikas was when he decided to assist Nikas in making illegal profits. *See, e.g.*, Tr. 633 (associate of Nikas testifying that he observed Nikas and Lavidas discuss the stock market "frequently"); GX 501-127 (Nikas sending Lavidas an email regarding a pharmaceutical company takeover); GX 1100-4T (text message exchange between Lavidas and Nikas discussing the stock market). As noted above, Nikas himself earned over $6.5 million in profits and avoided nearly $800,000 in losses. (PSR ¶¶ 17-18, 20-21).

Moreover, by providing MNPI to Nikas, the defendant enabled insider trading by a network of insider traders who received that information from Nikas. As demonstrated at trial, a large-scale group of international traders made many millions of additional profits by trading based on the Ariad MNPI originally stolen by the defendant and his father. (GX-605). Thus, by sharing Ariad's MNPI in the first place, the defendant was the but-for cause for millions of dollars of additional illegal profits generated through the scheme, which have not been attributed to him for purposes of calculating the applicable Guidelines range. In short, through his actions the defendant enabled a far-reaching insider trading scheme, which highlights, once again, the seriousness of the defendant's offense.

9

*Nature and Circumstances of the Defendant*

The defendant understandably spends the overwhelming majority of his submission focusing on his personal life and characteristics, rather than the facts described above. Without detracting from the defendant's achievements in other aspects of his life, a couple of points are worth noting. First, the defendant's submission makes clear that the defendant is highly intelligent, has provided service to others, and has a wife and children who depend on him. These are not mitigating circumstances; they exacerbate the defendant's culpability. Unlike others who appear before this Court for sentencing after living a life of limited opportunities, the defendant had every opportunity to achieve success ethically and lawfully. Instead, he engaged in behavior he knew to be unlawful in order to further his friendship with Nikas and assist Nikas in earning substantial illegal profits. His was a crime of greed and arrogance. The only way to meaningfully deter people in his position from breaking the law in that fashion is to impose a meaningful sentence of imprisonment.

The defendant's submission also paints him as a man who prizes the value of hard work. (*See, e.g.*, Def. Sub. at 3 ("Hard Work and Familial Support Have Been the Pillars of Telemaque's Life From a Very Young Age"); 7 ("Rather Than Rely On The Family Business, Telemaque Works Hard To Build A Successful Business On His Own")). In fact, his participation in the instant offense shows that when he thought no one was looking, he sought to give Nikas a shortcut to avoid "hard work" and instead earn millions of dollars by using MNPI that was not available to the ordinary investing public. The defendant offers no explanation for how this conduct is consistent with his claimed lifelong belief in the importance of hard work. While the defendant claims to have exhibited ethics and values in other areas of life, his conduct in this case shows a different side of his character: a willingness to cheat to help a friend make illegal profits. In this regard, while the defendant asks the Court to take note of his "sense of his place in the world as a

10

family man" (Def. Sub. at 3), the Court should also consider that the defendant chose to commit this crime with his father. Given his history and circumstances, the defendant should not escape a substantial term of imprisonment commensurate with his culpability.

The defendant also argues that he should not be given a custodial sentence because he endured purportedly "harsh conditions" while in pretrial detention at MDC. (Def. Sub. at 16-18). In support of this argument, he points to administrative measures taken at MDC to protect the health and safety of inmates and staff members in light of the COVID-19 pandemic. Those measures have applied with equal force to all detainees, and should not weigh in favor of a non-custodial sentence.

*Comparable Sentences in Insider Trading Cases*

Finally, the defendant asserts that a sentence of time served is warranted based on a comparison to other recent insider trading cases in this District. (Def. Sub. at 38-48). While there are examples of insider trading defendants who have received non-custodial sentences, or terms of imprisonment lower than the eight months the defendant has spent in detention, the fact that someone's role was that of an insider or middleman helping a friend should not lead to an automatic reduction in sentence, and in fact significant terms of imprisonment have been imposed on such defendants in this District. *See, e.g.*, *United States v. Stewart*, 15 Cr. 287 (discussed *supra* at 6).

The defendant, in a supplemental submission (*see* Dkt. No. 114), also compares his case to that of former Goldman Sachs investment banker Bryan Cohen, who is a member of the same broad insider trading ring. Cohen was recently sentenced by the Honorable William H. Pauley III to a sentence of time served with 12 months of supervised release on home confinement. A few important distinctions between Cohen's case and the defendant's bear noting. First, for Guidelines purposes, Cohen's direct tippee earned only approximately $260,000 in profits, which

11

resulted in an applicable Guidelines range of 30 to 37 months of imprisonment. By contrast, the defendant's direct tippee (Nikas) earned approximately $6.5 million in profits. That amount of profits – 25 times the profits that contributed to the Guidelines in Cohen's case – results in a much higher applicable Guidelines range for the defendant – 63 to 78 months of imprisonment. Cohen also timely pled guilty in advance of trial, while Lavidas chose to proceed to trial and, apparently based on his sentencing submission, still contests the jury's verdict. Cohen also suffered from certain medical ailments that would be of concern if he were incarcerated during a pandemic. Put simply, Cohen's case is distinguishable from this case in a number of important respects and does not serve as a compelling precedent for this Court's sentence. Nonetheless, in part to avoid unwarranted sentencing disparities, having considered the result of Cohen's sentencing, the Government recommends a substantial, but below-Guidelines, sentence.

