K72KLAVS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                 v.                        19 CR 716 (DLC)
                                            Telephone Conference
5   TELEMAQUE LAVIDAS,

6                   Defendant.

7   ------------------------------x

8                                           New York, N.Y.
                                            July 2, 2020
9                                           11:00 a.m.

10  Before:

11                      HON. DENISE COTE,

12                                          District Judge

13
                          APPEARANCES
14
    AUDREY STRAUSS,
15        Acting United States Attorney for the
          Southern District of New York
16  RICHARD A. COOPER
    DANIEL TRACER
17  DREW SKINNER
          Assistant United States Attorneys
18
    DECHERT LLP
19        Attorneys for Defendant
    BY:  JONATHAN R. STREETER
20

21

22

23

24

25

K72KLAVS

| | |
|---|---|
| 1 | (The Court and all parties appearing telephonically) |
| 2 | THE COURT:  I'm going to take appearances first, and |
| 3 | then I'm going to create a record of the situation in which we |
| 4 | find ourselves. |
| 5 | I'll take an appearance from the government. |
| 6 | MR. TRACER:  Daniel Tracer, for the government.  Good |
| 7 | morning, your Honor. |
| 8 | THE COURT:  And I will take an appearance from the |
| 9 | defendant. |
| 10 | MR. STREETER:  Jonathan Streeter, for Mr. Lavidas. |
| 11 | THE COURT:  And, Mr. Lavidas, you are participating, |
| 12 | as well, in this proceeding? |
| 13 | THE DEFENDANT:  Yes, your Honor. |
| 14 | THE COURT:  Thank you. |
| 15 | THE DEFENDANT:  I can hear you well. |
| 16 | THE COURT:  This is a CourtCall proceeding.  It is now |
| 17 | 11:12.  The situation is as follows: |
| 18 | This proceeding was scheduled to begin at |
| 19 | 11:00 o'clock.  The defendant is incarcerated in the MDC.  We |
| 20 | are conducting this proceeding virtually through a technology |
| 21 | called CourtCall.  The plan was for the defendant and defense |
| 22 | counsel, who are separately located, to both be able to |
| 23 | participate through videoconferencing procedure. |
| 24 | Mr. Streeter, defense counsel, has audio access, but |
| 25 | it is -- to our great disappointment, he does not have video |

K72KLAVS

1    access.  I can see both the defendant and the Assistant United

2    States Attorney, and they can see me.

3         Am I right, Mr. Lavidas, you can see me?  Is that

4    correct?

5         THE DEFENDANT:  That's correct, your Honor.

6         THE COURT:  And am I right, Mr. Tracer, that you can

7    see me?

8         MR. TRACER:  Yes, your Honor.

9         THE COURT:  Thank you.

10        But, unfortunately, Mr. Streeter cannot see any of us,

11   and we cannot see him.  One of the capabilities that we had

12   hoped to be available to the defendant and defense counsel in

13   this conference call and sentencing proceeding is that they

14   would be able to consult with each other separately if that

15   became important for either of them during this sentencing

16   proceeding.

17        Mr. Rogers, can I ask, even though defense counsel

18   does not have video access to this proceeding, will he still,

19   technologically, be able to have a private conversation with

20   his client or not?

21        MR. ROGERS:  Yes, Judge.  I was just actually in a

22   private room with him, and we were communicating without issue.

23        THE COURT:  Thank you.

24        Mr. Rogers, from the District Executive's office, has

25   been helping us with the technological challenges that we've

K72KLAVS

1     been faced with since 11:00 o'clock.

2              Mr. Streeter, I apologize, on behalf of the Court and

3     CourtCall, that the videoconferencing capability has not

4     permitted you to see us or us to see you.  When I say "us," I

5     mean -- oh, ho, Mr. Streeter just --

6              MR. STREETER:  My associate, Siobhan Namazi, sent me

7     an email telling me how to fix the problem.  So thank you to

8     her.

9              THE COURT:  Oh, wonderful.

10             So, let me begin again.

11             Mr. Lavidas, can you see your attorney now?

12             THE DEFENDANT:  Yes, I can, your Honor.

13             THE COURT:  And, Mr. Streeter, are you able to see

14    your client?

15             MR. STREETER:  I am, yes, your Honor.  Thank you.

16             THE COURT:  And are you able to see me, Mr. Streeter?

17             MR. STREETER:  I am, yes, your Honor.

18             THE COURT:  Okay, good.

19             So let's begin the sentencing proceeding.  I'm going

20    to ask, for the benefit of others who use CourtCall,

21    Mr. Streeter, if, when this proceeding is done, you could let

22    my deputy, who will then send the information to Mr. Rogers, if

23    you could let Ms. Rojas know what tips you got from your staff

24    that solved the problem, so that Mr. Rogers can help others in

25    this same way in future difficulty.  Would you be able to do

K72KLAVS

1      that, Mr. Streeter?

2                  MR. STREETER:  I absolutely will, yes, your Honor.

3                  THE COURT:  Thank you so much.

4            Mr. Rogers has been able to work magic in a number of

5      ways in these proceedings, but there are always new challenges.

6            Let me begin with further comments about the situation

7      in which we find ourselves.

8            We are conducting the sentencing proceeding remotely.

9      And under our district's rules, no one may broadcast or record

10     this proceeding, and a violation of those rules will result in

11     sanctions.

12           Notice of this sentencing proceeding has been filed on

13     the public record, and both the press and the public have

14     access to the audio of this proceeding, and counsel should

15     assume that they are participating remotely and able to hear

16     all that we have to say during the course of this proceeding.

17           I want to make findings with respect to the CARES Act

18     as well.  The chief judge of our district has entered a number

19     of orders pursuant to the CARES Act making appropriate findings

20     as to why it is not possible at this time for us to proceed in

21     court in person with a proceeding of this importance, including

22     a sentencing proceeding.  Her most recent order of that kind

23     was issued on June 24th of this year.  She found that felony

24     sentences cannot be conducted in person without seriously

25     jeopardizing public health and safety due to our pandemic.

K72KLAVS

1          I am able to find that there are good reasons for not

2     further delaying this sentencing proceeding and that a further

3     delay in this sentencing proceeding would result in serious

4     harm to the interests of justice, and I am able to make that

5     finding because of a variety of things.

6          First of all, the defendant is seeking a sentence of

7     time served here.  It is possible that in July, we would be

8     able to conduct in-person sentencing proceedings in the

9     Southern District courthouse with the defendant present in the

10    courtroom, and able to see me and me able to see him, and all

11    counsel appearing, as well, in my courtroom, but the defendant

12    has waived his right to that personal presence in my courtroom

13    for a sentencing proceeding.  He's waived it a number of times,

14    as represented by his counsel, and, most recently, this week,

15    when given the option of waiting a bit longer and seeing if we

16    could conduct an in-person proceeding in July.

17         I have a written waiver from the defendant, I believe,

18    and I think that was filed on June 18th.

19         I have recent letters from defense counsel, filed on

20    ECF, indicating the defendant's strong desire to move forward

21    with the sentencing today and not to wait to see if we could do

22    it in person a few weeks from now or even next week.

23         So, with that sort of background, I want to confirm

24    today, first with you, Mr. Streeter, and then with the

25    defendant.  Mr. Streeter, have I accurately described the

K72KLAVS

1  defendant's desire to proceed with his sentence today to a

2  videoconference procedure and to give up his right to appear

3  before me in person, in my courtroom, for a sentencing?

4        MR. STREETER:  You have, your Honor.

5        THE COURT:  And, Mr. Lavidas, let me ask you:  Have

6  you heard what I described on the record as to the options that

7  you have for proceeding to sentence either today or at a later

8  date, perhaps in my courtroom?

9        THE DEFENDANT:  Yes, I did, your Honor.

10        THE COURT:  And is it your desire to proceed with your

11  sentence today even though it cannot occur in my courtroom with

12  you and me present in the same room?

13        THE DEFENDANT:  Yes, your Honor.

14        THE COURT:  Okay.

15        I find a knowing and voluntary waiver of the right to

16  be present for this sentencing proceeding and of the

17  defendant's desire to, instead, proceed remotely to this

18  videoconference facility.

19        Let me describe some other things that are sort of

20  background to this sentencing proceeding.

21         I received a number of submissions in connection with

22  this sentence.  I have the defense submission of June 8th; I

23  have the supplemental submission of June 9th; I have, as part

24  of the sentencing submissions, 144 letters from family and

25  friends of the defendant and fellow inmates of the defendant; I

K72KLAVS

have two letters from psychologists regarding the mental health

and impact of their separation from the defendant on the wife

and daughter of the defendant, who live in New York; I have

sentencing transcripts for defendants that the defendant wishes

the Court to consider when arriving at what he suggests is an

appropriate sentence for this individual defendant; I have the

government's submission of June 16th; I have another defense

submission of June 22nd, and I should mention, as well, that in

connection with some comparators' sentences, or sentences of

other defendants, the defendant, in particular, wants me to

consider the sentence imposed on Bryan Cohen, an investment

banker that pleaded guilty as part of the same overall or

overarching insider trading scheme, not someone directly

involved with the defendant at all.  I don't want to imply

that, but there's a large scheme here, and that was somewhat

described at trial, and it's not in dispute that there was an

overarching scheme.