Finally, the defendant compares his case to that of cooperator Marc Demane Debih and ███████████████████████████████████████████████████████████████ ███████████████████████████████.[2] (Def. Sub. at 52-54). First, Demane has yet to be sentenced for his crimes, rendering any comparison impossible. Second, while these three individuals all provided significant assistance to the Government in connection with a large-scale insider trading investigation, the defendant instead opted to provide no assistance, to proceed to trial, and to refuse to accept responsibility even after his swift conviction. Accordingly, a significant disparity between those individuals and the defendant *is* warranted – the defendant's conduct, lack of acceptance of responsibility, and lack of cooperation merit a substantially more significant sentence.

---

2 The Government has redacted the portion above from the public docket, consistent with the Protective Order in this case.

*The Court Should Reject the Defendant's Request for a Minimal Role Adjustment*

The defendant also contends that he is entitled to a minimal role adjustment pursuant to U.S.S.G. § 3B1.2. (*See* Def. Sub. at 30). The Court should reject this suggestion. First, it cannot be said that the defendant "lack[ed] . . . knowledge or understanding of the scope and structure of the enterprise and of the activities of others." U.S.S.G § 3B1.2(a), cmt. 4. Indeed, the defendant knew full well that Nikas was a prolific securities trader. The jury heard and saw evidence that the defendant and Nikas communicated about securities, including about a stock in which Nikas had committed insider trading. *See, e.g.*, Tr. 633 (associate of Nikas testifying that he observed Nikas and Lavidas discuss the stock market "frequently"); GX 501-127 (Nikas sending Lavidas an email regarding a pharmaceutical company takeover); GX 1100-4T (text message exchange between Lavidas and Nikas discussing the stock market); GX 501-97 (March 20, 2013 email from defendant to Nikas sending news announcement about a significant corporate development involving AmerisourceBergen Corporation); Tr. 361-62 (testimony by Demane that he obtained and traded on inside information about AmerisourceBergen Corporation).

Moreover, given the closeness of their relationship, it strains credulity to suggest that the defendant did not understand what Nikas was going to do with the MNPI that he illegally provided. In the face of these facts, the defendant creates a strawman by suggesting that he "had no way of knowing that Nikas would tip or involve Demane, whom he only met once many years before at a social function" and "had no knowledge about all the deceptive conduct in which Nikas and Demane engaged to hide their criminal conduct" (Def. Sub. at 31). As was clear from the trial evidence, Demane played a tertiary role in the Ariad scheme. Athanasios was the corporate insider, the defendant was the middleman who sourced the MNPI from his father and illegally passed it to Nikas, and Nikas was the trader. It is of little moment that the defendant did not have a full appreciation for others who received Ariad MNPI from Nikas—the defendant is not being

13

held responsible for the full scope of their profits or for their "deceptive conduct" in other areas of their criminal activity.

Second, the defendant misstates the record by claiming that he "played no role in the 'planning or organizing of the criminal activity.'" (Def. Sub. at 31). As set forth above, when the defendant learned MNPI from his father, *he* was the one who picked up the phone to call Nikas. *He* was the one who walked to Nikas's apartment to share the news. *He* was the one who chose when and how to provide the information to Nikas so he could trade on it. In fact, passing the stolen MNPI to Nikas for illegal trading *was* the crime, therefore it is incorrect to say that the defendant 'played no role" in the planning of this criminal activity.

Accordingly, the Court should deny the defendant's application for a minimal role adjustment.

*The Court Should Order Restitution to the Victim of the Defendant's Crimes*

The Government also respectfully requests that the Court enter a restitution order in the amount $186,430.99. As set forth in a letter by counsel to Takeda Pharmaceuticals U.S.A., Inc., the successor company to Ariad, attached hereto as Exhibit A, Ariad and Takeda expended that amount in fees and costs when responding to various inquiries by the Government during the investigation of this case.

## **CONCLUSION**

The Court should sentence the defendant to a term of imprisonment below the applicable Guidelines range of 63 to 78 months, but substantially in excess of the Probation Department's recommendation of 18 months.

Dated: New York, New York
June 16, 2020

                                                   Respectfully submitted,

                                                   AUDREY STRAUSS
                                                 Attorney for the United States,
                                                 Acting Under Authority Conferred by
                                                 28 U.S.C. § 515

                             By:          /s/
                                                 Richard Cooper/Daniel Tracer
                                                 Assistant United States Attorneys
                                                 Tel. (212) 637-1027/2329