        I also received, on June 24th, a consent restitution

order.  The defendant is consenting to restitution in the

amount of $186,430.99.  Pursuant to the terms of the

restitution order, he is to make payment of half that amount

within 90 days of entry of the order -- that is, $93,215.50 --

and the requirement to pay the remainder is dependent on what

happens with respect to the sentence of a coconspirator,

Mr. Demane, who testified at trial.  The government represents

K72KLAVS

1    in the restitution order that it will seek the same amount of

2    restitution to be paid to Takeda/Ariad from Mr. Demane at his

3    sentence and will seek an order that he be required to pay that

4    amount in 90 days.

5            Let me ask the government:  When you make a reference

6    to that amount, you mean the amount to be $186,000, et cetera,

7    roughly, Mr. Tracer?

8            MR. TRACER:  I'm sorry, I'm not sure I understand the

9    Court's question.

10           THE COURT:  Thank you.

11           The restitution order that's been proposed here is for

12   joint and several liability, as I understand it, for the

13   amount -- and I'm rounding here -- of $186,000.  Do I

14   understand that correctly?

15           MR. TRACER:  Correct, your Honor.

16           THE COURT:  And, therefore, you would be seeking an

17   order within 90 days of Mr. Demane's sentence, that he pay that

18   amount -- that is roughly 186,000 -- or that he pay half of

19   that amount -- roughly 93,000 -- within 90 days of Mr. Demane's

20   sentence?

21           MR. TRACER:  That's right, your Honor.

22           THE COURT:  What?  What is right?

23           MR. TRACER:  So, if Mr. Lavidas pays half of the

24   restitution, in other words, if he complies with the agreement

25   that we have to pay his half, then we will seek the remainder,

K72KLAVS

so the 93,000 or so from Mr. Demane within 90 days of his

sentencing, such that the restitution would be split between

the two of them.

THE COURT:  So, counsel, I need your guidance with

respect to the following situation:  As I understand it, this

proposed restitution order contemplates that this defendant, if

I sign this order of restitution, that Mr. Lavidas will pay the

entire amount of 186,000 subject to reduction, since it would

be imposed jointly and severally on he and Mr. Demane, subject

to reduction for any amount that Mr. Demane pays within 90 days

of Mr. Demane's sentence.  I want to ask counsel what their

understanding is if Mr. Demane does not pay his half -- that is

roughly the 93,000 -- within 90 days of Mr. Demane's sentence.

MR. TRACER:  So, our expectation is that if

Mr. Demane, for whatever reason, does not or is not able to pay

that amount, then because the defendant is still on the hook

for the entire amount -- in other words, the 186,000 -- then

the defendant would be liable for that other half as well after

that time.  But what this does is, effectively, it defers his

obligation to pay that in order to allow us to seek that from

Demane.  But to your Honor's question, again, if Mr. Demane

were not to pay that, then Mr. Lavidas would be on the hook for

the entire amount.

THE COURT:  Okay.  Thank you.

So, one of the things I have to do in ordering

K72KLAVS

restitution is also to order a payment schedule for restitution

of any remaining amount that remains due and owing from

Mr. Lavidas.

Have counsel discussed what schedule -- for any

remaining amount of restitution beyond the roughly $92,000,

what that payment schedule should be?

MR. TRACER:  We have not had any discussions between

counsel about that.

We'd be happy --

MR. STREETER:  My understanding -- and we're agreeable

to this -- is that Mr. Lavidas' 93,000 would be due within 90

days of his -- the order being entered in his case, and then

the remaining 93,000 for him would be deferred until after 90

days after Mr. Demane's sentencing, and if Mr. Demane does not,

or is not ordered to, pay the other 93,000, then Mr. Lavidas'

would come due.

And maybe what your Honor can do is set a schedule for

after 90 days.  So maybe another 90 days after that, because I

think if Mr. Demane doesn't pay, I certainly will be

encouraging the government to try to make him pay, because the

intent of this order is that they will split it, and if he

doesn't pay within 90 days, I would like there to be some

period of time for the government to pursue him for it before

Mr. Lavidas is obligated to pay the other half.

But the intent of the order is -- I'm sorry, that's

K72KLAVS

it.

THE COURT:  Okay.

So, I will revise the restitution order, so that
should any amount remain outstanding after Mr. Demane's
sentence, then Mr. Lavidas will have 90 days thereafter to
complete payment of the restitution amount due and owing.

Is that agreeable to the government?

MR. TRACER:  It is, your Honor.

THE COURT:  Thank you.

Another open issue:  Mr. Tracer, any need to issue a
forfeiture order?

MR. TRACER:  No, your Honor.  We're not seeking any
forfeiture here.

THE COURT:  Thank you.

So, I think we can now go into the substance of the
issues presented to me for this sentence.  Let me just talk
about the guidelines calculation for a moment.

The defendant was convicted at trial.  The presentence
report calculates his guidelines range as follows:  An offense
level of 26 and a criminal history category of I, with a
sentencing range of 63 to 78 months.

Let me first ask defense counsel:  Have you and your
client both reviewed the presentence report?

MR. STREETER:  We have, your Honor.

THE COURT:  Do you have any objections to the

K72KLAVS

1    presence report, other than what might be contained in your

2    written sentencing submissions to me?

3          MR. STREETER:  None other than what's in the written

4    sentencing submissions.

5          THE COURT:  Thank you, Mr. Streeter.

6          I should mention with respect to the presentence

7    report, the presentence report is made part of the record in

8    this case and shall be filed under seal.  Counsel, should there

9    be an appeal, counsel on appeal may have access to the sealed

10   presentence report without further application to this Court.

11         The defendant seeks a role adjustment here and,

12   therefore, a different calculation of the sentencing guidelines

13   range.  He seeks a role adjustment as a minimal participant in

14   the criminal activity.

15         He also seeks, after application of Section 3553(a)

16   factors, a sentence of time served.  The defendant has been in

17   custody since October 18th, 2019.

18         The probation department recommends a sentence of 18

19   months.  It does not adopt the defendant's request for a role

20   adjustment.

21         The government also opposes a role adjustment.  Its

22   sentencing submission suggests a sentence substantially below

23   the bottom of the guidelines range; that is, 63 months, but

24   also a sentence substantially in excess of the 18 months

25   recommended by the probation department.

K72KLAVS

1          So, I think that is the structure of the issues before

2     me.  I want to hear counsel, obviously, on the issue of role

3     adjustment, if you wish to say anything to supplement your

4     written submissions to me.  But, also, I need to give counsel

5     an opportunity to address anything they'd like to say to me in

6     connection with this sentence and, in particular, how I should

7     apply the 3553(a) factors.  And, of course, I need to hear from

8     the defendant.

9          Because the role adjustment issue is so intimately

10    tied to the facts underlying the criminal conduct here for

11    which the defendant was convicted, I think it would be better,

12    unless counsel wish to proceed otherwise, that we bind any

13    additional arguments they want to make about role adjustment

14    with their general statements with respect to what the

15    appropriate sentence is in this case.

16          Is that agreeable to you, Mr. Streeter?

17          MR. STREETER:  It is, your Honor.

18          THE COURT:  Is that agreeable to you, Mr. Tracer?

19          MR. TRACER:  Yes, your Honor.

20          THE COURT:  Okay.

21          With that understanding, I'm going to begin by just

22    putting on the record -- well, no, I know counsel are familiar

23    with the sentencing guidelines for role adjustment, 3B1.2.  I'm

24    not going to put that on the record -- I may later -- but I'll

25    hear anything the government has to say, either about the role

K72KLAVS

adjustment or about the sentence that I should impose today,
for any reason that it believes is important for me to
consider.

          MR. TRACER:  Thank you, your Honor.  This is Daniel
Tracer.

          I'd like to address the role adjustment, and then I
will move from that into the larger 3553 discussion that we
want to amplify a little bit from our submission.

          With respect to the role adjustment:  I think that the
fundamental flaw in the defendant's argument here is that he
wants to have it both ways.  He wants to say that his client
was not involved in a larger conspiracy; in other words, all
these downstream tippees, he was not involved in that, but, at
the same time, for purposes of minor-role adjustment, he wants
to say, well, he didn't know about all these other things.  So
I think you can't have it both ways.

          Here, your Honor, the crime that was proven at trial
was really just a fairly narrow set of criminal conduct.  It is
the illegal tipping that comes from his father, he gets that
information, he gives it to Mr. Nikas, Mr. Nikas shares it with
Demane.  Now, other things happen, as your Honor alluded to
earlier, there's a lot more going on, but that's not the crime
that the defendant is charged with, and the crime that he is
charged with, he cannot be considered a minor role within that
crime.  And, again, specifically, the crime of tipping Ariad

K72KLAVS

1    MNPI from his father to Mr. Nikas.

2                    For example, the factors that we both address in our

3    submission talk with the degree to which the defendant

4    understood the scope of the criminal activity.  Mr. Lavidas

5    understood, when he was giving that information to Nikas, that

6    Nikas was going to trade on it.  That's the crime alleged, and

7    he understood the scope of that crime.

8                    With respect to the defendant's planning and

9    organizing of the activity and the defendant's decision-making

10   in that activity, it was the defendant's decision to share that

11   information with Nikas.  So he was -- not just was he not

12   minimal, he was central to the charged scheme in this case, the

13   illegal tipping on Ariad.

14                   And defense counsel makes note of the fact that he

15   being essential is not -- does not necessarily negate the minor

16   role.  And I think, your Honor, if you look at how that's

17   described and how it's used, our understanding of that is, you

18   know, you might have a drug conspiracy with someone who is

19   selling drugs on the corner, and that person is kind of a very

20   small level concern, and you might say, well, he's essential

21   because if he doesn't sell the drugs, the crime never happens.

22   And I think it's that kind of case that the guidelines is

23   getting at in saying the fact that someone is essential doesn't

24   necessarily preclude a minor role.

25                   This case is very different.  In this case, the

K72KLAVS

defendant had a unique position of access to confidential

information, he understood that that information was

confidential, he understood that that information was very

valuable, and he decided to use that information in order to

enrich his friend.  So, for those reasons, and as further

explained in our submission, we don't think that within the

charged crime and the proven claim in this case, the defendant

played a minor role in that particular crime.

Turning to the 3553 factors more generally:  As your

Honor stated, our view here -- and we've thought about it very

carefully -- is that the guideline range is probably a little

too high in this case, and so we are not asking for a guideline

sentence, but we do think a substantial term of incarceration

is necessary in terms of general deterrence and promoting

respect for the law for this serious crime, and we think that

the probation office's recommendation is a little bit low, and

the sentence really should be in excess of that to reflect the

severity of the crime and to make a proper set of deterrence

out of this case.

Reading through the defendant's submission, the

defendant talks a lot about the value of hard work in his life,

and without detracting from other areas of his life where he

may have worked hard, this case and what was proven at trial

shows a different side of his character, where the facts proven

at trial show that he was willing to take a shortcut when he

K72KLAVS

1    had information that was valuable and give it to his friend.

2            While the defendant says that he was not doing it for

3    pecuniary gain and he didn't make money out of it, I think

4    that's a little overly simplistic in this case.  This was a

5    crime of greed and arrogance.  It was a crime of greed in the

6    sense that having confidential information and giving it to

7    someone else is the same thing as stealing from a company and

8    giving it to your friend.  It bestows a pecuniary value on his

9    friend, and the fact that he chose not to take that money

10   himself, but to give it to his friend, because his friend was

11   someone he had a particularly valuable business relationship

12   with, does not take it out of the scope of a crime of greed in

13   any way.

14           And it was a crime of arrogance.  He did not think he

15   would get caught, he thought he had this position of privilege,

16   and he could freely give away this information to his chosen

17   few, and they could make money from it, and that's how this

18   crime worked, and it was a serious crime.

19           The defendant suggests that he was taken advantage of

20   a few times in his brief, that Nikas somehow hoodwinked him

21   into doing this.  And I don't think, your Honor, that that is

22   consistent with the picture that the defendant paints of

23   himself, a hard-working sophisticated businessman.  I think,

24   your Honor, the far more reasonable inference to draw is that

25   he knew what he was doing, understood what he was doing, and

K72KLAVS

believed that this was a good way for him to cheat, and get

ahead, and advance him and his friend's business interests.

The fact that the defendant also talks about he didn't

personally trade or he didn't understand how shorting worked,

at the end of the day, I don't think there's any dispute here

that the defendant understood that Nikas was a very wealthy

person, it was well-known that Nikas was a securities trader,

and it was no secret why Mr. Nikas wanted this information.

Again, the evidence shows that these tips happened multiple

times, so he continued to give it to Mr. Nikas and had the

continued understanding that this was valuable to Mr. Nikas.

So, the idea that somehow he didn't really understand what was

going to happen or he really didn't know how things worked once

he gave the information, again, I think it paints the defendant

as more naive than he really is and, again, downplays his role

as a middleman, which he really was in this scheme.

In terms of other cases, briefly, your Honor, we did

cite the Stewart case to your Honor.  I think that is a case

that bears a lot of similarity.  Stewart was an insider who

tipped to his father.  Kind of like here, he tipped to someone

he had a close personal friendship with.  It was not an

exchange for bags of cash or anything like that, he did it on

multiple occasions, and, in that case, Stewart originally got a

36-month sentence, and it was subsequently reduced to a

24-month sentence, but we think that kind of tipping and that

K72KLAVS

kind of case is actually far more comparable to the instant

case than some of the others that the defendant cited that

involved people who were far less sophisticated or who didn't

quite have that level of friendship that they were tipping.

I want to address, briefly, the Cohen sentence that

your Honor alluded to, which was the subject of the defendant's

supplemental letter to the Court.  Just three points about the

Cohen sentence, and, for context, your Honor is right, Cohen is

a participant in the broader insider trading scheme that this

investigation arises out of, but he had no -- there is no

alleged allegation between Mr. Lavidas and Mr. Cohen.

Mr. Cohen got a sentence of home confinement.  In that

case, however, I want to point out three things that I think

make Mr. Cohen's case different than this case:

Number one -- and this was something that Mr. Cohen

relied very heavily on -- is that Mr. Cohen agreed to accept

responsibility and pleaded guilty quite quickly after being

charged;

Number two, the guidelines in that case were far lower

than this case.  The actual actionable -- in other words, U.S.

trading, U.S. stock trading, that happened in that case was

around $260,000, and, so, versus Nikas, who made $6.5 million

in this case, which is a far, far greater amount at issue;

And, number three, Mr. Cohen had a substantial

submission -- and this came up at his sentencing -- of certain

K72KLAVS

medical conditions that created a real health risk if he were
to be put in prison, and Judge Pauley, I think, took that into
account substantially as well in imposing sentence.

So, the Cohen case, I think, for those three reasons,
really doesn't provide good instruction in this case, and,
instead, as we've outlined in our papers, we think this is a
case where a substantial term of imprisonment, albeit not
necessarily the guidelines, but a meaningful and substantial
term of imprisonment is appropriate.  And I'm happy to answer
any additional questions, if the Court has them.

THE COURT:  I want to give you a chance to address
this, Mr. Tracer, because I want, also, Mr. Streeter to have a
chance to address it:  The jury found, in returning its
verdict, that the defendant's father, who was on the board of
Ariad and a close friend of the CEO of Ariad, Mr. Berger, that
the jury found that the defendant's father knowingly violated
his fiduciary duty to Ariad by tipping his son; that the
defendant's father anticipated that securities trading would
occur; and that the defendant's father anticipated receiving a
personal benefit from the tipping.

The jury also found, by returning its verdict of
guilty, that the defendant himself knew that his father had
breached his fiduciary duty to Ariad when his father tipped
him; that the defendant anticipated that his father would
receive a personal benefit from the tipping; and that the

K72KLAVS

defendant also personally benefited, either directly or

indirectly, by the tipping that he did of Mr. Nikas.  So, I

think the evidence at trial painted a picture that the jury

apparently found credible of a wealthy Greek businessman, the

defendant's father, having liquidity problems during the very

time that the defendant was engaged in this tipping activity of

Mr. Nikas, and Greece was -- though I don't think this was

described in great detail to the jury, it wasn't disputed that

Greece was going through a period of great financial difficulty

at the time and that the defendant's father was as well.

       So, I think the jury found, based on the charge and

the guilty verdict, that the defendant was knowingly engaged in

a tipping scheme with his father, his father knowingly

breaching his duty to Ariad, in the hope that the family would

benefit from tipping Mr. Nikas.  I want to make sure that I

understood correctly what the government's theory was and what

the government believed the evidence at trial supported and

what the jury found.

       MR. TRACER:  Sure, your Honor.

       Let me go through what our understanding, and I think

the fair and reasonable inferences -- and this is Daniel

Tracer -- what the fair and reasonable inferences are from the

evidence presented at trial.

       Your Honor is right, there was evidence at trial that

the defendant's family had substantial wealth, but that they

did have liquidity problems, and there was also evidence at

trial that the defendant himself was building this snack

business and was also looking for investors, and investments,

and sources of liquidity.  So, both the family and the son,

during the relevant period, were looking for liquidity and were

looking for opportunities for business advancement.

        With respect to the -- and what Mr. Demane, I believe,

testified is that Mr. Nikas told him that he was having

meetings with the father and the son; in other words, Mr. Nikas

was very, very friendly with Mr. Lavidas, but was also friendly

with Mr. Lavidas' father and met with him from time to time.

And during those meetings, undoubtedly, they discussed

Mr. Nikas' business, and, ultimately, that led to the tipping

through the father, to the son, to Mr. Nikas.  So what I think

the evidence shows that the father was doing, by providing this

information to his son, was he was able to help his son without

reaching into his own pocket.  In other words, he knew that his

son -- he didn't have the liquidity to provide money to his

son, he knew that his son was building this business, and by

tipping confidential information to his son that his son could

give to Nikas, he was able to benefit his son without having to

draw on his own bank account.

        And the defendant, in turn, took that information and

gave it to Nikas as a way of developing the friendship with

Nikas, and that friendship was not just a friendship to

K72KLAVS

1      hangout, that was a friendship that involved substantive

2      business transactions.  So the evidence at trial, for example,

3      showed that Nikas made a loan to the defendant's company, that

4      his wife made an investment in the defendant's company, and

5      those were the sort of pecuniary benefits that the defendant

6      got from Mr. Nikas.  There was also testimony, I think from

7      Mr. Giatrakos, that Mr. Nikas may have been involved in helping

8      Mr. Lavidas with the snack bar business; in other words, like

9      where to put the bars in different drugstores and things like

10     that.  So, at the end of the day, Mr. Lavidas was cultivating

11     this friendship and relationship with Mr. Nikas in order to

12     advance his business interests.  That was the nature of the

13     quid pro quo here.  And the father, by supplying the

14     information, was essentially giving fuel to his son.  He was

15     able to financially benefit his son and ensure his son's

16     success through taking that confidential information that was

17     entrusted to him and giving it to his son.

18              That's the government's theory, and I think, for the

19     reasons I described, the evidence at trial, one can infer all

20     of those things very reasonably.

21              THE COURT:  Okay.  Thank you.

22              Mr. Streeter, I want to turn to you.  Obviously, I

23     know you want to address the role issue, but I'll also hear

24     anything you have to say with respect to what sentence I should

25     impose here.

K72KLAVS

1          MR. STREETER:  Thank you, your Honor.

2          I'm going to address the role issue and the other

3     issues that have come up here today in the course of my broader

4     discussion about what the appropriate sentence is in this case.

5          So, first off, I wanted to start off talking about

6     Mr. Lavidas as a person.

7          Mr. Lavidas has spent his entire life helping his

8     broader community.  He has engaged in many, many acts of public

9     charity, serving in many charities, volunteering and helping.

10    They are listed extensively in the presentence report and in

11    our sentencing submission.

12          He has also spent an enormous amount of time in his

13    life helping the people around him, his coworkers, the

14    employees of his family business, his friends, his family

15    members.

16          He has 144 letters of support that were submitted in

17    connection with this sentencing by coworkers, classmates,

18    teachers, employees, friends, business associates, inmates at

19    the MDC, members of his broader community.  At this time of

20    public shame, 144 people came forward and wrote letters to your

21    Honor, which have been publicly filed, put their names on those

22    letters for the public file, and said this is a good man who

23    has done an enormous amount of good in his life.  He's only 39

24    years old, and to already have this many people saying this

25    many things about his public charity, his personal charity, his

K72KLAVS

1   giving nature, the manner in which he helps his fellow inmates

2   at the MDC, which your Honor mentioned before in listing the

3   submissions, he is incredibly good to his community and to the

4   people --

5          THE COURT:  Excuse me, Mr. Streeter.  I think some of

6   the inmate letters were from the MCC inmates, I think.

7          MR. STREETER:  That's correct, your Honor.

8          THE COURT:  Thank you.

9          MR. STREETER:  Shortly after he got to the MDC, he was

10  put on lockdown, and it became impossible, and that's when the

11  sentencing was scheduled to occur much earlier, but, yes, your

12  Honor, thank you.

13         So, look, we have a record of, really, an

14  extraordinary amount of good service to the people in his life

15  and to the broader community at a very young age of 39, and I

16  think 144 letters is an extraordinary testament to that, and

17  that must be taken account of at the time of the sentencing.

18         The second thing I want to say is that, even according

19  to the government, even according to the government's most

20  strident representation of its evidence, this case is about

21  highly, highly aberrant conduct.  If you accept everything that

22  the government has alleged, it is about three tips provided,

23  two of them seven years ago, one of them five years ago, to

24  help a friend.  There is no allegation that he got a cut of the

25  profits.  We had a discussion just now about some of the

K72KLAVS

1   financial aspects of the case, and I want to talk about that

2   for a minute, but putting that aside, this is about three tips,

3   five and seven years ago, to one friend, to help that friend.

4   That is not a lifetime of crime or anything like it.  It is,

5   even accepting the government's evidence completely as true,

6   highly, highly aberrant conduct.

7            Now, in terms of the financial evidence, your Honor:

8            First of all, I want to say this:  You said some

9   things about the jury's verdict.  All that the jury needed to

10   conclude, as your instructions said, as a matter of law here,

11   was that Mr. Lavidas and his father expected to benefit a

12   friend, Mr. Nikas.  That's all that was required.  That's all

13   they needed to find, was that they were friends and that they

14   expected for Mr. Nikas to get a benefit as a friend from them,

15   the manner in which it makes them feel good by helping a

16   friend.  That is all the instructions required.  That's all

17   that is required by the law.  And we cannot surmise that the

18   jury concluded anything more than that from tendrils of

19   evidence about potential financial benefits even the government

20   did not aggressively pursue at this trial.  The government

21   argued in its opening and in its closing that the principal

22   motivation and the benefit that Mr. Lavidas got here was

23   helping a friend.

24            Now, I know there was some other evidence, and I want

25   to talk about that for a minute, but even the government did

K72KLAVS

1    not focus on that evidence.  Even the government, to its

2    credit, did not allege that there were cash payments, because

3    there were none, and there was no evidence of any.  It was an

4    assumption by Mr. Demane in his prep there were cash payments,

5    and he testified at trial that that was an assumption that he

6    made, but there was no basis for it, other than that he was

7    making cash payments to his sources.

8            Now, in terms of the financial benefits alleged here,

9    it is essentially an investment by Mr. Nikas' wife, who is

10   independently wealthy, in the health food bar company.  That

11   investment was made not close in time to the tips; it was made

12   well after the tips.  It was fully documented and public.  She

13   got shares in exchange for it, and she had an interest in sort

14   of the health food business, as was testified to at trial.  And

15   so the connection between the two was not made, and the

16   government, to its credit, didn't argue it in closing.  They

17   were friends, they had overlapping business interests, but it

18   did not say that one was a quid pro quo for the other in its

19   closing or its opening.

20           The second thing I wanted to say about the loan, the

21   loan that Mr. Nikas made, well after the tips alleged in this

22   case, number one, was not in any way explicitly tied to these

23   tips; and, secondly, one-half of that loan was paid back before

24   Mr. Lavidas was arrested.  It does not make sense that if he

25   was being paid for the tips, if you pay back one-half of the

K72KLAVS

loan, and he would have paid back the other half of the loan if
he hadn't been arrested in this case.

           And, so, the connection between the financial issues
and the benefit in this case was not strong, and the government
didn't argue it.  All they needed to prove was that both
Mr. Lavidas and his father expected to help a friend.  That's
all the jury had to find, and that is what the evidence is.

           Now, even accepting all of that, even accepting that
it's something more than that, there were no cash payments,
there was no such thing, and even according to the government,
Mr. Lavidas is much, much less culpable than the other players
in this scheme.

           And I want to focus now on the role for a minute.

           The relevant people to consider for a role reduction
are Mr. Nikas, Mr. Demane, who the government alleged was a
coconspirator, and Mr. Lavidas.  And I don't think, your Honor,
there's any way to look at this evidence that the conduct that
Mr. Demane and Mr. Nikas engaged in, even with respect to the
trading they did on Ariad, the burner phones, all of this
activity that they engaged in, there is no way to look at this
evidence, even if you just confine it to the Ariad scheme, and
not say that Mr. Lavidas was much, much less culpable than
those two other people.  Those two other people made about
$7-1/2 million in profits.  Mr. Lavidas had no way of knowing,
or controlling, or having any input into those profits.  He

K72KLAVS

1   participated in none of the trading, he got none of the

2   proceeds from it, he had no way of knowing what they would do.

3           Assuming everything about the verdict is true, that he

4   did know that Mr. Nikas would trade, there is no evidence that

5   he had any idea how much or what he would trade.  And the

6   burner phones and all the other deceptive conduct was certainly

7   part of the Ariad scheme, and so even just confining ourselves

8   to the individuals that the government says need to be compared

9   for purposes of culpability in evaluating a minor role,

10  Mr. Lavidas is clearly much, much less culpable than those two

11  other individuals.

12          The other thing to consider, your Honor, is that what

13  Mr. Tracer just said about his conduct that makes him not

14  eligible for a role reduction, what Mr. Tracer listed for your

15  Honor were the minimal requirements to find guilt that

16  Mr. Lavidas knew that Mr. Nikas would trade.  If they hadn't

17  proven that, he would not have been found guilty.  And the

18  other things that Mr. Tracer said were minimal requirements,

19  that there was a benefit that Mr. Nikas got, that there was a

20  breach of a duty at the company level by the father that then

21  resulted in the son being the middleman.  These are all things

22  that the government needed to prove minimally in order to meet

23  the elements of the crime.  It cannot be the law that if you

24  meet the elements of the crime, you are not eligible for a

25  minor-role reduction.  That would mean no one would ever be

K72KLAVS

1    eligible for a minor-role reduction.  The reality is that the

2    evidence here, even by the government's rendering, was about

3    minimal requirements for the elements of the crime.  And so a

4    minor-role reduction is appropriate here.

5         Now, I don't want to allow this proceeding to get sort

6    of taken over by that issue.  I think the real issue here, your

7    Honor, is what is a fair and just sentence in this case.  What

8    is the right sentence, in this case, in light of the sentences

9    that have been given to other people in this case, the

10   sentences that have been given to other people who engaged in

11   similar conduct, and the extraordinary circumstances under

12   which Mr. Lavidas has already served eight and a half months in

13   prison, and his otherwise extraordinary circumstances as a

14   very, very good man who has been an incredibly charitable

15   member of his community, as testified to by the 144 letters.

16   And I want to talk a little bit about some of that.

17        I want to talk for a minute about -- I mean, we talked

18   already about how Mr. Lavidas was much less culpable than the

19   other players in this scheme, even Mr. Demane and Mr. Nikas,

20   who the government acknowledges are part of the Ariad scheme.

21   Now, parenthetically, he's also much, much less culpable than

22   the other people in this case, who your Honor heard about:

23   John Dodelande, who received $12 million in cash, Yomi Rodrig,

24   and other players that we heard about at the trial, and,

25   certainly, Mr. Demane, who is a career criminal, you heard tens

K72KLAVS

1        of millions of dollars here, so there's no doubt about that.

2                But moving to comparing Mr. Lavidas to other people

3        who have been convicted of similar crimes:  18, U.S.C., 3553(a)

4        directs the Court to consider that.  And when you compare

5        Mr. Lavidas to the sentences that have been given to other

6        people like him, even the government acknowledges that there

7        have been many, many such sentences that have been below the

8        eight and a half months we're asking for here, that have been

9        probationary sentences or lower than the eight and a half

10       months, or perhaps slightly higher than the sentence here.  But

11       I'm going to explain to your Honor why I think the eight and a

12       half months is the right sentence here even if another

13       defendant got 12 months in other circumstances that were served

14       under very, very different circumstances from the circumstances

15       Mr. Lavidas has already served under.

16               We showed this in our sentencing submission.  There

17       are 12 pages or so in the sentencing submission that go through

18       in detail of a series of other sentences.  We canvassed every

19       single sentencing that has occurred in the Southern District in

20       an insider trading case in the last ten years, and we tried to

21       represent to your Honor a representative sample.  The

22       government came back with one sentence, the Sean Stewart

23       sentence, and I'm going to talk about this as I go through

24       this, but, first of all, I want to give you some examples from

25       what we submitted.

K72KLAVS

1      For one, there is the Benjamin Chow sentencing.

2  Benjamin Chow is very similar to Mr. Lavidas.  He worked at a

3  private equity fund.  He is alleged, and he was convicted at

4  trial -- not a plea -- convicted at trial of tipping a friend.

5  That friend made $5 million in profits on the tips.  Mr. Chow

6  had no knowledge or control over how much trading he would do,

7  just as Mr. Lavidas had no knowledge or control over how much

8  trading Nikas, or Demane, or anybody else would do here.

9  Mr. Chow was convicted at trial.  He had the exact same

10  sentencing guidelines range that the government alleges here.

11  And Judge Woods decided that the guidelines grossly overstated

12  his culpability because of the fact that he had no control over

13  the trading.  If there had been $10,000 worth of trading, he'd

14  have a totally different guidelines range than the 5 million in

15  trading that Benjamin Chow's tippee engaged in.  And Judge

16  Woods decided, in addition to the family circumstances and his

17  otherwise good life, like Mr. Lavidas, that the appropriate

18  sentence was three months in custody after a trial.  That is

19  significantly lower than the sentence here.  And, incidentally,

20  Judge, that sentence was served at a camp, self-surrender,

21  months after his sentencing.  Very, very different

22  circumstances than ours here.

23      The next sentence I wanted to mention to you in

24  thinking about other similarly situated defendants -- and,

25  incidentally, I will say, also, Mr. Chow lied to FINRA when he

K72KLAVS

was questioned about the conduct here in his case.  Mr. Lavidas

never, ever lied to anybody about any of this.  He went to

trial -- he did -- but he did not lie to anybody about any of

this.  And that is a difference between him and both Mr. Chow

that makes him less culpable, and I will get to Mr. Stewart in

a minute.

Cameron Collins:  Cameron Collins was the son of a

sitting U.S. House of Representatives member who was also a

member of the board of a pharmaceutical company.  His father

was that member of Congress.  He was tipped by his father about

some information about that company, and he himself tipped his

friends about it, and he himself traded, avoiding losses of

$571,000.  So, unlike Mr. Lavidas, who never, ever traded,

Mr. Collins traded on the information he was tipped to the tune

of $571,000, tipped others, and he also lied to the FBI when he

was asked about the conduct.

The defense in that case asked for a probationary

sentence based on his lifetime of good works, the fact that

this was aberrant conduct, and that the guidelines overstated

his culpability.  And Judge Broderick agreed and gave him a

sentence of probation.

Now, I know in that case, he pled guilty, but, number

one, his conduct was in many ways much more culpable, he lied,

he traded himself; and, secondly, he got probation, and

Mr. Lavidas has already served eight and a half months of very

K72KLAVS

1    hard time, as I'll discuss in a minute.

2              The last one I want to discuss with you is Bryan

3    Cohen.  The government raised it.  I want to talk about that

4    case for a minute.

5              Mr. Cohen tipped Demane, who then tipped Nikas.  The

6    government says the guidelines were much lower in that case.

7    The guidelines in that case were only much lower because of the

8    accident of where his tippees traded.  They traded in Europe,

9    and, therefore, that didn't count for purposes of the

10   sentencing guidelines, and so his guidelines were only 200 --

11   can you hear me still?

12             THE COURT:  Yes.

13             MR. STREETER:  His guidelines were only based on

14   $260,000 in trading, but as the government laid out in its

15   sentencing submission in the Cohen case, in fact, Mr. Demane

16   and Mr. Nikas made more money off of Cohen's tips than they did

17   off of Mr. Lavidas' tips.  They made about $9 million off of

18   Mr. Cohen's tips, and the government, in that sentencing

19   submission, said that that was relevant for considering

20   sentencing.  Now the government wants you only to consider the

21   fact that the guidelines sentence, which is determined only by

22   the accident of geographically where the trading occurred,

23   should be the difference maker.  The reality is that Bryan

24   Cohen's tips actually resulted in more profits for Demane and

25   Nikas than Mr. Lavidas' did.

K72KLAVS

1          Secondly, Mr. Cohen's conduct was much, much more

2     culpable.  He received more than a million dollars in cash

3     payments in bags in Europe, which he hid in safes at his

4     parents' house.  This is in the government's sentencing

5     submission.  He used burner phones.  He engaged in coded

6     conversations.  The person who handed out the burner phones

7     testified in this case and testified that Mr. Lavidas didn't

8     get burner phones.  Mr. Lavidas was much, much less culpable

9     than Bryan Cohen.

10          And, so, the Bryan Cohen case, where Judge Pauley

11     sentenced him to home confinement, is an important guide here,

12     and, frankly, Mr. Lavidas is much, much less culpable than

13     Mr. Cohen.

14          I want to talk for a minute about the Sean Stewart

15     case.  Now, the Sean Stewart case:  Number one, Mr. Stewart's

16     sentence was 24 months.  He had been released from BOP custody

17     five months before finishing serving his sentence.  He is now

18     out on home confinement.  He got out five months early.

19          And, incidentally, I want to say something about what

20     the government said about Cohen and his medical condition.

21     Mr. Cohen is a 34-year-old person who has asthma.  Now, I'm not

22     going to minimize that, but we're not talking about an aged

23     person who has COPD or something where COVID-19 is a much more

24     serious threat.  The reality is that Judge Pauley looked at all

25     this picture that I just told you, and he decided that the

K72KLAVS

appropriate sentence was a period of home confinement.

With respect to Mr. Stewart:  Mr. Stewart had a 24-month sentence, the longest sentence the government found to cite, and he was let out five months early as a consequence of COVID-19.  He is a middle thirties healthy person.  In addition, there were many, many factors in that case that made his conduct much, much more culpable than Mr. Lavidas is.  Number one, he lied to his employer when they came around and asked about him tipping his father;

Number two, he lied to FINRA when they came around and asked about his tipping his father;

Number three, he coached his father to lie to the SEC when his testimony was taken;

Number four, he violated the terms of his bail and engaged in basically liquidating assets he wasn't supposed to liquidate while he was out on bail;

Number five, he testified and perjured himself at his trial.

All of those factors were highly relevant to the government's position on his sentencing, made him much more culpable, and were highly relevant to the two judges who sentenced him to, ultimately, 24 months' imprisonment.

Incidentally, Mr. Stewart, like Mr. Chow, self-surrendered months after his sentence to camp, and when COVID-19 came around, Mr. Stewart was released.

K72KLAVS

1          I want to now move briefly to the conditions of

2    Mr. Lavidas' confinement.  This is highly relevant to

3    sentencing.

4          The time he has served has been very, very hard time.

5    It has been at the MCC and then the MDC, and for the last 90

6    days, it has been almost entirely on lockdown.  I want to give

7    your Honor an example of what that means.  The last week, as

8    your Honor knows, our sentencing was canceled last Thursday

9    because there was an issue at the MDC.  The issue was that they

10   got information that there was a weapon inside the facility,

11   and they locked the entire facility down to search for the

12   weapon.  Mr. Lavidas has been, and was, locked down from

13   Thursday morning, before the sentencing last week, up until

14   yesterday.  He was in his cell.  Mr. Lavidas --

15          THE COURT:  Okay.  I lost a visual of the defendant at

16   this very moment.

17          Mr. Rogers, are you still with us?

18          Ms. Rojas, could you please get Mr. Rogers to assist

19   us?

20          THE DEPUTY CLERK:  I will do so.

21          (Pause)

22          THE COURT:  I should put on the record that it's now

23   12:18, and we probably lost the defendant's participation at

24   about 12:15, roughly.  And I have a message from Ms. Rojas that

25   she has been in contact with Mr. Rogers from our District

K72KLAVS

1    Executive's office, who will, hopefully, be able to help us

2    regain the defendant's participation.

3                (Pause)

4                THE COURT:  Thank you.

5                The court reporter has rejoined the proceeding.

6    Nothing has happened in his absence.

7                (Pause)

8                THE DEPUTY CLERK:  Hello.  This is Gloria Rojas

9    speaking.

10               THE COURT:  Yes.  My courtroom deputy is now speaking.

11               THE DEPUTY CLERK:  Thank you, Judge Cote.

12               So, he should be reconnected soon, very soon.  Matt

13   Rogers will stay on until -- just to make sure that it does

14   happen.  So it should come up shortly.

15               THE COURT:  Thank you.

16               We received that message at 12:22.

17               (Pause)

18               THE DEFENDANT:  Hello.

19               THE COURT:  It is now 12:25.  I can see Mr. Lavidas.

20               Mr. Lavidas, can you see and hear me?

21               THE DEFENDANT:  Yes, I can, your Honor.

22               THE COURT:  Mr. Streeter, can you see and hear your

23   client?

24               MR. STREETER:  I can, your Honor.

25               THE COURT:  So, Mr. Lavidas, can you see and hear your

K72KLAVS

1    attorney?

2              THE DEFENDANT:  Yes, I can, your Honor.

3              THE COURT:  Thank you.

4              Mr. Streeter, you may continue.

5              MR. STREETER:  Thank you, your Honor.  I don't have

6    much more to do.

7              I just want to spend a little bit of time on the

8    conditions of confinement, and then I'll get to my last two

9    points and wrap up.

10             For the last six days, Mr. Lavidas has been on

11   lockdown.  He has been allowed out of his cell for five minutes

12   on two of those days to take a shower.  This is no criticism of

13   BOP, they were dealing with a crisis situation, but, your

14   Honor, they were literally fed bread, and peanut butter, and

15   granola bars for those six days.  This is really hard

16   circumstances for anybody to serve time in, your Honor, and it

17   is relevant in thinking about the sentencing.  He had no

18   contact with his wife, with his daughter, with me, or anybody

19   else.

20             And these basic conditions of confinement, this

21   lockdown circumstance, has been on and off for 70 of the last

22   90 days, first because of COVID-19 for 52 days, then because of

23   the George Floyd circumstances for another ten or so days, and

24   then for the last six days because of this situation at the MDC

25   that caused the sentencing to be delayed.  So, 70 of the last

K72KLAVS

1   90 days, roughly 70 of the last 90 days, he has been under

2   lockdown circumstances, essentially solitary confinement,

3   coming out of his cell for 15 minutes a day, three days a week,

4   those kinds of things.  It has been very, very hard.  And even

5   when those circumstances are lifted, he's out of his cell for

6   three hours a day on weekdays and back into his cell fully on

7   weekends.  He's been permitted no family visits for the last

8   four months, and he's not seen his wife, he has not seen his

9   daughter, who he's very close to, he's not seen his son, who

10  was born one month ago.  He has not had any visitation.

11          Now, I understand the government's approach, it's

12  everybody is enduring this.  And I also understand the BOP is

13  doing the best it can under the circumstances, and I do not

14  criticize that at all, but the facts are that Mr. Lavidas has

15  endured eight and a half months of very, very hard time, and

16  Judges McMahon, Rakoff, and Pauley have all decided, in other

17  cases recently in this district, that the conditions of

18  confinement and the harshness of those conditions is highly

19  relevant in fashioning a sentence, and in all three of those

20  cases where they considered it, they actually gave probationary

21  sentences or noncustodial sentences.  In the case of Judge

22  Pauley, it was Mr. Cohen, and it was home confinement.

23          The other thing is that none of the other defendants

24  that we discussed in our memo, the other people who we detail

25  in those pages about other insider trading defendants, endured

K72KLAVS

1    these kinds of conditions.  And so some of those people might

2    have gotten a year and a day or something like that, but they

3    got it by serving in a camp, self-surrendering, and that's part

4    of why we're asking for time served here, your Honor, because

5    eight and a half months has been a very, very stern punishment

6    of eight and a half months.

7              I want to march now, your Honor, to the probation

8    report, if I could, and address that briefly.

9              We're grateful for the probation report, we're

10   grateful that they recommended a sentence well below the

11   guidelines, but the probation report didn't take account of

12   everything that I think your Honor should take account of,

13   mostly because they couldn't have because some of the events

14   occurred after they issued their report.  Number one, I don't

15   know what finding your Honor is going to make with respect to

16   the role, but if your Honor does decide that some sort of role

17   reduction is appropriate here, probation did not, and if you do

18   decide a role reduction is appropriate, I think that changes

19   the starting place, which oftentimes changes the ending place.

20   So that's one thing that is relevant.

21             The next thing is that the probation report was issued

22   on April 6th.  That was just at the very beginning of these 70

23   days of lockdown that I just described to you.  They had no way

24   of knowing the sort of length, and extent, and sort of

25   difficulty of the conditions of that lockdown, and so they

K72KLAVS

1   could not have taken account of it in making their

2   recommendation.  And they didn't take account of it, obviously,

3   because it occurred after they issued their report.

4          Secondly, your Honor, the probation report doesn't

5   discuss any of the other sentences that we discuss in our

6   memorandum in which similarly situated defendants received

7   significantly less than 18 months for similar, and oftentimes,

8   more culpable conduct.

9          In addition, your Honor, the probation report was

10   issued well before the Cohen sentencing.  As we discussed,

11   Cohen was sentenced to home confinement for conduct that was

12   much more culpable.  Probation couldn't have taken account of

13   that because it happened well after they issued their

14   recommendation.

15          The last thing I'll mention that probation didn't take

16   account of -- again, because it occurred after the report -- is

17   that since April 6th, the Bureau of Prisons has released many

18   nonviolent first-time offenders, like Mr. Stewart, and that has

19   to be relevant in thinking about how similarly situated

20   defendants are being punished in these cases.  And probation

21   did not have access to that information because it had not yet

22   happened.  The Attorney General's memo authorizing the release

23   of people didn't occur until early April, and that's when the

24   report was issued, the probation report.

25          And, so, while we're grateful for the probation

K72KLAVS

1   report's analysis of some of the issues, probation did not have

2   access to or information about these other things because they

3   just simply hadn't yet occurred.

4            The last thing I want to talk about is the impact of

5   Mr. Lavidas' custody on his family.  Judge, Judge Kaplan

6   recently decided that this was highly relevant in sentencing an

7   insider trading defendant.  Other judges in this district, it

8   is a well-known basis finding that when the guidelines are

9   mandatory, for a downward departure from the guidelines, and

10  this, Mr. Lavidas' continual incarceration, has already had a

11  great impact on his family, and if it is continued on from

12  today, it will continue to have a profound and troubling impact

13  on his family.  Your Honor mentioned at the outset that there

14  are two letters in the exhibits that were issued back in March,

15  prior to the last three months, about the impact of the

16  incarceration on his wife and the impact of the incarceration

17  on his daughter, and now his son has been born in the last

18  month, and it will also has an impact on him.  There can be no

19  doubt from the 144 letters that Mr. Lavidas is a loving and

20  doting father.  He bathed his daughter regularly.  He spent

21  time with her all the time.  He was absolutely devoted to her.

22  And his absence is going to have a profound impact on her if it

23  is extended.

24            Secondly, he is a devoted and caring husband.  The

25  letters demonstrate this in so many ways, I can't count them.

K72KLAVS

And he obviously will be a devoted father to his son, who was born while he was in custody, his wife gave birth to a month ago.  His wife and two children are living in New York without any family support at all.  Her family is from Italy, his family is from Greece, and none of them can travel here because of COVID-19.  And so, Katerina Lavidas, his wife, is giving birth and dealing with raising their two children in their apartment in New York without any family support at all.  She cannot visit her husband; her children cannot visit her husband.  It seems obvious, given what's happening with COVID-19 exploding in many parts of the country, that visitations at BOP facilities are not going to be resumed anytime soon.  They barely get to speak to him on the phone, especially during these lockdown periods.

THE COURT:  I had a question about that last issue.  I know at one time, the defendant's sisters were in New York, and he had childcare or support in the home that was employed.  Can you address that?

MR. STREETER:  Sure, your Honor.  Absolutely.

So, he obviously has a father, a mother, and four siblings.  The father and mother are in Greece.  Three of his -- I'm sorry, three siblings.  There are four children in the family.  He has three siblings.  Two of those siblings, his elder sister and one of his twin sisters, are in Greece, one of his sisters is in New York, but Katerina cannot have visitors

K72KLAVS

1      at the apartment given COVID-19.  She's been pregnant for

2      almost the entire time of his custody.  People who are pregnant

3      are highly at risk for COVID-19, and so she hasn't been able to

4      even have friends over.  So it is true that one of his sisters

5      of his larger family is here in New York, but the reality is

6      that there's not much family support there.

7              And it is true, your Honor, that they have had the

8      assistance of a nanny inside the home, that is true, but there

9      is no family support whatsoever.  They are an ocean away.

10     Katerina is from Italy, she's not from New York, so she is

11     alone in New York with a nanny raising two children now,

12     without Mr. Lavidas, who's very close to them.  And releasing

13     him to be with his family and help take care of them would

14     alleviate that concern and that problem, and it is a relevant

15     factor in thinking about the sentence here.

16             The last thing I want to say, your Honor, is that over

17     the last eight months, I have gotten to know Mr. Lavidas and

18     his wife very well.  These are incredibly kind, respectful,

19     understated, generous, good people.  I ask your Honor to impose

20     a sentence of time served and return him to his family.

21             Thank you, your Honor.

22             THE COURT:  Thank you.

23             Mr. Lavidas, is there anything you would like to say

24     to me on your behalf in connection with this sentence?

25             THE DEFENDANT:  I do.

K72KLAVS

1      Your Honor, thank you for giving me the opportunity to

2  say a few words before you pronounce your sentence.

3      When I was a young boy, I remember hearing something

4  that my grandfather used to say.  He said that everyone

5  expression has an imaginary label on his or her back where

6  people can write what they think about us, but that label is

7  visible to everyone else but the person who wears it.  That

8  idea has struck me from a young age, and I have tried

9  throughout my life to work as hard as possible to fill my label

10  with as many good words as possible.

11      When I read the letters that people submitted in

12  support of my sentencing, so many events came to mind, so many

13  memories surfaced, that warmed my heart.  People have noticed

14  my love and acts of kindness.  When I read these letters, I

15  cried.

16      As I read them, I also thought of the mistakes I have

17  made in my life.  Every time I did a mistake, I worked very

18  hard to reflect upon it, to make sure I never repeat it.  The

19  last eight, almost nine months since my arrest have been the

20  most difficult of my life not because I missed the comforts of

21  life, no; it's because I miss, now appreciate, so much more --

22  what God has given us all for free - the people we love, the

23  beauty of nature, and the fulfillment we get when we help

24  others.

25      But, most of all, I miss my special wife, Katerina,

K72KLAVS

and my precious daughter.  We were very close.  I used to bathe
her, I used to feed her, and always make her a priority.  My
son has been born, but I still haven't met him.  I'm not there
to take care of my family, and I have not been there to support
them and protect them throughout this pandemic.

I'm so sorry to my wife, who had to endure such a
difficult pregnancy all by herself, with her family far away in
Italy and my family far away in Greece.  I'm so sorry to anyone
else in my life who has supported me and helped me.

Your Honor, in the last months, I have learned the
meaning of consequences and humility.  The verdict in this case
will be my personal burden for the rest of my life.  My wife
keeps me going, still standing on my feet, in the hope that as
soon as my sentence will be over, I have the opportunity to
vindicate myself by doing good, by being respectful, and
helping people in any way I can.  I know, your Honor, that I
can't control what people will write of this imaginary label
that I mentioned for my back, but what I know is that I will
spend the rest of my life giving people reasons to write good
words.

And I started this process, as Jon said, at MCC and
MDC, where I worked very hard to expend myself to become a
better person and a better professional and where I also helped
other people in here who needed help, either learning English,
or mathematics, or even help them help start a business as soon

K72KLAVS

as they will be out of here.

When my sentence is over, I will work even harder at giving back to the people in my life and helping those in need, giving back to society, and raising my children to become respectful, kind, and generous people in this world.

I want to finish by apologizing to your Honor, to the U.S. Government, and to anyone else affected by this case.  I hope I can make amends.  I ask for your leniency.

Thank you, your Honor.

THE COURT:  Thank you, Mr. Lavidas.

Let me begin by just describing, very briefly, the evidence at trial and give context to my analysis of the arguments about the defendant's role.

Although the evidence at trial was largely circumstantial, it was overwhelming with respect to the defendant's guilt.  Most of the critical facts were, of course, undisputed.  The defendant's father was on the board of Ariad and had access to his most confidential information.  The three announcements, which the insider trading anticipated, were material.  Two of them were in 2013 and concerned FDA action on a major drug for the company; one in 2015 concerned an offer to acquire Ariad by Baxalta.  Lavidas' very good friend, maybe one of his best friends, Mr. Nikas, engaged in significant trading in advance of each of these announcements.  That friend was in an insider trading conspiracy with a man named Marc Demane

K72KLAVS

Debih.  Demane and his network of traders made millions of
dollars or avoided substantial losses from trading in advance
of each of the three Ariad announcements.  Lavidas was in near
communication with both his father -- well, with his father and
in frequent communication with Nikas.

        The only issue that the defendant actually tried to
put in dispute at trial was whether it was the defendant,
Mr. Lavidas, who actually tipped Nikas.  The defendant offered
an analysis of some of the trading and telephone calls to argue
that the trading preceded the calls.  The defense suggested
that an investment banker in London at Centerview Partners may
have been the source for the confidential information which
went to Demane and then Nikas as opposed to the other way
around.

        This latter defense was premised on pure speculation
and suffered from a fatal defect.  The two 2013 announcements
concerned FDA announcements, and Centerview had no access to
that FDA activity.  While Centerview may have had access to the
2015 information about the corporate takeover, its lack of
access to the 2013 confidential information largely eviscerated
the strength of any speculation about Centerview being the
source of the tip in 2015.

        Second, Demane testified at trial that his only source
for tips about Ariad came from Nikas.  He was entirely credible
on this point.  Indeed, Nikas shorted stock in 2013 when he

K72KLAVS

learned that the FDA planned to remove a critical leukemia drug

from the market.  All of his other insider trading involved

taking long positions.

          In sum, the evidence of Mr. Nikas' guilt was

overwhelming, and the jury's verdict was well supported.

          With that as background, let's go to the argument

about a role adjustment.  3B1.2 allows role adjustment for both

a minor and a minimal participant.  The defendant seeks a

decrease of four levels in the sentencing guidelines analysis

based on the defendant's minimal participation.

          In order to assess this argument, I have to assess

whether the defendant has shown that he played a part in

committing the offense that makes him substantially less

culpable than the average participant in the criminal activity.

Of course, I'm looking here at only that criminal conduct in

which the defendant was personally involved.  It is only that

conduct on which the sentencing guidelines range has been

calculated here.

          I may consider whether or not, when guidelines range

is driven in part by a loss amount, whether that loss amount

greatly exceeds the defendant's personal gain or whether the

defendant had limited knowledge of the scope of the scheme.  If

either of those are true, they may support an adjustment.

          I am also guided by the sentencing guidelines to look

at a number of factors since this is a fact-based

K72KLAVS

determination.  They include the degree to which the defendant

understood the scope and structure of the activity, the degree

to which he participated in planning or organizing it, the

degree to which he exercised decision-making authority or

influenced the exercise of decision-making authority, the

nature and extent of his participation, including acts that he

performed and the responsibility and discretion that he had in

performing those acts, and the degree to which he stood to

benefit.

          I must keep in mind -- and defense counsel has

reinforced this -- that the fact that the defendant has

performed an essential or indispensable role is not

determinative.

          Now, for a minimal participant, the guidelines

cautions that it is intended to cover defendants who are

plainly among the least culpable of those involved in the

conduct.  And taking that admonition, I have considered the

defendant's motion in the following way:

          I have already described for the record what the jury

found in returning its verdict of guilty, both of the

defendant's knowledge and intent and also his father's

knowledge and intent.  And the jury charge with respect to

personal benefit described a finding of personal benefit

broadly.  It included an instruction that a personal benefit

may be intangible and it need not be pecuniary in nature.  It

K72KLAVS

can be simply the intention to confer a benefit on the

recipients of the information.  There were multiple ways in

which the jury was charged in this regard, but the defendant,

in his argument, has emphasized, I believe, that part of the

jury charge.

I find that the defendant's decision to tip Nikas here

was part of a family affair.  It's not disputed that he is

exceedingly close with his father, and the trial evidence

permitted the jury to find that.  The letters submitted on the

defendant's behalf reinforce that.

During the period 2013 to 2015, when the insider

trading was going on, Greece was suffering economically, to put

it mildly, and the defendant's father, although very wealthy,

was having a liquidity crisis.  He began borrowing from Ariad's

CEO in January 2012 and continued to do so periodically through

at least December 2015.  There were two loans extended in

September and December 2013, right around the time of the first

two tipping schemes.

I cannot find, based on this record, that a role

adjustment is appropriate.  The defendant understood this scope

and structure of his criminal activity.  He had the power to

halt the entire scheme.  Whether Lavidas, the defendant,

suggested the scheme to his father or vice versa, he was

certainly an equal partner with his father in the scheme in

which they both anticipated benefiting.

K72KLAVS

He also, the defendant, played a critical role.  Nikas was his friend.  The defendant knew Nikas was an active securities trader.  He had -- that is, the defendant had -- every reason to expect that Nikas' trading would involve large sums of money.

To make this scheme work, the defendant had to act with expedition, and he did so.

I cannot find that he is substantially less culpable than the average participant.  His culpability far extends beyond him playing a minimal, but indispensable role in this activity.

The defendant has argued that the crime was a misguided act of friendship to Nikas, that the defendant tipped Nikas on a few occasions as part of a selfless, but misguided effort to help a friend for the mutual benefit of a continued friendship and their overlapping business interests, that the defendant had limited knowledge of the scheme, and that the defendant had a limited function.

I do not find any of those statements made in the sentencing submission to accurately describe the evidence at trial.

Let me turn to what is more important here, though, in every way, and that is the 3553(a) factors, because whatever the sentencing guidelines would be in this case, whether it is as calculated by the PSR or even if there would be a minimal

K72KLAVS

role adjustment, as the defendant argues for, I will be

imposing a sentence far below the lowest level under either

calculation.

So, who is the defendant?

He submitted 144 letters.  I read each of them.  There

were at least a dozen that were particularly important to me in

my analysis and understanding of the defendant and the

appropriate sentence here, but each one of them has been

considered by me.

There is also a description of the defendant contained

in the PSR, and I have considered that as well.

Based on everything that's been argued to me and that

I have read, I find that the defendant was born into a wealthy,

privileged Greek family.  The family business, Lavipharm, was

founded in 1911.  He is his parents' only son and was trained

from an early age to succeed his father in running the

business.  He is devoted to Lavipharm and its employees, and

has done many acts of kindness for those employees.  From an

early age, he was perceived as being mature beyond his years.

He is a kind person, he is empathetic, he is a modest man, he

is a caring man.  He is devoted to his family and exceptionally

close to them, including to his father.  He is a wonderful and

generous friend to many, many friends.  He is a caring husband

and a devoted father.

He was born in New York and came to the United States

K72KLAVS

for college.  Between 2012 and 2018, roughly, he tried to make
his own way as an entrepreneur in New York and created a health
bar business named Mediterra.  When that venture failed, he
returned to the family business.

         Following his arrest, he has been incarcerated in the
MCC.  He has shown exceptional character while incarcerated.
He has assisted his fellow inmates.  He wrote a children's book
for his daughter to help her cope with his absence.

         After his trial, he was moved to the MDC, and he has
suffered there, as have other inmates, from the restrictions
implemented in response to the pandemic and, mostly recently,
in response to a security issue that arose in the institution.

         I'm pausing for a moment to look at notes that I made
from counsel's arguments to me and the defendant's statement,
to make sure, I don't want to add something beyond what I've
already said.

         I think it's clear, from what I've already said, that
I don't find that the defendant is less culpable than the
average participant.  The engagement on three separate
occasions, in the way that I described, shows the kind of
knowing and intentional behavior that the law should, and does,
punish.  It's involvement that was far beyond just being an
essential cog in a scheme.

         I do find that the fact that the defendant's
experience in prison has been very difficult because of the

K72KLAVS

lockdown relevant and important for me to consider.

I've also considered the variety of sentences imposed. Of course, in each case, a judge does their best to apply the 3553(a) factors, does their best to avoid unwarranted disparity, does their best to fashion a sentence based on the individual before them, and the criminal conduct involved.

So, let me turn to some of the additional findings I must make in weighing the 3553(a) factors.

No one is suggesting here that insider trading isn't a serious crime. It is. It's a difficult crime to prosecute, and particularly difficult when it's part of an international scheme, as this was. Many critical witnesses and defendants are beyond the reach of American prosecutors, but it is the American market and the integrity of that market that suffers. The integrity of the American stock market, and our securities markets generally, are important to our nation, and that's why we have the laws we have with respect to insider trading and violations of other securities regulations.

So, the issue of general deterrence and appropriate punishment both strongly support a serious term of imprisonment here.

The defendant has not expressed remorse; he has not acknowledged any wrongdoing. At the end of his statement to me, he said he wished to find vindication through doing good works. He apologized, in a general way, and said he wished to

K72KLAVS

1   make amends, but I have not heard a straightforward statement

2   acknowledging his criminal activity or expressing remorse for

3   helping his father breach his father's fiduciary duty to his

4   company by using, very intentionally, information about that

5   company's situation to allow an active securities trader to

6   benefit, to whatever extent that trader wanted to, from that

7   material nonpublic information.

8          There is an aspect here of the father's breach of his

9   fiduciary duty to his company, and the defendant's knowledge

10  that his father was doing that in making these three tips over

11  the course of 2013 and 2015, that is deeply troubling.  If it

12  hadn't been -- enough said on that.

13         I also want to acknowledge, however, that I don't

14  expect that either the defendant or his father are likely to be

15  in a position to commit insider trading again in any way that

16  would affect the U.S. stock market.  He has already -- that is,

17  the defendant -- paid a very steep price for doing so with

18  respect to Ariad.

19         I have no reason to believe that the issue of

20  individual deterrence should play any significant role in

21  deciding this sentence.

22         As I've said already, a sentence of either 63 months

23  in prison or 41 months in prison is not appropriate in this

24  case, and I have considered both guidelines ranges in deciding

25  what sentence to impose here.

K72KLAVS

1          I've also considered the other sentences, because I

2     must avoid unwarranted disparity; the other sentences, that is,

3     that counsel have directed my attention to.

4          So, what is the range that I think is important for me

5     to consider?

6          So, I think a sentence of 24 months' imprisonment

7     could be appropriate, I think a sentence of 18 months'

8     imprisonment could be appropriate, I think a sentence of a year

9     and a day could be appropriate.  And I think a sentence of time

10    served is not appropriate, considering all the 3553(a) factors.

11         I think that the sentence, if we weren't in the midst

12    of the pandemic, and if the defendant had not been experiencing

13    the situation that he has in prison, and if he hadn't shown the

14    character in responding to that situation, I don't know what

15    sentence I would have imposed, whether it would have been 18

16    months or 24 months, but I can't ignore how difficult this time

17    is, for reasons that have nothing to do with the defendant's

18    criminal culpability.  And I was deeply impressed by the fact

19    that the defendant, who responded to these very difficult

20    circumstances, responded in a way that was so positive, and it

21    really is part of the way he has lived his life.  He tried to

22    help others, he tried to help his fellow inmates, he tried to

23    help his daughter.  And that is part and parcel of his

24    character.

25         And based on that, and all of that, I am going to

K72KLAVS

1    impose a term of imprisonment of a year and a day.

2            I have additional components of the sentence to

3    announce.

4            I will order restitution as described in the consent

5    order and as amended to our discussion earlier today.

6            I impose a term of supervised release of three years.

7    The defendant must comply with the standard conditions of

8    supervised release and pay restitution.

9            He must also submit to a reasonable search.  He is to

10   provide the probation department access to any and all

11   requested financial information.  He shall not incur any credit

12   card charge or open any new credit lines without approval of

13   the probation department.

14           I'm sorry, Mr. Streeter cannot hear me.  We'll just

15   pause for a moment while I wait to see if he can indicate he

16   can hear me.  It's 1:02.

17           Mr. Lavidas, can you still hear me?

18           THE DEFENDANT:  Yes, your Honor.

19           THE COURT:  And can the government still hear me?

20           MR. TRACER:  Yes, your Honor.

21           (Pause)

22           THE COURT:  I am watching Mr. Streeter on the video

23   link as he apparently is trying to gain access to audio --

24   regain access to audio.

25           Mr. Rogers, are you still with us?

K72KLAVS

1          (Pause)

2          THE COURT:  Ms. Rojas, are you with us?

3          THE DEPUTY CLERK:  I am, your Honor.

4          THE COURT:  Please communicate by email with

5     Mr. Streeter to see if there's anything we can do to help him,

6     and please contact Mr. Rogers.

7          THE DEPUTY CLERK:  Will do.

8          (Pause)

9          THE COURT:  Mr. Streeter, are you able to hear me yet?

10          MR. TRACER:  Your Honor, can you hear me?

11          THE COURT:  I can hear you, Mr. Tracer.

12          MR. TRACER:  Okay.

13          So, Mr. Streeter called me and I put him on speaker

14     next to my phone, and if he can hear me, this may be a pass

15     that works for now.

16          THE COURT:  Mr. Streeter, are you able to hear me?

17          MR. STREETER:  Yes.  I think you're going to have to

18     take your headphones out and put both phones on speaker.

19          MR. TRACER:  Okay.  How about now?

20          THE COURT:  Mr. Streeter, can you hear me?

21          MR. STREETER:  I can't hear the Court.  I can hear

22     you.  Unplug your headphones.

23          MR. TRACER:  Okay.  I've just done that.

24          MR. STREETER:  Put both phones on speaker.

25          MR. TRACER:  Okay, done.

K72KLAVS

1          THE COURT:  Mr. Streeter, are you able to hear me?

2          MR. STREETER:  I can now, yes, your Honor.  Thank you.

3          I'm sorry, I don't know what -- my phone just cut out.

4     It's not my phone, it's something else happened, I don't know

5     what, but I was just terminated from the call about three

6     minutes ago.

7          THE COURT:  Thank you.  It's now 1:11.

8          I was listing the conditions of supervised release.

9     I'm happy to go back as far as I need to, to fill you in,

10    Mr. Streeter.

11         When did you lose audio connection?

12         MR. STREETER:  I didn't hear the sentence that just

13    got announced.

14         THE COURT:  Okay.

15         I announced a sentence of one year and one day, to be

16    followed by a term of supervised release of three years.

17         Do I need to go back further, Mr. Streeter?

18         MR. STREETER:  No.  I'll see the transcript.

19         Thank you, your Honor.

20         THE COURT:  The three years of supervised release has

21    the following conditions:  The standard conditions of

22    supervised release, the requirement that the defendant pay

23    restitution as described in the earlier portion of this

24    proceeding, the condition that the defendant submit to a

25    reasonable search, that the defendant provide the probation

K72KLAVS

department access to any and all requested financial

information, that the defendant not incur any new credit card

charge or open any new credit lines without approval of the

probation department, that he perform community service at the

rate of 100 hours for each of the three years of supervised

release in a way that is approved by the probation department,

that he be supervised by the district of his residence, that he

pay a special assessment of $700, that he pay a fine of

$50,000.

       And I don't believe -- I know there are no open

counts.

       Let me ask, counsel, do you know of any legal reason

why I cannot impose the sentence I have just described as

stated?

       I'll ask the government first.  Mr. Tracer?

       MR. TRACER:  No, your Honor.

       THE COURT:  Mr. Streeter?

       MR. STREETER:  No, your Honor.

       THE COURT:  I order the sentence I have described on

the record to be imposed as stated.

       I need to advise the defendant of his right to appeal.

       If you're unable to pay the costs of an appeal, you

may apply for leave to appeal in forma pauperis.  Any notice of

appeal must be filed within 14 days of the judgment of

conviction.

K72KLAVS

1          Mr. Tracer, is there anything else that we need to do?

2          MR. TRACER:  No, your Honor.

3          THE COURT:  Mr. Streeter, is there anything else that

4    we need to do?

5          MR. STREETER:  I know I went to trial on a superseding

6    indictment.  I thought that ordinarily the underlying

7    indictment would be dismissed under those circumstances.

8          MR. TRACER:  I agree with that.

9          THE COURT:  So, the underlying indictment is dismissed

10   as to this defendant.

11         Anything else, Mr. Streeter?

12         MR. STREETER:  Not that I can think of, no, your

13   Honor.

14         THE COURT:  And, Mr. Lavidas, were you able to hear my

15   instruction as to your right to appeal?

16         THE DEFENDANT:  I did, your Honor.

17         THE COURT:  Okay.

18         Thank you, all, and thank you for your submissions and

19   assistance in this sentence.  Thank you.

20         MR. TRACER:  Thank you, your Honor.

21                              *  *  *

22

23

24

25